**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CATHOLIC LEGAL IMMIGRATION NETWORK,
INC. (CLINIC), AFRICAN COMMUNITIES
TOGETHER, AGNES KYEREMAA, PATRICIA
RICHARDSON, CESAR ANDRED AGUIRRE,
MARU MAHMUD HASSEN, MUNTHAZ MAHMUD
HASSEN, ADRIAN MITCHELL, JUAN DAVID
BUITRAGO CAGUA, ALEJANDRA ALCENDRA
MOSCOTE, ANDRES ALFONSO MEDINA
RAMIREZ, FERNANDO LIZCANO LOSADA and
LINA MARGARITA ANGULO PEÑARANDA

                         Plaintiffs,

  -against-

MARCO RUBIO, in his official capacity as Secretary of
State, and the UNITED STATES DEPARTMENT OF
STATE,

                     Defendants.

**COMPLAINT FOR
VACATUR, DECLARATORY
AND INJUNCTIVE RELIEF**

---

      Plaintiffs Catholic Legal Immigration Network, Inc. ("CLINIC"), African

Communities Together, Agnes Kyeremaa, Patricia Richardson, Cesar Andred Aguirre, Maru

Mahmud Hassen, Munthaz Mahmud Hassen, Adrian Mitchell, Juan David Buitrago Cagua,

Alejandra Alcendra Moscote, Andres Alfonso Medina Ramirez, Fernando Lizcano Losada

and Lina Margarita Angulo Peñaranda, for their Complaint against Defendants Marco Rubio,

in his official capacity as Secretary of State, and the United States Department of State,

allege as follows:

**INTRODUCTION**

1.      For centuries, the United States has welcomed immigrants seeking opportunity, family unity, and a chance to contribute to their communities. Congress gave effect to these principles in the Immigration and Nationality Act ("INA"), sharply circumscribing when the government may exclude intending immigrants. The "public charge" ground of inadmissibility is one such limited exception—but it has never been a sweeping bar. As Congress and the courts have long recognized, "public charge" refers only to an individualized determination that a noncitizen is likely to become primarily and permanently dependent on the government for subsistence, demonstrated by reliance on cash assistance or long-term institutional care at public expense. The law has never deemed a person inadmissible merely because they have received, or may one day need, non-cash public benefits or private charitable assistance; indeed, such temporary support has always been understood as part of the lawful process of integration and economic growth. But the Department of State ("DOS") has now attempted to rewrite Congress's carefully crafted provisions governing public charge and visa issuance.

2.      First, DOS has imposed a *categorical* nationality-based ban on legal immigration for nationals of 75 countries – nearly half of all visa applicants -- based on an unsupported and demonstrably false claim that nationals of the covered countries migrate to the United States to improperly rely on cash welfare and are likely to become "public charges". *See Immigrant Visa Processing Updates for Nationalities at High Risk of Public Benefits Usage*, U.S. Dep't of State uu(Jan. 14, 2026) (Ex. A) ("Blanket Visa Ban" or "Ban"); Jan. 14, 2026, U.S. Dep't of State Visa Cable, *Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge*, 26 STATE 3740 (Ex. B) ("Blanket Visa Ban Cable").[1]  In fact, nationwide, many applicants for

---

[1] The 75 countries listed include Afghanistan, Albania, Algeria, Antigua and Barbuda, Armenia,

immigrant visas are not eligible for cash welfare and remain ineligible for years. Ignoring both law and fact, DOS has invented a visa processing- regime that is not grounded in the INA or its regulations—one that authorizes visa refusals based solely on nationality, without individualized assessment or statutory authority. The result is a blanket deprivation of the case by case -adjudication Congress mandated, unlawfully denying and stripping working people and families of the individualized adjudication, approval and immigration visa issuance process the INA guarantees.

3.      Second, DOS has promulgated sweeping new, discriminatory rules governing public-charge determinations that depart dramatically from decades of settled legal precedent and practice. *See* Exhibit C (the "Consular Processing Cable," issued Nov. 6, 2025).[2] Like the Blanket Visa Ban, the Consular Processing Cable purports to implement the public charge ground of inadmissibility. But it does far more than restate existing standards. Instead, the Consular Processing Cable unlawfully attempts to authorize consideration of a broad array of public benefits outside the longstanding definition of public charge into consular officers' review, rewrites how affidavits of support are evaluated, and injects new, discriminatory considerations into the statutory five factor-analysis Congress prescribed, including consideration of common public benefits in a manner contrary to the express language and intent of the Personal

---

Azerbaijan, Bahamas, Bangladesh, Barbados, Belarus, Belize, Bhutan, Bosnia and Herzegovina, Brazil, Cambodia, Cameroon, Cape Verde, Colombia, Congo, Cuba, Dominica, Egypt, Eritrea, Ethiopia, Fiji, Gambia, Georgia, Ghana, Grenada, Guatemala, Guinea, Haiti, Iran, Iraq, Ivory Coast, Jamaica, Jordan, Kazakhstan, Kosovo, Kuwait, Kyrgyzstan, Laos,  Lebanon, Liberia, Libya, Moldova, Mongolia, Montenegro, Morocco, Myanmar, Nepal, Nicaragua, Nigeria, North  Macedonia, Pakistan, Republic of the Congo, Russia, Rwanda, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Senegal, Sierra Leone, Somalia, South Sudan, Sudan, Syria, Tanzania, Thailand, Togo, Tunisia, Uganda, Uruguay, Uzbekistan and Yemen. (Exs. A & B.)

[2] Upon information and belief, the unofficial version attached as Exhibit C is an accurate copy of the Consular Processing Cable, as it corresponds to the details regarding the cable reported by the Associated Press and other news outlets. *See, e.g.*, Amanda Seitz, *Immigrants With Health Conditions May Be Denied Visas Under New Trump Administration Guidance* (Nov. 6, 2025), https://kffhealthnews.org/news/article/visa-public-charge-health-conditions-trump-state-department/.

Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat.

2105 (1996) ("PRWORA"), the Patient Protection and Affordable Care Act, Pub. L. No. 111-148,

124 Stat. 119 (2010) ("ACA") and the Children's Health Insurance Program Reauthorization Act

of 2009, Pub. L. No. 111-3, 123 Stat. 8 (2009) ("CHIPRA"), designed by Congress to extend

certain public benefits to eligible and lawfully present immigrants and citizens in the United

States.  In doing so, DOS replaces the INA's narrow, individualized public charge- inquiry with a

far broader and more exclusionary regime that Congress never authorized.

4.    This case seeks to preserve what Congress intended: an individualized immigration

system that honors the INA's statutory commitment to family unity and bars the Executive from

rewriting immigration law by fiat. By promulgating the DOS Blanket Visa Ban, the Blanket Visa

Ban Cable, and the Consular Processing Cable, DOS attempts to eviscerate decades of settled

immigration law and practice with the stroke of a pen—stripping families of dignity, denying

working people fair consideration, and supplanting Congress's carefully calibrated framework

with its own unlawful regime.

5.    Defendants' radical reversal of longstanding law, practice, and policy through the

DOS Blanket Visa Ban, Blanket Visa Ban Cable, and Consular Processing Cable violates the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* and the *Accardi* doctrine

articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), which

requires government agencies to follow their own existing valid regulations, and the United States

Constitution.

6.    Defendants' Blanket Visa Ban, Blanket Visa Ban Cable, and Consular Processing

Cable (together, the "Consular Rules"), and any related agency actions taken to implement them

(including, without limitation, related internal email exchanges and memoranda, criteria for

country selection, data and analyses, alternatives considered, timeline and exit criteria, and any legal opinions or cross-agency communications) (hereinafter, "Implementing Actions"), operate as binding, substantive rules that unlawfully foreclose statutorily authorized visa issuance and the ability of otherwise-eligible applicants to immigrate legally. The Consular Rules violate the APA because they are final agency actions that were adopted without notice-and-comment rulemaking, are arbitrary and capricious, and are contrary to law; the Consular Rules are also *ultra vires* and violate the constitutional separation of powers; and they are infected by discriminatory animus in violation of the Fifth Amendment's guarantee of Equal Protection.

7.      For these reasons, Plaintiffs—individuals facing exclusion from the United States; their petitioning United States citizen relatives; and nonprofit organizations that legally advise, assist, advocate for and serve hundreds of thousands of low-income noncitizens and their families in New York City and nationwide—bring this action under the INA, the APA and the Fifth Amendment to the United States Constitution to enjoin and vacate the DOS Blanket Visa Ban, DOS Blanket Visa Cable, the DOS Consular Processing Cable and any related Implementing Actions, declare them unlawful and *ultra vires*, and set them aside.

### JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this case arises under the United States Constitution and federal statutes, including the APA, 5 U.S.C. § 551 *et seq.*, and the INA, 8 U.S.C. § 1101 *et seq*. Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202. Injunctive relief is authorized by the Court's equitable powers and 5 U.S.C. § 705.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiffs
Patricia Richardson and Agnes Kyeremaa reside in this district, Plaintiff ACT has offices in this
district, and Plaintiffs ACT and CLINIC serve clients in this district.

PARTIES

**A.    Plaintiffs**

10.     Plaintiffs are Catholic Legal Immigration Network, Inc. ("CLINIC"), African
Communities Together, Agnes Kyeremaa, Patricia Richardson, Cesar Andred Aguirre, Maru
Mahmud Hassen, Munthaz Mahmud Hassen, Adrian Mitchell, Juan David Buitrago Cagua,
Alejandra Alcendra Moscote, Andres Alfonso Medina Ramirez, Fernando Lizcando Losada and
Lina Margarita Angulo Peñaranda. Plaintiff Agnes Kyeremaa is a member of African
Communities Together ("ACT").

11.     Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a national
nonprofit organization that provides training, resources, and support to a network of immigration
law providers to support the provision of comprehensive immigration representation. CLINIC's
network includes more than 415 affiliate Catholic and community-based immigration law
programs, supporting approximately 3,000 network employees in 49 states, including New York
and the District of Columbia.

12.     CLINIC employs a staff of eighty-four (84). Seventeen (17) staff members devote
their time to substantive immigration law matters including family-based immigration as
members of CLINIC's Training and Technical Assistance section.  Approximately 70 percent of
the budget of CLINIC's Training and Technical Assistance Team is allocated to address
substantive immigration law matters including family-based immigration. CLINIC staff are
located throughout the country with staff presence in states including California, Maryland,

Virginia, Ohio, Florida, Texas, and New York.  CLINIC serves 34 affiliate organizations in New York, including 17 affiliates in New York City.

13.     As a direct result of the Defendants' promulgation of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, and Consular Processing Cable, CLINIC has already had to divert its human and financial resources from previously scheduled legal trainings and technical support for immigrant visa applications where CLINIC expects to receive an  increase in daily requests for legal consultations and technical assistance on the significance of the State Department's actions and its effect on pending immigrant visa applications, to which CLINIC staff are required to respond.

14.     Approximately 79 percent of CLNIC affiliates offer consular processing services. CLINIC must therefore also now develop new trainings, written guidance, and operational protocols specifically addressing how affiliates should counsel clients, prepare applications, and manage expectations under an indefinite, nationality-based suspension of adjudications.

15.     The DOS Blanket Immigrant Visa Ban also threatens CLINIC with economic harm. CLINIC's affiliates operate on limited budgets and provide low-cost or free representation. The increased complexity, duration, and uncertainty of consular processing caused by the Ban make representation more time-consuming and less sustainable. This frustrates the mission of CLINIC, which is focused on enabling affiliates to keep costs down and serving as many low-income immigrants as possible.  If fewer low-income immigrants pursue immigrant visa applications due to the Ban—as CLINIC reasonably anticipates-—affiliates will experience reduced revenue, potential staff reductions, and pressure to cut costs. This, in turn, may lead some affiliates to cancel their memberships with CLINIC, directly harming CLINIC's financial stability and ability to carry out its mission.

16.     Plaintiff African Communities Together (ACT) is a national nonprofit membership organization of African immigrants fighting for civil rights, economic opportunity, and a better life for African immigrant families residing in the United States. ACT serves thousands of members across its chapters in in New York, Virginia, Pennsylvania and the District of Columbia, and facilitates a national network of African leaders and African immigrant-serving organizations. ACT's members include Maryland, Virginia, Pennsylvania, Washington, D.C. and New York City residents applying for and/or planning to apply for adjustment of status via consular processing for family members, ACT provides legal services to assist members petitioning on behalf of their parents, spouses, siblings and children in their service area, which can include families from Algeria, Cameroon, Cape Verde, Egypt, Ethiopia, Ghana, Liberia, Morocco, Nigeria, Democratic Republic of Congo, Rwanda, Tunisia, and Uganda, all of which are listed among the 75 countries in the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable.

17.     As part of its mission, ACT serves African immigrants seeking legal assistance with immigration relief, including assisting with adjustment of status applications, family-based petitions, affidavits of support, and consular processing. ACT also assists with applications for asylum, U-Visas and T-Visas, Temporary Protected Status, Employment Authorization Documents, and renewals for lawful permanent residence. ACT also engages in national advocacy and community "Know Your Rights" education, seeking to advance opportunities for permanent status for the more than two million African immigrants residing in the United States.

18.     ACT serves members and clients who are adjusting or will seek to adjust status in the United States. ACT's clients include individuals who access Medicaid, Supplemental Nutrition Assistance Program ("SNAP") and other public benefit programs. ACT provides

education to community members on public benefits programs, including on eligibility. The majority of ACT's members are low-income.

19.    ACT provides immigration legal assistance by phone to members and clients from all over the country. These services consist mostly of immigration legal information and referral to nonprofit immigration legal service providers. Callers receive these services free of charge, regardless of which state they call from.  ACT also provides immigration legal assistance to clients seeking immigration legal information or referral on behalf of family members in other states—often in immigration detention centers.

20.    ACT also provides immigration legal information online, through video and audio recordings, infographics, "explainer" articles and similar resources that are distributed through its website, email lists, ethnic media, social media channels, and—most frequently—are forwarded by community members to African immigrant associations and chats on WhatsApp. These files are accessed, viewed, downloaded, and shared thousands of times. While it is not possible to track exactly which states this information is distributed to, ACT believes based on online interactions, calls to ACT offices, emails, etc. in response to the shared files that they are disseminated throughout the United States.

21.    ACT anticipates a need to conduct additional training and produce new resources regarding DOS's latest final agency actions. ACT's Legal Team has already received questions on the significance of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, DOS Consular Processing Cabler and their effect on pending immigrant visa applications. ACT Legal Staff will need to train further in response to DOS' latest actions to prepare for immigrant visa interviews at affected consulates, particularly with the State Department's new Consular Processing Cable's focus on the public charge ground of inadmissibility.

22.     Organizational Plaintiff CLINIC and Associational Plaintiff ACT represent and support immigrants and U.S. family members affected by DOS's policies and have standing in their own right and on behalf of their members, and they provide direct legal services, training, and technical assistance concerning family-based immigration and consular processing nationwide, including within this District.

23.     ACT sues on behalf of its members. At least one identified member (Plaintiff Agnes Kyeremaa, ACT Member), her children and grandchildren are currently subject to the challenged policy and have already suffered harm, including discriminatory visa refusal and prolonged suspension of immigrant visa adjudication that is fairly traceable to Defendants' final agency actions and would be redressed by vacatur and injunctive relief. The interests ACT seeks to protect—individualized, lawful visa adjudication and family unity under the INA—are germane to its mission of securing family unification, dignity, and economic opportunity for African families and communities in the United States. The claims and requested equitable relief do not require individualized proof or participation by members.

24.     This case challenges final, Department-level policies and agency actions promulgated by Defendants, including the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, and the Consular Processing Cable and any Implementing Actions, that govern immigrant visa adjudications across posts worldwide. Plaintiffs do not seek review of any consular officer's issuance or refusal of any particular visa. Rather, Plaintiffs bring a facial challenge under the Administrative Procedure Act ("APA") to final agency rules and directives that are unlawful both on their face and as applied to Plaintiffs and their members and clients. *See* 5 U.S.C. §§ 702, 704, 706.

25.     Plaintiff Agnes Kyeremaa, a U.S. Citizen and member of African Communities

Together ("ACT"), who lives in New York, New York is petitioning on behalf of her four adult

sons and daughters and three derivative grandchildren who are nationals of and who reside in

Ghana. All four of her adult sons and daughters' visa petitions were approved and visa fees paid,

and they had their consular interviews on January 22, 2026, when they each received notices

under 8 U.S.C. § 1201(g) advising them that their visas were refused because Ghana is one of 75

countries subject to the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable. Ms.

Kyeremaa has diabetes, high blood pressure, and high cholesterol, and takes medications for those

conditions. Ms. Kyeremaa also receives SSI, SNAP and Medicaid. She petitioned for her four

children and three grandchildren with the understanding that neither their nationality nor her

health status nor her receipt of SSI, SNAP or Medicaid would impact her children or her

grandchildren's visa applications. Ms. Kyeremaa has never been institutionalized, or wholly

dependent on government aid for her life in the United States. She lives, works, shops, and pays

local, state and federal taxes in New York City, New York.

      26.     Plaintiff Patricia Richardson is a U.S. citizen who lives in the Bronx, New York.

Ms. Richardson is a social worker, and made about $68,000 in 2024. She pays all required income

taxes in the United States. Ms. Richardson's sister, Andrea Anderson, is a national of and resides

in Jamaica. Her visa petition has been approved and visa fees paid, and she is scheduled for her

interview on March 17, 2026, in Kingston, Jamaica, but she cannot receive a visa because

Jamaica is one of the 75 countries subject to the Ban. Ms. Richardson's sister is healthy and has

no health conditions. Ms. Richardson has hypertension and diabetes for which she takes

prescription medication to effectively manage her conditions, and is otherwise healthy with no

other chronic health conditions, which is partially covered under her private health insurance plan,

she pays other health costs out of pocket. Her sister also has diabetes and takes prescription

medication to effectively manage her condition, and pays out of pocket for her medical needs. From 1993-1998, Ms. Richardson received benefits through the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). Ms. Richardson petitioned for her sister with the understanding that neither her sister's nationality nor her own health status or her previous receipt of WIC would impact her sister's visa application. Ms. Richardson has never been institutionalized, or wholly dependent on government aid for her life in the United States. She supports herself and her family financially. She lives, works, shops, and pays local, state and federal taxes in New York City, New York.

27.    Plaintiff Cesar Andred Aguirre is a U.S. citizen who lives in Shirley, Suffolk County, New York. He is currently employed as a warehouse supervisor and made about $104,000 in 2024. He pays all required income taxes in the United States. Mr. Aguirre's wife, Dania Mariela Escobar Carranza is a national of Guatemala and usually resides with Mr. Aguirre and their two children, ages seven and two, n in the United States, in Shirley, New York, but after traveling to appear for her scheduled consular interview, she is currently stuck in Guatemala, with their youngest child, because she is still nursing. Their youngest child has Turner's Syndrome, special needs and requires frequent medical care; she needs her heart and eyes to be constantly monitored and recently had ear surgery. The medical care she needs is not available in Guatemala. She has already missed medical appointments because of the Ban. Ms. Aguirre's visa petition has been approved and visa fees paid. Mr. Aguirre, his wife, and both of their minor daughters all traveled to Guatemala about a week before his wife's visa interview. Mr. Aguirre and his wife believed her visa interview was at the consulate on January 20, 2026, based on an email they received from the National Visa Center (NVC). When she appeared at the consulate on that date, the consular officer accepted her documents but told her that her interview was actually

scheduled for January 21, 2026. Mr. Aguirre's wife returned to the consulate and completed her interview on January 21, 2026, but was advised and received a notice from the consulate that she cannot receive a visa under INA because Guatemala is one of 75 countries subject to the Ban, which went into effect that same day.  Both Mr. Aguirre and his wife are healthy and have no health conditions. Mr. Aguirre's wife received Emergency Medicaid for her care in the hospital in New York during the birth of their first daughter in 2018, until Mr. Aguirre could include her as a dependent later, on his private health insurance plan.  Neither Mr. Aguirre nor his wife has ever been institutionalized, or wholly dependent on government aid for their life in the United States. He supports himself and his family, including his two minor daughters, financially. He lives, works, shops, and pays local, state and federal taxes in Shirley, Suffolk County, New York.

28.     Plaintiff Maru Mahmud Hassen is a U.S. citizen who lives in Rochester, New York. He is currently employed as an environmental services worker at two different companies and made about $51,000 in 2024. He expects to earn approximately $62,000 this year from these two jobs. He pays all required income taxes in the United States. Mr. Hassen's wife, Tigist Asmare Mekonnen, is a national of and resides in Ethiopia. Her visa petition has been approved and visa fees paid, but she cannot receive a visa because Ethiopia is one of 75 countries subject to the Ban.  Mr. Hassen's wife is healthy and has no health conditions.  Mr. Hassen has heart problems and high blood pressure, for which he takes prescription medication to effectively manage his condition.  He has no other health conditions and is otherwise healthy.  From 2019-2023, Mr. Hassen received Medicaid via New York State of Health.  Mr. Hassen petitioned for his wife with the understanding that neither her nationality, his health status, nor his previous receipt of Medicaid would impact his wife's eligibility for an immigrant visa.  Mr. Hassen has never been institutionalized, or wholly dependent on government aid for his life in the United

States. He supports himself and his family financially. He lives, works, shops, and pays local, state and federal taxes in Rochester, New York.

29.    Plaintiff Munthaz Mahmud Hassen is a U.S. citizen who lives in Rochester, New York. He is currently employed in relief scaling in the bakery department of a major grocery chain and made about $72,608 in 2024.  He pays all required income taxes in the United States. Mr. Munthaz Hassen is the legal guardian for his two minor children, ages 11 and 14, who are nationals of and reside in Ethiopia. Both of their visa petitions have been approved and visa fees paid, but they cannot receive a visa because Ethiopia is one of 75 countries subject to the Ban. Both of Mr. Munthaz Hassen's children are healthy with no health conditions. Mr. Munthaz Hassen has high cholesterol, for which he takes prescription medication to effectively manage his condition.  He has no other health conditions and is otherwise healthy. From 2019-2022, Mr. Munthaz Hassen received Medicaid via New York State of Health.  Mr. Munthaz Hassen petitioned for his children with the understanding that neither his children's nationality, his health status nor his previous receipt of Medicaid would impact his children's eligibility for an immigrant visa.  Mr. Munthaz Hassen has never been institutionalized, or wholly dependent on government aid for his life in the United States. He supports himself and his family financially. He lives, works, shops, and pays local, state and federal taxes in Rochester, New York.

30.    Plaintiff Adrian Mitchell is a U.S. citizen who lives in Port St. Lucie, Florida. Plaintiff Mitchell is a roofer by profession but is presently unemployed. His estimated annual income last year was $20,000.  He pays all required income taxes in the United States. Mr. Mitchell is petitioning with a co-sponsor on behalf of his 70-year-old mother, Carol Marie Baugh, who is a national of Jamaica.  Mr. Mitchell's mother had been living in the United States since the 1980s.  Prior to applying, Mr. Mitchell's mother received an I-601A waiver and she traveled to

Jamaica to attend her interview and is now unable to return home to the United States.  Mr.

Mitchell's mother's visa petition has been approved and visa fees paid, and she attended her visa

interview on January 12, 2026 in Kingston, Jamaica, but now she cannot receive a visa because

Jamaica is one of 75 countries subject to the Ban. Mr. Mitchell is healthy with no chronic health

conditions. Mr. Mitchell's mother has high blood pressure and knee and back pain, but is

otherwise generally healthy with no other chronic health conditions.  From 2013-2024, Mr.

