**Exhibit D**

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TIFFANY SANGSTER, et al.,<br><br>　　　　　Plaintiffs,<br>　v.<br>MARCO RUBIO, et al.,<br><br>　　　　　Defendants. | Case No. 3:25-cv-00447-ART-CSD<br><br>ORDER<br><br>(ECF NO. 9) |

Plaintiffs Tiffany Sangster and Julie Muangala are adoptive mother and daughter. They bring this action to compel the Department of State to adjudicate Ms. Muangala's application for an immigrant visa, and the application of her sister, B.M., who is also Mrs. Sangster's adoptive child. Plaintiffs move on an emergency basis for a Temporary Restraining Order ("TRO") to compel the Department of State ("the Department") to immediately adjudicate their applications, and/or to stay the effective date of its policy of January 14, 2026 ("the Policy"), which would indefinitely prevent the adjudication of visas of nationals of the Democratic Republic of the Congo ("DRC"), among other countries. For the foregoing reasons, the Temporary Restraining Order against the Policy is GRANTED with respect to Plaintiffs' request to stay the Policy only.

## I. BACKGROUND

### A. Relevant Procedural History of the International Adoption

The following facts are taken from Plaintiffs' amended complaint unless otherwise noted. (ECF No. 8-1.)

Ms. Muangala was born in 2006 in the Democratic Republic of the Congo, and B.M., one of her siblings, was born in 2013. In 2015, Mrs. Sangster, not knowing of Ms. Muangala and B.M.'s existence, adopted their other two siblings and brought them to the United States. After one of the siblings told Mrs. Sangster that Ms. Muangala and B.M. were still in the DRC, Mrs. Sangster and

her husband, reasoning that all four should be part of one family, adopted them too. (ECF No. 9-3.) On December 29, 2016, the Appeals Court of Kananga, DRC ordered the adoption based on the passing of the children's biological parents, and on February 11, 2017, a Congolese civil registry office issued adoption certificates. Mrs. Sangster noted in her declaration that since then, she and her U.S.-based family have maintained a consistent and supportive relationship with Ms. Muangala and B.M. (ECF No. 9-3.) They speak to them regularly over the phone and have traveled to the DRC "many times" to spend time with Ms. Muangala and B.M. (*Id.*) Ms. Muangala and B.M. call Mrs. Sangster and her husband "mommy and daddy," and have dreams for their futures in the United States. (*Id.*)

After adopting Ms. Muangala and B.M., Mrs. Sangster submitted two Forms I-600 to the U.S. Embassy in Kinshasa, DRC. They were forwarded to USCIS and denied. On November 16, 2018, Mrs. Sangster gathered additional evidence and submitted new Forms I-600 to USCIS. (ECF Nos. 8-2, 8-3.) These petitions were also denied.

On December 8, 2023, Mrs. Sangster filed suit in this court seek seeking review of the denials of the latter visa petitions. *Sangster v. Jaddou et al,* No. 3:23-cv-631-LRH-CLB (D. Nev. filed Dec. 8, 2023). Through that lawsuit, Mrs. Sangster learned for the first time that the denial related to USCIS's concerns that Ms. Muangala and B.M. were not biologically related to their siblings in the United States, and that their uncle and guardian was involved in child trafficking.

In or around August 2024 (ECF No. 9-3), Mrs. Sangster moved to supplement the administrative record, and USCIS ultimately approved the visa petitions. Mrs. Sangster received notices from the Department dated October 31, 2024, confirming that they had received the approved I-600s for processing. On the same date, Mrs. Sangster's counsel emailed the Embassy to request the

2

expedited processing of immigrant visas for Ms. Muangala and B.M, noting that "the older child, Julie, will turn 18... and thus become ineligible for automatic acquisition of U.S. citizenship under the Child Citizenship Act, INA 320. The State Department has a policy of expediting cases for children in this situation." (ECF No. 8-6.) On January 16, 2025, the two children's Forms DS-260, Immigrant Visa and Alien Registration Application, were forwarded to the Embassy. (ECF Nos. 8-7, 8-8).

Despite continued back-and-forth with the Embassy, and the support of the Department of State's Office of Children's Affairs, Ms. Muangala and B.M. are waiting for interviews and adjudication still. Ms. Muangala is now 19 years old. (ECF No. 9-3.)

