# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC. (CLINIC), et al., <br><br> *Plaintiffs*, <br><br> v. <br><br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the UNITED STATES DEPARTMENT OF STATE, <br><br><br> *Defendants*. | Civil Action No. 1:26-cv-00858-JAV |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ...................................................................................................2

I.     THE STATUTORY AND REGULATORY SCHEME ............................................................2

II.    THE VISA BAN ..........................................................................................................5

III.   PLAINTIFFS ...............................................................................................................7

ARGUMENT ....................................................................................................................9

I.     THE VISA BAN IS FINAL AGENCY ACTION SUBJECT TO CHALLENGE UNDER THE APA. ..........9

II.    THE VISA BAN VIOLATES THE APA BECAUSE IT IS IN EXCESS OF DEFENDANTS' STATUTORY
AUTHORITY AND CONTRARY TO LAW. ...............................................................................12

       A.   THE VISA BAN IS CONTRARY TO THE INA PUBLIC CHARGE PROVISION. ...........................12

       B.   THE BAN VIOLATES THE INA'S ANTIDISCRIMINATION PROVISION. ..................................14

       C.   THE BAN IS CONTRARY TO—AND NOT AUTHORIZED BY—8 U.S.C. §§ 1104(A) AND
       1201(G). ..............................................................................................................14

III.   THE VISA BAN WAS UNLAWFULLY ISSUED WITHOUT NOTICE AND COMMENT. ...................17

IV.    THE VISA BAN VIOLATES THE APA UNDER THE *ACCARDI* DOCTRINE. .................................20

V.     PLAINTIFFS HAVE ARTICLE III STANDING ..........................................................................22

VI.    VACATUR IS THE APA'S ORDINARY STATUTORY REMEDY AND IS APPROPRIATE HERE........24

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*African Communities Together v. Lyons*,
    799 F. Supp. 3d 362 (S.D.N.Y. 2025) ............................................................................. 10

*Alburakeh v. Armstrong*,
    2025 No. 25 Civ. 2700 (PAE), 2025 WL 3440600 (S.D.N.Y. Dec. 1, 2025) .................. 16

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ..................................................................................... 25

*Am. Fed'n of Tchrs., AFL-CIO v. Davis*,
    2025 WL 3763813 (S.D.N.Y. Dec. 30, 2025) ............................................................... 24

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993) ............................................................................... 17, 18

*Azar v. Allina Health Servs.*,
    587 U.S. 566 (2019) ....................................................................................................... 19

*Bennett v. Spear*,
    520 U.S. 154 (1997) .................................................................................................... 9, 10

*Bridgeport Hosp. v. Becerra*,
    108 F.4th 882 (D.C. Cir. 2024) ...................................................................................... 25

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020) ................................................................................. 23

*Centro de la Comunidad Hispana de Locust Valley v. Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) ........................................................................................... 22

*De La Mota v. U.S. Dep't of Education*,
    No. 02 Civ. 4276 (LAP), 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) ..................... 10

*Dep't of State v. Legal Assistance for Vietnamese Asylum Seekers*,
    519 U.S. 1 (1996) ........................................................................................................... 14

*Diamond Alternative Energy, LLC v. EPA*,
    145 S. Ct. 2121 (2025) ................................................................................................... 23

*Do No Harm v. Pfizer Inc.*,
    126 F.4th 109 (2d Cir. 2025) .......................................................................................... 23

*Filazapovich v. Dep't of State,*
    560 F. Supp. 3d 203 (D.D.C. 2021) ................................................................................16

*Gomez v. Trump,*
    485 F. Supp. 3d 145 (D.D.C. 2020) ................................................................................17

*Goodluck v. Biden,*
    104 F.4th 920 (D.C. Cir. 2024) .....................................................................................16

*Guertin v. United States,*
    743 F.3d 382 (2d Cir. 2014) .....................................................................................24, 25

*Haitian Evangelical Clergy Ass'n v. Trump,*
    789 F. Supp. 3d 255 (E.D.N.Y. July 1, 2025) ...............................................................24

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ......................................................................................................23

*Hunt v. Wash. State Apple Advertising Comm'n,*
    432 U.S. 333 (1977) .................................................................................................23, 24

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*
    45 F.3d 469 (D.C. Cir. 1995) ........................................................................................14

*Make the Rd. N.Y. v. Pompeo,*
    475 F. Supp. 3d 232 (S.D.N.Y. 2020) ...............................................4, 13, 18, 18, 22, 25

*Mantena v. Johnson,*
    809 F.3d 721 (2d Cir. 2015) ..........................................................................................22

*Melody Pak v. Biden,*
    91 F.4th 896 (7th Cir. 2024) ..........................................................................................22

*Milligan v. Pompeo,*
    502 F. Supp. 3d 302 (D.D.C. 2020) ...............................................................................17

*Montilla v. I.N.S.,*
    926 F.2d 162 (2d Cir. 1991) ................................................................................20, 21, 24

*Morton v. Ruiz,*
    415 U.S. 199 (1974) ......................................................................................................20

*N.Y. Legal Assistance Grp. v. Cardona,*
    No. 20-cv-1414 (LGS), 2025 WL 871371 (S.D.N.Y. Mar. 20, 2025) ............................25

*N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*,
    267 F.3d 128 (2d Cir. 2001) ...............................................................................17

*Nat. Res. Def. Council v. EPA*,
    676 F. Supp. 2d 307 (S.D.N.Y. 2009) ...............................................................24

*New York v. HHS*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...............................................................24

*New York v. Trump*,
    767 F. Supp. 3d 44 (S.D.N.Y. 2025) .................................................................10

*New York v. Trump*,
    784 F. Supp. 3d 619 (S.D.N.Y. 2025) ...............................................................10

*New York v. United States Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020) ............................................................................4, 13

*Olsen v. Albright*,
    990 F. Supp. 31 (D.D.C. 1997)...........................................................................14

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) ..............................................................................11

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015) ..............................................................................................19

*Pietersen v. Dep't of State*,
    138 F.4th 552 (D.C. Cir. 2025) .....................................................................12, 14

*Rai v. Biden*,
    567 F. Supp. 3d 180 (D.D.C. 2021)....................................................................17

*Rajabi v. Rubio*,
    24 Civ. 494, 2025 WL 1266961 (W.D. Va. May 1, 2025)...................................3

*Rashed v. Blinken*,
    24 Civ. 964 (PAE), 2024 WL 4904701 (SDNY Nov. 27, 2024) .......................3

*Resources Defense Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ...........................................................................17, 19

*Rumsfeld v. Forum of Acad. and Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ..............................................................................................22

*Salazar v. King*,
  822 F.3d 61 (2d Cir. 2016) ...................................................................10, 20

*Sangster v. Rubio*,
  No. 3:25-cv-00447, 2026 WL 222316 (D. Nev. Jan. 28, 2026). ...................11, 13, 15, 18

*Shen v. U.S. Consulate Gen.*,
  866 F. Supp. 779 (S.D.N.Y. 1994) ...............................................................15

*Singh v. U.S. Dep't of Justice*,
  461 F.3d 290 (2d Cir. 2006) ......................................................................20

*Sweet v. Sheahan*,
  235 F.3d 80 (2d Cir. 2000) .......................................................................17

*Tate v. Pompeo*,
  513 F. Supp. 3d 132 (D.D.C. 2021)...........................................................3, 17

*Texas v. United States*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021)......................................................11, 19

*Thein v. Trump*,
  No. 25-2369, 2025 WL 2418402 (D.D.C. Aug. 21, 2025).................................16

*Time Warner Cable Inc. v. F.C.C.*,
  729 F.3d 137 (2d Cir. 2013) ......................................................................19