Mitchell received SNAP.  In the 1990s, Mr. Mitchell's mother received food stamps and housing

assistance for about a year and a half. Mr. Mitchell petitioned for his mother's admission with the

understanding that neither his health status nor his previous receipt of SNAP or her previous

receipt of food stamps and housing assistance would impact his mother's eligibility for an

immigrant visa.  Mr. Mitchell has never been institutionalized, or wholly dependent on

government aid for his life in the United States. He supports himself and his family, including his

three minor children, as well as his father and mother, financially. He lives, works, shops, and

pays local, state and federal taxes in Port St. Lucie, Florida.

    31.    Plaintiff Juan David Buitrago Cagua is a Colombian national and an energy

engineer with expertise in solar photovoltaic (PV) systems who resides in Lisbon, Portugal. He

works as a PV Design Engineer, designing solar and energy-storage systems and preparing code-

compliant permitting packages for projects across multiple jurisdictions. Mr. Buitrago Cagua

applied for an EB-2 national interest waiver petition on July 7, 2023, and was approved on

February 21, 2024. He proceeded through consular processing and appeared for his immigrant

visa interview in Bogotá, Colombia, on January 26, 2026. He traveled from Lisbon, where he

resides, for the express purpose of attending his interview. Plaintiff Buitrago Cagua was

documentarily cleared by DOS and has no serious health conditions that would pose a risk to

others. After the interview, he received a notice that he was ineligible for an immigrant visa under INA § 221(g) (8 U.S.C. § 1201(g)) and that the State Department was pausing immigrant-visa issuance for nationals of 75 countries, including Colombia.

32.     Mayra Alejandra Alcendra Moscote, a Colombian national who resides in Spain, is a finance and project-management professional with specialized training in mining, oil, and energy regulation. On June 5, 2023, Ms. Alcendra Moscote filed for an EB-2 national interest waiver, which was approved on November 3, 2023. She proceeded through consular processing and appeared for her immigrant visa interview in Madrid, Spain, on October 7, 2025, but her case was placed in administrative processing due to a missing vaccine for her daughter. Ms. Alcendra Moscote later submitted updated medical exams, yet the U.S. Embassy informed her by email that it was "not possible to issue the visas" and directed her to travel.state.gov for information about the January 21, 2026, pause affecting certain immigrant visas. Plaintiff Alcendra Moscote was documentarily cleared by DOS and has no serious health conditions that would pose a risk to others. No immigrant visa has been issued to date.

33.     Andres Alfonso Medina Ramirez, a Colombian national who resides in Colombia, is an architect specializing in public management. He has spent the past two decades leading architecture, construction, and consulting projects, including as CEO of two firms. He applied for an EB-2 national interest waiver on December 11, 2023, and was approved on April 16, 2025. His proposed endeavor focuses on facilitating the construction and development of weather-resistant and sustainable housing for disadvantage communities in the United States. Plaintiff Medina Ramirez was documentarily cleared by DOS and has no serious health conditions that would pose a risk to others. Mr. Medina Ramirez completed consular processing and appeared for his immigrant visa interview in Bogotá, Colombia, on January 22, 2026. After the interview, he

15

received a notice reflecting a refusal under INA § 221(g) (8 U.S.C. § 1201(g)) that referenced the State Department's January 21, 2026, pause on immigrant-visa issuance for covered nationalities, including Colombia.

34.     Plaintiff Lina Margarita Angulo Peñaranda is a Colombian national and professional architect specializing in residential architecture and interior design. She has more than 20 years of experience in architecture and interior design and, since March 2020 has owned and led a firm that provides interior design services for residential and corporate clients. Ms. Angulo Peñaranda submitted her petition for an EB-2 national interest waiver on November 1, 2023, and was approved on January 10, 2025. USCIS recognized the national importance of her proposed endeavor in the United States, which seeks to create training and employment pathways tied to interior design work, and support regionally sourced materials and local suppliers. Plaintiff Angulo Peñaranda was documentarily cleared by DOS and has no serious health conditions that would pose a risk to others. Ms. Angulo Peñaranda proceeded through consular processing and appeared for her immigrant visa interview at the U.S. Embassy in Bogotá, Colombia. After the interview, she received a notice citing the State Department's January 21, 2026, pause on immigrant visas and indicating she was refused under (8 U.S.C. § 1201(g)) INA § 221(g). No immigrant visa has been issued, and her case remains pending.

35.     Plaintiff Fernando Lizcano Losada is a Colombian physician and endocrinologist with three decades of experience in metabolic disease research and clinical practice. Over his career, he has combined academic work with hands-on patient care, including founding and directing a biomedical research center at Universidad de La Sabana and providing specialized endocrine treatment at a leading academic hospital. He completed his Ph.D. in Spain at the University of Navarra, with a focus on cell biology and thyroid hormone research. From 1997 to

2000, he completed postdoctoral training in molecular physiology at Brigham and Women's

Hospital at Harvard Medical School. He previously served as the President of the Colombian

Association of Endocrinology, Diabetes, and Metabolism. He is also a member of the

International Society for Stem Cell Research and the Endocrine Society. He has received

numerous professional honors and research recognitions, including research and travel grants

from the National Institute of Health and Endocrine Society in the United States. Dr. Lizcano

Losada applied for an employment-based first preference immigration visa (EB-1A)—

colloquially known as the "Einstein visa"—and was approved on January 22, 2025. Plaintiff

Lizcano Losada was documentarily cleared by DOS and has no serious health conditions that

would pose a risk to others.  He proceeded through consular processing and appeared for his

immigrant visa interview on January 22, 2026. After the interview, he received a notice that he

was ineligible for an immigrant visa under INA § 221(g) (8 U.S.C. § 1201(g)) and that the State

Department was pausing immigrant-visa issuance for nationals of 75 countries, including

Colombia. No immigrant visa has been issued to date.

### B.    Defendants

36.    Defendant Marco Rubio is the Secretary of State.  He is responsible for overseeing

the enforcement and implementation of the DOS Blanket Visa Ban for all consular officers and

DOS staff and is charged by statute with the administration and enforcement of immigration laws,

including those related to the powers, duties, and nondiscretionary functions of consular officers.

8 U.S.C. § 1104. Defendant Rubio is sued in his official capacity.

37.    Defendant DOS is a cabinet department of the United States federal government.

Among other things, DOS oversees consular processing for applications for immigrant visas for

lawful permanent residence and non-immigrant visas for limited durations.

17

**FACTUAL ALLEGATIONS**

**A.      The INA's Statutory Scheme and the Relevant Public Charge Provisions.**

38.      The Immigration and Nationality Act ("INA") establishes a detailed statutory scheme governing the admissibility of immigrants. Congress has consistently prioritized family unity, ensuring that U.S. citizens and lawful permanent residents ("LPRs") can reunite with close family members through the immigrant visa petition and consular processing system.

39.      Family-based applicants for LPR status, whether adjusting their status in the United States or undergoing consular processing abroad, must demonstrate that none of the grounds of inadmissibility set forth in section 212(a) of the INA apply. 8 U.S.C. § 1182 (a)(1)–(10) (including, *e.g.*, grounds related to health, unlawful presence, criminal convictions, national security, and others). One such ground, as explained further below, relates to whether the applicant is likely to become a public charge. The public charge ground of inadmissibility is set forth in 8 U.S.C. § 1182(a)(4), which provides that a noncitizen applicant who, "in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General[3] at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A).[4] Where any ground of inadmissibility is present and not waived, the application for admission or adjustment of status will be denied. If the

---

[3] Several INA functions formerly vested in the Attorney General have been transferred to the Secretary of the Department of Homeland Security. Congress transferred the authority to naturalize individuals to the Secretary of the Department of Homeland Security in 8 U.S.C. § 1103(a)(1), "except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling." Some residual statutory references to the Attorney General that pertain to those functions are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 251, 271(b), 542 note, 557; 8 U.S.C. § 1551 note; *see also Nielsen v. Preap*, 139 S. Ct. 954, 959 n.2 (2019).

[4] A separate provision of the INA renders "deportable" noncitizens who, within five years after the date of entry, have "become a public charge from causes not affirmatively shown to have arisen since entry." 8 U.S.C. § 1227(a)(5). Regulations governing this provision would be promulgated by the Department of Justice and are not at issue here.

applicant is found eligible and there is no basis for denial, the application for an immigrant visa is approved, and the applicant is issued a lawful permanent resident card, commonly known as a green card.

40.    Some intending immigrants within the U.S. are ineligible to adjust their status here, for various reasons. After receiving an I-601A waiver of inadmissibility, these intending immigrants must depart the U.S. to seek an immigrant visa through consular processing, typically in their country of origin, subject to various statutory waiting periods. At that consular interview, the DOS consular officer must evaluate all the possible bases for denying admission codified in 8 U.S.C. § 1182(a), including the public charge provision.

41.    Congress has never authorized categorical bans, wealth tests, or nationality-based presumptions regarding public charge risk. To the contrary, the public charge determination is inherently individualized: immigration officers must evaluate the totality of the applicant's circumstances on a case-by-case basis, including the five factors listed in the INA that a consular officer or the Attorney General must consider when making a determination regarding whether the applicant is likely to become a public charge: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. *Id.* § 1182(a)(4)(B)(i); *see also* 8 C.F.R. § 212.22, and 22 C.F.R. § 40.41. The INA also permits a consular officer or the Attorney General to "consider any affidavit of support" from a financial sponsor. 8 U.S.C.§ 1182(a)(4)(B)(ii); *see also* 8 U.S.C. § 1183a.

42.    Further, the INA includes a provision—8 U.S.C. § 1201(g) (also referenced as INA § 221(g)), "Nonissuance of visas or other documents"—that instructs consular officers when they cannot issue or must refuse a visa. A consular officer may refuse a visa *only* if the officer, based on the individual application or the applicant's documents, believes the person is ineligible

under one of the specific grounds listed in the INA, such as health-related grounds, certain

criminal issues, or national-security concerns. *See also* 22 C.F.R. §§ 40.6, 42.81. That provision

of the INA requires consular officers to make case-by-case decisions based on an individual

applicant's eligibility. Congress has not authorized blanket denials or refusals based on

nationality, geography, or group-based suspensions.

43.    The INA also creates a narrow exception to the public charge ground of

inadmissibility: if someone is denied solely because of the "public charge" ground under 8 U.S.C.

§ 1182(a)(4), a visa can still be issued if the person provides a financial bond approved by the

government. 8 U.S.C. § 1201(g); 8 C.F.R. § 213.1.

44.    The INA expressly prohibits categorical nationality or country-level discrimination

in the issuance of immigrant visas, providing that "no person shall receive any preference or

priority or be discriminated against in the issuance of an immigrant visa because of the person's

race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

45.    The current DOS Foreign Affairs Manual ("FAM"), at 9 FAM 302.8-2 PUBLIC

CHARGE - INA 212(A)(4), provides explicit guidance to consular officers on how to apply the

public charge ground of inadmissibility when reviewing applications for lawful permanent

residence. The FAM, at 9 FAM 302.8-2(B)(1)-(2), explicitly instructs consular officers that:

(1) When determining ineligibility under INA 212(a)(4), the term 'public charge' means
that an individual, after admission into the United States, is likely to become primarily
dependent on the U.S. Government for subsistence. This means either:
(a) Receipt of public cash assistance for income maintenance (see paragraph b
below); or
(b) Institutionalization for long-term care at U.S. Government expense (see
paragraph d below). Short-term confinement in a medical institution for
rehabilitation does not constitute primary dependence on the U.S. Government
for subsistence.
(2) When considering the likelihood of an applicant becoming a 'public charge,' you look
at the totality of the applicant's circumstances at the time of visa application. See 9
FAM 302.8-2(B)(3) below.

In determining ineligibility under 8 U.S.C. § 1182(a)(4), the FAM instructs consular officers that "many factors are relevant, including age, health, family status, assets, resources, financial status, education, and skills. No single factor, other than the lack of a qualifying affidavit of support, in accordance with [8 U.S.C. § 1183a], INA 213A, if required, will determine whether an individual is a public charge." 9 FAM 302.8-2(B)(3).

## B.    Defendants' Unlawful Attempts to Rewrite the INA Public Charge Provisions

46.    Defendants' implementation of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable and the DOS Consular Processing Cable are the latest steps in their repeated efforts to use the INA's public charge provision as a pretext to limit the immigration of nonwhite immigrants, including working people and their families. These policies are final agency actions that purport to rewrite the immigration laws and processes that Congress has firmly established by statute and DOS reinforced through notice-and-comment rulemaking, including the settled definition of public charge and the statutory test consular officers must follow in making individualized immigrant visa determinations.

47.    The actions challenged here trace back to an April 2016 policy proposal from the Center for Immigration Studies ("CIS").[5] CIS's origins reflect the views of its founder, a white supremacist who asserted that "that for European-American society and culture to persist, it requires a European-American majority and a clear one at that."[6] CIS advanced multiple proposals to restrict immigration by low-income individuals and asylum seekers from non-

---

[5] *See Center for Immigration Studies*, S. Poverty L. Ctr., https://www.splcenter.org/fighting-hate/extremist-files/group/center-immigration-studies (last visited Jan. 31, 2026).

[6] *See* Matt Schudel, *John Tanton, architect of anti-immigration and English-only efforts, dies at 85*, Wash. Post, July 21, 2019, https://www.washingtonpost.com/local/obituaries/john-tanton-architect-of-anti-immigration-and-english-only-efforts-dies-at-85/2019/07/21/2301f728-aa3f-11e9-86dd-d7f0e60391e9_story.html.

European countries, including leveraging "the public charge doctrine to reduce the number of welfare-dependent foreigners living in the United States."[7]

48.    Within a week of President Trump's 2017 inauguration, the CIS's public charge doctrine became a proposed policy. A draft Executive Order indicated plans to target immigrant families who had used a broad range of public benefits, including the Children's Health Insurance Program ("CHIP") for their U.S. citizen children. News of the draft triggered widespread fear and caused immigrant families across the country to avoid enrolling in or withdraw from public benefits they were legally entitled to receive. The draft order directed the Department of Homeland Security ("DHS") to redefine "public charge" as anyone likely to use benefits based on income, resources, or need, and instructed the Department of State to amend its FAM to match.[8]

49.    Although President Trump never signed the draft Executive Order, DHS proceeded with rulemaking to overhaul the public charge criteria. On October 10, 2018, DHS published a Notice of Proposed Rulemaking.[9]  Over 266,000 legal services organizations, think tanks, scholars, advocacy groups, children's aid groups and other nonprofits, states, municipalities, and individuals submitted comments regarding the proposed rule. DHS recognized that the "vast majority" of commenters opposed the proposed rule.[10]

50.    DHS published its final public charge rule resulting from the 2018 Notice of Proposed Rulemaking (" NPRM") on August 14, 2019 ("DHS 2019 Rule").[11] Almost immediately, 23 states and the District of Columbia, six municipalities, 19 nonprofit public

---

[7] Ctr. for Immigr. Studies, A Pen and A Phone 8 (Apr. 6, 2016), https://cis.org/sites/cis.org/files/79-actions_1.pdf.

[8] *See* Memorandum from Andrew Bremberg on Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017), https://cdn3.vox-cdn.com/uploads/chorus_asset/file/7872571/Protecting_Taxpayer_Resources_by_Ensuring_Our_Immigration_Laws_Promote_Accountability_and_Responsibility.0.pdf (containing draft executive order as attachment).

[9] *See generally* Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (proposed Oct. 10, 2018).

[10] Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,2923, 41,304 (Aug. 14 2019).

[11] *See generally id*.

interest and immigrant rights organizations, and individual plaintiffs filed lawsuits in five federal district courts. All five courts issued injunctions blocking the DHS 2019 Rule, and notwithstanding temporary interlocutory stays, nationwide and region-specific injunctions ultimately blocked the rule.[12]

51.    The circuit courts that reached the merits in these lawsuits largely agreed that DHS's 2019 Public Charge rule departed from the INA's long-settled understanding of "public charge" and was likely arbitrary and capricious under the APA.[13] Collectively, these decisions confirmed the settled definition and meaning of "public charge": a prediction that a person is likely to become primarily dependent on the government for subsistence, not mere receipt of supplemental, short term, or noncash benefits.[14]

52.    Nonprofit immigration legal assistance organizations and individual plaintiffs similarly brought suit in the Southern District of New York challenging three interrelated DOS actions that expanded the "public charge" standard for immigrant visa applicants at the time: (1) DOS's January 2018 revisions to 9 FAM 302.8; (2) DOS's Interim Final Rule ("IFR"), Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54,996 (Oct. 11, 2019); and (3)

---

[12] *See City and Cnty. of San Francisco v. USCIS,* 408 F. Supp. 3d 1057 (N.D. Cal. 2019), *Washington v. DHS,* 408 F. Supp. 1191 (E.D. Wash. 2019), *aff'd in relevant part,* 981 F.3d 742 (9th Cir. 2020), *cert. denied,* 141 S.Ct. 1292 (2021).  No. 19-cv-4717 (N.D. Cal.); *Make the Rd. New York v. Cuccinelli,* 419 F. Supp. 3d 647 (S.D.N.Y. 2019*), aff'd as modified sub nom. New York v. DHS,* 969 F.3d 42 (2d Cir. 2020); *Cook County v. McAleenan,* 417 F. Supp. 3d 1008 (N.D. Ill. 2019), *aff'd as modified sub nom. Cook County v. Wolf,* 962 F.3d 208 (7th Cir. 2020); *CASA de Maryland, Inc. v. Trump,* 414 F. Supp. 3d 760 (D. Md. 2019), *rev'd,* 971 F.3d 220 (4th Cir. 2020), *reh'g on banc granted,* 981 F.3d 311 (4th Cir. 2020).

[13] *See Cook Cnty.*, 962 F.3d at 229, 232–33; *New York,* 969 F.3d at 76–78; *City & Cnty. of San Francisco,* 981 F.3d at 750–54. The Fourth Circuit's panel decision in *CASA de Maryland*, 971 F.3d is an outlier: it invoked *Chevron* and executive deference to uphold DHS's 2019 Rule at the preliminary injunction stage, yet every other circuit to reach the merits rejected the Rule as inconsistent with the INA's long-settled understanding of "public charge" and likely arbitrary and capricious. The Fourth Circuit later granted rehearing en banc, and the government abandoned its defense; the Rule was then vacated and removed from the CFR, further diminishing any persuasive force of the panel ruling. *See Casa de Maryland*, 981 F.3d at 313–14; *New York,* 969 F.3d at 2019. DHS, *Public Charge Rule Vacated and Removed; DHS Withdraws Proposed Rule Regarding the Affidavit of Support* (Mar. 11, 2021), https://tinyurl.com/54c52b3n.

[14] *See City and County of San Francisco*, 981 F.3d at 750–54; *Cook County, Illinois*, 962 F.3d at 229, 232–33; *New York*, 969 F.3d at 76–81; 64 Fed. Reg. at 28692–93.

Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans, Presidential Proclamation 9945, 84 Fed. Reg. 53,991 (Oct. 4, 2019) ("Health Care Proclamation"), requiring immigrants to provide proof of qualifying health insurance within 30 days of entry.[15]

53.    On July 29, 2020, the district court issued a nationwide preliminary injunction barring DOS from enforcing the 2018 FAM revisions, the 2019 IFR, and the Health Care Proclamation.[16] DOS then rescinded the enjoined FAM guidance and directed consular officers to apply the prior version of 22 C.F.R. § 40.41.[17]

54.    Ultimately, after the 2020 presidential election, the federal government abandoned its defense of the 2019 DHS Public Charge Rule and related DOS Rules. In March 2021, the United States requested dismissal of its still-pending Supreme Court appeals regarding the DHS Public Charge Rule, allowing the lower court decision vacating the rule to take effect, and formally removed the 2019 regulation from the Code of Federal Regulations.[18]

55.    On March 25, 2021, DOS updated the FAM to restore the pre-2018 public charge standard: primary dependence on the government for subsistence, not mere receipt of supplemental, short term, or noncash benefits.[19] This mirrors the standard in the former Immigration and Naturalization Service's ("INS") 1999 Public Charge Field Guidance ( "1999 Field Guidance").[20]

---

[15] *See generally* Complaint, *Make the Road N.Y. v. Pompeo*, No. 19-cv-11633 (S.D.N.Y. Dec. 19, 2019).

[16] *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020).

[17] Revised FAM Guidance (Aug. 5, 2020).

[18] *See 2019 Public Charge Rule Vacated and Removed; DHS Withdraws Proposed Rule Regarding the Affidavit of Support supra* n. 13.

[19] *See* CLINIC, State Department Restores Pre-2018 Public Charge Guidance (Apr. 8, 2021) https://www.cliniclegal.org/resources/ground-inadmissibility-and-deportability/public-charge/state-department-restores-pre-2018; 9 FAM § 302.8-2.

[20] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).

56.    On May 14, 2021, President Joseph R. Biden issued Proclamation 10209, 86 Fed. Reg. 27,015, revoking the Health Care Proclamation in full.

57.    DOS later confirmed that the 2019 IFR remained enjoined and had never been implemented, and on October 6, 2023, it formally restored the regulation governing public charge visa inadmissibility to the version in effect before October 11, 2019, realigning DOS policy with DHS's current framework.[21]

### C.  The DOS Consular Processing Cable

58.    Upon information and belief, the DOS Consular Processing Cable challenged in this case was issued to all consular officers worldwide on November 6, 2025. *See* Ex. C. While the unofficial copy of that cable states that officers should follow the statutory and regulatory definition of public charge and apply the public charge grounds in the manner set forth in the current FAM, 9 FAM 302.8-2, *see id.,* the Consular Processing Cable radically transforms the public charge evaluation by adding new, substantive elements.

59.    First, the Consular Processing Cable mandates that consular officers consider not only a visa applicant's current or past use of cash assistance and long-term institutional care at government expense, but also:

> *any other form of public assistance, social welfare, or private charity* either in the United States or elsewhere intended to help low-income people. This includes but is not limited to housing assistance, food assistance (including the use of private food banks), and medical assistance.
> (Ex. C at 8, ¶ 29) (emphasis added).

60.    DOS concedes that the use of such benefits is not part of the definition of public charge:

---

[21] *See* Visas: Ineligibility Based on Public Charge, 88 Fed. Reg. 60,574 (Sept. 5, 2023); Nat'l Immigr. L. Ctr., *Litigation Updates: Make the Road New York v. Pompeo - NILC*, https://www.nilc.org/litigation/make-the-road-new-york-v-pompeo/ (citing *Make the Rd. New York*, 475 F. Supp. 3d at 232) (last updated Aug. 24, 2024).

Although the current regulatory definition of public charge does not include these, use of them indicates that an applicant is or has been unable to provide for himself fully and could become a public charge in the future.

*Id.*

61.     Second, the Consular Processing Cable authorizes agents to go behind the face of The Form I-864 Affidavit of Support and assess the credibility of the sponsor, including "whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance." (Ex. C at 10, ¶ 35– 36 )

62.     Third, the Cable directs officers to consider a number of discriminatory factors under the guise of evaluating the statutorily mandated five factors, including hypothesizing about possible future effects of a visa applicant's and their family members' health conditions, Ex. C at (Ex. C, ¶¶ 15 –18 ); and English-language proficiency (Ex. C ¶¶ 24) ("For an applicant who intends to support himself and his dependents through employment, lack of the necessary English language proficiency could call into question his ability to become or remain self-sufficient within a reasonable time after entry into the United States . . . .") & 25).