On January 14, 2026, the Department promulgated a policy that requires consular officers to refuse all immigrant visa applications for nationals from the DRC. (ECF No. 8-11.) Plaintiffs allege that this policy applies to Ms. Muangala and B.M., and that it "threatens to keep the family separated indefinitely." (ECF No. 8-1 at 2.)

**B. The Department's New Policy**

On January 14, 2026, the Secretary of State circulated a memo titled "Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge" to the Department of State's diplomatic and consular officers. (ECF No. 8-11.) The Policy was issued without notice and comment.

The Policy functions as a ban on immigrants of certain nationalities. It directs that any application for an immigrant visa from one of 75 enumerated countries must be denied. In relevant part, the memo states that "effective January 21, consular officers must refuse under Section 221(g) of the Immigration and Nationality Act [8 U.S.C. 1201(g)] to **all immigrant visa applicants** who have not been refused under another ground of ineligibility" if the applicant is a national of one of an enumerated list of 75 countries, including

3

the Democratic Republic of the Congo. (*Id.* ¶ 2) (emphasis in original). Consular officers are directed to continue interviewing applicants and assessing their inadmissibilities. (*Id.* ¶ 4.) If applicants are inadmissible, consular officers will refuse the visa on the basis of the relevant inadmissibility; if no bases of inadmissibility are presented, officers will make a notation in the applicant's file and then refuse the visa on the basis of the policy alone. (*Id.*)

On their website, the Department further clarifies that visa interviews and processing will continue as before, even though the outcome will be refusal every time:

> What happens to my immigrant visa interview appointment?
>
> Immigrant visa applicants who are nationals of affected countries may submit visa applications and attend interviews, and the Department will continue to schedule applicants for appointments, but no immigrant visas will be issued to these nationals during this pause.

(ECF No. 8-12.)

The Department's rationale for promulgating the Policy is "based on indication of nationals from these countries having sought public benefits in the United States." (ECF No. 8-11 ¶ 3.) The Policy purports to remain in place "while the Department develops additional screening and vetting tools, policies and operations to more accurately identify any [immigrant visa] applicant likely to become a public charge." (*Id.* ¶ 4.) The duration of this process is "unknown" and indefinite. (ECF No. 20 at 5.) The President has expressed an intention to keep the Policy in place "permanently." (ECF No. 8 ¶ 40 n.7.)

The only statutory authority invoked for the memo is 8 U.S.C. § 1201(g). Under that subsection, a consular office will not grant a visa or other documentation to an applicant if it appears that the applicant is ineligible or the application is noncompliant under certain provisions of law. *Id.* Unlike some blanket refusal policies of the past, this memo was not issued with an accompanying Presidential Proclamation. *See Thein v. Trump,* No. CV 25-2369

4

(SLS), 2025 WL 2418402, at *18 (D.D.C. Aug. 21, 2025); *Trump v. Hawaii*, 585 U.S. 667, 678 (2018); 8 U.S.C. § 1182(f).

## II. RIPENESS

Defendants assert that Plaintiffs' claims are not ripe for decision because they have not been interviewed and the policy has not been applied to them. (ECF No. 20.)

The ripeness doctrine avoids premature adjudication and prevents the courts from entangling themselves in abstract disagreements. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148 (1967). Nevertheless, under certain circumstances, challenges to agency policies may be ripe even before the policy has been enforced. *Id; Hawaii v. Trump*, 898 F.3d 662, 678 (2017); *see Pietersen v. DOS*, 138 F.4th 552, 560 (D.C. Cir. 2025) ("[I]t is well settled that when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing consular decisions, courts may review them to assure that the executive departments abide by the legislatively mandated procedures") (internal quotation marks and citations omitted).