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ................................................................................22

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ............................................................................9, 11

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) .............................................................................2, 20

*Vo Van Chau v. Dep't of State*,
  891 F. Supp. 650 (D.D.C. 1995).................................................................14

**STATUTES**

5 U.S.C.
  § 551(4) ..............................................................................................17
  § 553 .............................................................................................17, 24
  § 706 ..................................................................................................25

§ 706(2) ..................................................................................................24
§ 706(2)(A) .............................................................................................25

8 U.S.C.
§ 1101 ..................................................................................................1, 2
§ 1104(a) ............................................................3, 12, 14, 15, 24
§ 1151 ........................................................................................................2
§ 1152 ......................................................................................................14
§ 1152(a)(1)(A) ...............................................5, 12, 14, 14, 24
§ 1182(a)(4) ..................................4, 5, 12, 13, 15, 16
§ 1201(g) ...............................................3, 7, 12, 14, 15, 16, 24
§ 1202(a) ...................................................................................................2
§ 1202(b) ..................................................................................................3
§ 1202(e) ..................................................................................................2
§ 1253(d) ................................................................................................19

Immigration and Nationality Act of 1965, Pub. L. No. 89-236, § 2 (1965)....................................5

INA § 221(g) ............................................................................................7

## REGULATIONS

9 FAM 302.8-2(B)(1) .......................................................................4, 5

9 FAM 302.8-2(B)(1)(a)(3) ...............................................................21

9 FAM 302.8-2(B)(2) ....................................................................4, 5, 21

9 FAM 302.8-2(B)(2)(a) .........................................................................4

9 FAM 302.8-2(B)(3) .............................................................................21

9 FAM 504.1-3(g) ............................................................................16, 21

9 FAM 504.11-2(A) ..........................................................................3, 21

18 FAM 201.1-1(B) ................................................................................3

22 C.F.R.
§ 5.5 ...........................................................................................................3
§ 40.6 .................................................................................3, 16, 20, 21
§ 42.130 ..................................................................................................19
§ 42.61 ......................................................................................................3
§ 42.71 ......................................................................................................3
§ 42.81 ...............................................................................................3, 19

## FEDERAL RULES

Fed. R. Evid.
Rule 201(b)........................................................................................................2

## STATE RULES

N.Y. Local R.
Rule 7.1.........................................................................................................28

N.Y. R. Civ. P.
Rule 56.1 (a) ....................................................................................................2

## OTHER AUTHORITIES

52 Fed. Reg 42590 (1987)................................................................................19, 20

52 Fed. Reg. 43894 (1987).....................................................................................20

Tom Gjelten, The Gilder Lehram Inst. of Am. History, *The 1965 Immigration Act:*
*Opening the Nation to Immigrants of Color* (Fall 2018),
https://www.gilderlehrman.org/history-resources/essays/1965-immigration-
act-opening-nation-immigrants-color................................................................5

PRELIMINARY STATEMENT

This case challenges the Trump-Vance administration's scheme to indefinitely suspend legal migration to this country for nationals of 75 countries. Congress, through the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq*., requires consular officers to adjudicate immigration visas based on a careful, individualized assessment of the totality of each applicant's circumstances. Through that framework, Congress has sought to promote family unity by prioritizing immigration of family members of U.S. citizens and lawful permanent residents and to encourage immigration by those seeking opportunity in the United States. And, despite the United States' long and shameful history of excluding immigrants based on race and nationality, since 1965 the INA has prohibited discrimination in the issuance of visas based upon the applicant's nationality.

Undeterred by Congress's choices in the INA, Defendants have imposed a categorical nationality-based ban on legal immigration for nationals of 75 countries—nearly half of all visa applicants—based on the unsupported and demonstrably false claim that nationals of the covered countries migrate to the United States to "unlawfully utilize welfare" or "public benefits" more broadly and are likely to become "public charges."[1] Under this "Visa Ban," Defendants assert authority to substitute the considered, case-by-case assessment by consular officers that the INA requires, including an individualized determination of whether the applicant is likely to become a "public charge," with a categorical ban based solely on the applicant's nationality. This evisceration of statutory mandates and decades of settled law and practice has already harmed vast numbers—including the individual, associational, and organizational Plaintiffs in this case—by

---

[1]    *See* Immigrant Visa Processing Updates for Nationalities at High Risk of Public Benefits Usage, U.S. Dep't of State (Jan. 14, 2026) (Ex. A) ("Blanket Visa Ban" or "Visa Ban" or "Ban"); U.S. Dep't of State Visa Cable, Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge, 26 STATE 3740 (Jan. 14, 2026) (Ex. B) ("Blanket Visa Ban Cable").

separating families and preventing intending immigrants including engineers, architects, physicians, and others from contributing to communities in this country.

Defendants' rewrite of the INA is unlawful and must be set aside under the Administrative Procedure Act (APA) because it is contrary to law, was promulgated without notice-and-comment procedures, and contravenes regulations the government must follow under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). The Court should therefore grant Plaintiffs summary judgment on Counts One, Three, and Seven,[2] set aside the Visa Ban, and restore the individualized, case-by-case adjudication the INA requires.

## FACTUAL BACKGROUND[3]

### I.    The Statutory and Regulatory Scheme

The INA, 8 U.S.C. §§ 1101 et seq., sets forth a comprehensive and controlling statutory framework governing the admissibility of immigrants—one that prioritizes the reunification of U.S. citizens and lawful permanent residents with their family members and employment-based immigration of people who contribute to communities in the United States. *See generally* 8 U.S.C. §§ 1151–1154.

Under the INA and its implementing regulations, an intending immigrant residing abroad must apply for and be issued an immigrant visa at a United States embassy or consulate. *See* 8

---

[2]    Consistent with the agreed scheduling order, ECF No. 44, this motion addresses only Counts One, Three, and Seven of the Complaint (on Count Seven, with respect to the Visa Ban and any related or implementing actions only), which can be resolved as a matter of law without the administrative record. Plaintiffs reserve the right to seek summary judgment or other relief on their remaining claims, or for additional relief with respect to Counts One, Three, and Seven, at an appropriate time after Defendants produce the administrative record.

[3]    The undisputed facts needed to rule on this motion are set forth in the public record of the Visa Ban (of which the Court can take judicial notice under Fed. R. Evid. 201(b)), and which is submitted for the Court's convenience as exhibits to the accompanying declaration of Joanna Cuevas Ingram and facts regarding the Plaintiffs in their accompanying declarations. Although no separate statement of undisputed facts is required, *see* Local Civ. R. 56.1(a), Plaintiffs nevertheless submit such a statement for the Court's convenience.

U.S.C. § 1202(a), (e); 22 C.F.R. §§ 42.61, 42.71, 42.81. The statute requires consular officers—

and only consular officers—to review and adjudicate immigrant visa applications. 8 U.S.C.

§ 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular

officer."). While the Act grants the Defendant Secretary of State broad statutory authority over the

administration and enforcement of immigration and nationality laws, including those relating to

the powers, duties, and functions of consular officers, it denies the Secretary authority relating to

"those powers, duties, and functions conferred upon the consular officers relating to the granting

or refusal of visas." 8 U.S.C. § 1104(a).