63.     On information and belief, Defendants imposed these new rules to require heightened scrutiny of all immigrant visa applications subject to the public charge ground of inadmissibility under 8 U.S.C. § 1182(a)(4).

64.     Although the November 6, 2025, Consular Processing Cable was never formally released to the public or otherwise published, and was not issued subject to notice-and-comment rulemaking, the Cable is a final agency action that, upon information and belief, went into effect the day it was issued, has been implemented by consular officers worldwide, and has adversely impacted the rights of nearly all immigrant visa applicants subject to 8 U.S.C. § 1182(a)(4).

65.     Eleven days later, on November 17, 2025, DHS and U.S. Citizenship and

Immigration Services ("USCIS") published, for notice and comment, a rule pertaining to public

charge determinations by DHS. This NPRM entitled "Public Charge Ground of Inadmissibility,"

sought comment within 30 days on a proposed rescission of the 2022 Public Charge Rule and

purports to change the standards governing public charge determinations under 8 U.S.C. §

1182(a)(4).[22] DHS also set a 60-day period for public comment on the NPRM's proposed changes

to the accompanying USCIS Form I-485 application for adjustment of status.[23] In response, nearly

90% of the over 8,000 submitted comments opposed the NPRM; many expressed concern that the

NPRM is broader and more arbitrary and punitive than even the unlawful DHS 2019 Rule, which

multiple courts enjoined.[24] Accordingly, commenters urged DHS to withdraw the NPRM and

retain the 2022 Public Charge Rule.[25]

**D.     The DOS Blanket Visa Ban**

66.     On January 14, 2026, DOS announced a sweeping suspension of all immigrant

visa issuance for nationals of 75 countries, effective January 21, 2026, on the stated ground that

applicants from these countries pose a heightened risk of becoming "public charges." (Exs. A &

B.)

---

[22] Public Charge Ground of Inadmissibility, 90 Fed. Reg. 52,168 (Nov. 19, 2025).

[23] *Id*. at 52,223.

[24] *See, e.g.*, Barbara McDowell Social Justice Ctr., USCIS NPRM Comment 2025-0304-3807 (arguing the proposed rule is arbitrary and capricious, lacks any supported justification under the APA, and unlawfully seeks to revive aspects of the 2019 public charge rule previously rejected by multiple federal courts); Ctr. on Budget & Pol'y Priorities, USCIS NPRM Comment 2025-0304-4751 at 9 (warning that the proposal would more deeply entangle public-charge determinations with non-cash public benefits than even the 2019 rule); Coal. on Human Needs, USCIS NPRM Comment 2025-0304-3840, at 4 (noting that, unlike even the 2019 rule, the proposal abandons long-standing exemptions for emergency care, immunizations, education, food banks, and state-funded assistance); Nat'l Ctr. for L. & Econ. Justice, USCIS NPRM Comment 2025-0304-5072 at 4 (raising serious concerns that the rule could permit retroactive consideration of benefit use, contrary to prior DHS assurances and basic principles of fairness).

[25] *See id*.

67.    The DOS announcement confirms that: (i) the freeze is limited to immigrant visas; (ii) nonimmigrant (e.g., tourist/business) visas are not covered; (iii) applicants may still apply and attend interviews, and may even have already been print-authorized for visas, but "no immigrant visas will be issued" to affected nationals during this indefinite "pause"; (iv) dual nationals applying with a passport from a non-listed country are exempt; and (v) no revocations of already issued immigrant visas are to occur under the guidance. (Exs. A & B.)

68.    Contemporaneous coverage by national outlets confirmed DOS's characterizations of the suspension as necessary to prevent the immigration of those who might "extract wealth"[26] or "take welfare and public benefits"[27] from the United States. Further, this coverage reported that the DOS Cable confirmed that DOS explicitly tied the suspension to assumptions about "public charge" and that DOS would implement the suspension through internal DOS Cables and Consular Directives.[28]

69.    The Blanket Visa Ban Cable (Ex. B), which was released to the public by persons unknown, operationalizes the freeze and lists affected countries with immediate and direct legal consequences, restricting both applicants' rights and straightjacketing consular officers' obligations -- mandating refusal of immigrant visas from all 75 countries indefinitely.  In multiple statements, DOS has framed the final agency action policy as taken "under existing

---

[26] Miriam Khan, *US to Suspend Visa Processing for 75 Countries Starting Next Week*, ABC News (Jan. 14, 2026), https://abcnews.go.com/US/us-suspend-visa-processing-75-countries-starting-week/story?id=129210370 ("'The Trump administration is bringing an end to the abuse of America's immigration system by those who would extract wealth from the American people.'") (quoting State Department Principal Deputy Spokesman Tommy Pigott).
[27] Matthew Lee, *US will Suspend Immigrant Visa Processing from 75 Countries over Public Assistance Concerns*, Associated Press (Jan. 14, 2026), https://apnews.com/article/trump-immigration-visas-79909bd01e9e1e3dedde144f865a1b9d ("'Immigrant visa processing from these 75 countries will be paused while the State Department reassess immigration processing procedures to prevent the entry of foreign nationals who would take welfare and public benefits.'") (quoting State Department statement).
[28] *See* Simon Lewis & Humeyra Pamuk, *Trump Administration to Suspend Immigrant Visa Processing for 75 Nations*, Reuters (Jan. 15, 2026), https://www.reuters.com/world/us/us-suspend-visa-processing-75-nations-next-week-fox-news-reports-2026-01-14/.

immigration law" while it "reassesses" procedures. (Exs. A & B.) It does not claim that it took the

action pursuant to any presidential proclamation, or any other independent suspension authority.

*Cf. id.*

70.     The DOS Blanket Visa Ban creates an entirely new ground of inadmissibility not

authorized by Congress. It immediately foreclosed visa issuance to tens of thousands of applicants

for every type of immigrant visa, including those with pending interviews, otherwise approved

petitions, and expiring statutory eligibility (including those selected for Diversity Visas). *Id.*

71.     DOS offered no factual findings, no data, and no explanation of why nationals of

these 75 countries pose any unique risk and cited no statutory authority for a categorical ban

based on national origin. *Id.* DOS cited only INA § 212(a)(4) (codified at 8 U.S.C. § 1182(a)(4))

(the public charge ground of inadmissibility) and INA § 221(g) (codified at 8 U.S.C. § 1201(g))

(individual immigrant visa refusals), neither of which permits a categorical ban.

72.     Although the January 14, 2026, DOS Blanket Ban Cable allows applicants to

submit evidence to rebut a public charge allegation under 8 U.S.C. § 1182(a)(4), it instructs

officers to categorically refuse and deny the visa under 8 U.S.C. § 1201(g) based on applicants'

nationality alone. (Ex. B, ¶¶2-5 & 9.) The Cable provides no exceptions, even where, after

applying heightened scrutiny (Ex. B, ¶¶3 & 4 (appearing to incorporate the directives of the

Consular Processing Cable)), the officer finds that an applicant is not likely to become a public

charge (Ex. B, ¶5), and even if an applicant has already been approved and "print-authorized" for

a visa. (Ex. B, ¶9.)

73.     DOS's official website announcement and its accompanying DOS Blanket Visa

Ban Cable characterize the action as part of a broader review to ensure immigrants from "high

risk countries" do not access U.S. public benefits but provide no evidentiary basis for the

classification, no explanation of the methodology used, and no timeframe by which the Ban will expire. (Exs. A & B.)

74.     News reports and analysts have described the "pause" as a "freeze," "suspension," or a functional immigrant visa "ban," noting both its dramatic expansion beyond other "travel bans" and its alignment with the administration's simultaneous efforts to rescind DHS' 2022 Public Charge Rule.[29]

75.     The Blanket Visa Ban departs from longstanding public charge definitions and standards under the INA and controlling regulations and the individualized inquiry mandated by statute. In past global disruptions (*e.g.*, COVID-19 related suspensions), DOS issued time-bound, criteria-based guidance, and articulated exceptions calibrated to operational realities. Here, DOS has instead adopted an open-ended, categorical, nationality-wide embargo without any stated criteria or sunset. (Ex. A & B).

76.     According to the contemporaneously DOS Blanket Visa Ban Cable implementing the DOS Blanket Visa Ban, consular posts must continue accepting and interviewing applicants but cannot issue immigrant visas during the pause and must refuse them under 8 U.S.C. § 1201(g). (Ex. B, ¶2). As noted above, however, 8 U.S.C. § 1201(g) mandates that a consular officer may refuse a visa only if the officer, based on the individual application or the applicant's documents, believes the person is legally ineligible under one of the specific grounds listed in the INA, such as public charge, specific health-related grounds, certain criminal issues, or national security concerns. *See also* 22 C.F.R. §§ 40.6, 40.201, and 42.81. The Blanket Visa Ban thus

---

[29] *See* David J. Bier, *New Ban Bars Half of Legal Immigrants, Even Citizens' Spouses & Kids*, Cato Blog (Jan. 14, 2026), https://www.cato.org/blog/new-ban-hits-half-legal-immigrants-even-citizens-spouses-kids; Mariel Ferragamo, *A Guide to the Countries on Trump's Travel Ban List*, Council on Foreign Relations (Jan. 14, 2026), https://www.cfr.org/articles/guide-countries-trumps-travel-ban-list; Ctr. on Budget & Pol'y Priorities, *State Department Unjustifiably Invokes "Public Charge" to Freeze Immigrant Visa Processing for 75 Countries* (Jan. 21, 2026), https://www.cbpp.org/blog/state-department-unjustifiably-invokes-public-charge-to-freeze-immigrant-visa-processing-for; *see also*, *e.g.*, Matthew Lee, *supra* n. 27; Simon Lewis & Humeyra Pamuk, *supra* n. 28.

compels consular officers to refuse a visa without a case-specific admissibility determination, stripping officers of their statutory discretion and converting INA § 221(g) into a categorical suspension mechanism the statute does not provide.

77.     Neither 8 U.S.C. § 1201(g) nor 8 U.S.C. § 1182(a)(4) (nor their implementing regulations) authorizes the government to refuse visas indefinitely for broad, categorical reasons—and certainly not based on nationality alone. Yet that is precisely what Defendants are ordering consular officers to do (Ex. A; Ex. B, ¶2), in direct violation of the INA's prohibition that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). The DOS Blanket Visa Ban unlawfully replaces that statutorily mandated individualized inquiry with a blanket, nationality-based embargo.

78.     The DOS Blanket Visa Ban also contradicts Congress's deliberate decisions to maintain the longstanding definition of public charge and to ensure that eligible immigrants and mixed-status families have access to critical noncash services.

### E.    Recent Developments

79.     On January 27, 2026, 75 Members of Congress sent a letter to Defendant Rubio and DHS Secretary Kristi Noem, condemning the Administration's "unilateral move to pause issuing all immigrant visas for 75 countries." *See* Jan. 27, 2026, Ltr. from Members of Congress to Secretary Rubio and Secretary Noem, attached hereto as Exhibit [D]. The Members noted that it was "stunning that such a drastic policy change impacting hundreds of thousands of people a year would be announced not only by tweet, but also without offering any meaningful information about the 'pause.'" *Id*. They declared that "[t]his discriminatory policy will have a devastating impact on our constituents." *Id*.

80.     On January 28, 2026, in *Sangster v. Rubio*, Case No. 3:25-cv-00447-ART-CSD

(D. Nev. Aug. 22, 2025), a case filed on behalf of three plaintiffs, a mother and two adoptive

daughters from the Democratic Republic of the Congo adversely impacted by the DOS's Blanket

Visa Ban, the U.S. District Court for the District of Nevada determined that the DOS's Ban was

likely arbitrary and capricious, an abuse of discretion, and contrary to law under the APA. *See id.,*

ECF No. 21, Order Granting Pls.' Motion for a Temporary Restraining Order (Jan. 28, 2026),

attached hereto as Exhibit [E]. The district court also determined that DOS likely issued the Ban

without the required notice and comment procedures an in excess of the Secretary of State's

authority. *Id.* at pp.10-15. The court granted the plaintiffs' motion for a temporary restraining

order and enjoined the Secretary of State from refusing to process the plaintiffs' visa applications.

*Id.* at p.16.[30]

## THE CONSULAR RULES ARE UNLAWFUL

### A. The Consular Processing Cable Radically Alters the Historical Definition of "Public Charge" to Include Many Benefits That Provide Support to Working People.

81.     Defendants' radical new approach to public charge determinations in the Consular

Processing Cable, which newly authorizes officers to consider "any other form of public

assistance, social welfare, or private charity" used to "help low-income people," whether used in

the United States or anywhere else, radically expands the public charge ground of inadmissibility,

which, as confirmed by multiple courts, has long been narrowly limited to the likelihood that a

person will receive recurring cash assistance and government-funded long-term institutional care.

(Exhibit C ¶ 29) Defendants' new definition goes beyond even the now defunct 2019 Public

Charge Rule, which expanded benefits consideration to SNAP, Medicaid, and federal housing

---

[30] The court's order was limited to the plaintiffs in that case, did not afford the full relief sought by Plaintiffs in this case, and did not address all the causes of action raised here.

assistance. The Cable references these categories of benefits, but notes that the benefits subject to consideration extends beyond them. *See id.* ("This includes but is not limited to housing assistance, food assistance (including the use of private food banks), and medical assistance.").

82.    By redefining "public charge" in this way, the Consular Processing Cable will drastically increase the number of persons potentially denied admission or entry on that basis.[31]

83.    Three of the most salient public benefits programs—SNAP, Medicaid, and federal housing assistance—are widely used by working families, like several of the individual plaintiffs herein, to supplement their other income. And they are, by design, available to people with incomes well above the poverty line and, in some cases, to people with significant assets. For example, the SNAP program provides only limited supplemental assistance, requires many recipients to meet strict work requirements, and excludes many significant assets from the eligibility determination.[32] Similarly, many Medicaid recipients work, and in many states, Medicaid is available to people with no resources cap and with earnings above the poverty level, precisely because access to affordable health care promotes people's ability to obtain and maintain employment.[33] And federal housing assistance programs—including public housing and

---

[31] *See* Morgan Phillips, *Trump Admin Enforces 'Public Charge' Visa Rules at US Embassies Worldwide*, Fox News (Nov. 6, 2025), https://www.foxnews.com/politics/trump-state-department-orders-global-visa-crackdown-under-revived-public-charge-rule ("Although both agencies apply the same immigration law, the State Department's guidance governs consular officers overseas, giving them broad discretion to deny visas on public charge grounds."); Migration Policy Institute Post, *The Trump administration's announcement that it will pause all issuance of permanent visas for would-be immigrants from 75 countries could dramatically reduce permanent legal immigration to the U.S.*| Migration Policy Institute, LinkedIn, https://www.linkedin.com/posts/migration-policy-institute_the-trump-administrations-announcement-that-activity-7417634959739416576-F9_I?utm_source=share&utm_medium=member_desktop&rcm=ACoAAAVfQEwBwtF65Xg1w6dMOXTB9pyXWIVWaDE; *see also* Bier, *supra* n. 29.

[32] *See SNAP Eligibility*, Food and Nutrition Service (Sept. 30. 2025), U.S. Dep't of Agriculture, https://www.fns.usda.gov/snap/recipient/eligibility; *see also A Quick Guide To SNAP Eligibility and Benefits*, Ctr. On Budget and Pol'y Priorities (Oct. 3, 2025), https://www.cbpp.org/research/food-assistance/a-quick-guide-to-snap-eligibility-and-benefits.

[33] Kaiser , Medicaid Income Eligibility Limits for Adults as a Percent of the Federal Poverty Level (Jan. 2025), https://www.kff.org/affordable-care-act/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level/?; Renuka Tipirnenim et al., *Longitudinal trends in enrollees' employment and student*

Section 8 programs—support work by enabling low income households to live in stable homes.

Indeed, of the non-elderly, non-disabled households receiving federal housing assistance,

approximately sixty percent are headed by working adults.[34] That number is even higher for

households containing noncitizens, where approximately three-quarters of non-elderly, non-

disabled households report earning wages.[35]

84.    Early judicial interpretations of the original public charge provisions confirmed

that Congress intended the public charge exclusion not to apply broadly to noncitizens who relied

on any outside assistance, but to instead require a substantial level of lengthy or permanent

dependence on the public for subsistence. *See Gegiow v. Uhl*, 239 U.S. 3, 9-10 (1915)*; Howe v.

United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917).

85.    Consistent with this narrow understanding of public charge, federal immigration

officials in the early 20th century excluded only a minuscule percentage of arriving immigrants

on public charge grounds. According to DHS's own data, of the approximately 21.8 million

immigrants seeking admission to the United States as lawful permanent residents between 1892

and 1930, approximately 205,000—less than one percent—were deemed inadmissible as likely to

become public charges. The same has been true in subsequent years: between 1931 and 1980 (the

---

*status after Medicaid expansion*, BMC Health Serv. Res. (February 19, 2022),
https://pmc.ncbi.nlm.nih.gov/articles/PMC8857876/ ("Medicaid expansion, absent a community engagement requirement, was associated with increased employment and related activities."); Minal R. Patel, et al., *Employment and Health Burden Changes Among Medicaid Expansion Enrollees*, JAMA Health Forum (October 31, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12579339/ ("Medicaid expansion beneficiaries reported employment gains across health burden. Among those unemployed in 2016, those with improved health burden were more likely to experience employment gains."); Ohio Dep't of Medicaid, Ohio Medicaid Group VIII Assessment 4 (August 2018), https://medicaid.ohio.gov/wps/wcm/connect/gov/2468a404-5b09-4b85-85cd-4473a1ec8758/Group-VIII-Final-Report.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_K9I401S01H7F40QBNJU3SO1F56-2468a404-5b09-4b85-85cd-4473a1ec8758-nAUQnlt ("A large majority of [Medicaid] enrollees (83.5%) reported that Medicaid made it easier to work; most unemployed enrollees (60.0%) reported that Medicaid made it easier to look for work.")

[34] *See* Ctr. for Budget and Pol'y Priorities, *Federal Rental Assistance Fact Sheets* (Jan. 23, 2025), https://www.cbpp.org/research/federal-rental-assistance-fact-sheets#US.

[35] *Id.*

last year for which DHS published such data), only 13,798 intending immigrants were excluded

on public charge grounds out of more than 11 million immigrants admitted as legal permanent

residents—an exclusion rate of approximately one-tenth of one percent.[36]

86.    The original interpretation of "public charge" by Congress and the courts persisted

in the mid-twentieth century, largely through decisions of the Board of Immigration Appeals ("the

Board") and the Attorney General, which narrowly limited the circumstances in which an

immigrant could be deported or denied admissibility or adjustment of status on public charge

grounds.

87.    In the leading case of *Matter of B*-, 3 I. & N. Dec. 323, 324 (BIA 1948), the Board

held that "acceptance by an alien of services provided by a State . . . to its residents, services for

which no specific charge is made, does not in and of itself make the alien a public charge."

Rather, the Board held, a noncitizen was removable as a public charge only if (1) the noncitizen

was "charged" for receipt of a public benefit under the law, (2) a demand for payment was made,

and (3) the noncitizen or a family member failed to pay. *Id.* at 326. *Matter of B*- has remained the

law for more than seventy years.

88.    In 1952, four years after *Matter of B*- was decided, Congress reenacted the public

charge provision in the Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163

(the "1952 Act," also known as the McCarran-Walter Act). The 1952 Act did not define the term

or purport to change existing administrative interpretations. *See* 1952 Act, 66 Stat. 163, 183.

---

[36] *See* DHS, *Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016*, (Dec. 18, 2017), https://www.dhs.gov/immigrationstatistics/yearbook/2016/table1; INS, *2001 Statistical Yearbook ofthe Immigration and Naturalization Service* 258 (2003), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2001.pdf; *see also* Mae Ngai, Impossible Subjects: Illegal Aliens and the Making of Modern America 18 (2004). Similarly, during the Great Depression, the INS did not consider immigrants who were "victims of the general economic depression" deportable simply because they received public relief. *Id.* at 72.

89.    This seminal administrative decision and its progeny continued to narrowly define "public charge" despite the increasingly broad array of public benefits that had become available for low-income people since the 1882 Immigration Act, including the Aid to Dependent Children program (1935), public housing (1937), food stamps (1964), Medicaid (1965), Supplemental Security Income (1972), and Section 8 housing vouchers (1974).[37]

90.    In the past forty years, Congress has repeatedly confirmed the public charge provisions of the INA without material change. Congress left the provisions virtually unchanged when passing the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. The legislative history of the 1990 Act recognized that something more than mere receipt of benefits was required to label an immigrant as a public charge.[38] In the debate leading to enactment of the 1990 Act, one member of Congress characterized someone who "would become a public charge" as a person "who gets here who is helpless."[39]

91.    In 1996, Congress passed two major pieces of legislation: the Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104-193, 110 Stat. 2105 ("PRWORA," colloquially called the "Welfare Reform Act") and the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"). Neither statute purported to redefine "public charge" or to alter the settled rule that mere receipt of means-tested benefits is not a basis for branding someone a public charge. In fact, PRWORA and

---

[37] The holding in *Matter of B-* that mere receipt of public benefits does not render a person a public charge has been applied in the context of admissibility as well as removal. *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 422 (BIA 1962) (collecting cases); *see also Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974) ("The fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge."); *Matter of Harutunian*, 14 I. & N. Dec. 583, 590 (BIA 1974) (finding that a 70-year-old noncitizen who was reliant on state old age assistance was inadmissible on public charge grounds where she "lacks means of supporting herself, . . . has no one responsible for her support and . . . expects to be dependent for support on old age assistance ...... ").

[38] A 1988 House report explained that courts associated the likelihood of becoming a public charge with "destitution coupled with an inability to work," H. Report Series 7, 100th Cong., 2d Sess., at 121 (Sept. 1988) (citing *Gegiow*, 239 U.S.).

[39] 135 Cong. Rec. S14,291 (July 12, 1989) (statement of Mr. Simpson).

subsequent legislation confirmed that certain classes of immigrants remained eligible to receive federally funded government benefits.[40] PRWORA also authorized states to choose to cover a broader group of noncitizens in state or local public benefits programs. 8 U.S.C. § 1621(d). And IIRIRA—which Congress passed the month after PRWORA—codified the existing standard for determining whether a noncitizen is inadmissible as a public charge. Pub. L. No. 104-208 § 531, 110 Stat. 3009 (1996) (amending 8 U.S.C. § 1182).[41]

92.     In the debate leading up to IIRIRA's enactment, Congress specifically considered and rejected a proposal to label as a public charge anyone who received certain means-tested public benefits, including Aid to Families with Dependent Children, Medicaid, food stamps, SSI, and other programs "for which eligibility for benefits is based on need." Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996). The express purpose of this proposed provision was to overturn the settled understanding of "public charge." See 142 Cong. Rec. S4401, S4408–09 (1996). That effort was met with substantial criticism and failed. *See, e.g.,* S. REP. 104-249, 63–64 (1996) (statement of Sen. Leahy); 142 Cong. Rec. S11872, S11882 (statement of Sen. Kyl).

---

[40] These benefits included Medicaid, Food Stamps (now SNAP), Supplemental Security Income ("SSI") and Temporary Assistance for Needy Families ("TANF," a form of cash assistance), the Children's Health Insurance Program ("CHIP"), and the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). *See generally* 8 U.S.C. §§ 1612–1613, 1615.