When deciding whether a case is ripe, courts primarily look to two considerations: "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Laboratories,* 387 U.S. at 149. In *Abbott,* the Supreme Court found a challenge against a regulation fit for decision when it was a "purely legal" challenge, and when the regulation at issue was a "final agency action" within the meaning of the Administrative Procedure Act ("APA"). *Id.* at 150; 5 U.S.C. § 704. Here, Plaintiffs have challenged the policy on its face, not as applied. There is no need to wait for enforcement to develop the factual record to understand whether the Policy violates the procedural and substantive requirements of the APA. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003). The Policy is also a "final agency action" in that it marks the "consummation of the agency's decisionmaking

5

1  process" and is one by which "right or obligations have been determined, or from
2  which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997)
3  (internal citations and quotations omitted). Although the agency claims that the
4  policy will be replaced with a new public charge screening at some future point,
5  a temporary policy may still be the consummation of the agency's
6  decisionmaking process. *See id.*; *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
7  465 F.3d 977, 984 (9th Cir. 2006) (finding that an agency policy statement that
8  is revised and re-issued every year is a final agency action). Legal consequences
9  certainly flow from the implementation of this policy. It is currently in effect, and
10 while it is in effect, the Department of State will not approve any immigrant visas
11 for nationals of seventy-five countries.

12       When evaluating the hardship to the parties of withholding court
13 consideration, the Supreme Court has evaluated whether parties must change
14 their primary conduct in response to the challenged policy, or whether parties
15 will suffer an irredeemable adverse effect if they are forced to delay their
16 challenge. *See, e.g. Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967);
17 *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810 (2003). Parties here
18 will suffer an irredeemable adverse effect in the form of delay and prejudice if
19 forced to wait until after a consular officer has applied the Policy to their
20 applications. If Plaintiffs wait to apply for a TRO after the applications are denied,
21 the doctrine of consular non-reviewability would bar direct judicial review of that
22 decision. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *Dep't of State v. Munoz*,
23 602 U.S. 899, 908 (2024). If Plaintiffs' claims become ripe at some intermediate
24 point—for example, after an interview is scheduled, but before a decision is
25 made—the judicial timeline may cause interference and prejudicial delay in their
26 visa application process. Normally, children of U.S. citizens are eligible for lawful
27 permanent residence as immediate family members until they turn 21 years old,
28 8 U.S.C. § 1101(b)(1), and Ms. Muangala is now 19. (ECF No. 9-3.) Because the

immigration relief they seek as adoptive children may be time-sensitive, the prejudice of delay worked by immediate pre-interview judicial review or post-interview reapplication may be greater than mere refusal.

In other cases where significant hardship would result from withholding court consideration, plaintiffs have been allowed to pursue forward-looking claims against immigration-related policies. In the Ninth Circuit case *Hawaii v. Trump*, the plaintiffs sought to prohibit implementation and enforcement of a Presidential Proclamation that indefinitely barred entry of certain nationals. 878 F.3d 662, 698–99 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667. There, as here, the Government argued that the plaintiffs' claims were not ripe for adjudication until a specific applicant was denied a visa. *Id.* The Ninth Circuit rejected that argument on the basis of the significant hardship to the plaintiffs that would result from withholding court consideration. *Id.* On appeal, the Supreme Court also reviewed the Proclamation on its merits without finding that any applicant had been denied a visa. *Trump v. Hawaii*, 585 U.S. at 678; *see also Pietersen*, 138 F.4th at 560 (finding that the plaintiffs had standing based on a prospective future harm, and then proceeding to adjudicate their challenge to a Department of State immigration policy). Delaying a decision on this TRO may deprive Ms. Muangala of her present opportunity to be united with her siblings and adoptive parents, as the statute provides no other opportunities for potentially satisfactory review. *Cf. Reno v. Catholic Social Services. Inc.*, 509 U.S. 43, 60 (1993) (declining to find claims ripe for decision where the INA provided a different, potentially satisfactory avenue for judicial review at a later point in the administrative process). In submitting their approved I-600s and DS-260s, Plaintiffs "took the affirmative steps that [they] could take before the [Department] blocked [their] path by applying" the policy to them. *Id.* at 59. This case is as ripe as it can become before additional judicial delay would create the risk of hardship.

7

### III. LEGAL STANDARD

A party seeking a preliminary injunction must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if preliminary relief is not granted, (3) the balance of equities is in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth *Winter* factors merge when the opposing party is the government, because the government is supposed to represent the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Ninth Circuit maintains a "sliding scale" approach to the *Winter* factors, where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The analysis for a temporary restraining order is "substantially identical" to that of a preliminary injunction. *Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

For a court to have the power to grant a preliminary injunction or temporary restraining order, "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 636 (9th Cir. 2015). "The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).