A consular officer may refuse an application for an immigrant visa only if the officer

concludes that the applicant is ineligible under one or more of the grounds listed in the INA. 8

U.S.C. § 1201(g). Thus, "[a] visa can be refused *only* upon a ground specifically set out in the law

or implementing regulations." 22 C.F.R. § 40.6 (emphasis added); *see also id.* § 42.81 (a consular

officer considering an application for an immigrant visa "must issue the visa" once the application

is properly completed and executed unless it may be refused under the INA or other applicable

law). As the Department's Foreign Affairs Manual explains:

> There are no exceptions to the rule that once a[n immigrant] visa application has been
> properly completed and executed before a consular officer, a visa must be either issued or
> refused . . . [A]ny applicant to whom a visa is not [timely] issued . . . must be found
> ineligible under one or more of the provisions of [8 U.S.C. §§ 1182(a), 1182(e), or
> 1201(g)].

9 Foreign Affairs Manual (FAM) 504.11-2(A).[4] The statute thus does not permit Defendants to

refuse visa applications or suspend the issuance of visas on any grounds other than those set forth

in the statute. *Tate* v. *Pompeo*, 513 F. Supp. 3d 132, 143–46 (D.D.C. 2021).

---

[4]    The Foreign Affairs Manual "articulates" the State Department's "official guidance,
including procedures and policies, on matters relating to Department management and
personnel[.]" 22 C.F.R. § 5.5; *see* 18 FAM 201.1-1(B) (FAM provides information for State
Department employees to "carry out their responsibilit[y] in accordance with statutory and

One ground of ineligibility for an immigrant visa under the INA is set forth in the "public charge" provision, 8 U.S.C. § 1182(a)(4). It provides that a noncitizen is inadmissible if, "in the opinion of the consular officer at the time of application for a visa, . . . [the noncitizen] is likely at any time to become a public charge." *Id.* The term "public charge" means a person who is primarily dependent on the government for subsistence: "a person who is unable to support herself, either through work, savings, or family ties." *New York* v. *United States Dep't of Homeland Sec.*, 969 F.3d 42, 70-81 (2d Cir. 2020); *Make the Rd. N.Y. v. Pompeo,* 475 F. Supp. 3d 232, 259 (S.D.N.Y. 2020); *see also* 9 FAM 302.8-2(B)(1)–(2) ("the term 'public charge' means that an individual, after admission into the United States, is likely to become primarily dependent on the U.S. Government for subsistence. This means either: (a) Receipt of public cash assistance for income maintenance . . . or (b) Institutionalization for long-term care at U.S. Government expense . . . ."). Public-charge determinations are made by consular officers employed by the Department of State (DOS) for noncitizens seeking immigrant visas abroad and by the Department of Homeland Security (DHS) and United States Citizenship and Immigration Services (USCIS) for noncitizens seeking status adjustment within the U.S. *See* Rule 56.1 Statement ¶¶ 66–74.

Public-charge assessments must be based on a case-by-case evaluation of the totality of the applicant's circumstances. *See generally* 9 FAM 302.8-2(B)(2)(a) (explaining that "public charge determinations" should be based upon "the 'totality of the circumstances' existing when the visa application is submitted"). The consular officer must "at a minimum" consider five statutory factors specific to the applicant, including their age; health; family status; assets, resources, and

---

Executive mandates"). Courts, including in this District, have treated the Manual as a "persuasive tool in reading the relevant statutes and regulations." *Rajabi v. Rubio*, 24 Civ. 494, 2025 WL 1266961, at *2 n.3 (W.D. Va. May 1, 2025); *see, e.g.*, *Rashed v. Blinken*, 24 Civ. 964 (PAE), 2024 WL 4904701, at *1, *4 (SDNY Nov. 27, 2024) (citing FAM provisions regarding issuance of immigrant visas).

financial status; and education and skills, 8 U.S.C. § 1182(a)(4)(B)(i), and may consider an affidavit of support from a sponsor, *id*. § 1182(a)(4)(B)(ii). The Foreign Affairs Manual instructs consular officers to apply the totality of circumstances test in each case based upon the definition of public charge above, 9 FAM 302.8-2(B)(1)–(2). Neither § 1182 nor any other INA provision authorizes categorical bans of visa processing on public-charge grounds based on the applicant's nationality or residence—indeed, the INA expressly prohibits them. The Act mandates—notwithstanding narrow statutory numerical quotas based on categories of immigrants not relevant here—that "[n]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality, place of birth, or place of residence*." 8 U.S.C. § 1152(a)(1)(A) (emphasis added). This prohibition against race, sex, and nationality discrimination was not incidental: it was a central pillar of the landmark Immigration and Nationality Act of 1965, Pub. L. No. 89-236, § 2 (1965).[5] That Act, as amended, remains in effect today.

## II.    The Visa Ban

On January 14, 2026, Defendants announced an unqualified and indefinite suspension of all immigrant visas for nationals of 75 countries—regardless of any individual applicant's statutory eligibility—on the asserted ground that applicants from these countries pose a heightened risk of becoming "public charges." Exs. A & B.[6] DOS's public announcement of the Ban, entitled "Immigrant Visa Processing Updates for Nationalities at High Risk of Public Benefits Usage," stated in relevant part:

---

[5]    *See generally* Tom Gjelten, The Gilder Lehram Inst. of Am. History, *The 1965 Immigration Act: Opening the Nation to Immigrants of Color* (Fall 2018), https://www.gilderlehrman.org/history-resources/essays/1965-immigration-act-opening-nation-immigrants-color (last visited February 20, 2026).

[6]    All exhibits are attached to the contemporaneously filed Declaration of Joanna Cuevas Ingram.

President Trump has made clear that immigrants must be financially self-sufficient and not be a burden to Americans. The Department of State is undergoing a full review of all policies, regulations, and guidance to ensure that immigrants from these high-risk countries do not utilize welfare in the United States or become a public charge. [¶] Effective January 21, 2026, the Department of State is pausing all visa issuances to immigrant visa applicants who are nationals of the following countries [listing 75 countries].

Ex. A at 2.[7] The announcement nowhere indicated how long the "pause" would last or when, if at all, it would end. Defendants did not provide notice or give the public any opportunity to comment on the Ban before putting the Ban into effect.

A cable from Defendants to consular officers worldwide purports to implement the Ban. Exs. B & G. The cable, dated January 14, 2026, from "SECSTATE WASHDC" to "ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate*," and identified as an "action request," provides that, effective January 21, 2026, "consular officers must refuse . . . **all immigrant visa applicants** . . . if the applicant is a national of the [75 targeted] countries." *Id*. at 4 (emphasis in original). The cable further provides that immigrant visa applications from the targeted countries are to be categorically denied "until further notice." *Id*. at ¶¶ 1, 2, 4. Once again, the only justification claimed in the cable is that the Ban is "based on indication of nationals from these countries having sought public benefits in the United States" and will "allow the Department to evaluate and enhance screening and vetting procedures and guidance related to the public charge ground of ineligibility." *Id*. at ¶ 3.[8]

The cable requires consular officers to refuse visas even where the consular officer has affirmatively concluded that the applicant is not inadmissible. Specifically, the cable instructs

---

[7]    *See also* Ex. F ("The Department of State is undergoing a full review of all screening and vetting policies to ensure that immigrants from high-risk countries do not unlawfully utilize welfare in the United States or become a public charge.").

[8]    While Defendants did not release the cable publicly, a leaked copy was widely distributed, and Defendants have not denied its authenticity. On March 6, 2026, Defendants produced an official copy, attached as Exhibit B, that matches the leaked copy. Cuevas Ingram Decl. ¶ 7.

consular officers to go through the motions of processing visa applications as usual. Thus, "interview appointments for applicants from these nationalities should not be cancelled," and consular officers should "continue to adjudicate all immigrant visa cases and carefully evaluate all potentially applicable grounds of ineligibility, including assessing whether an applicant is likely to become a public charge." *Id.* at ¶ 4. But it makes clear that no visas may be issued while the cable is in effect. *Id*. at ¶ 9. Even if the officer assesses all INA grounds of ineligibility and finds that none supplies a basis for refusing the visa, the officer must still refuse a visa under the Visa Ban. *Id*. at ¶ 4. Indeed, the cable instructs consular officers not to issue a visa even if a visa has already been authorized and was simply waiting to be printed.  *Id*. at ¶ 9.