[41] In legislation following enactment of PRWORA, Congress expanded the availability of certain benefits, particularly SNAP and Medicaid, to qualified immigrants. *See* Agricultural Research, Education and Extension Act of 1998 (AREERA), Pub. L. No. 105-185, 112 Stat 523, June 23, 1998, (restoring eligibility for certain elderly, disabled and child immigrants who resided in the United States when PRWORA was enacted); The Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171,116 Stat 134, May 13, 2002 (restoring eligibility for food stamps (now SNAP) to qualified immigrant adults who have been in the United States at least five years,  and immigrants receiving certain disability payments and for children, regardless of how long they have been in the country); Children's Health Insurance Reauthorization Act of 2009 (CHIPRA), Pub. L. No. 111-3, 123 Stat 8, February 4, 2009 (providing an option for states to cover lawfully present immigrant children and pregnant women, regardless of their date of entry into the U.S., under the federal Medicaid and Children's Health Insurance Program (CHIP) matching programs).

93.     IIRIRA thus specifically rejected this redefinition of "public charge" and retained

the longstanding INA public charge policy relating to admission and status adjustment. *See* 8

U.S.C. § 1182(a)(4).

94.     In 2013, Congress again rejected a proposed amendment to redefine public charge

to include anyone receiving means-tested public benefits when the Senate debated the proposed

Border Security, Economic Opportunity, and Immigration Modernization Act, a bill that sought to

create a path to citizenship for noncitizens who could show they were not "likely to become a

public charge." S. 744, 113th Cong. § 2101 (2013).[42]

95.     Congress has repeatedly rejected efforts to alter the definition of public charge

along the lines DOS appears to adopt in its reference to vague "indications that nationals from

these countries having sought public benefits in the United States." (Ex. A; Ex. B. ¶3). In so

doing, it has demonstrated its clear intent to continue to apply the historical definition of public

charge that has endured for over 140 years.

### B. The Consular Rules Violate the Administrative Procedure Act. (APA), 5 U.S.C. § 706(2)(A)-(D)

#### i. The Consular Rules Violate the Procedural "Notice and Comment" Requirements of the APA.

96.     The DOS Blanket Visa Ban and DOS Visa Ban Cable violate the APA because

they were promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

DOS's haphazard process for promulgating dramatic changes to the immigration system is

deficient because DOS issued the indefinite categorical 75-country DOS Blanket Visa Ban

without any opportunity for notice and comment—despite its unprecedented scope and sweeping

---

[42] During committee deliberations, Senator Jeff Sessions sought to amend the definition of public charge to include receipt of "noncash employment supports such as Medicaid, the SNAP program, or the Children's Health Insurance Program."  S. Rep. No. 113-40, at 42 (2013). The committee rejected the proposed amendment by voice vote. *Id.*

legal consequences—absent any permitted exception to the notice-and-comment procedures required by the APA.

97.    Labeling the Ban a "pause" does not alter its legally binding effect on applicants and consular officers alike. It is a substantive rule and final agency action determining the rights and obligations of applicants and consular officers and therefore must comply with the APA. (*See* Exs. A & B.)

98.    Indeed, DOS announced the Blanket Visa Ban on January 14, 2026, as "U.S. Visas News" on the DOS website with absolutely no notice or opportunity for comment. (Ex. A.) The general public was alerted via press reports and a screenshot of a DOS Visa Ban Cable apparently issued the same day, which gave more information about how the Ban would operate in practice and bind consular officers, but did not provide any reasoned explanation or justification.[43] (Ex. B.) DOS provided no opportunity for comment on what are unquestionably final agency actions that impose direct and material legal consequences on those affected—quintessential matters that should be subject to proper rulemaking, as they would if such changes were made through any other vehicle, including the FAM.

99.    Likewise, the Consular Processing Cable was not externally published. It was not published for notice and comment. Instead, upon information and belief, it was circulated directly to consular officers around the world.

### ii. The Consular Rules Are Contrary to Law under the APA, 5 U.S.C. § 706(2)(A)-(C).

100.    *First*, the Consular Rules impose rules that contravene the definition of public charge as used in the INA. As alleged above, the Consular Processing Cable explicitly directs

---

[43] Ken Klippenstein, *U.S. Freezes Visas to 75 Countries* (Jan. 14, 2026), https://www.kenklippenstein.com/p/trump-freezes-visas-to-75-countries.

officers to consider benefits use beyond cash assistance and government-funded long-term institutional care, newly extends the definition to include charity as a negative factor, and extends the scope of benefits use beyond the United States to anywhere in the world. *See supra* ¶¶ 59-81, Likewise, as alleged above, *see supra* ¶¶ 95-99, the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable's vague references to "indications that nationals from these countries having sought public benefits in the United States," (Ex. A; Ex. B, ¶3), and "that immigrants must be financially self-sufficient and not be a financial burden to Americans" in order "to ensure that immigrants from these high-risk countries do not utilize welfare in the United States or become a public charge," (Ex. A), appear to refer to individuals who may at some time in the future receive even a minimal amount of noncash public benefits. The adoption of such a "test" is contrary to the definition of "public charge" that has endured for 140 years: an individual primarily dependent on the government for subsistence. The statutory meaning of the term "public charge" is evident from, among other things: (i) the plain meaning of the phrase, (ii) the judicial and administrative interpretation of the term since it first became part of federal immigration law; (iii) Congress' approval of that interpretation in repeatedly reenacting the statute; and (iv) Congress' rejection of efforts to expand that interpretation in the manner DOS now seeks to accomplish.

101.    Accordingly, the Consular Rules are not in accordance with the law and exceed DOS's statutory authority. 5 U.S.C. §§ 706(2)(A), (C). Further, even without expressly defining "public charge" in contravention of 8 U.S.C. § 1182(a)(4), the Blanket Visa Ban implements the public charge provision to deny admission to intending immigrants based on an overbroad, erroneous interpretation inconsistent with the INA. Specifically, the Blanket Visa Ban substitutes blanket refusal of all covered visas for the case-by-case considerations and criteria that

Congress directed consular officers to rely on in adjudicating visas.  Because the Ban

categorically refuses admission to all immigrants on the basis of nationality or "based on an

indication of nationals from these countries having sought public benefits in the United States" or

that they may be a "high risk for becoming a public charge," without any individualized

assessments (Ex. B, ¶¶2 &3), it expressly contravenes acts of Congress, and is contrary to law.

102.    *Second,* the Blanket Visa Ban and Blanket Visa Ban Cable directly conflicts with 8

U.S.C. § 1182(a)(4) by seeking to effectively erase the statutorily mandated individualized

evaluation, excluding all of the other statutorily mandated factors, and arbitrarily adopting one

sole, dispositive factor: nationality.

103.    According to the contemporaneously posted Blanket Visa Ban Cable implementing

the Ban, consular posts must continue accepting and interviewing applicants but are categorically

prohibited from issuing immigrant visas during the indefinite pause and must refuse them under

codified at 8 U.S.C. § 1201(g) on the basis of nationality. (Ex. A; Ex. B., ¶2.)

104.    As noted *supra* at ¶¶42-43, 71-72 & 76-77, however, 8 U.S.C. § 1201(g) mandates

that a consular officer may refuse a visa only if the officer, based on the individual application or

the applicant's documents, believes the person is legally ineligible under one of the specific

grounds listed in the INA, such as the health-related grounds, certain criminal issues, or national-

security concerns. If someone is denied solely because of the "public charge" ground under 8

U.S.C. § 1182(a)(4), a visa can still be issued if the person provides a financial bond approved by

the government. 8 C.F.R. § 213.1.

105.    *Third*, the Consular Rules also contravene PRWORA, the ACA and CHIPRA,

because all three statutes authorize and attempt to encourage immigrant families' access to the

public benefits and health care that the DOS Visa Ban and Visa Ban Cable may now seek to

categorically exclude, and the use of which the Consular Processing Cable penalizes.[44] All three statutes express and reflect Congress' clear intent to expand access to meaningful and affordable health insurance coverage to immigrants who are lawfully present in the United States, along with U.S. citizens. The Consular Rules frustrate this intent.

### iii. The Consular Rules are Arbitrary and Capricious

106.    Defendants' Consular Rules are arbitrary and capricious for multiple reasons, including that the DOS has failed to articulate a reasoned explanation for its decision to issue each of the Consular Rules; has relied on factors which Congress has not intended it to consider; entirely failed to consider important aspects of noncitizens' use of government benefits and available means to address this issue; offered an explanation for Defendants' decisions that runs counter to the evidence before the agency and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise; and has departed from prior agency policy without explanation.

107.    Defendants have also failed to explain their departure from the statutory individualized totality of circumstances public charge test codified at 8 U.S.C. § 1182(a)(4) and decades of consistent statutory interpretation; Defendants have similarly failed to explain what authority they relied upon in taking such actions despite the prohibition in 8 U.S.C. § 1201(g) (*see* Ex. B, at 2, ¶ 4, referencing INA § 221(g), codified at 8 U.S.C. § 1201(g)), which does not permit categorical visa refusals on the basis of nationality or the implementation of an indefinite "pause" untethered to a case-specific inadmissibility determination.

---

[44] In 2025, Congress passed a Budget Reconciliation bill, An Act To provide for reconciliation pursuant to title II of H. Con. Res. 14., P.L. 119-21 (July 4, 2025), that limited immigrant eligibility for several public benefits, but declined to alter the public-charge statute or tamper with its legal standards. Congress also preserved ACA eligibility for certain groups (including COFA residents and specified Cuban and Haitian nationals) and retained the state option to extend Medicaid and CHIP to additional lawfully residing children and pregnant individuals, some of whom would now be impacted by Defendants' attempt to rewrite the longstanding definition of public charge under the statute.

108. The Blanket Visa Ban and Visa Ban Cable do not explain why the case-by-case statutory framework for assessing public charge inadmissibility, as established by Congress, is insufficient to satisfy their purported goals. The Blanket Visa Processing Ban conspicuously omits an explanation as to why a categorical, indefinite bar to immigrant visa processing for nationals of 75 countries is necessary to achieve Defendants' purported goals. For example, the statutory mechanism established by Congress provides for case-by-case assessment by a consular officer of whether an immigrant visa applicant may become a public charge in the United States, and further provides that even if an applicant is likely to become a public charge, the consular officer may nonetheless grant the visa "if such alien is otherwise entitled to receive a visa or other documentation, upon receipt of notice by the consular officer from the Attorney General of the giving of a bond or undertaking providing indemnity as in the case of aliens admitted under section 1183 of this title." 8 U.S.C. § 1201(g). The Blanket Visa Ban and Visa Ban Cables do not address or even acknowledge why the statutory bond or indemnity provisions in 8 U.S.C. § 1201(g) are insufficient to address the purported problem Defendants purportedly seek to solve.

109. The Blanket Visa Ban and Visa Ban Cable offer no evidence or reasoned justification for selecting the affected 75 countries or why the ban must be indefinite in duration. DOS has asserted, without evidence, that there is an "indication of nationals from these countries having sought public benefits in the United States" and that nationals from these countries are "high risk for becoming a public charge." (Ex. B, ¶¶2 & 3.) Defendants fail to identify, let alone discuss, country-specific data for each of the 75 countries whose nationals the Blanket Visa Ban alleges are likely to become public charges upon being admitted to the United States. The Blanket Visa Ban and Visa Ban Cable are devoid of *any* reference to any instance of *any* visa applicant becoming a public charge, let alone specific categories of visa applicants.

110.    In fact, many of the 75 countries are "high family admissions countries"[45] for immigration to the United States. Only 1.6% of a group of immigrants from high family admissions countries received public assistance income between 2021 and 2023.[46] Immigrants from these countries have high labor force participation rates and significant earnings growth.[47] The vast majority of immigrants, including from the 75 countries, do not receive any type of welfare benefits, including SNAP benefits (which are not cash benefits relevant to public charge).[48] Therefore, the assertion that nationals from these countries are "high risk for becoming a public charge" is not only unsupported but incorrect.

111.    The Blanket Visa Ban and Visa Ban Cable are devoid of any explanation that could justify a wholesale, indefinite suspension of *all* immigrant visa processing for the covered countries, as opposed to a more limited suspension for nationals of some countries or applicants for specific types of immigrant visas. Nor do Defendants explain why all categories of immigrant visa applicants are equally likely to become public charges.

112.    The Defendants failed to consider or promulgate less restrictive alternatives to the Blanket Visa Ban and Visa Ban Cable that would comply with the INA's public charge mandate and existing statutory mechanisms in 8 U.S.C. §§ 1182(a)(4), 1201(g), and 1152(a)(1)(A), including the requirement of individualized case-by-case adjudication.

---

[45] Mark Regets, *The Economic Advancement, Adaptation, and Integration of Family Immigrants in America* at 2, Nat'l Found. for Am. Policy (Nov. 2025), https://nfap.com/research/new-nfap-policy-brief-the-economic-advancement-adaptation-and-integration-of-family-immigrants-in-america/. ("High family admissions countries" are Antigua, Barbuda, Bahamas, Bangladesh, Barbados, Belize/British Honduras, Cambodia, Cape Verde, Costa Rica, Czechia, Dominica, Dominican Republic, Ecuador, El Salvador, Grenada, Haiti, Honduras, Hong Kong, Jamaica, Jordan, Lebanon, Lithuania, Mexico, Nicaragua, Pakistan, Panama, Paraguay, Peru, Philippines, Poland, Portugal, Syria, Tonga, Trinidad and Tobago, Uruguay, Vietnam and Yemen.")

[46] *Id.* at 10.

[47] *Id.* at 5–7.

[48] Dallin Overstreet, *Immigrant Welfare Participation by the Numbers*, PoliMetrics (Jan. 5, 2026), https://polimetrics.substack.com/p/immigrant-welfare-participation-by. As this article notes, only Afghanistan has a welfare participation rate of over 50%, but that is because Afghan immigrants are overwhelmingly refugees who receive assistance through the United States' refugee resettlement program.

113.    In issuing the Blanket Visa Ban and Visa Ban Cable, Defendants also considered factors that Congress did not authorize. Congress provided that public charge inadmissibility determinations are to be made case by case, considering "age, health, family status, assets, resources, and financial status," among other factors. 8 U.S.C. § 1182(a)(4)(B)(i). Congress further provided that in addition to those factors, "the consular officer or the Attorney General may also consider any affidavit of support under section 1183a of this title for purposes of exclusion under this paragraph." *Id*. § 1182(a)(4)(B)(ii). Congress also provided that individuals found likely to be public charges but otherwise entitled to receive a visa may still receive a visa if they post "bond or undertak[e] providing indemnity as in the case of aliens admitted under section 1183 of this title." 8 U.S.C. § 1201(g).

114.    Congress did not provide that "additional screening and vetting tools, policies, and operations to more accurately identify any IV [immigrant visa] applicant likely to become a public charge," (Ex. A at 1; Ex. B. ¶4), are a basis to find someone inadmissible as a public charge or to refuse issuance of a visa under 8 U.S.C. § 1201(g) to someone otherwise eligible to receive a visa.

115.    In issuing the Blanket Visa Ban and Visa Ban Cable, Defendants failed to consider the reliance interests of applicants, petitioners, U.S. families,[49] and employers[50] who have submitted visa applications and paid necessary fees with the reasonable expectation that Defendants would not arbitrarily and capriciously change or halt their procedures.

---

[49] *E.g.*, David J. Bier, *supra,* n. 29 ("[T]his ban will target even close family members of US citizens and legal permanent residents. Approximately 100,000 of their spouses and minor children will be barred by this policy, one of the most extreme legal immigration policies in US history.")

[50] *See* Drishti Pillai & Samantha Artiga, *Potential Impact of the Federal Pause on Immigrant Visas From 75 Countries on the U.S. Health Care Workforce*, KFF (Jan. 29, 2026), https://www.kff.org/immigrant-health/potential-impact-of-the-federal-pause-on-immigrant-visas-from-75-countries-on-the-u-s-health-care-workforce/ (observing that foreign-Born workers from 69 of the 75 countries impacted by the DOS Blanket Visa Ban comprise nearly one in ten U.S. health care workers).

116.    Defendants also failed to provide any acknowledgment or explanation for their substantial alterations to prior, longstanding agency positions.

117.    In issuing the DOS Blanket Visa Ban and Visa Ban Cable, Defendants failed to consider or address significant harms to the U.S. economy, as well as to state and local economies, that may be directly and indirectly caused by the indefinite suspension.[51]

118.    In issuing the Blanket Visa Ban and Visa Ban Cable, Defendants provided no criteria or articulable standard for when or how the suspension will end. DOS ordered consular officers to categorically refuse visas—even where individual officers have determined that the applicants are unlikely to become a public charge—"while the Department develops additional screening and vetting tools, policies, and operations to more accurately identify any IV applicant likely to become a public charge." (Ex. B. ¶ 4). DOS does not identify any changed circumstances that would necessitate categorical denial for an indefinite duration, and it imposes final agency action before proposing any legislative rulemaking for notice and comment.

119.    In promulgating the Ban and Visa Ban Cable, Defendants rely on conclusory assertions about "wealth extraction," without explanation or articulable evidence, methodology, or defined criteria. (Ex. A.)

---

[51] *Id.* ("[I]mmigrants reduce the deficit by paying more taxes than they use in benefits. [The DOS Blanket Visa Ban] will also reduce economic growth, increasing America's debt-to-GDP."); Alex Nowrasteh, Sarah Eckhardt & Michael Howard, *The Fiscal Impact of Immigration in the United States*, Cato Institute (Mar. 21, 2023), https://www.cato.org/white-paper/fiscal-impact-immigration-united-states#executive-summary ("Immigrants have a more positive net fiscal impact than that of native-born Americans in most scenarios in the Updated Model and in every scenario in the Cato Model…."); David J. Bier, *Manhattan Institute's "Lifetime Fiscal Impact of Immigrants" Report Shows Upside to Immigration*, Cato Institute (Nov. 13, 2024); *Trump's 2025 Travel Ban: Who Is Affected and What It Could Cost the U.S.*, Am. Immigr. Council (Aug. 6, 2025), https://www.americanimmigrationcouncil.org/report/trump-2025-travel-ban/   (Aug. 6, 2025)  ("At least 298,600 nationals of the 19 countries named in the most recent travel ban arrived in the United States in 2022. These new arrivals made significant contributions to the U.S. economy. In 2023 alone, households led by these recent arrivals earned $3.2 billion in household income, paid $715.6 million in federal, state, and local taxes, and held $2.5 billion in spending power.")

120.    The Ban and Visa Ban Cable are also arbitrary and capricious because they have a racially disparate impact on immigrants of color seeking immigrant visas and their U.S. citizen and lawful permanent resident family members seeking to reunite with them in the U.S.: over 85 percent of the countries covered by the Ban are non-European countries with significant nonwhite populations; the small number of European countries that are listed are southeastern European nations with significant ethnic minority populations.[52] (*See* Exs. A–B).

121.    The Consular Processing Cable is also arbitrary and capricious for multiple reasons, including, among other things, because Defendants failed to provide a reasoned explanation for the changed standards announced in the Consular Processing Cable, failed to consider reliance interests of individuals and families who, in the past, participated in government programs or received charitable donations based on their well-founded understanding that such actions would not bear on a public charge determination, and because the changed standards in the Consular Processing Cable are  a pretext for Defendants' goal of reducing lawful immigration.

122.    Also, the Consular Processing Cable's mandate to consider the "applicant's current or past use of any other form of public assistance, social welfare, or private charity either in the United States or elsewhere intended to help low-income people," (Ex. C. ¶ 29), directly contradicts the FAM, which instructs that "[n]either the past nor possible future receipt of such non-cash or supplemental assistance is relevant when determining whether an applicant is likely to become a public charge." 9 FAM 302.8-2(B)(1)(c). Further, the Consular Processing Cable's direction that consular officers "should consider whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance," (Ex. C ¶ 36), directly contradicts 8 C.F.R. § 213a.2(c)(2)(i)(C)(1), which provides conclusively that "[t]he

---

[52] *See* Ex. A; *see also* Bier, *supra* n. 29.

sponsor's ability to meet the income requirement will be determined based on the sponsor's household income." Also, its direction that consular officers "should consider whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance," (Ex. C ¶ 36), directly contradicts 8 CFR § 213a.2(c)(2)(ii), which enumerates the only factors to be considered: (A) income, (B) number of persons to be supported, and (C) sufficiency of income. In turn, 8 C.F.R. § 213a.2(c)(2)(i)(C)(1) provides conclusively that "[t]he sponsor's ability to meet the income requirement will be determined based on the sponsor's household income," without any allowance for consideration of prior use of public assistance. And its charge that a "sufficient [I-864 Affidavit of Support] that meets the minimum financial requirements is a threshold condition and one factor (but not the only) in the totality of circumstances you must consider to determine if an applicant is likely at any time to become a public charge," (Ex. C ¶ 30) again directly conflicts with the FAM, which informs consular officers that "a properly filed, non-fraudulent Form I-864 in those cases where it is required, is normally sufficient to meet the INA 212(a)(4) requirements and satisfy the 'totality of the circumstances' analysis," 9 FAM 302.8-2(B)(3)(a)(2).

### iv. The Consular Rules Are Based on Discriminatory Animus Against Immigrants of Color and Have a Racially Disparate Impact on Nonwhite Immigrants.

123. The Trump Administration's immigration policy has been characterized by consistently hostile regulatory and sub-regulatory actions justified by false and inflammatory rhetoric and ultimately racist motivations. The significant changes the Administration has proposed, and in many cases implemented, to transform the family-based immigration system[53]

---

[53] *See* Muzaffar Chisti, Kathleen Bush-Joseph, & Colleen Putzel-Kavanaugh, *Unleashing Power In New Ways: Immigration in the First Year of Trump 2.0*, Migration Information (Jan. 13, 2026), https://www.migrationpolicy.org/article/trump-2-immigration-1st-year.

do not represent neutral policy choices, but rather a radical reversal of the nation's immigration laws—often in clear violation of Congressional mandate—in order to exclude immigrants from predominately nonwhite countries from admission and lawful status.

124.    High-level administration officials subscribe to a conspiratorial "Great Replacement Theory" or "White Replacement Theory," which falsely imagines there has been an orchestrated plot to replace white Americans with nonwhite immigrants—a theory that animates this and other racist-exclusionary immigration policies. Recent recruitment videos for Immigration and Customs Enforcement feature white supremacist slogans such as "Defend the Homeland" (with heroic depictions of white men from a bygone era) and "We Will Have Our Homeland Again," parroting a mantra from the white supremacist Proud Boys.[54]

125.    In pursuit of this broader racially discriminatory aim, the Ban overwhelmingly targets nonwhite and limited-English-proficient immigrants from nations across Africa, Asia, Latin America, and the Caribbean. No reasonable, factual, or empirical basis has been offered for why nationals of these specific countries pose any heighted public charge "risk." *See* ¶¶126-148, *infra.*

126.    As noted *supra* at ¶¶44, 77 & 112, the INA prohibits categorical nationality or country-level discrimination in the issuance of immigrant visas, and "no person shall receive any

---

[54] On January 9, 2026, "the White House and the Department of Homeland Security jointly posted a recruitment ad for Immigration and Customs Enforcement on Instagram, Facebook and X, overlaid with the words 'WE'LL HAVE OUR HOME AGAIN'" and playing the song's chorus "[t]hat's also the name of a song, written by members of a self-described 'pro-White fraternal order,' that has been embraced by the Proud Boys and other white-nationalist groups." Evan Gorelick, *Administration Social Media Posts Echo White Supremacist Messaging*, NY Times (Jan. 27, 2026), https://www.nytimes.com/2026/01/27/us/politics/white-supremacy-trump-administration-social-media.html. On January 10, 2026, the Department of Labor posted a video with the caption "One Homeland. One People. One Heritage," which intentionally echoes the Nazi slogan "*Ein Volk, ein Reich, ein Führer*" ("One people, one realm, one leader"). *Id.* On December 31, 2025, the White House posted a photo of Trump with the word "remigration," which is "a decades-old European concept centered on the expulsion of nonwhite people and immigrants deemed 'unassimilated,'" and which Germany's "far-right Alternative für Deutschland party secretly met with neo-Nazis to discuss plans to implement . . . ." *Id.*

preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

127.    Defendants' stated rationale for issuing the DOS Blanket Visa Ban mirrors earlier rhetoric rooted in racialized stereotypes and debunked narratives portraying immigrants and people of color as "taking welfare" and "extracting wealth," (Exs. A & B) and aligns with prior efforts by the Trump Administration to restrict immigration from nonwhite countries. Courts have repeatedly recognized similar statements and patterns of action as sufficient to allege discriminatory intent.[55]

128.    Defendants' stated rationales, to ensure that immigrants are "self-sufficient," and to guard against "wealth extraction" and "use of public benefits," (Exs. A & B),[56] are a pretext for discrimination against immigrants from predominately nonwhite countries, even those who are complying with the country's long-standing rules for obtaining lawful permanent residence.[57] The DOS Blanket Visa Ban, Visa Ban Cable and any Implementing Actions are neither rational nor tailored to serve any compelling government interest.