### IV. DISCUSSION

Plaintiffs assert claims under the Administrative Procedures Act, arguing that the policy is unlawful under 5 U.S.C. § 706, and the visa processing delay they have experienced is unreasonable in violation of 5 U.S.C. §§ 555. The injunctive relief Plaintiffs seek is an order enjoining the Government from

8

applying the policy to them and requiring the Government to adjudicate their applications. The Government argues that the delay is routine, not unreasonable, and that any injunctive relief is premature as the policy has not yet been applied to Plaintiffs. The Government's opposition brief does not address Plaintiffs' claims that the policy is unlawful under § 706 of the APA.

### A. Likelihood of Irreparable Harm

Plaintiffs have shown a likelihood of irreparable harm if preliminary relief is not granted. If preliminary relief is not granted before Ms. Muangala and B.M.'s visas are denied, whether under the Policy or on some other basis, the denials will be unreviewable. (ECF Nos. 19, 20.) Final injunctive or declaratory relief may come too late. And if relief is too late for these Plaintiffs, the Policy is likely to indefinitely prolong or make permanent Ms. Muangala and B.M.'s separation from family members. *Cf. Hawaii v. Trump,* 878 F.3d at 698–99. Indefinite delay can rise to the level of irreparable harm. *See, e.g., id.; CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994). "The Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. East Cleveland,* 431 U.S. 494, 503–04 (1977). The harm of family separation is "not compensable with monetary damages and therefore weigh[s] in favor of finding irreparable harm." *Hawaii v. Trump*, 878 F.3d, 698–99 (citing *Washington v. Trump*, 847 F.3d 1151, 1168–69 (9th Cir. 2017); *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984)).

### B. Likelihood of Success on the Merits of Plaintiffs' Challenge Against the State Department's Policy Memo

Plaintiffs challenge the Department's new travel ban under the APA, arguing that the policy is arbitrary and capricious, lacks statutory authority, and failed to comply with the notice and comment requirement for a policy with such legal effect. As noted, the Government fails to address arguments on the merits.

9

### a. The Administrative Procedure Act

The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. For an agency action to be final, the agency action must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature[—and] second, the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal quotations omitted).

Section 706 of the APA outlines the scope of judicial review of agency actions. 5 U.S.C. § 706. Under Section 706(2)(A) of the APA, reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Section 706(2)(C) authorizes courts to set aside agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and Section 706(2)(D) to do the same to those "without observance of procedure required by law." *Id.* Plaintiffs challenge the Policy under all three of these subsections.

### b. The State Department's Policy is Likely Arbitrary, Capricious, An Abuse of Discretion, or Otherwise Not in Accordance with the Law

The APA allows a court to overturn informal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404 n.12 (D.C. Cir. 1995).

The Policy is "not in accordance with law" because it contravenes the visa adjudication framework established by Congress. *See* 5 U.S.C. § 706(2)(A). "[W]hen a particular statute delegates authority to an agency consistent with

10

constitutional limits, courts must respect the delegation, *while ensuring that the agency acts within it.*" *Loper Bright Enterprises v. Raimondo*, 604 U.S. 369, 413 (emphasis added). Even if agency interpretations of law may have the "power to persuade," they have only that power, and courts "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 402, 413; *Murillo-Chavez v. Bondi*, 128 F.4th 1076, 1086–87 (9th Cir. 2025). The Policy essentially nullifies the grounds of inadmissibility that Congress created in Section 1182(a), and in particular the public charge determination set out in 8 U.S.C.A. § 1182(a)(4). Although the policy asks officers to go through the motions of an individualized analysis to determine whether the grounds of inadmissibility may apply, even if the officer finds no basis for inadmissibility the result is still refusal. Congress set out a detailed statutory scheme that tasks consular officers with conducting a searching analysis of prospective immigrants' medical status, criminal history, financial affairs, and other personal details before admitting them. *See generally* 8 U.S.C. § 1182(a). Although it could have done so, nowhere did Congress give the Department the power to make an end run around the categories of inadmissibility by refusing all applications by immigrants based on their country of origin. *Compare id. with* 8 U.S.C. § 1182(f). The public charge ground of inadmissibility specifically sets forth minimum and optional factors that a consular officer must or can consider in determining if someone is likely to become a public charge. *Id.* § 1182(a)(4). The factors are meant to have an impact on the officer's decision. In making them redundant to the outcome, the Department has contravened the clear dictates of the statute. *Id.*