Neither DOS's announcement nor the cable provided a legal basis for the Visa Ban. The cable cited INA § 221(g), 8 U.S.C. § 1201(g), as the sole ground for refusing to issue visas under the "pause." *Id*. at ¶ 4. But, as noted, § 1201(g) and its implementing regulations affirmatively require consular officers to issue immigrant visas unless the officer determines the applicant is legally ineligible under a specific ground listed in the INA, including the public-charge ground. *See infra* at 12-17. Neither the announcement nor the cable identified any data to support the assertion that nationals of the targeted countries pose a "[h]igh [r]isk of [p]ublic [b]enefits [u]sage" or of becoming a public charge or explained why the individualized assessment required by the INA is insufficient to address that purported risk. Ex. B at 1.

## III.    Plaintiffs

Defendants' Blanket Visa Ban has indefinitely blocked individual Plaintiffs or their family members from receiving the individualized, case-by-case adjudication the INA requires and has directly harmed Plaintiffs CLINIC and ACT and ACT's members.

Several individual plaintiffs (including a member of ACT) are U.S. citizens who have petitioned for their relatives to come to the United States. For each of these plaintiffs, USCIS approved the petition, and the National Visa Center advised that all fees had been paid and all required documents had been received. Kyeremaa Decl. ¶ 10; Richardson Decl. ¶ 7; Andred Aguirre Decl. ¶ 11; Munthaz Hassen Decl. ¶ 6; Maru Hassen Decl. ¶ 6; Mitchell Decl. ¶ 12. Half of these Plaintiffs' family members have already attended their consular interviews. Kyeremaa Decl. ¶ 11; Andred Aguirre Decl. ¶ 14; Mitchell Decl. ¶ 13.  Yet the visa applications have been refused or left unresolved due to the Ban. Kyeremaa Decl. ¶ 13; Richardson Decl. ¶ 10; Andred Aguirre Decl. ¶¶ 16–18; Munthaz Hassen Decl. ¶ 7; Maru Hassen Decl. ¶ 7; Mitchell Decl. ¶¶ 14–15. The Ban has thus indefinitely separated Plaintiffs from their family members and caused them stress, anxiety, insomnia, and other adverse effects. Kyeremaa Decl. ¶¶ 20-21, 25; Richardson Decl. ¶¶ 15–18, 24; Andred Aguirre Decl. ¶¶ 25, 32–39; Munthaz Hassen Decl. ¶¶ 16–18; Maru Hassen Decl. ¶¶ 13–17; Mitchell Decl. ¶¶ 21–26.

Other individual plaintiffs are intending immigrants who the government has already determined satisfy the demanding statutory standards for employment-based immigration. Four were approved for EB-2 national interest waivers, a classification that requires USCIS to find both that the applicant's proposed work has substantial merit and national importance and that waiving the ordinary labor-certification requirement benefits the United States. Buitrago Cagua Decl. ¶ 5–6; Alcendra Moscote Decl. ¶¶ 5–6; Medina Ramirez Decl. ¶ 6; Angulo Peñaranda Decl. ¶¶ 6–7. The fifth was approved for EB-1A ("extraordinary ability") classification, an even more selective category reserved for individuals at the top of their fields. Lizcano Losada Decl. ¶ 5. All had their petitions approved and attended their consular interviews before the Ban abruptly halted visa issuance. Buitrago Cagua Decl. ¶¶ 6, 9–10; Alcendra Moscote Decl. ¶¶ 6, 8–9; Medina Ramirez

Decl. ¶¶ 6, 8–9; Lizcano Losada Decl. ¶¶ 5–7; Angulo Peñaranda Decl. ¶¶ 7–8.

Plaintiffs CLINIC and ACT are likewise harmed. CLINIC is a national nonprofit organization that supports a network of immigration law providers spanning 49 states. Defendants denied them an opportunity to comment on and oppose the Ban, and CLINIC would have submitted a comment in opposition to the Ban. Wheeler Decl. ¶¶ 15–16. The Ban interferes with one of CLINIC's core business activities of providing effective visa application assistance to affiliates and achieving positive outcomes for their United States-based clients and their relatives. *Id.* at ¶¶ 11–14. Likewise, ACT, a member-based organization composed of African immigrants from across the African diaspora, is harmed by the Ban, including because the Ban prevents ACT members from unifying with their families, and ACT would have submitted a comment in opposition to the Ban. Kassa Decl. ¶¶ 11, 17–20, 34–35

ARGUMENT

Plaintiffs are entitled to summary judgment on each of the claims raised in this motion because the Visa Ban is final agency action under the APA that exceeds the government's statutory authority, was promulgated without required notice-and-comment procedures, and violates the *Accardi* doctrine. This suit does not ask the Court to second-guess any individual consular officer's merits determination. Instead, it challenges a Department-wide policy that categorically displaces the individualized adjudication and visa issuance process Congress required.

## I.     THE VISA BAN IS FINAL AGENCY ACTION SUBJECT TO CHALLENGE UNDER THE APA.

The Supreme Court has adopted a two-prong test for determining when agency actions are "final" and thus subject to challenge under the APA. Agency actions are final where they (1) "mark the consummation of the agency's decision-making process" and (2) are actions by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett* v. *Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted); *see also U.S. Army Corps*

9

*of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597-98 (2016) (reaffirming the *Bennett* standard). The Supreme Court has interpreted this test "in a pragmatic way." *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (internal quotation marks omitted). Thus, as this Court has explained, "[t]he practical effect of the [agency's] action, not the informal packaging in which it was presented, is the determining factor in evaluating whether the [agency's] action was 'final.'" *New York v. Trump*, 767 F. Supp. 3d 44, 76 (S.D.N.Y. 2025) (Vargas, J.), modified by *New York v. Trump,* 784 F. Supp. 3d 619 (S.D.N.Y. 2025), *pending appeal* No. 25-1860 (July 31, 2025) (quoting *De La Mota v. U.S. Dep't of Education*, No. 02 Civ. 4276 (LAP), 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003)). Here, the challenged final actions are DOS's January 14, 2026, public announcement of the Visa Ban and its same-day cable directing consular posts worldwide to refuse issuance to covered applicants effective January 21, 2026.

The January 14 announcement and cable satisfy both *Bennett* prongs. *First*, they mark the consummation of DOS's decision-making process as to the challenged policy: the Department publicly announced the nationality-based suspension, directed posts worldwide to implement it effective January 21, 2026, and left it in force indefinitely "until further notice." Ex. A at 2; Ex. B at 4. Those instruments were not tentative, interlocutory, or merely advisory; they were the Department's operative and binding instructions to consular posts. *See also African Communities Together v. Lyons*, 799 F. Supp. 3d 362, 387 (S.D.N.Y. 2025) (holding that Department of Justice email providing guidance to immigration judges was likely a final action because it constituted the adoption of a policy determining the agency's obligations, from which legal consequences would flow) (citing *New York v. Trump*, *supra*).

*Second*, the January 14 announcement and cable are plainly actions by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S.

at 178 (internal quotation marks omitted). They impose mandatory obligations on consular officers assessing visa applications from the targeted countries, directing that they "must" refuse all such visa applications while the Ban is in force. Ex. B at 4. And the Ban has immediate legal consequences for applicants and their U.S.-based sponsors and family members: it categorically forecloses the individualized adjudications the INA prescribes, and it has already resulted in visa refusals in Plaintiffs' cases.