129.    Individually and together, the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable target people from countries where most residents are persons of color. The Ban and DOS

---

[55] *lan Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding court erred in finding term "boy" alone must be accompanied by modifiers or qualifications to be probative of bias); *Hicks v. IBM*, 44 F. Supp. 2d 593, 598 (S.D.N.Y. 1999) (crediting comments about "[B]lacks on welfare" such as "I'm tired of black people taking taxes" as "sufficient to give rise to an inference of discriminatory intent"); *Saget v. Trump*, 375 F. Supp. 3d 280, 371-72 (E.D.N.Y. 2019) (finding "shithole countries" statement, "African countries are toast," and that Haitians were "welfare recipients" supported plaintiffs' equal protection claim as likely to succeed); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 401 (D. Mass. 2018) (finding Trump's statements about "shithole countries" and against Haitians but in favor of "countries like Norway," together with other *Arlington Heights* factors, were "sufficient to plausibly allege that a discriminatory purpose was a motivating factor in a decision"); *Ramos v. Wolf*, 975 F.3d 872, 886-87 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (finding "shithole countries" and preference for immigrants from Norway among other statements supported plaintiffs' equal protection claim as likely to succeed).

[56] *See also* Khan, *supra* n. 26; Lee *supra* n. 27; Simon Lewis & Humeyra Pamuk, *supra* note 28.

[57] *See* Heba Gowayed, *Racial quotas for immigration are back*, The Guardian, (Jan. 17, 2026), https://www.theguardian.com/commentisfree/2026/jan/17/racial-quotas-for-immigration-are-back.

Visa Ban Cable impact nearly half of all legal visa applicants.[58] The Ban categorically bars approval and issuance of all legal immigrant visas to nearly 90% of all African immigrant visa applicants, including nationals of over 30 countries in Africa, with nearly 70% all African nationalities represented; 8 countries in the Middle East, with half of all Middle Eastern nationalities represented; 15 countries in Latin America and the Caribbean, with over 42% of all Latin American and Caribbean nationalities represented; and 14 countries in Asia and Oceania. At the same time, it suspends visas from a small minority of European nations, with only 7 countries impacted in southeastern Europe, representing less than 14% of European nationalities. Over 85 percent of the countries covered by the DOS Blanket Visa Ban are non-European countries with significant nonwhite populations. In addition, the 7 southeastern European nations have significant ethnic minority populations.[59] (*See* Exs. A & B.)

130.    The Ban particularly targets those seeking immigrant visas through family-based petitions, who are primarily nonwhite, or through the diversity visa, who are majority African.[60] On information and belief, the Consular Processing Cable also targets immigrants seeking visas through family-based petitions or through the diversity visa in an attempt to reduce the immigration of immigrants of color.[61]

---

[58] Bier, *supra* n. 29.

[59] *Id*.

[60] *See* Adam Mahoney, *Ghana Helped U.S. Deport Migrants, and Now Its Own Citizens Are Shut Out*, Yahoo!News (Jan. 17, 2026), https://tinyurl.com/mdkby6vv (stating that "African nations make up a striking share of the 75 countries swept into the Trump administration's new freeze on immigrant visas,"); *see generally* Malise Omoloye, *US Visa Pause Hits African Countries*, Face2FaceAfrica.com (Jan. 14, 2026), https://face2faceafrica.com/article/us-visa-pause-hits-african-countries; Martina Schwikowski, *Donald Trump's latest visa ban hits African countries hard*, Deutsche Welle (Jan. 22, 2026), https://www.dw.com/en/donald-trumps-latest-visa-ban-hits-african-countries-hard/a-75590864.

[61] Lewis & Pamuk, *Trump administration to suspend immigrant visa processing for 75 nations*, Reuters (Jan. 15, 2026), https://www.reuters.com/world/us/us-suspend-visa-processing-75-nations-next-week-fox-news-reports-2026-01-14/ ("The decision follows a November directive to U.S. diplomats asking them to ensure that visa applicants are financially self-sufficient and do not risk becoming dependent on government subsidies during their stay in the U.S., according to a State Department cable seen by Reuters at the time."); Mathew Lee, *State Department suspending immigrant visas for 75 countries, citing public assistance concerns*, PBS News, (Jan. 14, 2026),

131.    The Consular Rules deliberately target nonwhite immigrants. Reducing immigration by people of color has been a consistent policy thread uniting each of the Trump Administration's numerous attempts to change existing immigration regulations. President Trump has a long and well-documented history of disparaging and demeaning immigrants, particularly those from Latin American, Caribbean, African, and predominately Muslim nations. Using ugly, racist and white-supremacist rhetoric,  President Trump has referred to such immigrants as coming from "shithole countries," countries that are "filthy, dirty, disgusting," "a disaster," and "hellholes," and stated that such immigrants are "trash" and "garbage," are "poisoning the blood of our country," and are "non-compatible with Western Civilization."[62]

132.    Moreover, there is a revealing pattern uniting the countries on the 75-country DOS Blanket Visa Ban list: nearly all were also restricted through the racial quotas mandated by the 1924 Immigration Act, also called the Johnson-Reed Act,[63] which were largely driven by racist and eugenicist beliefs of policy makers at the time.[64] Senator Albert Johnson, one of the authors of the now defunct Act, boasted about participating in Ku Klux Klan violence against South Asians,[65] and openly wrote the 1924 Immigration Act to exclude anyone who was not a "white

---

https://www.pbs.org/newshour/nation/state-department-suspending-immigrant-visas-for-75-countries-citing-public-assistance-concerns ("The November guidance on which Wednesday's decision is based directed U.S. embassy and consulate officials to comprehensively

and thoroughly vet visa applicants to demonstrate that they will not need to rely on public benefits from the government any time after their admission in the U.S.").

[62] *Donald Trump's 'racist slur' provokes outrage*, BBC (Jan. 12, 2018), https://www.bbc.com/news/world-us-canada-42664173;  Amna Nawaz & Jonah Anderson, *Trump's affordability speech turns into a rant against immigrants*, PBS News (Dec.10, 2025), https://www.pbs.org/newshour/show/trumps-affordability-speech-turns-into-a-rant-against-immigrants; Josh Boak, *Trump says he wants to 'permanently pause' migration to the U.S. from poorer countries*, Associated Press (Nov. 28, 2025), https://apnews.com/article/trump-national-guard-shooting-migration-17bc0655f4544cc702623574ed08eb62; Ginger Gibson, *Trump says immigrants are 'poisoning the blood of our country.' Biden Campaign likens comments to Hitler*, NBC News (Dec. 17, 2023), https://www.nbcnews.com/politics/2024-election/trump-says-immigrants-are-poisoning-blood-country-biden-campaign-liken-rcna130141.

[63] U.S. Dep't of State Office of the Historian, *The Immigration Act of 1924 (The Johnson-Reed Act)*, https://history.state.gov/milestones/1921-1936/immigration-act.

[64] Gowayed, *supra* n. 57.

[65] *Id.* (citing Trevor Griffey, *Citizen Klan: Electoral Politics and the KKK in WA*, Seattle Civ. Rts. & Labor History Project (2007)*, https://depts.washington.edu/civilr/kkk_politicians.htm).

Anglo-Saxon Protestant."[66] The Immigration and Nationality Act of 1965 abolished the racial

quotas at the heart of the Johnson-Reed Act,[67] and created uniform rules and standards for family-

based immigration and visa processing, *see* 8 U.S.C. § 1151(b)(2)(A).  Now, the nationality-based

DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable seek to reverse the race-neutral 1965

Act, and revert to its racially discriminatory predecessor.

133.    In addition to explicit statements by DOS to the press about the motive for the 75-

country DOS Blanket Visa Ban, prior and contemporaneous statements made by President Trump

demonstrate that the Consular Rules are motivated by racialized stereotypes and discriminatory

animus against immigrants of color. On information and belief, his statements influenced and

manipulated the decision by other officials to implement all of the Consular Rules challenged

here.  (*See* Exs. A & B).

134.    President Trump has exhibited a profound and unrelenting racial animus towards

nonwhite immigrants for years. During President Trump's first term, every federal district court to

consider the question found "evidence that President Trump harbors an animus against nonwhite,

non-European aliens which influenced his (and thereby the Secretary's) decision to end the

[Temporary Protected Status] designation[s]" for El Salvador, Haiti, Sudan, and Nicaragua in

2017 and 2018.[68]

---

[66] *Id.*

[67] *The Immigration Act of 1924 (The Johnson-Reed Act)*, *supra* n. 63.

[68] Administrative action may violate equal protection if the alleged animus of other senior executive officials, including the President, "influenced or manipulated their decisionmaking process." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated,* 59 F.4th 1010 (9th Cir. 2023). (internal quotation marks omitted). *See also, e.g. Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras); *Saget v. Trump*, 375 F. Supp. 3d 280, 372 (E.D.N.Y. 2019) (finding that "evidence of [White House] animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti).

135.    President Trump has routinely described regular immigration from nonwhite countries[69] as an "invasion"[70] meriting military or paramilitary action.[71] During his prior administration, President Trump infamously referred to countries designated for Temporary Protected Status ("TPS") as "shithole" countries in a conversation with legislators about TPS. He still harbors these racist views. On December 9, 2025, President Trump repeated his "shithole countries" comment, and "boasted about pausing immigration applications from what he called 'third-world countries' including 'hellholes like Afghanistan, Haiti, Somalia and many other countries."[72]

136.    President Trump has routinely dehumanized nonwhite immigrants,[73] describing many as "animals,"[74] even comparing some immigrants to a "snake" that would bite and kill anyone foolish enough to shelter them.[75] For months in late 2024, President Trump repeated and

---

[69] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. Times (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html ("The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East . . . .").

[70] *See Protecting the American People Against Invasion*, Executive Order (Jan 20. 2025) https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/

[71] *DoW Support to U.S. Border Security,* U.S. Northern Command (last accessed Jan. 24, 2026), https://www.northcom.mil/BorderSecurity/ (last accessed Jan. 24, 2026) ("Over 10,000 service members are deploying / have deployed to the southern border to augment the approximately 2,500 service members already deployed supporting CBP's southern border mission.").

[72] Lalee Ibssa & Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, ABC News (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166

[73] For example, President Trump said about some undocumented immigrants during a March 2024 rally, "I don't know if you call them people. In some cases, they're not people, in my opinion, but I'm not allowed to say that[.]"Scott Detrow, *Trump says some migrants are 'not people' and warns of a 'bloodbath' if he loses*, NPR (Mar. 17, 2024), https://www.npr.org/2024/03/17/1239078695/trump-says-some-migrants-are-not-people-and-warns-of-a-bloodbath-if-he-loses.

[74] Miriam Valverde, *In Context: Donald Trump's comments about immigrants, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/truth-ometer/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals."); *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[75] *See, e.g., Dara Lind, "The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, Vox (Feb. 23, 2018), www.vox.com/policy-andpolitics/2018/2/23/17044744/trump-snake-speech-cpac.

amplified the false claim that Haitian TPS holders were "eating the dogs," "eating the cats," and "eating the pets of the people that live" in Springfield, Ohio.[76]

137.    President Trump's most recent racist statements have been targeted at Somalis. On or about December 9, 2025 in Mount Pocono, Pennsylvania, he described Somalia— which is one of the countries subject to the DOS Blanket Visa Ban—as "filthy, dirty, [and] disgusting," and expressed his desire for white immigrants from Denmark, Norway, and Sweden, all countries which were spared from the DOS Blanket Visa Ban.[77] During a December 2025 Cabinet meeting, President Trump made disparaging remarks regarding Somalia, Somali immigrants, and Somali Americans, saying he did not "want them in our country," the country "stinks," that among Somali immigrants, the rate of "welfare is eighty-eight percent"[78] and that Somali-American Congresswoman Ilhan Omar was "garbage."[79] On December 31, 2025, the President posted on his social media platform, Truth Social:

> Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia. 'Congresswoman' Omar, an ungrateful loser who only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth. MAKE AMERICA GREAT AGAIN!!!"[80]

In January 2026, the President went even further, posting,

> There is 19 Billion Dollars in Minnesota Somalia Fraud. Fake 'Congresswoman' Illhan [sic] Omar, a constant complainer who hates the USA, knows everything there is to know.

---

[76] *See, e.g.,* CBS NEWS, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024) at approx. 29:26, https://www.c-span.org/program/campaign-2024/simulcast-abc-newspresidential-debate/648383

[77] Amna Nawaz & Jonah Anderson, *Trump's Affordability Speech Turns into a Rant against Immigrants*, PBS News (Dec. 10, 2025), https://www.pbs.org/newshour/show/trumps-affordability-speech-turns-into-a-rant-against-immigrants.

[78] D'Angelo Gore, *Probing Trump's Verbal Attack on Somalis - FactCheck.org*, (last updated Dec. 17, 2025) https://www.factcheck.org/2025/12/probing-trumps-verbal-attack-on-somalis/

[79] Anna Betts, *From 'criminals' to 'garbage', Trump is ramping up anti-immigrant language*, The Guardian (Dec.6, 2025), https://www.theguardian.com/us-news/2025/dec/06/trump-anti-immigrant-language.

[80] Donald J. Trump (@realDonaldTrump), Truth Soc. (Dec. 31, 2025, 10:55 AM), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464.

She should be in jail, or even a worse punishment, sent back to Somalia, considered one of the absolutely worst countries in the World.[81]

138.    Other members of President Trump's Cabinet share these sentiments. His Vice President, J.D. Vance, trafficked the fabricated myth that Haitian immigrants ate household pets.[82] Stephen Miller, Deputy Chief of Staff to the President, has long expressed support for White Nationalism, "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[83] DHS Secretary Noem has also habitually described Venezuelans in the United States as "dirtbags,"[84] a belief that informed the Trump Administration's most recent decision to restrict immigration from that country.[85]

139.    President Trump has expressed a preference, instead, for immigrants from predominantly white countries "such as Norway."[86] While campaigning in 2023 and 2024, President Trump explicitly adopted those racist views, and said that nonwhite, non-European immigrants "from Africa" and Asia are "poisoning the blood of our country."[87] During his recent

---

[81] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 18, 2026, 10:43 PM), https://truthsocial.com/@realDonaldTrump/posts/115919697262007872; *see also, e.g., id.* (Dec. 31, 2026, 10:55 AM).

[82] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sept. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv ("The American media totally ignored this stuff until Donald Trump and I started talking about cat memes. If I have to create stories so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do.").

[83] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SS. Poverty Law Ctr. (Nov. 12, 2019), https://www.splcenter.org/resources/hatewatch/stephen-millers-affinity-white-nationalism-revealed-leaked-emails/.

[84] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings, *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, (Jan. 29, 2025) at approx. 1:10,https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country.").

[85] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025) at approx. 1:00, https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad68603.

[86] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash,. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html .

[87] *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country*," C-SPAN (Dec. 16, 2023) at approx.. 00:15, https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 ; Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YOUTUBE (Sep. 2023) at approx.. 1:34 to 1:45, https://www.youtube.com/watch?v=v283kLQbe1M&t=89s..

campaign, President Trump defended these remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[88]

140.    This racist ideology has clearly influenced the Trump Administration's immigration policy. In March 2025, President Trump posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country to reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[89] In October 2025, President Trump announced that the refugee cap for the coming year would be reduced from 125,000 for 2025, to just 7,500 people for 2026—the majority of whom will be white South Africans,[90] on the patently false assertion that these white landholders from the former Apartheid state now face persecution by the Black majority population. Prior to that announcement, on February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*,[91] which directs Secretary Noem (among others) to: "[T]ake appropriate steps, consistent with law, to prioritize humanitarian relief,

---

[88] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries,* N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[89] Donald J. Trump (@realDonaldTrump), Truth Soc. (Mar. 7, 2025, at 9:05 AM). *See also* Shane Croucher, *Trump Invites South African Farmers to US: 'Rapid Pathway to Citizenship' - Newsweek,* (Mar. 7, 2025) , https://www.newsweek.com/trump-south-africa-farmers-us-citizenship-2041178. Though only 7 percent of the population of South Africa is white, white farmers own 80 percent of the country's commercial farmland—that which generates $55,396 annually or more—and President Trump has frequently expressed his belief that white Afrikaner famers are being subjected to a 'genocide' at the hands of the Black majority. *See* Mogomotsi Magome, *Trump says there's a "genocide" in South Africa, but white Afrikaner farmers reject that claim*, PBS News (May 21, 2025), https://www.pbs.org/newshour/world/trump-says-theres-a-genocide-in-south-africa-but-white-afrikaner-farmers-reject-that-claim.

[90] Rebecca Santana, *Trump limits annual U.S. refugees to 7,500. It'll be mostly white South Africans,* PBS News (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

[91] The American Presidency Project (Feb. 7, 2025), https://www.presidency.ucsb.edu/documents/executive-order-14204-addressing-egregious-actions-the-republic-south-africa.

including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."

141.    Federal courts have credited allegations of racial animus by President Trump and government officials in DHS and DOS, including "numerous public statements made by President Trump, during his presidential campaign and as president, in which he disparately disparaged nonwhite immigrants," and statements by Secretary Noem describing immigration as an "invasion happening on purpose ... to remake the foundation of this country."[92]

142.    While evaluating prior equal protection challenges to DOS agency actions purporting to address "public charge" determinations, federal courts have also found that various plaintiffs plausibly alleged connections between President Trump's wishes and actions taken by the Secretary of State in response.[93]

143.    In 2025, despite President Trump's professed desire to restrict immigration, DOS launched a program to expressly grant asylum to white residents of South Africa, primarily

---

[92] *See Nat'l TPS All. v. Noem,* No. 25-CV-05687-TLT, 2025 WL 2684340 at *5 (N.D. Cal. Aug. 8, 2025) (finding plausible racial animus where DHS officials issued statements characterizing TPS as a "de facto amnesty" exploited by "criminal aliens," notwithstanding the government's concession that the TPS holders at issue had no criminal convictions, and concluding that such stereotyping supports equal-protection claims), *aff'd*, No. 25-4901 (9th Cir. Aug. 29, 2025); *stay granted sub nom. Noem v. Nat'l TPS All.,* No. 25A326 (U.S. Oct. 3, 2025) (emergency stay pending appeal; Supreme Court did not reach the merits). *See also CASA, Inc. v. Noem,* 792 F. Supp. 3d 576, 604 (D. Md. 2025) (holding that disparaging statements by executive officials plausibly support APA and equal-protection claims challenging TPS restrictions); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018) (rejecting the argument that discriminatory intent may be laundered through subordinate officials where the President allegedly influenced the challenged decision); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 414–15 (D. Mass. 2018) ("Defendants argue that the allegations regarding statements by Trump are irrelevant because animus held by the President cannot be imputed to Duke or Nielsen, the two officials who terminated the TPS designations at issue, notwithstanding allegations that the White House was closely monitoring decisions regarding TPS designations. . . . [B]ecause the exact time that the new policy regarding the criteria for TPS designations was made and the exact participants involved in that decision are unclear, it would be premature to conclude that President Trump had nothing to do with that decision such that his statements would be irrelevant.").

[93] *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452 (D. Md. Sept. 20, 2019) (denying motion to dismiss equal protection claims in challenge to FAM Revisions); *see also Make the Road New York*, 475 F. Supp. 3d 232, 266 (S.D.N.Y. July 29, 2020) ("The 2018 FAM Revisions, DOS Rule, and Proclamation were all announced within months of those statements. Moreover, as noted, Plaintiffs allegations also extend beyond the President's statements to include statements by high-level officials that are responsible for the public charge framework represented by the government actions at issue", finding plaintiffs challenging DOS interim final rule, FAM revisions, and Presidential Health Care Proclamation adequately stated their equal protection claim).

Afrikaners.[94] Defendant Rubio indicated publicly that DOS would welcome more white Afrikaner South Africans to come to the United States. ("[W]e welcome them to the United States, and I think there may be more coming soon."[95])

144.    As it did in 2016, the Trump administration appears to be relying on CIS' unsubstantiated allegations regarding immigrants' use of public benefits (*see supra* ¶¶48-49), to justify reducing legal immigration by people of color, including from Somalia.[96]  As recently as January 2026, President Donald Trump also "claimed that about 33.3 per cent of Nigerian immigrant households receive some form of public assistance in the United States" sharing an unverified chart on his Truth Social platform detailing welfare participation rates among immigrant households by country of origin.[97]  Both Somalia and Nigeria are listed among the 75 countries in the DOS Blanket Visa Van and Blanket Visa Ban Cable issued on January 14, 2026 and effective January 21, 2026. (Exs. A & B).

145.    The DOS Blanket Visa Ban, its accompanying Cable and the DOS Visa Processing Cable also each departed from normal administrative procedures in multiple ways: Defendants failed to issue notice and comment for final agency action for each of the Consular Rules; the

---

[94] *See* U.S. Embassy & Consulates in Addressing Egregious Actions of the Republic of South Africa, 90 Fed. Reg. 9497, *Refugee Admissions Program for South Africans* (Feb. 7, 2025); *see also* U.S. Mission South Africa, *Refugee Admissions under E.O 14204 "Addressing Egregious Actions of the Republic of South Africa,"* U.S. Embassy & Consulates in South Africa (Nov. 4, 2025), https://za.usembassy.gov/refugee-admissions-program-for-south-africans/.

[95] Kaia Hubbard, *Rubio Says 'There May Be More Coming Soon amid Afrikaner Resettlement Controversy*, CBS News (May 18, 2025), https://www.cbsnews.com/news/marco-rubio-afrikaner-refugee-resettlement/.

[96] Gore, *supra,* n. 78 ("In a disparaging attack on Somalia in which he said he didn't want people of Somali descent in the United States, President Donald Trump said Somalis 'ripped off' Minnesota 'every year' for 'billions of dollars,' an apparent reference to a fraud investigation, and suggested that 'like 88%' of Somalis receive 'welfare' benefits. But the White House didn't provide us with evidence for either of those figures. *Update, Dec. 10: We updated this article to include information the Center for Immigration Studies published on Dec. 10 about 81% of Somali immigrant households in Minnesota receiving "some form of welfare." We had reached out to CIS for such information prior to the publication of our article but did not receive a response.*") (emphasis in original); *see also* Jason Richwine, *Somali Immigrants in Minnesota,* Ctr. For Immigr. Studies, (Dec. 10, 2025), https://cis.org/Report/Somali-Immigrants-Minnesota.