Plaintiffs also challenge the Department of State's decisionmaking process as "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). An agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor*

11

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

When faced with a challenge against a regulation on the grounds that it is arbitrary and capricious, "[a] reviewing court must review the administrative record before the agency at the time the agency made its decision." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004). Absent an administrative record reflecting the agency's decisionmaking process and choices, the Court cannot readily determine whether the Department's decisionmaking process was inadequate under the APA.

Because the Court finds that the Policy is contrary to existing law, Plaintiff has shown a likelihood of success in challenging it under § 706(2)(A).

### c. The Policy Is Likely Issued in Excess of Statutory Authority

Plaintiffs argue that the Department's policy was issued "in excess of [the] statutory... authority" that was granted to it under Section 1201(g). *See* 5 U.S.C. § 706(2)(C). Section 1201(g) states that a consular officer shall not issue a visa to any applicant who the officer "knows or has reason to believe" is ineligible due to inadmissibility under 8 U.S.C. § 1182(a). As explained *supra*, the Policy contravenes the framework Congress set forth for adjudicating inadmissibility in 8 U.S.C. § 1182(a) by substituting blanket denial for the considerations that Congress intended officers to take. The Policy also abrogates the discretion of consular officers, which Congress invested in them by statute. It requires consular officers to deny applications, purportedly due to risk of public charge status, regardless of whether it is "in the[ir] opinion" that the applicant will become a public charge. 8 U.S.C. § 1182(a)(4). *See also* 8 U.S.C. § 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular officer.")

12

There are no other sections of the INA that appear to authorize the Department's memo. The Department did not invoke Section 1182(f) as the basis of its policy, and neither could it have, since that section requires that the President issue a Proclamation before suspending the entry of a class of noncitizens. *See Trump v. Hawaii*, 585 U.S. No Proclamation has been issued here.

### d. The State Department Was Likely Required to Promulgate The Policy Through Notice-and-Comment Procedures

Plaintiffs allege that the Department was required to promulgate this rule through a notice-and-comment process, and they failed to do so. The APA requires agencies to advise the public of all so-called "legislative rules" through a notice in the Federal Register of the terms or substance of a proposed substantive rule, allowing the public a period to comment. See 5 U.S.C. § 553(b) and (c); *Erringer v. Thompson*, 371 F.3d 625, 629–30 (9th Cir. 2004). The notice-and-comment requirement "is designed to give interested persons, through written submissions and oral presentations, an opportunity to participate in the rulemaking process." *Chief Prob. Officers of California v. Shalala*, 118 F.3d 1327, 1329 (9th Cir.1997). Generally, "[t]he procedural safeguards of the APA help ensure that government agencies are accountable and their decisions are reasoned." *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 758 (9th Cir.1992). This procedural requirement does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). Neither does it apply "to the extent that there is involved …[a] foreign affairs function of the United States." *Id.* § 553(a)(1). An interpretive rule, unlike a substantive rule, is only "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995).

The Ninth Circuit has borrowed a D.C. Circuit framework for distinguishing between interpretive and legislative rules. A rule is a legislative rule in the following circumstances:

> (1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action;
> (2) when the agency has explicitly invoked its general legislative authority; or
> (3) when the rule effectively amends a prior legislative rule.

*Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003) (citing *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1109 (D.C.Cir.1993)). Here the first criterion is most applicable.

The Policy meets the test as a legislative rule that should be subject to the notice-and-comment requirement. When determining whether or not there is an adequate legislative basis for enforcement action outside of the challenged rule, courts look to the governing statute and undisputed implementing regulations to see if they would authorize the action that the challenged rule implements. *Compare Alameda Health Sys. v. Centers for Medicare & Medicaid Servs.*, 287 F. Supp. 3d 896, 915 (N.D. Cal. 2017) *with LeadIC Design USA LLC v. United States Citizenship & Immigr. Servs.*, 766 F. Supp. 3d 946, 954 (N.D. Cal. 2025). In relevant part, Section 1201(g) provides that a consular officer will not grant an application where they "know or have reason to believe" that an applicant will become a public charge. 8 U.S.C. § 1201(g). Absent this policy, a consular officer would not have sufficient reason to refuse every single application from the affected countries, especially not on the basis of their nationality alone. Because no authorization for blanket denial exists besides the Policy, it is legislative.