> Another court, applying similar reasoning, recently held that the Ban is final agency action:
>
> > Although the agency claims that the policy will be replaced with a new public charge screening at some future point . . . , [l]egal consequences certainly flow from the implementation of this policy. It is currently in effect, and while it is in effect, the Department of State will not approve any immigrant visas for nationals of seventy-five countries.

*Sangster v. Rubio*, No. 3:25-cv-00447, 2026 WL 222316, at *3 (D. Nev. Jan. 28, 2026) (citations omitted) (granting motion by two individual plaintiffs for temporary restraining order enjoining Secretary of State from refusing visa applications of one plaintiff and the other plaintiff's daughter where such refusal is based on the Blanket Visa Ban).

As the court recognized in *Sangster*, Defendants cannot evade judicial review merely by labeling the Ban a temporary "pause"—particularly where, as in this case, the "pause" on its face has immediate effect, applies in sweeping fashion to every visa applicant from 75 countries, and will remain in place indefinitely. *Id.*; Ex. B at 5 ¶ 4. *E.g.*, *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984–86 (9th Cir. 2006) (holding that agency policy statement that is routinely revised and reissued annually was a final agency action because it was the agency's "last word" so long as it remained in effect). As the Supreme Court has emphasized, the possibility that the agency revises its rules in the future "does not make an otherwise definitive decision nonfinal." *Hawkes*, 578 U.S. at 598; *see Texas v. United States*, 524 F. Supp. 3d 598, 642–43 (S.D. Tex. 2021) (temporary 100-day pause on removals of certain noncitizens by DHS was a final agency

because it was to be given "immediate" effect and determined rights and obligations of affected noncitizens and DHS). Here, too, the Visa Ban directly affects the rights of visa applicants from the 75 targeted countries to have their applications adjudicated and consular officers' obligations to adjudicate visas for the indefinite period in which the Visa Ban remains in effect. The purportedly "temporary" nature of the Visa Ban does not render it unreviewable.

Nor does this APA challenge seek review of any individual consular officer's merits determination. Plaintiffs challenge a Department-wide rule and implementing directive that categorically govern visa adjudications across posts worldwide. That sort of forward-looking challenge to overarching State Department policy is distinct from an effort to overturn an individual visa refusal and is therefore reviewable under the APA. *Pietersen v. Dep't of State*, 138 F.4th 552, 560-61 (D.C. Cir. 2025).

## II.    The Visa Ban Violates the APA Because It is In Excess of Defendants' Statutory Authority and Contrary to Law.

The Visa Ban is in excess of statutory authority and contrary to law because it conflicts with—and is not authorized by—multiple provisions of the INA, including 8 U.S.C. §§ 1182(a)(4) (public charge provision), 1152(a)(1)(A) (prohibiting nationality-based discrimination), 1104(a) (denying Secretary of State authority conferred on consular officers relating to granting or refusal of visas), and 1201(g) (governing individual refusals of immigrant visa applications).

### A.  The Visa Ban is Contrary to the INA Public Charge Provision.

As discussed above—and as is clear from the statute's text, the implementing regulations, governing case law, and Defendants' own Foreign Affairs Manual—the INA does not permit categorical denials of visa applications such as the Visa Ban on public-charge grounds. Instead, it requires that a public-charge determination must rest upon a case-by-case, individualized assessment of the application in accordance with the definition of public charge under the statute

and long established legal precedent. *E.g., New York,* 969 F.3d at 70–81; *Make the Rd. N.Y.,* 475 F. Supp. 3d at 244-45, 259; 8 U.S.C. § 1182(a)(4). Indeed, even Defendants' cable implementing the Blanket Visa Ban recognizes that the INA requires consular officers to "assess the totality of circumstances to determine an applicant's eligibility under [the statutory public charge provision]." Exs. B & G at 4.

The Blanket Visa Ban seeks to overturn this framework entirely, however. Rather than resting a public-charge denial of a visa on the required individual assessment of the totality of the applicant's circumstances, based on the five factors identified in the statute and the affidavit of support, the Ban mandates the categorical refusal of all visa applications from nationals of the targeted countries on the sole basis of nationality, irrespective of the applicant's circumstances, on the ground that nationals of those countries are purportedly "at High Risk of Public Charge." Exs. B & G at 4 (subject line). Indeed, as noted, consular officers must refuse visas even after determining that the applicant is not likely to become a public charge and that no other statutory ground of ineligibility applies. Exs. B & G at 5 ¶¶ 4, 9. The Ban is thus squarely contrary to—and unauthorized by—8 U.S.C. § 1182(a)(4).

For substantially these reasons, the court in *Sangster* held that the Visa Ban is likely contrary to law. The court explained that the Ban "essentially nullifies" the statutory grounds of inadmissibility under § 1182(a)(4) and represents an unlawful "end run around the [statutory] categories of inadmissibility." 2026 WL 222316, at *5. The court reasoned that,

> [a]lthough the policy asks officers to go through the motions of an individualized analysis to determine whether the grounds of inadmissibility may apply, even if the officer finds no basis for inadmissibility the result is still refusal. . . . The [statutory public charge] factors are meant to have an impact on the officer's decision. In making them redundant to the outcome, the Department has contravened the clear dictates of the statute.

*Id.* (citations omitted). The same is true here.

13

### B.  The Ban Violates the INA's Antidiscrimination Provision.

The Visa Ban also violates the antidiscrimination mandate of 8 U.S.C. § 1152. Section 1152(a)(1)(A) prohibits discriminating against any person in the issuance of a visa "because of the person's . . . nationality, place of birth, or place of residence." *Id.* As the D.C. Circuit has said of this provision, "Congress could hardly have chosen more explicit language." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995) *vacated on other grounds*, 519 U.S. 1 (1996).

The Visa Ban violates this antidiscrimination prohibition by requiring consular officers to refuse immigrant visa applications based solely on the nationality of the applicant, even while permitting such visas to be granted to nationals of any other country who are otherwise identically situated. It is difficult to imagine a clearer example of "discriminat[ing] against [a person] in the issuance of an immigrant visa because of the person's . . . nationality." 8 U.S.C. § 1152(a)(1)(A). *See Legal Assistance*, 45 F.3d at 472–74 (holding unlawful under § 1152 a policy of refusing to process visa applications by Vietnamese nationals at U.S. consulate in Hong Kong while continuing to process applications by nationals of other countries there); *Vo Van Chau v. Dep't of State*, 891 F. Supp. 650, 654–55 (D.D.C. 1995) (same with respect to similar policy applied to Laotian and Cambodian as well as Vietnamese nationals); *Olsen v. Albright*, 990 F. Supp. 31, 37-39  (D.D.C. 1997) (policies requiring consular officers to adjudicate visas based on "profiles" that predicted fraud based in part on applicant's race, ethnicity, and national origin violated § 1152(a)(1)).

### C.  The Ban Is Contrary To—And Not Authorized By—8 U.S.C. §§ 1104(a) and 1201(g).

The Visa Ban is squarely contrary to—and not authorized by—8 U.S.C. §§ 1104(a) and 1201(g). *First*, § 1104(a) expressly withholds from the Secretary authority relating to "powers,

duties, and functions conferred upon the consular officers relating to the granting or refusal of visas." Thus, the INA "grants consular officers exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations." *Pietersen*, 138 F. 4th at 556 (internal quotation marks omitted); *See* 8 U.S.C. §§ 1104(a), 1201; *see also Shen v. U.S. Consulate Gen.*, 866 F. Supp. 779, 782 (S.D.N.Y. 1994) (same). And the public-charge provision renders inadmissible applicants who are likely to become a public charge "in the opinion of the *consular officer* at the time of application for a visa." *Id*. § 1182(a)(4) (emphasis added).