[97] Michael Adesina, "*One-third of Nigerian immigrant[s] 'on US welfare'" - Trump* (January 2026) PMNews/MSN, https://www.msn.com/en-xl/africa/nigeria/one-third-of-nigerian-immigrant-on-us-welfare-trump/ar-AA1TBdM6?ocid=BingNewsVerp.

DOS Blanket Visa Ban and its accompanying Cable directly conflict with the INA's statutory mandates for individualized public charge assessments and visa refusals under 8 U.S.C. §§1182(a)(4) and 1201(g); the DOS Blanket Visa Ban and Blanket Visa Ban Cable directly conflict with the INA's statutory prohibitions against categorical nationality or country-level discrimination in the issuance of immigrant visas under 8 U.S.C. § 1152(a)(1)(A); Defendants issued the Ban via a website announcement with little advance notice; and the Ban is unprecedented in its breadth. Upon information and belief, the Consular Processing Cable was issued directly to consular offices without general publication. These irregularities, in combination with contemporaneous rhetoric employed by Defendants and other Executive officials and the absence of country-specific evidence, demonstrate an impermissible purpose.

146.    On information and belief, Defendants' actions were each motivated, in whole or in part, by a discriminatory motive and/or a desire to harm a particular group: nonwhite immigrants.

147.    The Blanket Visa Ban and related Visa Ban Cable target individuals for discriminatory treatment on the basis of race, ethnicity, or national origin because the vast majority of nations targeted are majority nonwhite, and the Ban is based on an unsupported pretext that individuals from the listed countries may seek "public benefits" or "extract wealth" from the United States by settling here permanently. (Exs. A & B.) They are therefore not rationally related to a legitimate government interest. (Exs. A & B.) The Consular Processing Cable targets family-based and diversity visa applicants, the vast majority of whom are nonwhite, and is based on the unsupported pretext that individuals seeking such visas are coming to the United States to use government benefits. (Ex. C.) The Consular Processing Cable is therefore not rationally related to a legitimate government interest.

148.    The Consular Rules target individuals for discriminatory treatment based on their race, ethnicity, and/or national origin, without lawful justification, in violation of 8 U.S.C. § 1152(a)(1)(A). By taking these actions, Defendants violated the equal protection and due process guarantees of the Fifth Amendment. This violation will cause ongoing harm to plaintiffs.

### C.  Defendants' Blanket Visa Ban and Consular Processing Cable are *Ultra Vires* and Violate the Constitution.

149.    The DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable and DOS Consular Processing Cable exceed DOS's authority under the immigration laws established by Congress.[98] The Ban's purpose is inconsistent with, and openly conflicts with, Congress' individualized approach for determining inadmissibility by ordering consular officers to categorically refuse visas to nationals of 75 countries without presenting any explanation or underlying data related to national security or public safety. The Ban applies even where individual officers have determined that individuals are unlikely to become a public charge under the FAM at 9 FAM 302.8-2, "while the Department develops additional screening and vetting tools, policies, and operations to more accurately identify any IV applicant likely to become a public charge." (Ex. B, ¶4.) And it fails to address the possibility of posting of a public charge bond under 8 U.S.C. § 1201(g) and 8 C.F.R. § 213.1 in the event an intending immigrant is found to be inadmissible as a public charge. To justify this unprecedented action, Defendants present only the unsupported

---

[98] The statute that authorizes, in certain circumstances, the President to suspend "the entry of any aliens or of any class of aliens into the United States . . . by proclamation," 8 U.S.C. § 1182(f), is not at issue in this case. The President has not issued any proclamation, and DOS does not purport to rely on such authority in issuing the agency actions at issue in this complaint. Even if there were such a proclamation, it would exceed the scope of executive authority under 8 U.S.C. § 1182(f). Unlike *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 82 Fed. Reg. 45161 (Sept. 27, 2017), better known as the "Muslim Ban," there is no foreign policy or national security interest articulated by the DOS website announcement/news post, DOS Cable, or any other public Implementing Action issued to date by DOS. *Compare Trump v. Hawaii,* 585 U.S. 667 (2018). And unlike the country-specific approach  the government ultimately took, purporting to "encourage foreign governments to improve their . . . practices" in vetting and information sharing as a national security matter, 82 Fed. Reg. at 45162, the challenged actions here contain no such country-specific actions, let alone any such actions or findings.

assertions that there is an "indication of nationals from these countries having sought public benefits in the United States" and that nationals from these countries are "high risk for becoming a public charge." (Ex. B, paras 2 and 3.)

150.    The Blanket Visa Ban, Blanket Visa Ban Cable and Consular Processing Cable attempt to directly address a domestic matter on which Congress has already spoken. The Ban is unmoored to 8 U.S.C. § 1182(a)(4) and to any authority delegated to DOS in the INA. It is unprecedented in its subject matter and its scope: it sweeps hundreds of thousands of immigrants into a blunt and blanket embargo entirely and exclusively on the basis of their country of origin and unexplained "indications" and assumptions about nationals "having sought public benefits in the United States." Without articulating any foreign policy or national security interest, Defendants attempt to rewrite the longstanding definition of "public charge" and Congress' individualized approach to determining admissibility under the INA via an indeterminate ban. The Consular Processing Cable likewise unilaterally changes the meaning of public charge in the INA as repeatedly ratified by Congress by expanding the benefits that count in a public charge determination, the types of assistance that are considered, including private "charity," and the consideration of benefits used even in the home country.

151.    The Blanket Visa Ban, Blanket Visa Ban Cable and Consular Processing Cable do not even attempt to set forth factual findings to justify these changes. In the case of the Ban, there are no factual findings to support the sweeping refusal and suspension of nearly half of all prospective immigrants around the world seeking admission to the United States.

152.    For instance, the Blanket Visa Ban is wholly unsupported by factual findings explaining how the entry of an immigrant from any individual country listed could be detrimental to the United States or any explanation justifying the purpose of reducing the number of

individuals likely to become a public charge. Most visa applicants are ineligible for public

benefits in their first five years after arriving in the United States, and for those who are eligible,

Congress has already determined that such benefit use is not detrimental to the interests of the

United States. Defendants' actions are thus patently unreasonable.

153.    To the extent the Blanket Visa Ban, Blanket Visa Ban Cable and Consular

Processing Cable focus on preventing entry to nationals with U.S.-based family members who

have already received public benefits, such an objective undermines DOS's stated goal of

preventing the admission of immigrants "who would extract wealth" from the United States. (Ex.

A.) For mixed-status families where members receive noncash assistance, the resulting long-term

productivity and access to economic opportunity increase the family's opportunities to invest and

build wealth in local communities and the U.S. economy and tax base more broadly.[99]

154.    Moreover, the Blanket Visa Ban, Visa Ban Cable and Consular Processing Cable

violate the constitutional separation of powers.

155.    The stated intent, terms, and effect of the Blanket Visa Ban, Visa Ban Cable and

Consular Processing Cable contravene Congress's goal of family unification, codified at 8 U.S.C.

§ 1151(b)(2)(A), the INA's mandated public charge totality of circumstances test, 8 U.S.C. §

1182(a)(4); the INA's mandated individualized visa issuance process, 8 U.S.C. § 1201(g); the

INA's prohibition on categorical discrimination on the basis of race, nationality, place of birth or

place of residence in visa issuance, 8 U.S.C. § 1152(a)(1)(A); as well as the express language and

intent of PRWORA, ACA and CHIPRA, designed by Congress to extend certain health-care

---

[99] Julia Gelatt, *Explainer: Immigrants and the U.S. Economy*, Migration Policy Inst. (Oct. 2024), https://www.migrationpolicy.org/content/explainer-immigrants-and-us-economy; Alex Nowrasteh, *The Fiscal Impact of Immigration in the United States*, Cato Inst. (Mar. 21, 2023), https://www.cato.org/blog/fiscal-impact-immigration-united-states; *New Data: Immigrants Keep Economy Strong, As Congress Considers Wasting Billions on Mass Deportation*, Am. Immigr. Council (Feb. 25, 2025), https://www.americanimmigrationcouncil.org/press-release/immigrants-keep-economy-strong-as-congress-debates-mass-deportation/.

related public benefits to all eligible and lawfully present immigrants and citizens in the United States. Congress has not authorized Defendants to contravene the INA or any other statutes.

### D. The DOS Blanket Visa Ban and Consular Processing Cable Harm the Plaintiffs.

156.    The Trump Administration's first public charge rule in 2019 caused a severe and demonstrable chilling effect, with many immigrant families declining to seek health coverage and other essential services for which they were eligible. Many immigrant families disenrolled from or otherwise avoided noncash benefits, even for their citizen children. On information and belief, the same negative impacts and chilling effect will likewise follow from the Consular Rules.[100] In addition, the Consular Rules will cause broader economic harms, particularly to the health care workforce, by barring a significant number of skilled health care workers from admission.[101]

### i.  Plaintiff Catholic Legal Immigration Network, Inc.

157.    Plaintiff Catholic Legal Immigration Network, Inc. (CLINIC) provides training and support to a network of more than 3,000 attorneys and accredited representatives in 49 states, including New York and Washington, D.C., who, in turn, serve hundreds of thousands of low-income immigrants each year, including by aiding them with applications for adjustment of status. In seeking to further its mission of embracing the Gospel value of welcoming strangers, CLINIC supports its network by hosting in-person and multi-day trainings on immigration-related matters; providing e-learning courses and webinars; publishing newsletters, fact sheets, and reports detailing developments in the immigration landscape; and, in some instances, providing direct funding to affiliates working with immigrant communities.

---

[100] *See* Samantha Artiga et al., *Potential "Chilling Effects" of Public Charge and Other Immigration Policies on Medicaid and CHIP Enrollment*, KFF (Dec. 2, 2025), https://www.kff.org/medicaid/potential-chilling-effects-of-public-charge-and-other-immigration-policies-on-medicaid-and-chip-enrollment/.

[101] Pillai & Artiga, *supra* n. 50 (observing that foreign-Born workers from 69 of the 75 countries impacted by the DOS Blanket Visa Ban comprise nearly one in ten U.S. health care workers).

158.     Defendants deprived CLINIC of an opportunity to comment on DOS's Public

Charge Ban, DOS's Public Charge Ban Visa Cable and the Consular Processing Cable, something

DHS provided CLINIC an opportunity to do on both the 2025[102]and the 2018[103] public charge

NPRMs published by the Trump Administration.

159.     Defendants' actions threaten to impede CLINIC's core mission, have already

directly harmed CLINIC, and threaten ongoing and future harm to CLINIC, including by forcing

it to divert resources from other substantive immigration law matters in order for it to expend

resources to respond to and address the Consular Rules and their impact. Attorneys and accredited

representatives from affiliates submit inquiries to CLINIC regarding individual immigration

matters that are particularly complex and rely on CLINIC staff to provide expert consultations.

CLINIC has experienced increased demand for consultations since the Consular Processing Cable

and the DOS Blanket Visa Ban and accompanying Cable were announced.

160.     CLINIC has had no choice but to apply its resources to address the situation

precipitated by the Consular Processing Rules, both by advising on individual cases brought to it

by its affiliates and dispensing accurate information to its network, to the detriment of its prior

work addressing other substantive immigration law matters. This diversion of resources impairs

CLINIC's core mission which is focused on enabling affiliates to keep costs down and serving as

many low-income immigrants as possible.  If fewer low-income immigrants pursue immigrant

visa applications due to the Ban—as CLINIC reasonably anticipates-—affiliates will experience

reduced revenue, potential staff reductions, and pressure to cut costs. This, in turn, may lead some

---

[99] See NPRM Public Charge Ground of Inadmissibility (2025), comment ID USCIS-2025-0304-3889, https://www.regulations.gov/comment/USCIS-2025-0304-3889.
[103] See NPRM Public Charge Ground of Inadmissibility (2018), comment ID USCIS-2010-0012-56022, https://www.regulations.gov/comment/USCIS-2010-0012-56022; comment ID USCIS-2010-0012-43255, https://www.regulations.gov/comment/USCIS-2010-0012-43255; comment ID USCIS-2010-0012-49608, https://www.regulations.gov/comment/USCIS-2010-0012-49608.

affiliates to cancel their memberships with CLINIC, directly harming CLINIC's financial stability and ability to carry out its mission.

### ii. Plaintiff African Communities Together

161.    ACT's members suffer direct harm. At least one identified member (Plaintiff Agnes Kyeremaa, ACT Member), her children and grandchildren are currently subject to the challenged policy and have already suffered harm, including discriminatory visa refusal and prolonged suspension of immigrant visa adjudication that is fairly traceable to Defendants' final agency actions and would be redressed by vacatur and injunctive relief. The interests ACT seeks to protect—individualized, lawful visa adjudication and family unity under the INA—are germane to its mission of securing family unification, dignity, and economic opportunity for African families and communities in the United States. The claims and requested equitable relief do not require individualized proof or participation by members.

162.    Defendants' promulgation of the Consular Rules without notice and comment deprived ACT members of the opportunity to provide comments detailing the extensive harms created by the Consular Rules.

163.    Defendants' actions substantially impede ACT's core mission, have already directly harmed ACT, and threaten ongoing and future harm to ACT.  In the last month, ACT has an experienced an increased volume of questions from members about the impact of the Consular Processing Cable and the DOS Blanket Visa Ban and accompanying Cable, since they were announced.  ACT has had no choice but to apply its resources to address the situation precipitated by the Consular Processing Rules raised by ACT members and clients, to the detriment of its prior work addressing other substantive immigration law matters for its members. This impairs ACT's ability to accomplish its mission, which includes helping immigrant families

unite and stabilize and connecting them to government services and benefits for which they are eligible as an additional means of support. Reuniting families through family-based immigration and connecting them to needed forms of assistance is especially important for ACT's members and clients, who are vulnerable due to chronic health conditions and usually lack private health insurance. The DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable and the Consular Processing Cable together affect ACT's ability to link clients with the benefits and services they need due to clients' warranted fear that receiving such benefits today will be held against them in the future when they pursue their goals of seeking LPR status through consular processing or when they help a family member or loved one to do so by serving as a petitioner or a sponsor.

### iii. Plaintiff Agnes Kyeremaa

164.    Plaintiff Agnes Kyeremaa suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against her as a U.S. Citizen petitioning on behalf of her four children and three derivative grandchildren, and mandate the refusal of their joint visa applications on the prohibited basis of nationality, because they are from Ghana, one of the 75 nations listed in the Ban, without lawful justification.

165.    Plaintiff Agnes Kyeremaa is a U.S. citizen petitioning for her four children and three derivative grandchildren's admission to the United States. Ms. Kyeremaa, her four children and three derivative grandchildren are currently subject to DOS Blanket Visa Ban, Blanket Visa Ban Cable, and Consular Processing Cable and have already suffered harm, including discriminatory visa refusal and prolonged suspension of immigrant visa adjudication on the basis of nationality, causing indefinite family separation that is fairly traceable to Defendants' final agency actions and would be redressed by vacatur and injunctive relief.

166.    Ms. Kyeremaa, her children and grandchildren suffer discriminatory treatment, including documented visa refusals for all four of her children and three derivative grandchildren, indefinite family separation and categorical exclusion from statutorily mandated individualized consular processing on the sole basis of their race, ethnicity, and national origin in Ghana, one of the countries subject to the DOS Blanket Visa Ban.  This injury is immediate and concrete. Ms. Kyeremaa and her children already invested substantial time and expense to comply with all required steps for immigrant-visa issuance—including USCIS adjudication, National Visa Center processing, medical examinations and preparing for scheduled in-person visa interviews—only for them to be refused and her family separated from her in the United States at the final stage with no endpoint, timetable, or criteria for resolution.

167.    Ms. Kyeremaa began the Form I-130 petitioning process for her four adult sons and daughters and her derivative grandchildren in June 2016, almost a decade ago, and has been anxiously waiting to be reunited with her children and grandchildren once they immigrate to New York to be with her.  She petitioned for her four children and three grandchildren with the understanding that neither their nationality, her health status nor her receipt of SSI, SNAP or Medicaid would impact her children or grandchildren's visa applications. Instead, they all received an INA § 221(g) (8 U.S.C. § 1201(g)) refusal notice that expressly tied DOS refusal of their visa applications to the DOS Blanket Visa Ban and Blanket Visa Ban Cable. Their cases remain stuck in administrative processing with no timetable and no individualized recourse.  The last-minute unexpected refusal and denial after a decade of waiting, and on the discriminatory basis of race, ethnicity and national origin simply because they come from Ghana has been extremely upsetting and acutely distressing for her, and for her affected children and grandchildren.

168.    Ms. Kyeremaa is 80 years old, and her U.S. citizen husband (the father of her children) is 88 years old. The need for her children and grandchildren's physical presence in New York has taken on added urgency after her husband suffered a stroke on January 27, 2026. Ms. Kyeremaa also has five additional adult sons and daughters for whom she filed Form I-130 petitions, but those cases are not yet ready for consular interviews. She is nonetheless anxious about them being able to complete the consular process and join her in New York and now suffers nightmares and insomnia lying awake at night, and loss of appetite wondering if the DOS Consular Processing Cable will also lead to refusal of their application if the Ban is ever lifted. The acute emotional distress, insomnia, loss of appetite and anxiety she has suffered due to Defendants' actions continue today.

### iv.  Plaintiff Patricia Richardson

169.    Plaintiff Patricia Richardson suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against her as a U.S. Citizen petitioning on behalf of her sister and mandate the refusal of their joint visa application on the prohibited basis of nationality, because her sister is from Jamaica, one of the 75 nations listed in the Ban, without lawful justification.

170.    Plaintiff Patricia Richardson is a U.S. citizen petitioning for her sister's admission to the United States.  Ms. Richardson and her sister are currently subject to DOS Blanket Visa Ban, Blanket Visa Ban Cable and Consular Processing Cable and have already suffered harm even as her sister awaits her scheduled interview on March 17, 2026, in Kingston, Jamaica, because she will be subject to a categorical discriminatory visa refusal: Jamaica is one of the 75 countries subject to the Ban.  Ms. Richardson's petition for her sister is subject to prolonged

suspension of immigrant visa adjudication on the basis of nationality, causing indefinite family separation that is fairly traceable to Defendants' final agency actions and would be redressed by vacatur and injunctive relief.

171.    This injury is immediate and concrete. Ms. Richardson and her sister already invested substantial time and expense to comply with all required steps for immigrant-visa issuance—USCIS adjudication, National Visa Center processing, the process of scheduling her medical examinations, scheduling her in-person interview—only for her to be refused at the final stage with no endpoint, timetable, or criteria for resolution.  Ms. Richardson and her sister suffer discriminatory treatment including indefinite family separation and categorical exclusion from statutorily mandated individualized consular processing on the sole basis of their race, ethnicity, and national origin in Jamaica.  Ms. Richardson petitioned for her sister with the understanding that neither her health status nor her prior receipt of WIC would impact her sister's visa applications. The anticipated refusal of her visa, after a decade of waiting, and on the discriminatory basis of race, ethnicity and national origin simply because they come from Jamaica is causing them harm.

172.    Ms. Richardson is a social worker and is very close to her sister, who is generally healthy, effectively manages her diabetes, and who wants to work in early childhood education and childcare in New York once reunited with her in the United States.  Ms. Richardson is shocked and upset, not only for her own family but for everyone who is affected by the Ban, given the sudden change after they followed all the laws and processes and her sisters' application was approved.  The Ban and the DOS Consular Processing Cable impact families in Jamaica and so many families around the world who have spent over a decade and lots of money trying to bring a family member to the United States.

173.    After learning about the Ban and Consular Processing Cable, Ms. Richardson has

suffered insomnia, has had trouble sleeping and lost her appetite.  She lies awake at night

suffering from anxiety about whether the DOS Consular Processing Cable will also lead to refusal

of their application if the Ban is ever lifted.  Because of the DOS Blanket Visa Ban, DOS Blanket

Visa Ban Cable, and DOS Consular Processing Cable, the acute anxiety, loss of appetite and

insomnia Ms. Richardson suffers worrying about whether she and her sister will ever be reunited

in the United States continues today.

### v. Plaintiff Cesar Andred Aguirre

174.    Plaintiff Cesar Andred Aguirre suffers immediate harm because the DOS Blanket

Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular

Processing Cable, categorically discriminate against him as a U.S. Citizen petitioning on behalf of

his wife and mandate the refusal of their joint visa application on the prohibited basis of

nationality, because she is from Guatemala, one of the 75 nations listed in the Ban, without lawful

justification.

175.    Plaintiff Cesar Andred Aguirre is a U.S. citizen petitioning for his wife's

admission to the United States and they both have already suffered significant harm due to the

DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable and Consular Processing Cable.  Mr.

Aguirre's wife is a national of Guatemala and usually resides with Mr. Aguirre and their two

children, ages seven and two, in the United States, in Shirley, New York, but after traveling to

appear for her scheduled consular interview, she is currently stuck in Guatemala, with their

youngest child, because she is still nursing. Their youngest child has Turner's Syndrome, special

needs and requires frequent medical care; she needs her heart and eyes to be constantly monitored

and recently had ear surgery.  The medical care she needs is not available in Guatemala. She has already missed medical appointments because of the Ban.

176.    Mr. Aguirre, his wife, and two minor children suffer discriminatory treatment including indefinite family separation and categorical exclusion from statutorily mandated individualized consular processing on the sole basis of their race, ethnicity, and national origin in Guatemala, as one of the 75 countries listed in the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable.

177.    Mr. Aguirre's visa petition for his wife has been approved and visa fees paid.  Mr. Aguirre, his wife, and both of their minor daughters all traveled to Guatemala about a week before his wife's visa interview.  Mr. Aguirre and his wife believed her visa interview was at the consulate on January 20, 2026, based on a November 24, 2025 email confirmation they received from the National Visa Center (NVC). When she appeared at the consulate on that date, the consular officer accepted her documents but told her that her interview was actually scheduled for January 21, 2026. Mr. Aguirre's wife returned to the consulate and completed her interview on January 21, 2026, yet immediately after her interview she received a notice from the consulate that she was no longer eligible for an immigrant visa under INA § 221(g) (8 U.S.C. § 1201(g)) and that the State Department was indefinitely suspending immigrant-visa issuance in Guatemala, and she was advised that this is because Guatemala is one of 75 countries subject to the Ban, which went into effect that same day.

178.    Mr. Aguirre, his wife, and their two U.S. citizen children are currently subject to DOS Blanket Visa Ban, Blanket Visa Ban Cable and Consular Processing Cable, and have already suffered harm because they were subject to a categorical discriminatory visa refusal on the basis of nationality.  Mr. Aguirre's petition for his wife is subject to prolonged suspension of

immigrant visa adjudication on the basis of nationality, causing indefinite family separation and immediate harm to his wife and his minor U.S. citizen child's medical condition, all of which are fairly traceable to Defendants' final agency actions and would be redressed by vacatur and injunctive relief.

179.    This injury is immediate and concrete. Mr. Aguirre and his wife already invested substantial time and expense to comply with all required steps for immigrant-visa issuance— USCIS adjudication, National Visa Center (NVC) processing, medical examinations, and significant expense for the whole family to travel to Guatemala support his wife's in-person interview, along with medical expenses to support their baby who has Turner's Syndrome—only for her to be refused and separated from her family in the United States at the final stage with no endpoint, timetable, or criteria for resolution.