Neither is the Policy subject to an exception to notice-and-comment on the basis of dealing with foreign affairs. The Ninth Circuit has held that the foreign affairs exception applies in the immigration context only when ordinary application of "the public rulemaking provisions [will] provoke definitely

14

1  undesirable international consequences." *East Bay Sanctuary Covenant v.*
2  *Trump*, 932 F.3d 742, 775-76 (2018) (quoting *Yassini v. Crosland*, 618 F.2d
3  1356, 1360 n.4 (9th Cir. 1980)). The agency here has not explained or brought
4  evidence showing the international consequences of a notice-and-comment
5  period, nor is it obvious. At this stage, it is not likely that this Policy qualifies for
6  the foreign affairs exception.

### C. Balance of Equities and the Public Interest

The balance of equities is in Plaintiffs' favor, and an injunction is in the public interest. Since Plaintiffs show a likelihood of success on the merits, they can show these factors as well because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *United Farm Workers v. DOL*, 509 F. Supp. 3d 1225, 1253–54 (E.D. Cal. 2020). To the contrary, "[t]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Thein,* 2025 WL 2418402, at *18 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (holding that plaintiffs subject to a travel ban have shown that the balance of equities and the public interest tip in their favor, and are entitled to preliminary injunctive relief); *Gomez v. Trump*, 485 F. Supp. 3d 145, 200 (D.D.C.), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden,* No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (same); *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ("[T]he public interest is served by compliance with the APA.") (cleaned up).

The promulgating memo alleges that it protects the public fisc. But the Government offers nothing beyond a "mere assertion" that nationals of the DRC are overusing or unlawfully using public benefits. *See Thein,* 2025 WL 2418402, at *18 (declining to lend credence to the Government's argument that prioritizing the plaintiffs' visa applications would cause harm to other applicants when

15

1  evaluating the balance of equities and the public interest). The promulgating
2  memo also does not account for the fact that usage of public benefits by
3  immigrants from the DRC is limited by law. 8 U.S.C. § 1613(a) (certain
4  noncitizens must wait five years after entry to obtain federal means-tested public
5  benefits); 8 U.S.C. § 1431 (under certain conditions, children under eighteen
6  years of age of U.S. citizens are automatically citizens of the United States).
7  Because injunctive relief here is limited to Plaintiffs only, it can cause no more
8  than a slight burden on the purposes of the Policy.

### D. Plaintiffs' Request for an Order Compelling the Department to Adjudicate Their Applications

Plaintiffs request injunctive relief to compel Defendants to immediately adjudicate Ms. Muangala and B.M.'s applications. This request must also be evaluated under the *Winter* factors, which include a showing of imminent harm in the absence of preliminary relief. 555 U.S. at 20. Plaintiffs submitted their motion for both forms of injunctive relief before the Policy's effective date, facing a possibility that if their applicants were not adjudicated in mere days, they would be interviewed but nevertheless automatically refused. Given that the Policy is now in effect, but enjoined as to Ms. Muangala and B.M., Plaintiffs have not met their burden to show that the harm they would suffer in the absence of an order compelling adjudication would constitute a basis for further injunctive relief. *Skalka v. Kelly,* 246 F. Supp. 3d 147, 153-54 (D. D.C. 2017) (noting that a two-year delay in processing an immigration visa "does not typically require judicial intervention").

### V.   CONCLUSION

The Court ORDERS that the Secretary of State, directly and through his designees, is enjoined from refusing the applications of Ms. Muangala and B.M where such refusal is based on the Secretary's memo of January 14, 2026. (ECF No. 8-11.)

16

The Plaintiffs are ordered to post collectively a bond in the amount of $1.00. See Fed. R. Civ. P. 65(c).

DATED: January 28, 2026

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

17