In the Blanket Visa Ban, Defendants seek to exercise authority that § 1104(a) expressly denies them. Defendants' cable, which identifies the sender as "SECSTATE WASHDC," tells consular officers that they "must" refuse visa applications from nationals of the 75 targeted countries regardless of the officials' determination about the admissibility of any particular applicant. Exs. B & G at ¶¶ 2, 4. Where a consular officer has found no individualized ground of inadmissibility, the Secretary has no authority to override that determination or direct refusal despite that decision. 8 U.S.C §§ 1104(a), 1201. But the Visa Ban does exactly that. The cable instructs officers to refuse applicants on public-charge grounds if the officer actually makes that case-specific finding. Yet even where the officer makes no such finding—and no other individualized finding of ineligibility—the cable still directs an § 1201(g) refusal based solely on the applicant's nationality. Tellingly, none of the individual Plaintiffs was refused because of an individualized public-charge finding. Upon attending their interviews, Plaintiffs and petitioning family members received only the blanket § 1201(g) refusal the Ban prescribes—confirming that the refusals were issued directly on the basis of the Ban's nationality-based categorical rule, not on any applicant-specific ineligibility determination. Kyeremaa Decl. ¶ 13; Andred Aguirre Decl. ¶ 16; Mitchell Decl. ¶ 15; Lizcano Losada Decl. ¶ 7; Buitrago Cagua Decl. ¶¶ 9–10; Alcendra

Moscote Decl. ¶¶ 8–9; Medina Ramirez Decl. ¶¶ 8–9; Angulo Peñaranda Decl. ¶ 8; *see Sanger*, 2026 WL 222316, at *6 (Visa Ban improperly "requires consular officers to deny applications, purportedly due to risk of public charge status, regardless of whether it is 'in the[ir] opinion' that the applicant will become a public charge").

*Second*, § 1201(g)—the only INA provision cited in Defendants' announcement of the Blanket Ban or their cable—likewise provides no authority for the Ban. That Section merely provides that a visa will not be issued if the *consular officer* determines that the applicant is ineligible for a visa under § 1182 or another provision of law, or the applicant fails to comply with other provisions of the INA. Likewise, as discussed above, DOS's regulations provide that "[a] visa can be refused *only* upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6 (emphasis added); *see also id*. § 42.81 (a consular officer considering an application for an immigrant visa "must issue the visa" once the application is properly completed and executed unless it may be refused under the INA or other applicable law) (citing § 1201(g)). And the Foreign Affairs Manual explains that a consular officer legally "cannot temporarily refuse, suspend, or hold the visa for future action." 9 FAM 504.1-3(g); *see also Alburakeh v. Armstrong*, No. 25 Civ. 2700 (PAE), 2025 WL 3440600, at *1 (S.D.N.Y. Dec. 1, 2025) (noting that "the consular officer—by regulation—'must' make the binary decision to either 'issue' or 'refuse the visa'").

Courts have accordingly held that the Secretary lacks authority under §§ 1104 and 1201(g) to suspend the issuance of visas to statutorily eligible applicants. *See, e.g.*, *Thein v. Trump*, No. 25-2369 (SLS), 2025 WL 2418402, at *14–17 (D.D.C. Aug. 21, 2025), *pending appeals* No. 25-5338 (Sep. 23, 2025) & No. 25-5357 (Oct. 09, 2025); *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 233–35 (D.D.C. 2021), *rev'd and remanded on other grounds*, 104 F.4th 920 (D.C. Cir.

2024); *Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021); *Rai v. Biden*, 567 F. Supp. 3d 180,

194 (D.D.C. 2021), *rev'd and remanded on other grounds*, 104 F.4th 920 (D.C. Cir. 2024); *Gomez*

*v. Trump*, 485 F. Supp. 3d 145, 191–94 (D.D.C. 2020); *Milligan v. Pompeo*, 502 F. Supp. 3d 302

(D.D.C. 2020). The Visa Ban is thus contrary to law and should be vacated.

### III.    The Visa Ban Was Unlawfully Issued Without Notice and Comment.

The APA, with narrow exceptions, requires agencies to give the public notice and an

opportunity to comment before adopting any rule. 5 U.S.C. § 553. The Act broadly defines a "rule"

in relevant part as any "agency statement of general or particular applicability and future effect

designed to implement, interpret, or prescribe law or policy or describing the organization,

procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). "The burden is on the agency

to establish that notice and comment need not be provided." *Resources Defense Council v. Nat'l*

*Highway Traffic Safety Admin*. (hereinafter "*NRDC*"), 894 F.3d 95, 113–14 (2d Cir. 2018)

(vacating rule promulgated without required notice and comment).

The Second Circuit has explained that "substantive" or "legislative" rules requiring notice

and comment are "those that create new law, right[s], or duties, in what amounts to a legislative

act." *N.Y. State Elec. & Gas Corp*. *v. Saranac Power Partners, L.P*., 267 F.3d 128, 131 (2d Cir.

2001) (internal quotation marks omitted); *Sweet v. Sheahan*, 235 F.3d 80, 90–91 (2d Cir. 2000)

(same).  In *Sweet*, the Second Circuit approvingly cited a test for "distinguishing legislative and

interpretative rules" originally set forth by the D.C. Circuit. *Sweet*, 235 F.3d at 91 (citing *Am.*

*Mining Cong*. *v. Mine Safety & Health Admin*., 995 F.2d 1106, 1110–12 (D.C. Cir. 1993)).

*American Mining* identifies four questions relevant to this inquiry:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for
> enforcement action or other agency action to confer benefits or ensure the performance of
> duties, (2) whether the agency has published the rule in the Code of Federal Regulations,
> (3) whether the agency has explicitly invoked its general legislative authority, or (4)
> whether the rule effectively amends a prior legislative rule.

*Am. Mining*, 995 F.2d at 1112. If any of these questions are answered affirmatively, the rule is legislative rather than interpretive. *Id.*; *see also Make the Rd.*, 475 F. Supp. 3d at 263.

Under these standards, the Visa Ban is a legislative rule requiring notice and comment. It "create[s] new law, rights, or duties" by foreclosing issuance of immigrant visas to all applicants from the 75 targeted countries indefinitely. It does not merely "clarify" an existing statute or regulation but instead overrides existing law by refusing visas to statutorily eligible nationals of the targeted countries. For similar reasons, the Visa Ban is not a tentative or advisory communication that simply "advise[s] the public of the agency's construction of the statutes and rules which it administers." *Am. Mining*, 995 F.2d at 1109 (internal quotation marks omitted). On the contrary, Defendants' cable implementing the Ban directs consular officers that they "must" refuse visa applications from nationals of the targeted countries. Ex. B at 4.

The *Sangster* court thus held that the Visa Ban violates the APA because it was issued without notice and comment. 2026 WL 222316, at *7. The court explained:

> Absent [the Ban], a consular officer would not have sufficient reason [under the INA and implementing regulations] to refuse every single application from the affected countries, especially not on the basis of their nationality alone. Because no authorization for blanket denial exists besides the Policy, it is legislative.

*Id.* (applying *Am. Mining*). *See also Make the Rd.*, 475 F. Supp. 3d at 264 (holding that State Department's revised standards for public-charge determinations required notice and comment because they "impos[ed] new legal limitations on visa applicants not previously reflected in the FAM or INA," and "[m]any of the [Department's] directives are mandatory").