180.    Mr. Aguirre has also been harmed by the DOS Blanket Visa Ban because it makes his and his older daughter's separation from his wife and their youngest daughter indefinite. Mr. Aguirre's wife is the primary caregiver for their two minor daughters, and now that she is barred from returning to the U.S., Mr. Aguirre is solely responsible for bringing his older daughter to school, cooking her meals, and making sure she attends all of her appointments.  The Ban is also harming their older daughter who is in the United States with Mr. Aguirre. Their older daughter cannot understand why her mom cannot come back home. She misses her mom and her younger sister. Mr. Aguirre observes that his daughter is upset and confused about why her mother and little sister are not able to come back home.  Their younger daughter is two years old and also continues to suffer as a direct result of the DOS Blanket Visa Ban and Blanket Visa Ban Cable. Their two year old daughter has Turner's Syndrome and requires frequent medical care. The medical care she needs is not available in Guatemala. She has already missed medical

appointments because of the Ban. His wife also has limited access to water and electricity which makes it even harder for her to care for their daughter, who is nursing with her.

181.    When Mr. Aguirre learned about the Ban, he was shocked, scared and riddled with anxiety.  He had hoped that the Ban would not affect his family as it was his understanding that his wife's interview was on January 20, 2026, the day before the Ban went into effect.  Mr. Aguirre and his wife had no idea about the Ban before they departed the U.S. for Guatemala, so learning about the Ban was incredibly shocking.

182.    Mr. Aguirre suffers from insomnia as result of the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable.  He lays awake at night and suffers from nightmares and anxiety about the violence his wife might face alone in Guatemala as a woman with a baby. She does not have any family or friends in the country or a permanent place to live, as she had not been back to Guatemala for over a decade.  Mr. Aguirre also suffers anxiety, panic attacks, and fear about the future.  He is constantly thinking about the Ban, which has led him to have difficulty concentrating, and loss of his appetite, as he does not know if his family will ever be reunited in the United States. The fact that the Ban is indefinite with no end in sight makes their separation even more difficult.  Because of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, and DOS Consular Processing Cable, the acute anxiety, insomnia, and loss of appetite Mr. Aguirre suffers worrying about whether he and his daughter will ever be reunited with his wife and baby in the United States continues today.

### vi.  Plaintiff Maru Mahmud Hassen

183.    Mr. Hassen suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against him as a U.S. Citizen petitioning on behalf of his wife and

mandate the refusal of their joint visa application on the prohibited basis of nationality, because she is from Ethiopia, one of the 75 nations listed in the Ban, without lawful justification.

184.    Mr. Hassen and his wife suffer discriminatory treatment, including indefinite family separation and exclusion from statutorily mandated individualized consular processing on the basis of their race, ethnicity, and national origin, fairly traceable to Defendants' final agency actions which would be redressed by vacatur and injunctive relief.

185.    This injury is immediate and concrete. Mr. Hassen has already invested substantial time and expense to comply with all required steps for immigrant-visa issuance—USCIS adjudication, National Visa Center processing, medical examinations, and awaiting scheduling for an in-person interview—yet his wife remains stuck at the final stage with no endpoint, timetable, or criteria for resolution.

186.    Mr. Hassen petitioned for his wife with the understanding that neither her nationality, his health status nor his previous receipt of Medicaid would impact his wife's eligibility for an immigrant visa, and now suffers nightmares, lying awake at night wondering if the DOS Consular Processing Cable will also lead to refusal of their application if the Ban is ever lifted.   Due to the DOS Blanket Visa Ban, Blanket Visa Ban Cable, and DOS Visa Processing Cable, Mr. Hassen is distressed and has withdrawn from family members and friends. Since the Ban was issued, Mr. Hassen has suffered heightened anxiety, stress, and has had frequent nightmares, insomnia and trouble sleeping. He lies awake at night worrying if he and his wife will ever be reunited.  He suffers insomnia and anxiety about whether the DOS Consular Processing Cable will also lead to refusal of their application if the Ban is ever lifted.  Because of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, and DOS Consular Processing Cable, the acute

stress, anxiety, sadness and insomnia Mr. Hassen suffers worrying about whether he and his wife

will ever be reunited in the United States continues today.

### vii.  Plaintiff Munthaz Mahmud Hassen

187.    Plaintiff Munthaz Mahmud Hassen suffers immediate harm because the DOS

Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the

Consular Processing Cable, categorically discriminate against him as a U.S. Citizen petitioning on

behalf of his two minor sons and mandate the refusal of their joint visa application on the

prohibited basis of nationality, because they are from Ethiopia, one of the 75 nations listed in the

Ban, without lawful justification.

188.    Mr. Munthaz Hassen and his children suffer discriminatory treatment, including

indefinite family separation and exclusion from statutorily mandated individualized consular

processing on the basis of their race, ethnicity, and national origin, fairly traceable to Defendants'

final agency actions which would be redressed by vacatur and injunctive relief.

189.    This injury is immediate and concrete. Mr. Munthaz Hassen has already invested

substantial time and expense to comply with all required steps for immigrant-visa issuance—

USCIS adjudication, National Visa Center processing, medical examinations, and awaiting

scheduling for an in-person interview—yet his children remain stuck at the final stage with no

endpoint, timetable, or criteria for resolution.

190.    Mr. Munthaz Hassen petitioned for his children with the understanding that neither

their nationality, his health status nor his previous receipt of Medicaid would impact their

eligibility for an immigrant visa, and now suffers nightmares, lying awake at night wondering if

the DOS Consular Processing Cable will also lead to refusal of their application if the Ban is ever

lifted.   Due to the DOS Blanket Visa Ban, Blanket Visa Ban Cable, and DOS Visa Processing

Cable, Mr. Munthaz Hassen is distressed and has withdrawn from family members and friends. Since the Ban was issued, Mr. Munthaz Hassen has suffered heightened anxiety, stress, and has had frequent nightmares, insomnia and trouble sleeping. He lies awake at night worrying if he and his wife will ever be reunited.  He suffers insomnia and anxiety about whether the DOS Consular Processing Cable will also lead to refusal of their application if the Ban is ever lifted.  Because of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, and DOS Consular Processing Cable, the acute stress, anxiety, sadness and insomnia Mr. Hassen suffers worrying about whether he and his children will ever be reunited in the United States continues today.

### viii.    Plaintiff Adrian Mitchell

191.    Plaintiff Adrian Mitchell suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against him as a U.S. Citizen petitioning on behalf his mother and mandate the refusal of their joint visa application on the prohibited basis of nationality, because she is from Jamaica, one of the 75 nations listed in the Ban, without lawful justification.

192.    Mr. Mitchell and his mother are currently subject to DOS Blanket Visa Ban, Blanket Visa Ban Cable and Consular Processing Cable. Mr. Mitchell and his mother suffer immediate harm because although their visa petition has been approved, visa fees paid, and she completed her interview, the final stage before visa approval and issuance, on January 12, 2026 at the U.S. Embassy in Kingston, Jamaica, she will be subject to a categorical discriminatory visa refusal because she is from Jamaica, one of 75 countries subject to the Ban.

193.    Mr. Mitchell and his mother suffer discriminatory treatment including indefinite family separation and categorical exclusion from statutorily mandated individualized consular processing on the sole basis of their race, ethnicity, and national origin in Jamaica, as one of the

75 countries listed in the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable, fairly traceable to Defendants' final agency actions which would be redressed by vacatur and injunctive relief.

194.    This injury is immediate and concrete. Mr. Mitchell has already invested substantial time and expense to comply with all required steps for immigrant-visa issuance—USCIS adjudication, National Visa Center processing, medical examinations, and his mother's travel for an in-person interview—yet she remains stuck at the final stage with no endpoint, timetable, or criteria for resolution.

195.    Mr. Mitchell petitioned for his mother with the understanding that neither her nationality nor his previous receipt of SNAP would affect his mother's ability to receive an immigrant visa, and now suffers from anxiety and nightmares, lying awake at night wondering if the DOS Consular Processing Cable will also lead to refusal of their application if the Ban is ever lifted. Mr. Mitchell is healthy and his mother is also generally healthy, though she has high blood pressure and knee and back pain.  Mr. Mitchell has a close relationship with his mother, who he relies on for emotional support, and who has lived with him in the U.S. since the 1980s, but only returned to Jamaica recently for her consular interview.  He suffers acute anxiety being separated from his mother indefinitely; he is worried since she has not lived in Jamaica for over four decades, that his mother could become a victim of violence, especially as a 70-year-old woman, and is concerned she will not have access to adequate healthcare in Jamaica if something were to happen to her there.  The stress, sadness, and anxiety caused by the Ban have led Mr. Mitchell to experience traumatic nightmares, insomnia and loss of appetite, causing him to unintentionally lose weight.

196.    Because of the Ban, Mr. Mitchell does not know if he and his mother will ever be reunited in the United States.  The Ban not only separates him from his mother, but from her U.S. citizen daughter, U.S. citizen husband and Mr. Mitchell's children, her grandchildren.  Mr. Mitchell's children complain that they miss their grandmother and don't know when they will be able to see her again. When she lived in the United States, his mother would support the family with childcare and meal preparation.  Mr. Mitchell's mother is also her U.S. citizen husband's caregiver and now that responsibility has fallen on Mr. Mitchell.  His stepfather is 92 years old and suffers from multiple health conditions, including high blood pressure, high cholesterol, renal disease, severe chronic kidney disease, hearing loss, cataracts, and knee problems. Financial, legal and physical responsibility for Mr. Mitchell's stepfather will continue to fall on him indefinitely as his mother is no longer available to care for him or take him to his medical appointments.

197.    Mr. Mitchell, his mother, and their family in the U.S. are harmed by Defendants actions because they are unlawful, unnecessary, unfair, discriminatory, and cruel, not only for Mr. Mitchell's mother and himself, but for everyone who is denied the opportunity to go through the legal immigration visa process to reunite with their family because the Ban blocks them from doing so based on their family members' nationality.   Mr. Mitchell believes the ban is unfair because his mother has been living in the United States for so long and has been contributing to her community in the United States. Mr. Mitchell and his mother have dutifully followed all instructions to apply for admission under the law, but the Defendants' actions categorically refuse and deny them the opportunity to reunite, on the basis of her nationality.

198.    Because of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, and DOS Consular Processing Cable, the acute stress, anxiety, sadness, weight loss and insomnia Mr.

Mitchell suffers worrying about whether he and his mother will ever be reunited in the United States continues today.

### ix. Plaintiff Juan David Buitrago Cagua

199.    Plaintiff Juan David Buitrago Cagua suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against him and mandate the refusal of his visa application on the prohibited basis of nationality, because he is from Colombia, one of the 75 nations listed in the Ban, without lawful justification, resulting in indefinite visa suspension fairly traceable to Defendants' final agency actions which would be redressed by vacatur and injunctive relief.

200.    Plaintiff Juan David Buitrago Cagua has pursued a yearslong, lawful pathway to U.S. permanent residence through the EB-2 national interest waiver process. He filed his National Interest Waiver ("NIW") petition on July 7, 2023, and USCIS approved it on February 21, 2024, reflecting the agency's determination that he satisfied the statutory NIW criteria and could proceed toward an immigrant visa.

201.    Mr. Buitrago Cagua then completed the required consular-processing steps and appeared for his immigrant-visa interview in Bogotá, Colombia, on January 26, 2026. He traveled from Lisbon, Portugal—where he resides—for the express purpose of attending the interview and completing what he reasonably understood to be the final step in the process.

202.    After the interview, Mr. Buitrago Cagua was not denied based on any individualized inadmissibility ground. Instead, he received a notice reflecting a refusal under 8 U.S.C. § 1201(g) tied to the Blanket Visa Ban. As implemented, the Ban has placed him in

indefinite "administrative processing" based on nationality rather than any particularized finding that he is ineligible for a visa.

203.    This injury is immediate and concrete. Mr. Buitrago Cagua has already invested substantial time and expense to comply with all required steps for immigrant-visa issuance—USCIS adjudication, National Visa Center processing, medical examinations, and travel for an in-person interview—yet he remains stuck at the final stage with no endpoint, timetable, or criteria for resolution.

204.    The Blanket Visa Ban prevents Mr. Buitrago Cagua from entering the United States to do the clean-energy work that USCIS approved through his NIW petition. He is a solar energy engineer who designs and supports solar and battery projects, and his approved plan is to expand small, community-level solar systems that can keep power reliable where it is most needed. The Ban blocks his relocation and disrupts U.S.-based planning around it. His U.S. employer has written that it urgently needs him physically present in the United States. The Ban prevents that transition and complicates the company's staffing and project planning—work that it anticipated he would be able to support on site—without any clear end date.

205.    Finally, because employment-based visas are subject to strict annual numerical limits and per-country caps, and because visa numbers generally become available in the order in which the petition was filed, Mr. Buitrago Cagua faces an additional risk beyond delay. His visa number is not "reserved" until a visa can be issued. While his case is held in indefinite administrative processing, DOS continues issuing a limited annual supply of employment-based visas to others not subject to the Blanket Visa Ban. If the fiscal year's numbers are exhausted before the Ban ends, Mr. Buitrago Cagua will not only be delayed. Instead, he will be pushed into

competition for a later year's capped supply, again subject to the same statutory limits and global demand for visas that exist at that time.

### x. Plaintiff Mayra Alejandra Alcendra Moscote

206.     Plaintiff Mayra Alejandra Alcendra Moscote suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against her and mandate the refusal of her visa application on the prohibited basis of nationality, because she is from Colombia, one of the 75 nations listed in the Ban, without lawful justification, resulting in indefinite visa suspension fairly traceable to Defendants' final agency actions which would be redressed by vacatur and injunctive relief.

207.     Plaintiff Mayra Alejandra Alcendra Moscote has similarly cleared the process for visa issuance. USCIS approved her EB-2 national interest waiver on November 3, 2023. She then did the rest of what the immigration system demands—consular processing, waiting for scheduling, and an in-person immigrant-visa interview at the U.S. Embassy in Madrid on October 7, 2025. Post-interview, she did not receive an individualized inadmissibility determination. Her case went into 8 U.S.C. § 1201(g) administrative processing for a discrete, fixable documentation issue: a missing vaccine in her daughter's medical record.

208.     She resolved that issue by submitting updated medical exams, and the Embassy confirmed it received the remaining documentation. Yet it then told her that it "was not possible to issue the visas" and pointed her to travel.state.gov for information about the Blanket Visa Ban. She is left stranded at the finish line, despite dutifully complying with every requirement imposed upon her.

209.    The United States also bears the cost of that suspension. Ms. Alcendra Moscote's national interest waiver is not about generalized "finance." Her proposed endeavor, which USCIS has recognized as nationally important, aims to strengthen competitiveness and efficiency in the mining-energy sector while accelerating digital transformation in an industry that often modernizes slowly. The pause turns USCIS's merits determination into a dead letter. Ms. Alcendra Moscote's expertise, which the agency determined was valuable, cannot be put to use because her case is held at the last step for a reason unrelated to her individual eligibility.

### xi. Plaintiff Andres Alfonso Medina Ramirez

210.    Plaintiff Andres Alfonso Medina Ramirez suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against him and mandate the refusal of his visa application on the prohibited basis of nationality, because he is from Colombia, one of the 75 nations listed in the Ban, without lawful justification, resulting in indefinite visa suspension fairly traceable to Defendants' final agency actions which would be redressed by vacatur and injunctive relief.

211.    Plaintiff Andres Alfonso Medina Ramirez has also reached the end of the visa process, only to be frozen out. USCIS approved his EB-2 national interest waiver on April 16, 2025. He completed consular processing and appeared for his immigrant-visa interview in Bogotá on January 22, 2026—after a multi-year process that culminates, in ordinary course, with visa issuance.

212.    Instead, he received an 8 U.S.C. § 1201(g) refusal notice that expressly tied non-issuance to the Blanket Visa Ban. His case remains stuck in administrative processing with no timetable and no individualized recourse.

213.    This is likewise not a harmless bureaucratic delay. USCIS granted Mr. Medina Ramirez a national interest waiver because his work was judged important to the United States and because he was well positioned to carry it out. His approved endeavor focuses on weather-resistant, sustainable housing for disadvantaged communities—work that depends on real-time execution with respect to budgeting, coordinating with contractors and suppliers, and keeping projects on track.

214.    By consigning him indefinitely to administrative processing solely based on his Colombian nationality, the Blanket Visa Ban blocks the start of that critical work and strips his national interest waiver of practical effect. The Ban prevents U.S. communities and counterparties from relying on any timeline at all, in an industry where schedules, financing windows, and build cycles demand predictability.

### xii. Plaintiff Lina Margarita Angulo Peñaranda

215.    Plaintiff Lina Margarita Angulo Peñaranda suffers immediate harm because the DOS Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, categorically discriminate against her and mandate the refusal of her visa application on the prohibited basis of nationality, because she is from Colombia, one of the 75 nations listed in the Ban, without lawful justification, resulting in indefinite visa suspension fairly traceable to Defendants' final agency actions which would be redressed by vacatur and injunctive relief.

216.    Plaintiff Lina Margarita Angulo Peñaranda also made it to the final stage of the visa process and was abruptly stopped there. USCIS approved her EB-2 national interest waiver on January 10, 2025. She proceeded through consular processing and appeared for her immigrant-

visa interview at the U.S. Embassy in Bogotá. After the interview, she received an 8 U.S.C. §
1201(g) refusal notice referencing the Blanket Visa Ban.

217.    Because she has already completed all the measures required for visa issuance, she
cannot "fix" this posture through additional submissions. There is no step left for her to take. The
injury is immediate: indefinite waiting caused by a categorical pause rather than an individualized
determination.

218.    The United States will lose the benefit of work USCIS already found nationally
important. Ms. Angulo Peñaranda's proposed endeavor in the United States is centered on
supporting regionally sourced materials and local suppliers and creating training and employment
pathways tied to that work—including for single mothers who are heads of household.

219.    That kind of endeavor depends on physical presence and continuity—building
supplier relationships, coordinating production, and supervising multi-step projects. The Blanket
Visa Ban prevents that work from starting at all, even though USCIS has already determined the
United States has a strong interest in it proceeding.

### xiii. Plaintiff Fernando Lizcano Losada

220.    Plaintiff Fernando Lizcano Losada suffers immediate harm because the DOS
Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the
Consular Processing Cable, categorically discriminate against him and mandate the refusal of his
visa application on the prohibited basis of nationality, because he is from Colombia, one of the 75
nations listed in the Ban, without lawful justification, resulting in indefinite visa suspension fairly
traceable to Defendants' final agency actions which would be redressed by vacatur and injunctive
relief.

221.    Plaintiff Fernando Lizcano Losada pursued a lawful pathway to U.S. permanent residence through the employment-based visa category for individuals with "extraordinary ability" in the sciences. 8 U.S.C. § 1153(b)(1)(A). USCIS approved his EB-1A petition on January 22, 2025, confirming that he met the demanding statutory criteria and could proceed toward immigrant-visa issuance.

222.    Dr. Lizcano Losada then did what the system demands, navigating all of DOS's documentary and medical requirements, waiting for a visa appointment to open, and finally appearing in person for the interview at the U.S. Embassy in Bogotá. Yet, instead of an individualized decision at the end of that long process, he received an 8 U.S.C. § 1201(g) refusal tied to the Blanket Visa Ban and has been left in "administrative processing."

223.    Dr. Lizcano Losada's case illustrates just how the Blanket Visa Ban defeats the point of the EB-1A category. The EB-1A visa exists to attract extraordinary talented immigrants—people at the top of their fields whose presence will benefit the United States. In Dr. Lizcano Losada's case, that means a physician-scientist who can treat complex endocrine disease, build and lead research programs, and train the next generation of clinicians and researchers. Dr. Lizcano Losada has built and directed biomedical research operations, published extensively on cutting-edge topics in endocrinology and metabolic disorders, and garnered recognition from major professional institutions throughout the world. The DOS Blanket Visa Ban blocks that deep and varied expertise from coming into the country, despite USCIS having already concluded that he qualifies to immigrate based on his extraordinary ability.

## CAUSES OF ACTION

### COUNT ONE
**(Blanket Visa Ban—Violation of Administrative Procedure Act—5 U.S.C. § 706(2)(A)-(C)**
**—Contrary to Law and Constitutional Right and Excess of Statutory Authority)**

224.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

225.    The APA, 5 U.S.C. § 706(2), prohibits federal agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

226.    DOS is an "agency" under the APA. 5 U.S.C. § 551(1).

227.    In instituting a blanket ban on the issuance of visas to nationals of 75 countries, Defendants took unconstitutional and unlawful actions, in violation of the APA, by, among other things: (a) barring the issuance of visas without statutory authority; (b) seeking to alter the definition of public charge and override the INA by repudiating its requirement of an individualized public charge determination for each visa applicant and replacing it with a blanket ban on nationals of 75 countries; (c) barring the issuance of a visa to an individual based solely on their nationality without any consideration of their individual financial circumstances and other circumstances that demonstrate that they are not likely to become a public charge; (d) barring the issuance of visas to the nationals of 75 countries without evidence that nationals of these countries are at "high risk" of becoming a public charge; (e) barring the issuance of visas to the nationals of 75 countries based on a rationale that runs counter to the evidence; and (f) instituting a visa ban motivated by animus against nonwhite immigrants.; and (g) substituting blanket refusal of all covered visas for the case-by-case considerations and criteria that Congress directed consular officers to rely on in adjudicating visas.

228.    *First,* Defendant's Blanket Visa Ban and Blanket Visa Ban Cable impose rules that contravene the definition of public charge as used in the INA. As alleged above, the DOS Blanket

87

Visa Ban and DOS Blanket Visa Ban Cable also appear to incorporate the Consular Processing Cable (Ex. B., at 2 ¶4, "Ref. B."), which explicitly directs officers to consider benefits use beyond cash assistance and government-funded long-term institutional care, newly extends the definition to include charity as a negative factor, and extends the scope of benefits use beyond the United States to anywhere in the world.  (Ex. C.  ¶29).  Likewise, the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable's vague references to "indications that nationals from these countries having sought public benefits in the United States," (Ex. A; Ex. B, ¶3), and "that immigrants must be financially self-sufficient and not be a financial burden to Americans" in order "to ensure that immigrants from these high-risk countries do not utilize welfare in the United States or become a public charge," (Ex. A), appear to refer to individuals who may at some time in the future receive even a minimal amount of noncash public benefits. The adoption of such a "test" is contrary to the definition of "public charge" that has endured for 140 years: an individual primarily dependent on the government for subsistence. The statutory meaning of the term "public charge" is evident from, among other things: (i) the plain meaning of the phrase, (ii) the judicial and administrative interpretation of the term since it first became part of federal immigration law; (iii) Congress' approval of that interpretation in repeatedly reenacting the statute; and (iv) Congress' rejection of efforts to expand that interpretation in the manner DOS now seeks to accomplish.

229. *Second,* the DOS Blanket Visa Ban and Blanket Visa Ban Cable directly conflicts with 8 U.S.C. § 1182(a)(4) by seeking to effectively erase the statutorily mandated individualized evaluation, excluding all of the other statutorily mandated factors, and arbitrarily adopting one sole, dispositive factor: nationality.

230.    *Third,* the DOS Blanket Visa Ban and Blanket Visa Ban Cable also violate 8

U.S.C. § 1201(g), which permits visa refusal only where a consular officer determines, based on

an individual application, that an applicant is legally ineligible under a specific INA ground.

Neither § 1201(g) nor § 1182(a)(4) authorizes an indefinite, nationality-based refusal of visas, nor

a suspension without exception or end date.

231.    *Fourth,* by directing consular officers to refuse visas categorically under 8 U.S.C.