Defendants' decision to label the Ban a "pause" does not alter its status as a substantive rule affecting the rights of visa applicants and their families and thus requiring notice and comment. As the Supreme Court has explained,

> [a]gencies have never been able to avoid notice and comment simply by mislabeling their

substantive pronouncements. On the contrary, courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply.

*Azar v. Allina Health Servs*., 587 U.S. 566, 575 (2019); *see Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 168 (2d Cir. 2013) ("label that the particular agency puts upon its given exercise of administrative power is not . . . conclusive; rather it is what the agency does in fact"); *Texas*, 524 F. Supp. 3d at 656–62 (100-day pause in enforcement of certain INA removal provisions was a legislative act requiring notice and comment despite agency characterizations to the contrary).

The Visa Ban required notice and comment for the additional, independent reason that it purports to modify or suspend operation of legislative regulations, including regulations that were themselves issued with notice and comment. It is well settled that "agencies [are mandated to] use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). Thus, "an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked," "may not alter such a rule without notice and comment," and may not suspend implementation of such a rule. *NRDC*, 894 F.3d at 113.

Here, the Visa Ban has the effect of modifying or suspending indefinitely the operation of 22 C.F.R. § 42.81, among other regulations. As discussed above, § 42.81 provides that when a visa application has been properly completed and executed, the officer "must" either issue the visa, refuse the application based on one of the statutory grounds for inadmissibility (including on public-charge grounds), or discontinue the grant pursuant to an outstanding order under 8 U.S.C. § 1253(d) (which does not apply here). Section 42.81 is substantively identical to prior 22 C.F.R § 42.130, which was substantially revised pursuant to notice-and-comment rulemaking before being renumbered in 1987. *See* Visas; Regulations and Documentation Pertaining to Both Nonimmigrants and Immigrants Under the Immigration and Nationality Act, 52 Fed. Reg. 42590

(1987) (noting effective date of renumbering); *id*. at 42591 (redesignation table showing "old section" 42.130 redesignated as "new section" 42.81); *id*. at 42590 (stating that renumbering made "no substantive changes"); Visas: Documentation of Immigrants and Nonimmigrants Under the Immigration and Nationality Act, as Amended, 52 Fed. Reg. 43894 (1987) (final rule effective November 17, 1987, describing notice-and-comment process followed); *id*. at 43896–97 (showing revisions to § 42.130). The Visa Ban also effectively modifies 22 C.F.R. § 40.6, under which "[a] visa can be refused *only* upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6 (emphasis added). Unlike the Blanket Visa Ban, § 40.6 was promulgated pursuant to notice-and-comment rulemaking. The Visa Ban thus cannot modify or suspend these legislative regulations without notice and comment.

## IV.    The Visa Ban Violates the APA Under the *Accardi* Doctrine.

For similar reasons, the Visa Ban should also be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which requires government agencies to follow their own "existing valid regulations." *Id*. at 268.

The Second Circuit has explained that the *Accardi* doctrine

[I]s not limited to rules attaining the status of formal regulations. As the Supreme Court noted '[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required,' and even though the procedural requirement has not yet been published in the federal register.

*Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (alteration in original) (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)). As the Second Circuit emphasized in *Montilla*, the *Accardi* doctrine "has continued vitality, particularly where a petitioner's rights are 'affected.'" *Id.* (quoting *Morton*, 415 U.S. at 235). *See also Salazar*, 822 F.3d at 76  (reversing dismissal of claim that Department of Education failed to comply with its own regulations regarding collection of student loans and citing *Montilla*); *Singh v. U.S. Dep't of Justice*, 461 F.3d 290, 296 (2d Cir. 2006) (holding

under *Accardi* that Board of Immigration Appeals abused its discretion by failing to adhere to its own regulations).

The Blanket Visa Ban grossly departs from the Department's existing regulations and procedures by requiring consular officers to refuse visa applications without a case-by-case assessment and without any determination that the applicant is ineligible under any provision of the Act—indeed, even after the officer has determined that the applicant is eligible under the statute. Among other things, as discussed above, the Visa Ban departs from Department's regulatory requirements that "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations," 22 C.F.R. § 40.6, and that a consular officer considering an application for an immigrant visa "must issue the visa" once the application is properly completed and executed unless it may be refused under the INA or other applicable law, *id*. § 42.81(a). The Blanket Visa Ban also violates multiple policies and procedures of the State Department reflected in the Foreign Affairs Manual. These include the requirement that a consular officer cannot "temporarily refuse, suspend, or hold the visa for future action," 9 FAM 504.1-3(g), but must instead either grant or refuse the visa, *id*. at 504.11-2(A), and that public-charge determinations must be based on the "totality of [each applicant's] circumstances" and "[n]o single factor, other than the lack of a qualifying affidavit of support, . . . if required, will determine whether an individual is a public charge." *Id*. at 302.8-2(B)(1)(a)(3), (B)(2), (B)(3).

The *Accardi* doctrine is particularly applicable here because the Blanket Visa Ban on its face "affect[s]"—indeed, it profoundly prejudices—the interests of Plaintiffs and their family members in obtaining the lawful procedures and individualized adjudication the INA, the regulations, and the Department's own rules require. *Montilla*, 926 F.2d at 167. It seeks to preclude Plaintiffs' family members and similarly situated applicants from receiving that process even

21

where no statutory ground of inadmissibility has been found. And it affects the interests of the individual plaintiffs in uniting with their family members indefinitely, harm that courts have repeatedly recognized constitutes a form of irreparable injury. *Make the Rd.*, 475 F. Supp. 3d at 268 ("Courts, including those within this Circuit, have recognized indefinite family separation as a form of irreparable injury.")).

## V.    PLAINTIFFS HAVE ARTICLE III STANDING

Plaintiffs have standing to challenge the Blanket Visa Ban and bring the claims at issue in this motion for partial summary judgment. *See Centro de la Comunidad Hispana de Locust Valley v. Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) ("It is well settled that where . . . multiple parties seek the same relief, 'the presence of one party with standing is sufficient…'" (quoting *Rumsfeld v. Forum of Acad. and Inst. Rights, Inc*., 547 U.S. 47, 52 n.2 (2006)).

The individual Plaintiffs have standing. The Ban has separated each U.S. citizen Plaintiff from their family members. Family separation is a quintessential injury in fact. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 698–99 (2018). The employment-based Plaintiffs have standing because their visas have been refused due to the Ban based on their nationalities, even though their petitions had been approved and they had completed consular processing. *See, e.g., Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015); *see also Melody Pak v. Biden*, 91 F.4th 896, 900 (7th Cir. 2024). These injuries are traceable to the Ban, which directs consular officers not to issue visas to applicants from the covered countries and was the sole basis cited for refusal of Plaintiffs or their family members' visas. And they are redressable because vacatur would remove that categorical, nationality-based barrier and restore the individualized adjudications Congress required.

CLINIC and ACT likewise have standing because the Ban interferes with one of their core business activities of providing effective visa application assistance to achieve positive outcomes for U.S.-based individuals and their relatives. Organizations are "entitled to sue on their own behalf

for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). Further, Defendants imposed the Ban without prior notice and without offering anyone, including CLINIC and ACT, the opportunity to submit public comment. Defendants' failure to provide notice and opportunity to comment in connection with the issuance of the Ban has caused a concrete procedural injury to CLINIC and ACT. *E.g.*, *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 42 (D.D.C. 2020) ("The procedural right at stake here—the ability to comment on [a rule which categorically bars a large number of people from qualifying for asylum]—is quite obviously linked to their concrete interest, [providing assistance with asylum applications]." (citation and internal quotation marks omitted)). Vacating the Ban would redress those injuries, as a return to the status quo ante would require Defendants to resume providing individualized consular review and determinations to nationals of the 75 affected countries—a return to business as usual for CLINIC and ACT's members, *see Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2137 (2025) (noting "it would be surprising and unusual if invalidating the regulations did not" provide redress), and requiring Defendants to conduct notice-and-comment rulemaking would permit CLINIC and ACT to submit comments, as they would have done had there been a prior opportunity to do so,  Wheeler Decl. ¶ 15; Kassa Decl. ¶ 20.