§ 1201(g) based on nationality alone, Defendants have ordered conduct expressly forbidden by

the INA's nondiscrimination provision, which provides that "no person shall be discriminated

against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of

birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

232.    *Fifth,* the DOS Blanket Visa Ban and Blanket Visa Ban Cable,  independently and

together with the Consular Processing Cable (Ex. B. at 2, ¶ 4 (citing "Ref. B.")) they appear to

incorporate in their directives, conflict with and frustrate Congress's objectives in PRWORA,

Pub. L. No. 104193, 110 Stat. 2105 (1996), the ACA, Pub. L. No. 111148, 124 Stat. 119 (2010), ,

and CHIPRA, Pub. L. No. 1113, 123 Stat. 8 (2009), each of which reflects the congressional

intent to preserve or expand access to lawfully available benefits and affordable health coverage

for lawfully present immigrants and their families. By penalizing or deterring the lawful use of

such benefits, the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable are not in accordance

with law.

233.    Defendants' violations have harmed and will continue to harm Plaintiffs and the

general public. Accordingly, the Blanket Visa Ban and Implementing Actions are not in

accordance with the law and exceed DOS's statutory authority. 5 U.S.C. §§ 706(2)(A), 706(2)(C).

Therefore, the Court should hold Defendants' actions unlawful and vacate and set them aside pursuant to 5 U.S.C. § 706(2).

**COUNT TWO**
**(Consular Processing Cable—5 U.S.C. § 706(2)(A)-(C) —Contrary to Law and Constitutional Right and Excess of Statutory Authority)**

234.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

235.    In issuing the Consular Processing Cable and instructing diplomatic and consular posts to institute a new framework and new standards, for making public charge determinations, Defendants took unconstitutional and unlawful actions, in violation of the APA, by, among other things, as set forth herein: (a) expanding the definition of "public charge" in a manner contrary to the settled statutory meaning of the term under 8 U.S.C. § 1182(a)(4)(A); (b) seeking to establish a framework for public charge determinations that will deny admission to large numbers of intending immigrants who would be approved for admission to the U.S. as immigrants or non-immigrants under an approach consistent with the INA; (c) establishing a scheme that is so confusing, vague, and broad that it fails to give applicants notice of the conduct to avoid, and inviting arbitrary, subjective, and inconsistent enforcement; (d) seeking to establish a framework for public charge determinations that undermines the Congressional goal of promoting family unity; (e) seeking to establish a framework that applies retroactively by directing consular officers to consider the past use of benefits by visa applicants and their family members; and (f) seeking to establish a framework that is motivated by animus against nonwhite immigrants.

236.    The Consular Processing Cable (Ex. C. ¶ 29) conflicts with and frustrates Congress's objectives in PRWORA"), the Patient Protection and Affordable Care Act ("ACA"), and the Children's Health Insurance Program Reauthorization Act ("CHIPRA"), each of which

reflects the congressional intent to preserve or expand access to lawfully available benefits and affordable health coverage for lawfully present immigrants and their families. By penalizing or deterring the lawful use of such benefits, the DOS Consular Processing Cable is not in accordance with law. 5 U.S.C. § 706(2)(A).

237.    Defendants' actions are not in accordance with law, contrary to constitutional rights, and an abuse of discretion, in violation of the APA. Defendants' violations have harmed and will continue to harm Plaintiffs and the general public. Therefore, the Court should hold the Consular Processing Cable issued on November 6, 2025, unlawful and vacate and set it aside pursuant to 5 U.S.C. § 706(2).

**COUNT THREE**
**(Blanket Visa Ban—Violation of Administrative Procedure Act—Failure to Follow Notice-and-Comment Procedures, 5 U.S.C. § 553)**

238.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

239.    A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

240.    The Blanket Visa Ban is a legislative rule under the APA for which notice and comment was required. 5 U.S.C. §§ 551(4), 553(b), (c); *Sweet v. Sheahan*, 235 F.3d 80, 90–91 (2d Cir. 2000). Defendants failed to provide notice and an opportunity for public comment on the Blanket Visa Ban in any manner prior to its issuance on January 14, 2026.

241.    The INA provides that rules governing the processing of visas, including immigrant visas, may be promulgated by "regulations issued" to implement the controlling statutes. *Cf.* 8 U.S.C. § 1201(a) (stating that consular officers may issue visas subject to limitations prescribed by regulations issued pursuant to the INA).

242.    In issuing the Blanket Visa Ban, Defendants have effectively amended prior rules governing visa issuance that were previously issued as legislative rules, including in some cases through notice-and-comment rulemaking; impacted and altered the rights and obligations of noncitizens; constrained consular discretion that previously existed through a categorical and indefinite prohibition on granting visa applications; encoded a substantive value judgment; and created new, additional grounds upon which an immigrant visa application can be refused under 8 U.S.C. § 1201(g) that exist nowhere in the statute or implementing regulations. The Blanket Visa Ban restricts and impacts the substantive rights and obligations of Plaintiffs and all immigrant visa applicants covered by the policy.

243.    In addition, the Blanket Visa Ban indefinitely pauses the operation of regulations that were previously issued as legislative rules, including in some cases through notice-and-comment procedures. Pausing the operation of rules that were issued through notice-and-comment procedures is itself a legislative rule subject to the procedural requirements of the APA.

244.    The APA also presumptively requires that a substantive rule be published "not less than 30 days before its effective date." *Id*. § 553(d). Defendants failed to publish the Blanket Visa Ban as required by law.

245.    No exception to notice-and-comment procedures applies to the Blanket Visa Ban.

246.    The Blanket Visa Ban therefore violates the APA for failure to comply with required procedures and must be vacated and set aside.

**COUNT FOUR**
**(Consular Processing Cable—Violation of Administrative Procedure Act—Failure to Follow Notice-and-Comment Procedures, 5 U.S.C. § 553)**

247.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

248.    The Consular Processing Cable is also a legislative rule under the APA for which notice and comment was required. *See* 5 U.S.C. §§ 553(b), (c). Defendants failed to provide notice and an opportunity for public comment on the Consular Processing Cable in any manner prior to its issuance on November 6, 2025.

249.    In issuing the Consular Processing Cable, Defendants have changed the substantive criteria regarding evaluating whether an individual is a public charge by altering the framework established by statute at 8 U.S.C. §§ 1182(a)(4) and 1201(g) and by regulations at 8 C.F.R. § 212.22, 22 C.F.R. § 40.41, and 22 C.F.R. Part 42,  particularly 22 C.F.R. § 42.81 (regarding refusal of visas and grounds of inadmissibility); impacted the rights and obligations of noncitizens; encoded a substantive value judgment; and created new, additional grounds upon which an immigrant visa application can be refused under 8 U.S.C. § 1201(g) and 22 C.F.R. § 42.81, including but not limited to the past receipt of noncash assistance or charitable contributions, that exist nowhere in the statute or implementing regulations.

250.    The APA also presumptively requires that a substantive rule be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendants failed to publish the Consular Processing Cable as required by this provision.

251.    No exception to the notice-and-comment requirement is applicable to the Consular Processing Cable.

252.    The Consular Processing Cable therefore violates the APA for failure to comply with required procedures and must be vacated and set aside.

## COUNT FIVE
### (Blanket Visa Ban —Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Arbitrary and Capricious)

253.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

254.     Pursuant to the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

255.     The Blanket Visa Ban is arbitrary and capricious for multiple reasons, including, among other things, because Defendants failed to provide a reasoned explanation for the Ban; failed to consider important aspects of the problem (including less restrictive, statutory tools like individualized public charge adjudication); failed to consider reliance interests of applicants and petitioners who have already paid fees and scheduled or attended interviews; and provided no end date or metrics supporting countrywide suspensions. Further, Defendants relied on conclusory assertions (*e.g.*, preventing immigrants who would "extract wealth from the American people") without country-specific evidence or reasoned distinctions, relied on factors Congress did not intend for them to consider, departed from prior agency policy without explanation, and the Blanket Visa Ban is a pretext for Defendants' aim to curtail lawful immigration.

256.     Defendants failed to distinguish among visa classification types, including employment-based immigration categories—particularly NIW beneficiaries—whose recipients are unlikely to implicate public-charge concerns and have already demonstrated an ability to support themselves and their endeavors through extensive documentation. Public charge is, by statute, an individualized inquiry, yet the Ban applies countrywide without explaining why employment-based or family-based applicants should be swept in rather than addressed through case-by-case adjudication. Defendants also failed to consider the economic disruption the Ban will cause through the loss of skilled workers and investment capital, and whether Defendants' goals could be accomplished through alternative, less disruptive means.

257.    The Blanket Visa Ban therefore violates the APA because it is arbitrary and capricious agency action and must be vacated and set aside.

## COUNT SIX
### (Consular Processing Cable—Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)—Arbitrary and Capricious)

258.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

259.    Pursuant to the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

260.    The Consular Processing Cable is arbitrary and capricious for multiple reasons, including, among other things, because Defendants failed to provide a reasoned explanation for the changed standards announced in the Consular Processing Cable; failed to consider reliance interests of employers, workers or individuals and families who, in the past, participated in government programs or received charitable donations based on their well-founded understanding that such actions would not bear on a public charge determination; and because the Consular Processing Cable is a pretext for Defendants' goal of reducing lawful immigration.

261.    Defendants also failed to consider that the Consular Processing Cable's generalized public-charge premise makes little sense as applied to applicants pursuing employment-based visas, given the ordinary record development and financial vetting that accompanies employment-based immigration. Employment-based cases typically include substantial documentation bearing on the applicant's professional standing, plans, and resources, substantially reducing any plausible basis to presume future dependence. The Cable nonetheless offers no reasoned explanation for applying its heightened screening approach indiscriminately to

employment-based applicants, including NIW beneficiaries, let alone any applicants, instead of making individualized determinations under the statutory factors in 8 U.S.C. § 1182(a)(4).

262.    The Consular Processing Cable therefore violates the APA because it is arbitrary and capricious agency action and must be vacated and set aside.

## COUNT SEVEN
**(Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), 8 U.S.C. §§ 1201–1202, 22 C.F.R. §§ 40.6, 42.81—Accardi Doctrine)**

263.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

264.    The Blanket Visa Ban and the Consular Processing Cable are contrary to the express terms of the statute and the implementing regulations described above and should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which requires government agencies to follow their own "existing valid regulations." *Id.* at 268.

265.    *Accardi* "is not limited to rules attaining the status of formal regulations. As the Supreme Court noted '[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required,' and even though the procedural requirement has not yet been published in the federal register." *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (alteration in original) (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

266.    Specifically, 8 U.S.C. § 1201(g) provides authority for consular officers to refuse issuance of visas only based on one of the specific grounds listed in the INA and on the specific facts in each visa applicant's materials.

267.    Moreover, 8 U.S.C. § 1202(b) provides that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer."

268.    "A visa can be refused [under 8 U.S.C. § 1201(g)] only upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6.

269.    "When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, [or] refuse the visa[.]" 22 C.F.R. § 42.81(a). And the Foreign Affairs Manual (FAM), which provides consular processing guidance on implementing the INA, further provides that a consular officer cannot "temporarily refuse, suspend, or hold the visa for future action." 9 FAM 504.1-3(g).

270.    The Blanket Visa Ban purports to override these regulations, without even mentioning or discussing them. Contrary to 8 U.S.C. §§ 1201(g), 1202(b) and 22 C.F.R. § 42.81(a), the Blanket Visa Ban provides that "Immigrant Visa issuance to applications from [covered] countries is paused until further notice." (Ex. B, at 2, ¶ 4.) And in direct contravention of 22 C.F.R. § 40.6, the Blanket Visa Processing Ban directs consular officers to refuse visas even where the officer has no reason to believe any inadmissibility ground exists.  (Ex. B, at 2, ¶ 4.) ("Officers should assess all other potential grounds of ineligibility first, and if an officer has not refused the applicant under any other ground, the officer should make detailed case notes explaining all aspects of the case (including the factors highlighted in Ref. B) where additional information could yield more data concerning the applicant's eligibility vis-à-vis 212(a) (4). Officers should then refuse the applicant 221(g) while the Department develops additional screening and vetting tools, polices, and operations to more accurately identify any IV [immigrant visa] applicant likely to become a public charge.").

271.    Requiring consular officers to refuse visas as "the Department develops additional screening and vetting tools, polices, and operations to more accurately identify any IV applicant likely to become a public charge," (Ex. B, at 2, ¶ 4), is not premised on a ground specifically set out in the law or implementing regulations and is therefore forbidden by statute and regulation.

272.    Similarly, the Consular Processing Cable's mandate to consider the "applicant's current or past use of any other form of public assistance, social welfare, or private charity either in the United States or elsewhere intended to help low-income people," (Ex. C. ¶ 29), directly contradicts the FAM, which instructs that "[n]either the past nor possible future receipt of such non-cash or supplemental assistance is relevant when determining whether an applicant is likely to become a public charge," 9 FAM 302.8-2(B)(1)(c)(1). Also, its direction that consular officers "should consider whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance," (Ex. C ¶ 36), directly contradicts 8 C.F.R. § 213a.2(c)(2)(ii), which enumerates the only factors to be considered: (A) income, (B) number of persons to be supported, and (C) sufficiency of income. In turn, 8 C.F.R. § 213a.2(c)(2)(i)(C)(1) provides conclusively that "[t]he sponsor's ability to meet the income requirement will be determined based on the sponsor's household income," without any allowance for consideration of prior use of public assistance. And its charge that a "sufficient [I-864 Affidavit of Support] that meets the minimum financial requirements is a threshold condition and one factor (but not the only) in the totality of circumstances you must consider to determine if an applicant is likely at any time to become a public charge," (Ex. C ¶ 30) again directly conflicts with the FAM, which informs consular officers that "a properly filed, non-fraudulent Form I-864 in those cases where it is required, is normally sufficient to meet the INA 212(a)(4) requirements and satisfy the 'totality of the circumstances' analysis," 9 FAM 302.8-2(B)(3)(a)(2).

273.    Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations in contravention of *Accardi* and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), and must be vacated and set aside.

## COUNT EIGHT
### (Violation of the Fifth Amendment – Equal Protection and Due Process)

274.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

275.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying individuals the equal protection of the laws.

276.    The INA mandates individualized public charge assessments, 8 U.S.C. § 1182(a)(4), 8 C.F.R. § 212.22, and 22 C.F.R. § 40.41; allows for the posting of a public charge bond even if an intending immigrant is found to be inadmissible as a public charge, under 8 U.S.C. § 1201(g) and 8 C.F.R. § 213.1; prescribes an individualized case-by-case framework for immigrant visa allocation, adjudication, processing, approvals, and refusals under 8 U.S.C. § 1201(g)  and 22 C.F.R. §§ 40.6, 40.201, and 42.81; and prohibits categorical nationality or country-level discrimination in the issuance of immigrant visas under 8 U.S.C. § 1152(a)(1)(A). The blanket nationality bar contravenes the INA's anti-discrimination mandates.

277.    The Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in tandem with the Consular Processing Cable, target individuals, including U.S. Citizens and Legal Permanent Residents petitioning for their family members from the nations listed in the Ban, for discriminatory treatment based on their race, ethnicity, and/or national origin, without lawful justification.

278.    The Blanket Visa Ban and related Visa Ban Cable, issued shortly after and in

tandem with the Consular Processing Cable, target nationals of 75 countries—disproportionately from nonwhite and limited-English proficient populations—and were issued together with official statements from DOS that targeted immigrants that "take welfare" and "extract wealth" from Americans, supporting an inference of discriminatory intent. They are an outgrowth of Defendants and the Trump Administration's broader commitment to white nationalist principles and rhetoric, particularly relating to exclusion of immigrants of color in order to preserve their vision of a "white" nation.

279.    The sequence of events, contemporaneous rhetoric employed by Defendants and other Executive officials, and unprecedented breadth of the Blanket Visa Ban—combined with the absence of country-specific evidence and departure from ordinary individualized adjudication—demonstrate an impermissible purpose.

280.    The Consular Rules were each motivated, in whole or in part, by a discriminatory motive and/or a desire to harm a particular group: nonwhite immigrants. Nonwhite immigrants, including Plaintiffs, will be disproportionately harmed by Defendants' actions.

281.    The Blanket Visa Ban and related Visa Cable Ban, issued shortly after and in tandem with the Consular Processing Cable, target individuals for discriminatory treatment on the basis of race, ethnicity, or national origin because the majority of the nations listed are majority nonwhite, and the Ban is based on an unsupported and unexplained pretext that individuals from the listed countries may seek "public benefits" or "extract wealth" from the United States by settling permanently in the United States, and so it is not rationally related to a legitimate government interest.

282.    By taking these actions, Defendants violated the equal protection and due process guarantees of the Fifth Amendment.

283.    This violation will cause ongoing harm to plaintiffs, and must be vacated and set aside.

### COUNT NINE
### (Ultra Vires Violation of the Constitution)

284.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

285.    The Consular Rules (Exs. A–C), individually and taken together, are illegal and ultra vires.

286.    Courts "ordinarily presume that congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986). The INA mandates individualized public charge assessments, 8 U.S.C. § 1182(a)(4), prescribes an individualized case-by-case framework for immigrant visa allocation, adjudication, processing, approvals, and refusals, 8 U.S.C. § 1201(g), and prohibits categorical nationality or country-level discrimination in the issuance of immigrant, 8 U.S.C. § 1152(a)(1)(A).

287.    DOS does not have any authority to rewrite the INA by imposing a blanket nationality bar.

288.    By DOS's own account, the Ban was adopted "under existing immigration law" while DOS "reassess[es]" procedures, (Exs. A & B), not pursuant to a Presidential proclamation under 8 U.S.C. § 1182(f). Even it were, it would exceed Executive authority under 8 U.S.C. § 1182(f).

289.    Defendants have imposed an indefinite de facto nationality embargo on immigrant visas absent an 8 U.S.C. § 1182(f) Presidential proclamation and have repudiated Congressionally

required individualized assessments under 8 U.S.C. § 1182(a)(4) and 8 U.S.C. § 1201(g). These actions are ultra vires by any measure.

290.    Defendants' attempt to indefinitely ban certain immigrants based on their nationality via the DOS Blanket Visa Ban exceeds Congress's delegated power to the Executive to suspend the entry of noncitizens and issue reasonable rules for the entry of noncitizens.

291.    Defendants' attempt to ban certain immigrants based on their nationality in the DOS Blanket Visa Ban and its accompanying Cable. (Exs. A & B), to create a new ground of inadmissibility and an expansion of the public charge ground of inadmissibility that Congress has previously considered and chosen not to include in the INA in the DOS Blanket Visa Ban, the Blanket Visa Ban Cable and the Consular Processing Cable, (Exs. A–C), and to legislate a new embargo against the individualized totality of circumstances test mandated by statute, (Exs. A & B), violate constitutional separation of powers principles because their actions contravene Congress's expressed intent in creating the public charge test as an individualized inquiry based on the totality of circumstances, not on applicants' country of nationality nor on the receipt of other noncash public benefits.

292.    Defendants' Consular Rules are therefore *ultra vires,* violate the Constitution and must be vacated and set aside.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Assume jurisdiction over this action;

b.    Issue a declaratory judgment stating that the indefinite DOS Blanket Visa Ban and DOS Visa Ban Cable (as described in Exs. A & B) and any related Implementing

Actions are unauthorized by and contrary to the Constitution and laws of the United States;

c. Issue a declaratory judgment stating that the November 6, 2025, Consular Processing Cable (as described in Ex. C) is unauthorized by and contrary to the Constitution and laws of the United States;

d. Vacate and set aside Defendants' immigrant visa "Pause" or Blanket Visa Ban and Blanket Visa Ban Cable announced on January 14, 2026, effective January 21, 2026 (as described in Exs. A & B and related directives) under 5 U.S.C. § 706(2) of the APA, and stay its effectiveness under 5 U.S.C. § 705;

e. Vacate and set aside Defendants' November 6, 2025, Consular Processing Cable (as described in Ex. C) and the amended public charge standards contained therein under 5 U.S.C. § 706(2) of the APA, and stay its effectiveness under 5 U.S.C. § 705;

f. Permanently enjoin Defendants from enforcing (a) the DOS Blanket Visa Ban (as described in Exs. A & B and related directives or Implementing Actions) and immigrant visa freeze nationwide; and (b) the Consular Processing Cable (as described in Ex. C) nationwide;

g. Order Defendants to resume case-by-case adjudications, processing approvals and issuance for immigrant visas consistent with 8 U.S.C. § 1182(a)(4), the definition of public charge in the current 9 FAM 302.8-2 and the INA's individualized framework and complete visa processing, approvals, and issuance in accordance with statutory law;

h. Award Plaintiffs their reasonable attorneys' fees and costs; and

i. Grant such other and further relief as the Court deems just and proper.

Dated: February 2, 2026

Respectfully submitted,

*/s/ Joanna Elise Cuevas Ingram*
Joanna Elise Cuevas Ingram (JC 2704)
Tanya Broder*
Efrén C Olivares*
Elizabeth Choo**
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
(213) 377-5258
cuevasingram@nilc.org
broder@nilc.org
olivares@nilc.org
choo@nilc.org

*/s/ Erez Reuveni*
Erez Reuveni*
Catherine M.A. Carroll*
Elena Goldstein
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 316-9538 (Reuveni)
ereuveni@democracyforward.org
ccarroll@democracyforward.org
egoldstein@democracyforward.org

*/s/ Hasan Shafiqullah*
Hasan Shafiqullah (HS3231)
Evan Henley
Emily Lundgren
THE LEGAL AID SOCIETY
49 Thomas St., 5th Floor
New York, NY 10013
(212) 577-3300
hhshafiqullah@legal-aid.org
ewhenley@legal-aid.org
elundgren@legal-aid.org

*/s/ Susan Welber*
Susan Welber
Government Benefits Unit
Bronx Neighborhood Office
260 E. 161st Street

Bronx, New York 10451
sewelber@legal-aid.org

*/s/ Baher Azmy*
Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445

*/s/ Antionette Dozier*
Antionette Dozier*
David Kane*
Joy Dockter*
WESTERN CENTER ON LAW & POVERTY
3701 Wilshire Blvd. Suite 208
Los Angeles, CA 90010
(213) 487-7211
adozier@wclp.org
dkane@wclp.org
jdockter@wclp.org

*/s/ Sarah Wilson*
Sarah Wilson*
David Kim*
COLOMBO & HURD
301 E. Pine Street, Suite 450
Orlando, Florida 32801
(407) 478-1111

*\*Motion for Admission Pro Hac Vice Forthcoming*

*\*\*Petition for Attorney Admission Forthcoming*

*Attorneys for Plaintiffs*

105

## CERTIFICATE OF SERVICE

I, <u>Joanna Elise Cuevas Ingram</u>, hereby certify that on February 2, 2026, I filed the

foregoing Complaint with the Clerk of the Court for the United States District Court for the

Southern District Court of New York using the CM/ECF system. Notice of this filing is being sent

by operation of the Court's electronic filing system to all counsel of record who

are registered CM/ECF users.

I further certify that on February 2, 2026, I caused a true and correct copy of the foregoing

Complaint to be served upon the following parties by Certified Mail, addressed as follows:

Secretary of State Marco Rubio
U.S. Department of State
2201 C Street
NW Washington, DC 20520

Executive Office
Office of the Legal Adviser
U.S. Department of State
600 19th Street, NW, Suite 5.600
Washington, DC 20522

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Civil Process Clerk
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

*/s/ Joanna E. Cuevas Ingram*
Joanna E. Cuevas Ingram (JC2704)