Finally, ACT has associational standing. At least one of ACT's members, plaintiff Agnes Kyeremaa, has standing to sue in her own right for the reasons stated above. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see also Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025). Challenging a nationality-based ban that prevents African immigrant families from reuniting is plainly germane to ACT's mission. *See Hunt*, 432 U.S. at 343. And because ACT seeks declaratory relief and vacatur against a Department-wide policy,

neither the claims nor the requested relief require participation by individual members beyond the member standing already established. *Id.*

## VI.     Vacatur Is the APA's Ordinary Statutory Remedy and Is Appropriate Here.

The APA directs courts to vacate or "hold unlawful and set aside" agency action that is arbitrary, capricious, contrary to law, in excess of statutory authority, procedurally defective, or unsupported by substantial evidence. 5 U.S.C. § 706(2). This statutory language makes vacatur the ordinary remedy for unlawful agency action, *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014), and courts in this Circuit routinely vacate defective rules at summary judgment where APA issues present pure questions of law. *See, e.g.*, *New York v. HHS*, 414 F. Supp. 3d 475, 575–76 (S.D.N.Y. 2019) (vacatur is the proper remedy when the agency's errors are fundamental and cannot be cured through further explanation); *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 271-72 (E.D.N.Y. July 1, 2025) (vacatur reestablishes the *status quo ante*, absent the unlawful agency action); *Am. Fed'n of Tchrs., AFL-CIO v. Davis*, --- F. Supp. 3d ----, 2025 WL 3763813, at *23–25 (S.D.N.Y. Dec. 30, 2025),   *appeal*, No. 26-461 (Mar. 02, 2026).

Vacatur is appropriate here because the Visa Ban and Cable and implementing actions present pure questions of law: they contradict the INA's statutory requirements for individualized adjudication under 8 U.S.C. §§ 1182(a)(4), 1104(a) & 1201(g), and violate 8 U.S.C. § is 1152(a)(1)(A)'s prohibition on national origin discrimination; were issued without notice-and-comment rulemaking; and violate the *Accardi* doctrine by directing officers to disregard binding law. *See Montilla,* 926 F.2d at 166–70; *CLINIC v. Rubio,* Compl. ¶¶ 224–33, 238–43, 263–73. Procedural violations under 5 U.S.C. § 553 likewise require vacatur. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) ("lack of notice and comment is a fundamental flaw that normally requires vacatur") (citation and internal quotation marks omitted). Moreover, Plaintiffs and the public suffer ongoing, irreparable harm—including prolonged family

separation, loss of approved visa opportunities, stalled employment-based immigration, and harm

to the economy—all directly caused by Defendants' unlawful policy. Leaving the Blanket Visa

Ban in place would entrench unlawful outcomes and exacerbate these injuries. *Make the Rd.*, 475

F. Supp. 3d at 268; Compl. ¶¶ 13–35; 156–223; Wheeler Decl. ¶¶ 10–14.

These legal defects cannot be cured on remand. The Second Circuit has not adopted the

remand-without-vacatur remedy "borrowed from the D.C. Circuit," *N.Y. Legal Assistance Grp. v.*

*Cardona*, No. 20-cv-1414 (LGS), 2025 WL 871371, at *2 (S.D.N.Y. Mar. 20, 2025), and for good

reason: the APA directs that unlawful agency action must be "set aside," *i.e.,* vacated, 5 U.S.C. §

706(2)(A). But even if remand without vacatur were ever appropriate, it is not appropriate here.

Courts vacate without remand where, as here, further administrative proceedings would serve no

purpose. *Guertin*, 743 F.3d at 388–89; *N.Y. Legal Assistance Grp.*, 2025 WL 871371, at *4 .

Indeed, because the "agency can't 'cure' the fact that it lacks authority to take a certain action,

remand-without-vacatur is unavailable." *Bridgeport Hosp. v. Becerra,* 108 F.4th 882, 890 (D.C.

Cir. 2024). Likewise, "'deficient notice is a fundamental flaw that almost always requires

vacatur.'" *N.Y. Legal Assistance Grp*., 2025 WL 871371, at *3  (quoting *Allina Health Servs. v.*

*Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs,

declare that the Blanket Visa Ban—both the announcement and cable—is contrary to law, in

excess of Defendant's statutory authority, and procedurally invalid, and hold unlawful and set

aside the Blanket Visa Ban under 5 U.S.C. § 706.

//

//

Dated: March 10, 2026

Respectfully submitted,

*/s/ Joanna Elise Cuevas Ingram*
Joanna Elise Cuevas Ingram
Tanya Broder*
Efrén C Olivares*
Elizabeth Choo**
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, D.C. 20043
(213) 377-5258
cuevasingram@nilc.org
broder@nilc.org
olivares@nilc.org
choo@nilc.org

*/s/ Erez Reuveni*
Erez Reuveni*
Catherine M.A. Carroll*
Elena Goldstein
Jonathan H. Hurwitz
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 316-9538 (Reuveni)
ereuveni@democracyforward.org
ccarroll@democracyforward.org
egoldstein@democracyforward.org
jhurwitz@v.democracyforward.org

*/s/ Hasan Shafiqullah*
Hasan Shafiqullah
Susan Welber
Evan Henley
Emily Lundgren
THE LEGAL AID SOCIETY
49 Thomas St., 5th Floor
New York, NY 10013
(212) 577-3300
hhshafiqullah@legal-aid.org
sewelber@legal-aid.org

ewhenley@legal-aid.org
elundgren@legal-aid.org


*/s/ Baher Azmy*
Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445
bazmy@ccrjustice.org
aguisado@ccrjustice.org


*/s/ Antionette Dozier*
Antionette Dozier*
David Kane*
Joy Dockter*
WESTERN CENTER ON LAW &
POVERTY
3701 Wilshire Blvd. Suite 208
Los Angeles, CA 90010
(213) 487-7211
adozier@wclp.org
dkane@wclp.org
jdockter@wclp.org


*/s/ Sarah Wilson*
Sarah Wilson*
David Kim*
COLOMBO & HURD
301 E. Pine Street, Suite 450
Orlando, Florida 32801
(407) 478-1111
swilson@colombohurd.com
dkim@colombohurd.com


*\* Admitted Pro Hac Vice*


*\*\* Petition for Attorney Admission Forthcoming*


*Attorneys for Plaintiffs*

27

**CERTIFICATE OF SERVICE**

I, <u>Erez Reuveni</u>, hereby certify that on March 10, 2026, I filed the foregoing Document with the Clerk of the Court for the United States District Court for the Southern District Court of New York using the CM/ECF system. Notice of this filing is being sent by operation of the Court's electronic filing system to all counsel of record who are registered CM/ECF users. I have also emailed counsel of record for Defendants.

*/s/ Erez Reuveni*
Erez Reuveni

**CERTIFICATE OF COMPLIANCE**

I, <u>Erez Reuveni</u>, hereby certify that this document complies with Local Rule 7.1's word-count limitations, as it is less than 8,750 words.

*/s/ Erez Reuveni*
Erez Reuveni