# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

CATHOLIC LEGAL IMMIGRATION
NETWORK, INC., et al.,

    Plaintiffs,

    v.

MARCO RUBIO, Secretary of State, et al.,

    Defendants.

Case No: 1:26-cv-00858

# INDEX FOR ADMINISTRATIVE RECORD

1.  Cable, *Pausing Immigrant Visa Issuances for Nationalities of High-Risk Public Charge*, 26 STATE 3740……………………………………...…………...…..STATE00001

2.  Action Memo for the Secretary, *Pausing Immigrant Visa Processing for Nationals of Certain Countries*…………………………………………………….………STATE00005

3.  Cable, *Action Request: New Actions on Entry Restrictions Pursuant to Section 212(f) of the INA (8 U.S.C. 1182(f))*, 25 STATE 113496………………….…………...……STATE00016

4.  Cable, *Visas Properly Implementing the INA 212(a)(4) Public Charge Ineligibility*, 25 STATE 102426 ………………………….…………..…...…STATE00028

5.  Action Memo for CA Assistant Secretary Mora Namdar, *Updated Immigrant Visa Guidance Related to Public Charge Concerns*............................................STATE00041

6.  Truth Social Truth by President Trump, Tab 2 to Action Memo…………………..……STATE00049

7.  Executive Order 14161, *Protecting the United States Frome Foreign Terrorists and Other National Security and Public Safety Threats*…...…………...….……...…STATE00050

8.  Cable, *The Importance of Security and Vigilance in Visa Adjudications*, 25 STATE 5914.........................................................................................STATE00053

9.  Cable, *Action Request: Expanding Screening and Vetting for FMJ Applicants*, 25 STATE 59756…………….……...…………………………………………STATE00061

I B 7 @5 GG÷ 98



| | |
|---|---|
| **MRN:** | 26 STATE 3740 |
| **Date/DTG:** | Jan 14, 2026 / 141945Z JAN 26 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O.:** | 13526 |
| **TAGS:** | CVIS, CMGT |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 102426 |
| | B) 25 STATE 113496 |
| **Subject:** | Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge |

1. (U) This is an action request. Please see paragraphs 4-7.

2. (SBU) SUMMARY and ACTION REQUEST: Effective January 21, consular officers must refuse under Section 221(g) of the Immigration and Nationality Act to **all immigrant visa applicants** who have not been refused under another ground of ineligibility, if the applicant is a national of the following countries:

Afghanistan, Albania, Algeria, Antigua and Barbuda, Armenia, Azerbaijan, Bahamas, Bangladesh, Barbados, Belarus, Belize, Bhutan, Bosnia, Brazil, Burma, Cambodia, Cameroon, Cape Verde, Colombia, Cote d'Ivoire, Cuba, Democratic Republic of the Congo, Dominica, Egypt, Eritrea, Ethiopia, Fiji, The Gambia, Georgia, Ghana, Grenada, Guatemala, Guinea, Haiti, Iran, Iraq, Jamaica, Jordan, Kazakhstan, Kosovo, Kuwait, Kyrgyzstan, Laos, Lebanon, Liberia, Libya, Macedonia, Moldova, Mongolia, Montenegro, Morocco, Nepal, Nicaragua, Nigeria, Pakistan, Republic of the Congo, Russia, Rwanda, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Senegal, Sierra Leone, Somalia, South Sudan, Sudan, Syria,

I B 7 @5 GG÷ 98

Tanzania, Thailand, Togo, Tunisia, Uganda, Uruguay, Uzbekistan, and Yemen

The Department is undergoing a full review of all policies, regulations, and guidance to ensure the highest level of screening and vetting of every visa applicant. Applicants from these countries are at a high risk for becoming a public charge and recourse to local, state, and federal government resources in the United States. Consular officers should continue to conduct interviews and fully assess each applicant for all possible ineligibilities, including INA 212(a)(4), Public Charge. END SUMMARY AND ACTION REQUEST

3. (U) President Trump has made clear that immigrants must be financially self-sufficient to protect public benefits for American citizens. In November, the Department underscored consular officers' critical responsibility to assess the totality of circumstances to determine an applicant's eligibility under INA 212(a)(4) (Ref B). As part of its ongoing review of all visa vetting protocols and guidance to consular officers, in order to ensure robust enforcement of all U.S. immigration laws, the Department is directing consular officers to take this action based on indication of nationals from these countries having sought public benefits in the United States, and in order to allow the Department to evaluate and enhance screening and vetting procedures and guidance related to the public charge ground of ineligibility. Exceptions to this guidance will be very limited and in cases that follow appropriate procedures for establishing that an applicant is not likely to become a public charge in the United States, and ineligible under INA section 212(a)(4).

4. (SBU) **Implementation Guidance**: Immigrant Visa issuance to applications from these countries is paused until further notice. However, interview appointments for applicants from these nationalities should not be cancelled. Consular officers should continue to adjudicate all immigrant visa cases and carefully evaluate all potentially applicable grounds of ineligibility, including assessing whether an applicant is likely to become a public charge, in accordance with guidance in 9 FAM 302.8-2. If an officer believes an applicant is likely to become a public charge and ineligible under INA section 212(a)(4)(a), the officer should refuse the applicant under that ground and include detailed case notes explaining this finding. Officers should assess all other potential grounds of ineligibility first, and if an officer has not refused the applicant under any other ground, the officer should make detailed case notes explaining all aspects of the case (including the factors highlighted in Ref. B) where additional information could yield more data concerning the applicant's eligibility vis-à-vis

212(a)(4). Officers should then refuse the applicant 221(g) while the Department develops additional screening and vetting tools, polices, and operations to more accurately identify any IV applicant likely to become a public charge. **Officers should include the hashtag "#4AIVPause" in the case notes for any applicant that has not already been refused under any other ground of ineligibility, including public charge.**

5. (SBU) If an officer refuses an applicant under 4(a) and then the applicant provides additional evidence that demonstrates he or she overcomes the public charge refusal, the consular officer should write detailed case notes including the hashtag "#4AIVPause", CLOK the 4(a) hit, and refuse the applicant 221(g).

6. (SBU) Like with nationalities suspended entry under INA section 212(f), posts should request any missing documents necessary to show the applicant is qualified for the visa, but time-limited documents like police clearances and medicals are not necessary for a 221(g) refusal related to the immigrant visa issuance pause, and posts may refuse an application 221(g) if the applicant declines to provide them. Posts should request all documentation necessary to resolve potential ineligibilities and enter appropriate 221(g) refusals for the missing documentation.

7. (SBU) For nationals of countries who are subject to a suspension of immigrant visas under 212(f) per Presidential Proclamation 10998, posts should refuse cases F251 per guidance in REF A. If an applicant qualifies for an exception to PP 10998, posts should refuse that applicant 221(g) consistent with the guidance in paragraphs 4 and 5 above.

8. (SBU) **Exceptions:** Dual nationals applying with a valid passport of a country that is not subject to this directive are not subject to this directive and may be processed to issuance. Clearly document the application of this exemption in case notes and continue to process the visa to conclusion. If an applicant is able to demonstrate his or her travel would serve a specific U.S. national interest, consistent with Executive Order 14150 "America First Policy Directive to the Secretary of State," which directs the Secretary of State to always put America and American citizens first, consular sections should reach out to their VO/F analyst to discuss appropriate steps to robustly assess the applicant's eligibility under INA section 212(a)(4)(a).

9. (SBU) **Already Approved Cases:** If post has print-authorized an immigrant visa for an applicant from a nationality included in the pause but the visa has not been printed, the consular officer must refuse the case under 221(g), inform the

applicant, and post may not print the visa foil.  For cases in which the applicant's visa was printed but has not left the consular section, the consular officer must CWOP the foil, open the case in the system, and refuse the case under 221(g).  The consular officer **must** also inform the applicant of the 221(g) refusal and that additional administrative processing is necessary to determine their eligibility for a visa under U.S. law.  No action should be taken for issued visas which have already left the consular section.  No visas issued previously should be revoked pursuant to this guidance.  Issued visas remain valid for travel.  Only DHS may make determinations on the admission of visa holders into the United States.

10.  (U) Inquiries:  Post must refer any U.S. media inquiries to CA-Press@state.gov and Congressional inquiries to ConsularOnTheHill@state.gov.  Once cleared press guidance specific to this pause in DV issuance is posted on CA Web and Content Commons, posts may respond to requests from international media using those points, copying CA-Press@state.gov.

11.  (U) Please contact your VO/F analyst with any questions regarding application of this guidance

| **Signature:** | RUBIO |
| --- | --- |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**

SBU



United States Department of State

Washington, DC 20520

January 8, 2026

## ACTION MEMO FOR THE SECRETARY

FROM:     CA – Mora Namdar, Assistant Secretary

SUBJECT:  (SBU) Pausing Immigrant Visa Processing for Nationals of Certain Countries

**(SBU) Recommendation:** That you approve an immediate pause in immigrant visa processing for nationals of the countries listed. The pause will last until the Department can implement new measures to ensure aliens admitted to the United States do not receive public assistance.
(Approve/Disapprove by 1/9/2026)
**Decision:** ☑ **Approve** ☐ **Disapprove** ☐ **Discuss**

**Background**
(U) Immigration and Nationality Act (INA) Section 212(a)(4) provides that an alien is ineligible for a visa if he is likely to become a public charge at any time after admission to the United States. However, the Council on Economic Advisors (CEA) recently found significant percentages of immigrants from certain counties use welfare (Tab).

(SBU) In coordination with U.S. Citizenship and Services, Consular Affairs is preparing new guidance and procedures to better enforce the public charge ineligibility. In the meantime, you can suspend immigrant visa processing to prevent the further admission of immigrants who present an elevated risk of welfare use. This pause would last until the Department can implement new measures to ensure aliens admitted to the United States do not receive public assistance. We anticipate this will take about 60 days.

(SBU) Countries listed were selected because, according to the CEA, 30 percent or more of immigrants from those countries use welfare. Some countries have been excluded due to foreign policy considerations, including: Sensitive Foreign Relations Information
Sensitive Foreign Relations Information

Sensitive Foreign Relations Information

(SBU) Nationals of some countries listed also are subject to visa restrictions or under Presidential Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States, or other directives. This pause on immigrant visa processing would operate in addition to any such restrictions.

(SBU) Countries Whose Nationals Would be Subject to Pause:

1. Afghanistan
2. Albania
3. Antigua and Barbuda
4. Algeria
5. Armenia
6. Azerbaijan
7. Bahamas
8. Barbados
9. Bangladesh
10. Belarus
11. Belize
12. Bhutan
13. Brazil
14. Bosnia
15. Burma
16. Cameroon
17. Cambodia
18. Cape Verde
19. Colombia
20. Cote d'Ivoire
21. Cuba
22. Democratic Republic of Congo
23. Dominica
24. Egypt
25. Eritrea
26. Ethiopia
27. Fiji
28. The Gambia

29. Georgia
30. Ghana
31. Grenada
32. Guatemala
33. Guinea
34. Haiti
35. Iran
36. Iraq
37. Jamaica
38. Jordan
39. Kazakhstan
40. Kosovo
41. Kuwait
42. Kyrgyzstan
43. Laos
44. Lebanon
45. Liberia
46. Libya
47. Macedonia
48. Moldavia
49. Mongolia
50. Montenegro
51. Morocco
52. Nepal
53. Nicaragua
54. Nigeria
55. Pakistan
56. Republic of Congo
57. Russia
58. Rwanda
59. Saint Kitts and Nevis
60. Saint Lucia
61. Saint Vincent and the Grenadines
62. Senegal
63. Sierra Leone
64. Somalia
65. South Sudan
66. Sudan
67. Syria
68. Tanzania

69. Thailand
70. Tunisia
71. Togo
72. Uganda
73. Uzbekistan
74. Uruguay
75. Yemen

Attachment:
    Tab - <u>Full Table for Welfare Recipient Rates by Country of Origin</u>

Approved:  CA – Mora Namdar, Assistant Secretary [ MN]

Drafted:   C – PII ██████████████████

Cleared:

| Bureau | Name | Clearance Status |
|---|---|---|
| C | PII ████████ | ok |
| CA | PII ████████ | ok |
| | | |
| | | |

SENSITIVE BUT UNCLASSIFIED

# Immigrant Welfare Recipient Rates by Country of Origin

| Country of origin (Countries Struckthrough are Proposed for Exemption) | Percent of immigrant households receiving assistance |
|---|---|
| Bhutan | 81.4% |
| Yemen Arab Republic (North) | 75.2% |
| Somalia | 71.9% |
| Sensitive Foreign Relations Information | |
| Afghanistan | 68.1% |
| Congo | 66.0% |
| Guinea | 65.8% |
| Samoa, 1940-1950 | 63.4% |
| Cape Verde | 63.1% |
| Iraq | 60.7% |
| Armenia | 60.3% |
| Burma (Myanmar) | 59.2% |
| Sensitive Foreign Relations Information | |
| Zaire | 56.9% |
| Guatemala | 56.5% |
| Sudan | 56.3% |
| Sensitive Foreign Relations Information | |
| Bangladesh | 54.8% |
| Tonga | 54.4% |
| Sensitive Foreign Relations Information | |
| Uzbekistan | 53.9% |
| Togo | 53.2% |
| Sensitive Foreign Relations Information | |
| Americas (not specified) | 52.7% |
| Eritrea | 52.7% |
| Haiti | 52.3% |
| South Sudan | 52.0% |
| Sensitive Foreign Relations Information | |
| Cambodia (Kampuchea) | 49.9% |
| Cuba | 49.6% |
| Laos | 49.2% |

| | |
|---|---|
| Ivory Coast | 49.1% |
| Liberia | 48.9% |
| Algeria | 48.1% |
| Syria | 48.0% |
| Jordan | 47.8% |
| Libya | 47.8% |
| Ethiopia | 47.6% |
| Rwanda | 47.1% |
| Morocco | 46.6% |
| Kosovo | 46.0% |
| Western Africa (not specified) | 45.9% |
| Nicaragua | 45.5% |
| Republic of Georgia | 45.4% |
| Dominica | 45.1% |
| Sierra Leone | 43.6% |
| Sensitive Foreign Relations Information | |
| American Samoa | 42.9% |
| Sensitive Foreign Relations Information | |
| Moldavia | 42.6% |
| Antigua-Barbuda | 41.9% |
| Belize/British Honduras | 41.8% |
| Sensitive Foreign Relations Information | |
| St. Lucia | 41.7% |
| Albania | 41.3% |
| Fiji | 40.8% |
| Grenada | 40.7% |
| Gambia | 40.5% |
| Pakistan | 40.2% |
| Senegal | 39.7% |
| Tunisia | 39.7% |
| North Africa (not specified) | 39.7% |
| Egypt/United Arab Rep. | 39.3% |
| St. Kitts-Nevis | 39.1% |
| Sensitive Foreign Relations Information | |
| Asia (not elsewhere classified/not specified) | 38.8% |
| Mongolia | 38.8% |
| Uganda | 38.8% |

| | |
|---|---|
| Byelorussia | 38.7% |
| Kirghizia | 38.6% |
| St. Vincent | 38.1% |
| Ghana | 37.9% |
| Sensitive Foreign Relations Information | |
| Azerbaijan | 37.8% |
| Montenegro | 37.6% |
| Cameroon | 37.6% |
| Sensitive Foreign Relations Information | |
| Lebanon | 36.9% |
| Africa (not elsewhere classified/not specified) | 36.9% |
| Eastern Africa (not elsewhere classified/not specified) | 36.8% |
| Jamaica | 36.7% |
| Thailand | 36.7% |
| Kazakhstan | 36.5% |
| Colombia | 36.5% |
| Azores | 36.4% |
| Sensitive Foreign Relations Information | |
| Other (not elsewhere classified) | 34.9% |
| Nepal | 34.8% |
| Uruguay | 34.6% |
| Bahamas | 34.0% |
| Tanzania | 34.0% |
| Barbados | 33.9% |
| Other USSR/Russia | 33.9% |
| USSR (not specified) | 33.5% |
| Nigeria | 33.3% |
| Macedonia | 33.0% |
| Sensitive Foreign Relations Information | |
| Bosnia | 32.4% |
| Brazil | 32.2% |
| Iran | 31.9% |
| Kuwait | 31.5% |

STATE00012

Sensitive Foreign Relations Information

| Countries below will not be paused. | |
|---|---|
| Iceland | 29.5% |
| Venezuela | 29.4% |
| Chile | 29.3% |
| Lithuania | 29.2% |
| Kenya | 28.5% |
| Portugal | 28.2% |
| Zambia | 28.0% |
| Korea | 27.2% |
| Argentina | 26.2% |
| Israel/Palestine | 25.9% |
| Saudi Arabia | 25.7% |
| Bermuda | 25.5% |
| Turkey | 24.6% |
| Romania | 24.6% |
| Poland | 24.4% |
| Hungary | 24.1% |
| Indonesia | 24.0% |
| Latvia | 23.7% |
| Greece | 23.7% |
| Sri Lanka | 23.3% |
| Hong Kong | 23.2% |
| Yugoslavia | 23.0% |
| Serbia | 22.4% |

| | |
|---|---|
| Malaysia | 22.3% |
| Italy | 21.8% |
| Bulgaria | 21.7% |
| Czech Republic | 20.9% |
| New Zealand | 20.6% |
| Croatia | 20.4% |
| United Arab Emirates | 19.4% |
| Zimbabwe | 18.8% |
| Germany | 18.85 |
| Belgium | 18.5% |
| Ireland | 18.3% |
| Taiwan | 17.6% |
| Slovakia | 17.2% |
| England | 16.6% |
| Spain | 16.6% |
| Japan | 16.4% |
| Switzerland | 16.4% |
| Australia | 16.0% |
| Austria | 15.7% |
| Canada | 15.4% |
| South Africa | 15.2% |
| Norway | 15.2% |
| Finland | 14.7% |
| India | 14.6% |
| Scotland | 14.6% |
| Netherlands | 14.1% |

| | |
|---|---|
| France | 13.7% |
| Sweden | 12.3% |
| Denmark | 11.5% |

**UNCLASSIFIED**

SBU



| | |
|---|---|
| **MRN:** | 25 STATE 113496 |
| **Date/DTG:** | Dec 17, 2025 / 172314Z DEC 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O.:** | 13526 |
| **TAGS:** | CMGT, CVIS |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 55146 |
| | B) 25 STATE 5914 |
| | C) 25 STATE 71920 |
| | D) 25 STATE 58350 |
| | E) 25 STATE 77258 |
| | F) 25 STATE 55754 |
| | G) 25 STATE 73478 |
| | H) 25 STATE 97068 |
| | I) 25 STATE 108252 |
| | J) 25 STATE 77020 |
| | K) 25 STATE 102428 |
| | L) 25 STATE 82210 |
| **Subject:** | ACTION REQUEST:  New Actions on Entry Restrictions Pursuant to Section 212(f) of the INA (8 U.S.C. 1182(f)) |

1.  (U) This is an action request.  **See paragraphs 3-24.  Note paragraph 21 goes into effect immediately.**

2.  (SBU) **SUMMARY**:  Presidential Proclamation "Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States" (hereafter referred to as "the PP") signed on December 16, 2025, fully or partially suspends the entry to the United States, including visa issuance, to nationals of 39 countries and individuals applying using travel documents issued or endorsed by the Palestinian Authority, pursuant to section 212(f) of the Immigration and

Nationality Act (INA) (8 U.S.C. 1182(f)).  Included in the order is the continuation and augmentation of the suspension on entry of nationals from 19 countries imposed by Presidential Proclamation 10949 (Ref A).  This cable details the restrictions and limitations imposed on nationals of countries covered by the PP and provides implementation guidance for processing nonimmigrant visa (NIV) and immigrant visa (IV) applications prior to, and following, the PP's **effective date on January 1, 2026, at 12:01 a.m. Eastern Standard Time (EST)**.  Once in effect, any visa applicant subject to the PP must be refused under the PP, unless the applicant qualifies for one of the narrowly defined exceptions detailed in paragraphs 11-16 below.  The suspension on entry applies ONLY to nationals who are outside the United States AND do not hold a valid visa on the effective date.  The PP does not direct the revocation of valid visas issued before the effective date.  **END SUMMARY.**

**ACTION REQUEST/IMPLEMENTATION GUIDANCE**

**Prior to January 1, 2026, at 12:01 a.m. EST**

3.  (SBU) GSS vendors, the National Visa Center (NVC), the Kentucky Consular Center (KCC), and posts should continue scheduling interviews for NIV and IV applicants from affected countries.  From the release of this ALDAC until January 1, 2026, at 12:00 a.m. EST, posts should continue normal visa processing, including approving eligible applicants, printing visas, and returning passports with issued visas.  Posts should deny any requests for expedited NIV appointments or expedited visa processing for affected applicants received after the announcement of the PP on December 16, 2025, absent specific approval from VO/F.  The National Visa Center will not approve expedite requests for immigrant visa appointments for affected applicants during this period.  Posts should **not** cancel already scheduled appointments for individuals affected by the suspension.

4.  (U) Presidential Proclamation 10949 remains in full effect until it is superseded by the restrictions and modifications of this new PP on January 1, 2026, at 12:01 a.m. EST.  Posts should continue to apply the guidance collected in CA Web and cited in Reftels.

**After January 1, 2026, at 12:01 a.m. EST**

5.  (SBU) After January 1, 2026, at 12:01 a.m. EST, GSS vendors, NVC, KCC, and posts should continue scheduling NIV and IV applicants from affected countries for interviews, and posts should continue adjudicating all applications in

accordance with the detailed guidance below. The Department will **not** provide refunds for MRV receipts purchased by a national of an affected country as these applicants are still permitted to proceed with an application, including making an appointment, interviewing, and having the application adjudicated. NVC will continue reviewing and approving, as appropriate, interview expedite requests for IV cases from PP-affected applicants utilizing standard criteria.

6. (SBU) The suspension and limitations of the PP apply only to nationals of the designated countries and individuals applying using travel documents issued or endorsed by the Palestinian Authority who are outside the United States on the effective date and who do not have a valid visa on the effective date. The PP includes several exceptions, including for lawful permanent residents of the United States.

**Full Suspension of Entry**

7. (SBU) Effective January 1, 2026, at 12:01 a.m. EST, full suspension of entry under INA 212(f) applies to **individuals traveling on any travel documents issued or endorsed by the Palestinian Authority** and nationals of the following 19 countries: **Afghanistan, Burma, Burkina Faso, Chad, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Mali, Niger, Republic of the Congo, Sierra Leone, Somalia, South Sudan, Sudan, Syria, and Yemen.** Effective January 1, 2026, at 12:01 a.m. EST, you must refuse under INA 212(f) (using **refusal code "F251"**) any NIV or IV applicant from any of these countries, with limited exceptions detailed below. (See paragraph 10 for detailed guidance on refusing applicants subject to the PP using the refusal code F251).

| Refuse | Except |
|---|---|
| **All NIVs including Ks** | <ul><li>Any dual national of a country designated under the PP when the individual is applying on a passport issued by a non-designated country;</li><li>Applicants for a visa in the A-1 and A-2 classifications;</li><li>Applicants for a visa in G-1, G-2, G-3, G-4 NATO-1, NATO-2, NATO-3, NATO-4, NATO-5, NATO-6 or C-2, C-3 classifications;</li><li>Participants in certain major sporting events;</li><li>Approved National Interest Exceptions.</li></ul> |

| All IV/DVs | <ul><li>Any dual national of a country designated under the PP when the individual is applying on a passport issued by a non-designated country;</li><li>Special Immigrant Visas for U.S. government employees and surviving spouses and children;</li><li>Immigrant visas for ethnic and religious minorities facing persecution in Iran;</li><li>Approved National Interest Exceptions.</li></ul> |
|---|---|

**Partial Suspension of Entry**

8.  (SBU) Partial suspension of entry under INA 212(f) applies to the following 20 countries:  **Angola, Antigua and Barbuda, Benin, Burundi, Cote d'Ivoire, Cuba, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Togo, Tonga, Turkmenistan*, Venezuela, Zambia, and Zimbabwe.**  See paragraph 9 for further guidance on nationals of Turkmenistan.  Effective January 1, 2026, at 12:01 a.m. EST, you must refuse under INA 212(f) **using refusal code "F251"** any NIV or IV applicant from any of these countries, with limited exceptions detailed below.  (See paragraph 10 for detailed guidance on refusing applicants subject to the PP using the refusal code F251).

| Refuse | Except |
|---|---|
| **B1, B2, B1/B2 (*not applicable to Turkmenistan)** | <ul><li>Any dual national of a country designated under the PP when the individual is applying on a passport issued by a non-designated country;</li><li>Participants in certain major sporting events;</li><li>Approved National Interest Exceptions.</li></ul> |
| **F, M, or J (*not applicable to Turkmenistan)** | <ul><li>Any dual national of a country designated under the PP when the individual is applying on a passport issued by a non-designated country;</li><li>Participants in certain major sporting events;</li><li>Approved National Interest Exceptions.</li></ul> |
| **All Other NIVs** | <ul><li>Reduced validity to the extent permitted by law (Further guidance regarding reduced or limited visa validity will be sent via septel).</li></ul> |

| All IV/DVs | • Any dual national of a country designated under the PP when the individual is applying on a passport issued by a non-designated country;<br>• Special Immigrant Visas for U.S. government employees and surviving spouses and children;<br>• Immigrant visas for ethnic and religious minorities facing persecution in Iran;<br>• Approved National Interest Exceptions. |
|---|---|

*Effective January 1, 2026, at 12:01 a.m. EST, the suspension on issuance of B-1, B-2, B1/B2, F, M, and J visas does **not** apply to nationals of Turkmenistan.

**Guidance for Adjudicating Nationals of Turkmenistan**

9.  (U) As noted above, the PP modified the suspension of entry for nationals of Turkmenistan, specifically by terminating the suspension on B-1, B-2, B1/B2, and F/M/J visa issuance.  Thus, effective January 1, 2026, at 12:01 a.m. EST, nationals of Turkmenistan may be issued B-1, B-2, B1/B2, F, M, and J visas if otherwise eligible.  This change is not retroactive; any national of Turkmenistan previously refused under 212(f) must make a new application and MRV fee payment to apply for a nonimmigrant visa.  The issuance of IVs, including Diversity Visas, to applicants using Turkmen passports remains suspended.

**Refuse Applicants Subject to the PP if No Exceptions Apply**

10.  (SBU) Beginning 12:01 a.m. EST on January 1, 2026, adjudicators must first determine whether the applicant is otherwise eligible for a visa under the INA, without regard to the PP.  Adjudicators are reminded that **all visa decisions are national security decisions and posts must maintain extra vigilance in our work and comprehensively review and screen every visa applicant for potential security and non-security-related ineligibilities, including to assess whether the applicant poses a threat to U.S. national security (Ref B).**  This includes all required steps that would normally be taken as part of the visa application process for an adjudicator to determine eligibility.

    A.  Adjudicators should first determine if an applicant subject to the PP overcomes 214(b) for nonimmigrant visa applicants, as well as reviewing any other ineligibility applicable to the visa class.  Adjudicators should make this determination independent from the PP.

B.  If the applicant is determined to not be eligible for the visa for any reason, independent of the PP, refuse the applicant and enter the appropriate refusal code - ███████████████████████████████████████████ ████████████.  This includes applicants who otherwise would require███ ██████ or have independent grounds of ineligibility (████████, etc.).

C.  If the applicant is subject to the PP and no exceptions apply, regardless of whether the applicant is determined to be ineligible on another basis, the officer must:

> i.  **Refuse the applicant 212(f) using refusal code "F251".**  You must refuse applicants "F251" even if they have another refusal code already entered.  **Do NOT use refusal code 212(f) for the purposes of this PP.**  For example, if an NIV applicant is subject to the PP and has been found 214(b), or an IV applicant is subject to 221(g), the adjudicator should enter both refusal codes into CLASS.

> ii.  Inform the applicant in writing of the refusal by providing the applicant a copy of the 212(f) refusal letter in addition to refusal letters for any other relevant ineligibilities.  A refusal letter template applicable to the new PP will be available on CA Web by the effective date.  If refusing an applicant "F251" after previously refusing 221(g), the 212(f) refusal letter can be sent to the refused applicant via email.  An applicant not previously refused orally under 221(g) or another refusal code will need to be called to inform him or her of the 212(f) refusal orally AND emailed the 212(f) refusal letter.

> iii.  Enter a case note stating, "Applicant was refused under INA 212(f) as per Presidential Proclamation 'Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States.'"

> iv.  Refuse under INA 221(g) derivative applicants who are not directly affected by the PP because they are not from an affected country, but whose principal applicant is refused under INA 212(f).

> v.  Do not request ██████ for applicants who will not be eligible for an exception and will be refused under the PP, unless the applicant is a close match to a security-related hit in ██████ or the consular officer

has another reason to believe the applicant may be ineligible under INA 212(a)(3)(B). See 9 FAM 302.6-2(C)(1) for additional guidance.

vi. See paragraphs 18 and 19 below for guidance on handling cases already issued to applicants from suspended countries.

vii. VO/SAC will continue to provide responses to all currently pending ███████ including for applicants from countries affected by the PP. Do not request ████████████████ for applicants from countries covered by the PP based solely on the PP. Consult with your VO/SAC analyst on questions about ████████████ for non-PP related issues.

**Reminders on Applying Exceptions**

11. (SBU) Some exceptions that were available under PP 10949 are modified by the PP, and not applicable effective on January 1, 2026, at 12:01 a.m. EST. Under the PP, there are no longer categorical exceptions available for immediate family immigrant visas (IR-1/CR-1, IR-2/CR-2, IR-5); adoption visas (IR-3, IR-4, IH-3, IH-4); and Afghan Special Immigrant Visas.

12. (SBU) **Ethnic and Religious Minorities Subjected to Religious Persecution in Iran:** For any IV applicant from a 212(f) affected country who does not fall under one of the categorical exceptions and who communicates that he or she is a member of an ethnic or religious minority facing persecution in Iran, follow the guidance in 25 STATE 71920 (Ref C).

13. (SBU) **Dual Nationals:** Dual nationals applying with a valid passport of a country not subject to an INA 212(f) suspension are excepted from a suspension of entry. The consular officer need not make a finding of nominal nationality for purposes of the PP. Clearly document the application of this exception in case notes and annotate the visa to read "Excepted from PP Restricting Entry."

14. (SBU) **The Major Sports Exception:** Section 6(b)(iv) of the PP excepts from suspension and limitation on entry "any athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State." Adjudicators are reminded that accredited travelers for the World Cup, the Olympics, and other major sporting events designated under the provision who are from the designated countries but who are

not an "athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives" do not benefit from this exception. For guidance on applying the Major Sports exception provision in PP 10494 for the 2026 FIFA World Cup and the 2028 Olympics, please see 25 STATE 58350 (Ref D) and 25 STATE 77258 (Ref E). The Department will issue guidance on the Secretary's determination on "other major sporting events" for this PP septel.

15. (SBU) **National Interest Exceptions (NIEs):** A Chief of Mission (COM) may consider an NIE request if the applicant is able to demonstrate his or her travel would serve a specific U.S. national interest, consistent with Executive Order 14150 "America First Policy Directive to the Secretary of State," which directs the Secretary of State to always put America and American citizens first. NIE requests should be made rarely and the U.S. national interests should be exceptional in nature. COMs should make NIE requests only after carefully considering the America First perspective and be able to articulate the specific U.S. national interest. Posts should continue to follow the guidance in 25 STATE 55754 (Ref F). Additional guidance and templates are available on CA Web.

16. (SBU) **Issuing Excepted Applicants from Suspended Countries:** Applicants who are excepted from the PP, as detailed in paragraphs 11-16 above, should not be refused under INA 212(f). If otherwise issuable, posts should annotate the visa to read: "Excepted from PP Restricting Entry." Posts must also add a case note in IVO or NIV explaining the circumstance of the exception and stating: "#XF251 applicant excepted from PP restricting entry of foreign nationals." If an F251 refusal is erroneously applied for an applicant who benefits from an exception, an officer must both overcome/waive the refusal from NIV or IVO and submit a CLOK deletion request.

**V92 Following-to-Join Asylee (FTJ-A) Cases**

17. (SBU) Beginning 12:01 a.m. EST on January 1, 2026, posts should follow the guidance above for all FTJ-A beneficiaries from suspended 212(f) countries. FTJ-A beneficiaries are subject to suspensions under 212(f). Guidance on exceptions, including requesting NIEs or exceptions for dual nationals, also applies to FTJ-A beneficiaries. Posts are reminded that processing of V-93 Follow to Join Refugee cases (FTJ-R) is suspended as of January 27, 2025, under Executive Order 14163.

I B 7 @5 GG÷ 98

**Handling Cases Already Adjudicated or Issued to Applicants from Suspended Countries prior to January 1, 2026.**

18.  (SBU) For any applicant ineligible under INA 212(f) as a result of the PP, for whom no exception applies, and for whom post has approved or printed but not yet passed back the visa as of 12:01 a.m. EST on January 1, 2026, post must:

> A.  Immediately stop the pass back of a printed visa for the now-ineligible applicant, physically cancel the visa without prejudice, and spoil for re-entry in the system.  Refuse the applicant using refusal code "F251."

> B.  Approved visas not yet printed as of January 1, 2026, at 12:01 a.m. EST should be reopened and refused using refusal code "F251."

> C.  Enter a case note in NIV or IVO stating, "Visa was canceled, and applicant was refused under INA 212(f) as per Presidential Proclamation Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States."

> D.  Call the applicant to inform him or her of the refusal orally AND email the 212(f) refusal letter.  Document the provision of the refusal in case notes.  The applicant does not need to be called back and refused in person if refused orally and in writing.

> E.  No action should be taken for issued visas which have already left the consular section.  No visas issued prior to the effective date should be revoked pursuant to this proclamation.

> F.  As a best practice, posts should seek to regularly clear print queues and expeditiously handle pass back after printing, minimizing the number of passports held by the consular section pending processing.

19.  (SBU) For any applicant excepted from INA 212(f) as detailed above, and for whom post has already printed but not yet passed back the visa, post must:

> A.  Physically cancel the visa, spoil for re-entry in the system, and reprint the visa with the annotation, "Excepted from PP Restricting Entry."

> B.  Enter a case note stating, "*#XF251 applicant excepted from PP restricting entry of foreign nationals.*"

**Interview Waiver**

20.  (SBU) Consular officers are reminded of the directive to require in-person interviews for **all** nonimmigrant visa applicants applying at any consular section abroad, regardless of age, who are applying using a passport from Angola, Afghanistan, Antigua and Barbuda, Benin, Bhutan, Burma, Burkina Faso, Burundi, Cabo Verde, Cambodia, Cameroon, Chad, Cote d'Ivoire, Cuba, Djibouti, Dominica, Equatorial Guinea, Eritrea, Ethiopia, Egypt, Gabon, The Gambia, Ghana, Haiti, Iran, Kyrgyz Republic, Laos, Liberia, Libya, Malawi, Mali, Mauritania, Niger, Nigeria, Republic of the Congo, Saint Kitts and Nevis, Saint Lucia, Sao Tome and Principe, Senegal, Sierra Leone, Somalia, Sudan, South Sudan, Syria, Tanzania, Togo, Tonga, Turkmenistan, Tuvalu, Uganda, Vanuatu, Venezuela, Yemen, Zambia, and Zimbabwe (REF H, 25 STATE 97068).  Exceptions to this requirement are as follows:

- Applicants who hold a cabinet-level position or above, regardless of visa type (e.g. official- or diplomatic-type visas) or classification;
- Applicants serving as an assigned ambassador (or acting capacity) to a bilateral mission in the United States;
- Applicants who will serve as the permanent representative (or acting capacity) to a country's permanent mission to a designated international organization;
- Applicants traveling to assume the position of secretary-general or deputy secretary general, or its equivalent, at designated international organizations (for example, the President of the World Bank and Managing Director of the International Monetary Fund).  Questions on equivalent ranks can be directed to: PII and
- Derivatives of any of the above, regardless of age or nationality.

21.  (SBU) **Palestinian Authority:  Effective immediately**, consular officers are directed to require in-person interviews for all nonimmigrant visa applicants applying with a Palestinian Authority passport or Palestinian Authority-issued or endorsed travel document at any consular section abroad, regardless of age, except those who fall under the exceptions listed in paragraph 20 above.  Effective January 1, 2026, at 12:01 a.m. EST, this guidance also supersedes the guidance in 25 STATE 102428 (Ref K) implementing a pause on issuance for applicants applying with a Palestinian Authority passport present in Gaza at any time since January 1, 2007.  Applications should be processed and refused under 212(f) using

code F251 unless an exception applies, such as travel to UN headquarters for UN business.

22.  (SBU) **Diplomatic and Official Travel By PA Officials or Others Holding Palestinian Authority Travel Documents:**  While the Department has determined that the Palestinian Authority (PA) is a competent authority for passport-issuing purposes as defined in INA 101(a)(30), the United States does NOT recognize the PA as a "foreign government."  Visa applicants holding Palestinian passports coming to the United Nations or for other official travel on behalf of the PA/PLO do not qualify for A or G visas and are only issued B-1 visas.  Posts are reminded of guidance on special clearances for such travelers, provided in 9 FAM 304-5(G)(1)(a).  The current policy on applications by PLO members or PA officials for official travel, including travel to the United Nations, outlined in 25 STATE 82210 (Ref L) will remain in effect irrespective of visa classification.  The travel sanctions imposed by the Deputy Secretary based on his determination that the PLO and the PA were not in compliance with their obligations under the PLO Commitments Compliance Act of 1989 (PLOCCA) and the Middle East Peace Commitments Act of 2002 (MEPCA) also remain in effect.  Any application for official travel by a PLO member or PA official to the UN must be brought to the attention of PII█████████████████ and PII████████████████████ G-3 and G-5 visas for bearers of Palestinian Authority documents who are employed by foreign governments (i.e. not the Palestinian Authority), or who are the immediate family members, attendants or personal employees of accredited officials of foreign governments, A and G-4 visa applications must also be refused under 221(g) pending further guidance.

23.  (SBU) **Afghan Nationals:**  Effective January 1, 2026, at 12:01 a.m. EST, this guidance supersedes the guidance in 25 STATE 108252 (Ref I) implementing a pause on issuance of visas to Afghan nationals applying with Afghan passports.  As of the effective date of the PP, applications from Afghan nationals should be processed and refused under 212(f) using code F251 unless an exception applies.

24.  (SBU) **Visa Bonds:**  Some nationals of suspended countries applying for B-1, B-2, B1/B2 visas that qualify for an exception to the PP, including an approved NIE, will also be subject to the requirement to pay a visa bond under the Visa Bonds Pilot Program (Ref J).  In such a case, the exception to the PP should be documented before the case is refused for payment of the bond.  If an applicant is subject to the PP and post's COM supports an NIE, the NIE must be approved before the visa can be refused for bond payment.  In extremely limited

circumstances where post's COM supports a request for both an NIE and a bond waiver, post should contact PII for guidance on submitting a combined memo for CA consideration.

25. (U) **Mission Website**: CA/P will coordinate with GPA to publish a notice at the top of the visa page on mission websites for countries with full or partial suspensions, and for missions serving as the designated processing posts for nationals of suspended countries. CA/EX will work with the GSS vendors to provide vendors cleared language to post on their websites. Posts should not/not ask their local GSS contacts to put alternative language on post-specific GSS websites.

26. (U) **Inquiries**: Post must refer any U.S. media inquiries regarding EOs and PPs to CA-Press@state.gov and Congressional inquiries regarding EOs and PPs to ConsularOnTheHill@state.gov. Posts may continue to reply to routine case-specific constituent inquiries about cases subject to the PP. Once cleared press guidance specific to the December 16, 2025, PP is posted on CA Web, posts may respond to requests from international media regarding EOs and PPs using those points, copying CA-Press@state.gov.

| Signature: | RUBIO |
|---|---|

| XMT: | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |
|---|---|

**UNCLASSIFIED**

SBU

**UNCLASSIFIED**

SBU



| | |
|---|---|
| **MRN:** | 25 STATE 102426 |
| **Date/DTG:** | Nov 06, 2025 / 060000Z NOV 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| **E.O.:** | 13526 |
| **TAGS:** | CMGT, CVIS |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914 |
| | B) 25 STATE 59756 |
| **Subject:** | Visas:  Properly Implementing the INA 212(a)(4) Public Charge Ineligibility |

## SUMMARY

1. (U) Aliens subject to the INA 212(a)(4) public charge ground of ineligibility must demonstrate that they are not likely to become a public charge at <u>any time</u> after admission to the United States.  Consular officers need to keep in mind that the public charge ineligibility applies to both applicants for nonimmigrant visas and immigrant visas (IV applicants will generally need to provide considerably more evidence to overcome it).  This guidance reminds consular officers to conduct a comprehensive and thorough vetting of visa applicants, considering all relevant factors and the totality of the applicant's circumstances, in order to determine an applicant's eligibility under INA 212(a)(4).  CA's Visa Office (VO) will update 9 FAM to reflect this guidance and carry out webinars for the field regarding this guidance.  The Department is reviewing other policies and procedures related to public charge ineligibility, as well as other INA 212(a) ineligibilities, and will continue to update the field as these evolve.

## WHY ARE WE DOING THIS?

2. (U) Self-sufficiency has been a longstanding principle of U.S. immigration policy, and the public charge ground of inadmissibility has been a part of our immigration law for more than 100 years.  The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) states that it is national policy that "aliens within the Nation's borders not depend on public resources to meet their needs."  E.O. 14218, Ending Taxpayer Subsidization of Open Borders, seeks to ensure, among other things, that no taxpayer-funded benefits go to unqualified aliens.

3. (U) Robust systems to ensure that unqualified aliens do not receive public resources still are being developed and implemented, however.  Further, removing foreign nationals from the United States, even when they have clearly violated our laws, is a lengthy, expensive, and difficult process.  Therefore, we must be vigilant during the visa issuance process, before aliens are admitted to the United States.  This includes ensuring that applicants subject to INA 212(a)(4) are not likely to become a public charge at <u>any time</u> after admission.

**WHICH CASES ARE COVERED?**

4. (U) All visa applicants, except those in the specific categories described in 9 FAM 302.8-2(B)(6), are subject to the public charge ground of ineligibility.

5. (U) The public charge ground of ineligibility is most commonly considered in the IV context.  However, the vast majority of NIV applicants also are subject to INA 212(a)(4), including those in classifications not subject to INA 214(b).  You must assess the public charge ineligibility each time a nonimmigrant applies for an NIV, as his circumstances may change.  Even if inconsistencies or potentially derogatory information you uncover do not lead to an INA 212(a)(4) ineligibility, you must consider whether they undermine the applicant's credibility or suggest that the applicant will not respect the terms of his admission to the United States.

6. (U) INA 214(b) requires an NIV applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his NIV classification.  That is, if you are not completely satisfied (1) that the applicant is credible and (2) that, during his time in the United States, the applicant will engage only in activities consistent with his nonimmigrant status, you should refuse the visa under INA 214(b).  If any NIV applicant cannot overcome INA 214(b), you should refuse the visa under INA 214(b) and need not pursue a possible INA 212(a)(4) ineligibility.

**WHAT DOES "PUBLIC CHARGE" MEAN?**

7. (U) INA 212(a)(4) renders ineligible any visa applicant who in the opinion of the consular officer is likely at any time to become a public charge.  Under current DHS regulation, this means the alien is "likely at any time to become primarily dependent on the government for subsistence, as demonstrated by either receipt of public cash assistance for income maintenance or long-term institutionalized care at government expense."

8. (U) Under current regulation, "public cash assistance for income maintenance" means the following:

- (U) *Supplemental Security Income (SSI)* is a U.S. government program available to people who have low or no incomes; few or no resources; and a disability, blindness, or are age 65 or older.  For SSI purposes, adults are considered "disabled" if they have a disability that results in the inability to do "substantial gainful activity" or work for a year or more; people over 65 do not need a disability to qualify.  Additional information on SSI eligibility is available at http://ssa.gov/ssi/eligibility.

- (U) *Temporary Assistance for Needy Families (TANF)* is a federally-funded program administered by states, territories, and tribal governments that provides a variety of benefits to low-income families with children.  These vary by location, but can include cash, food, and child care assistance, as well as employment services.

- (U) *General Assistance,* also known as "state aid," "general public assistance," or "cash aid," refers to a variety of state and local programs that aim to help low-income people, particularly those who do not qualify for other types of cash assistance. The names of these programs, their eligibility criteria, and the benefits they provide, vary across states and within states.

9. (U) Under current regulation, "long-term institutionalization at government expense" means government assistance for long-term institutionalization, including in a nursing facility or mental health institution. It does not include imprisonment for conviction of a crime or institutionalization for short periods for rehabilitation purposes.

**WHERE DO I LOOK?**

10. (U) To determine whether an applicant is likely to become a public charge, you must examine all aspects of the case, including but not limited to the petition, if applicable; the visa application and any supporting evidence; information you gather during the interview; the medical report, if applicable; the affidavit of support, if applicable; and any information uncovered in the course of screening and vetting (refs A and B).

11. (U) INA 212(a)(4) says the public charge determination is "in the opinion of the consular officer" and, under INA 291, the burden of proof is on the applicant to establish eligibility to the satisfaction of the consular officer. You may request that the applicant provide any information, including appropriate documentation, that you reasonably believe is necessary to help you determine that an applicant is not likely to become a public charge at any time. The burden of proof never shifts onto the adjudicator at any point during the adjudication.

**WHAT AM I LOOKING FOR?**

STATE00031

12. (U) There is no "bright-line" test in making a public charge ineligibility determination. No one factor, other than the lack of a sufficient Affidavit of Support Under Section 213A of the INA, if required, can be the sole criterion for the determination. **You must consider all aspects of the case and determine whether the applicant's circumstances, assessed in their totality, suggest that he is more likely than not to become a public charge at any time.**

13. (U) At a minimum, you must consider following factors related to the applicant:
- age
- health
- family status
- assets, resources, and financial status
- education and skills
- any current or past receipt of public cash assistance for income maintenance or long-term institutionalization at government expense
- a sufficient Affidavit of Support Under Section 213A of the INA, when required.

**AGE**

14. (U) You must consider an applicant's age in conjunction with the other factors identified, particularly his health and financial status. If an IV applicant is under the age of 16, he must have the support of a sponsor. For an IV applicant who is nearing or past normal retirement age, what is the likelihood that he will secure a job in the United States that will allow him to support himself and any dependents without the need for public cash assistance? If he is able to secure such a job, will he be able to work for enough time before retirement to accumulate savings or pension benefits sufficient to support himself and his dependents over his expected lifespan without the need to seek public cash assistance or long-term institutionalization government expense? Will he be receiving retirement benefits from his home country while in the United States? Long-term

institutionalization (e.g., at a nursing facility) can cost hundreds of thousands of dollars per year and should be considered.

**HEALTH**

15. (U) You must consider an applicant's health.  Certain medical conditions - including, but not limited to, cardiovascular diseases, respiratory diseases, cancers, diabetes, metabolic diseases, neurological diseases, and mental health conditions - can require hundreds of thousands of dollars' worth of care.  If an applicant has one of these conditions, does he have adequate financial resources or insurance coverage for such costs over his entire expected period of stay in the United States without seeking public cash assistance or long-term institutionalization at government expense?

16. (U) You must review the applicant's medical report in cases where one is required.  For any Class B condition, the CDC directs panel physicians to remark on the likely degree of disability or the need for extensive medical care or institutionalization.  You must consider the conditions and physician's remarks in assessing whether any aspects of the applicant's health would hinder him from maintaining employment, which could require him to seek public cash assistance; would require extensive medical care, especially for a chronic condition, which also could require him to seek public cash assistance; or would require his long-term institutionalization.  If the physician failed to include remarks about the likely degree of disability or the need for extensive medical care or institutionalization, you must refuse the application under INA 221(g) and return the medical exam result to the panel physician so he can include the remarks.

17. (U) You should pay particular attention to any chronic conditions identified in the medical report, as these can require expensive, long-term care or could mean an applicant is unable to support himself through employment.  Does the applicant have adequate financial resources to cover the costs of such care over his entire expected lifespan without seeking public cash assistance or long-term institutionalization at government expense?  If the applicant expects to rely on employer-provided health

insurance to help cover those costs, what is the likelihood he will be able to get and maintain a job that provides such a benefit?  Also, how does he plan to maintain such insurance after retirement?

18. (U) You also should consider aspects of the applicant's health that are not necessarily identified as Class B medical conditions but that could nevertheless lead to a public charge determination when assessed in the totality of the circumstances.  For example, according to the CDC, obesity in adults increases the risks of, among other conditions, high blood pressure; Type 2 diabetes; breathing problems, such as asthma and sleep apnea; joint problems, such as osteoarthritis; gallstones and gallbladder disease; and mental illness, such as clinical depression and anxiety.  All of these can require expensive, long-term care.

**FAMILY STATUS**

19. (U) You must consider an applicant's family status.  For example, if an applicant has dependent family members (including minor children and elderly parents) who will accompany him, what is the likelihood he will be able to provide for himself and them in the United States without seeking public cash assistance?  Is the applicant the sole breadwinner?  Do any of the dependents have disabilities, chronic medical conditions, or other special needs and require care such that the applicant cannot maintain employment?  If the applicant has no dependents, and taking into account his health and financial status, what is the likelihood he will be able to care for himself as he ages and thus avoid the need for long-term institutionalization at government expense in a nursing facility?

**ASSETS, RESOURCES, AND FINANCIAL STATUS**

20. (U) You must consider an applicant's assets, resources, and financial status.  For example, if an IV applicant is unable to work or does not intend to work in the United States, what assets and resources does he have now that will allow him to support himself and any dependents without seeking public cash assistance?  Are those assets and resources liquid, solely his, and

available for use in the United States?  Given his habitual lifestyle and family status, particularly his number of dependents, and considering the effect of inflation on the cost of living, would those assets last for his expected lifespan?  Long-term institutionalization (e.g., at a nursing facility) can cost hundreds of thousands of dollars per year.

21. (U) Among other things, you should consider whether any applicant's assets, resources, and financial status will allow him and any dependents to withstand the likely trials of life without the need at <u>any point</u> to seek public cash assistance or long-term institutionalized care at government expense.  For example, prudent financial planning normally includes having some cash savings in case of an interruption in income (e.g., a job loss) or significant unexpected expense (e.g., a major car repair).  Does the applicant have adequate resources to cover these without the need to seek public cash assistance?  Further, prudent planning for emergencies normally includes having appropriate medical insurance coverage for oneself and one's dependents.  What are the applicant's plans to handle a medical emergency while in the United States (including during that two-week trip to the Grand Canyon)?

22. (U) Whenever an applicant seeks to rely on his assets, resources, or financial status to help satisfy INA 212(a)(4) requirements, you should request documentary evidence of such assets, resources, insurance, and financial status.  This may include, but is not limited, to statements from banks and other financial institutions that show balances in checking and savings accounts, brokerage accounts, retirement contribution plans (e.g., 401(k) or Individual Retirement Account equivalents, etc.), trust funds, annuities, or any other investments or accounts.  As appropriate, you should verify such documents with the institutions that issued them.

**EDUCATION AND SKILLS**

23. (U) You must consider an applicant's education and skills.  These include, but are not limited to, any formal credentials and skills acquired over his educational and employment history.  You should assess whether these will

help or hinder the applicant in maintaining employment in the United States such that he can provide for himself and any dependents over his expected lifespan without seeking public cash assistance or long-term institutionalization at government expense.

24. (U) First among the applicant's education and skills, you should consider his English-language proficiency.  Even entry-level or lower-skilled job require applicants to be able to serve clients in English, get direction from supervisors in English, and read English-language product instructions and warnings.  For an applicant who intends to support himself and his dependents through employment, lack of the necessary English proficiency could call into question his ability to become or remain self-sufficient within a reasonable time after entry into the United States.

25. (SBU) You can assess the applicant's English-language proficiency by conducting the interview in English.  If the applicant does not have at least basic English proficiency, he should have a realistic plan to acquire it and to support himself and his dependents without using public cash assistance during that time.  If the applicant cannot or does not intend to acquire basic English proficiency, you should consider how he will be able to maintain employment that will allow him to provide for himself and any dependents over his expected lifespan without becoming a public charge.

26. (U) Many aliens obtain employment that is low-skilled but physically demanding (e.g., caregiving or agriculture) or hazardous (e.g., meat processing or construction).  For any applicant who intends to work in such a field, you should assess such plans in light of the applicant's age, health, and family status.  You should consider whether he will be able to work for enough time before retirement or in the event of disabling injury to accumulate savings or pension benefits sufficient to support himself and his dependents over his expected lifespan without seeking public cash assistance or long-term institutionalization at government expense in a nursing facility.

27. (U) For an applicant who plans to work in a professional field, you should determine whether he has the necessary qualifications and credentials to secure and maintain employment in the state where he intends to reside. You should request documentary evidence of such qualifications and credentials (e.g., diplomas and professional certificates) and, as appropriate, you verify them with issuing institutions. Many professions in the United States are subject to state-level licensing requirements, and foreign educational or profession credentials will not necessarily be honored. Until the applicant obtains the necessary U.S. qualifications and credentials, which can be a lengthy process, you should consider how he will support himself and his dependents without seeking public cash assistance.

**CURRENT OR PAST RECEIPT OF PUBLIC ASSISTANCE**

28. (U) The public charge ineligibility is forward-looking. Nevertheless, current or past receipt of public cash assistance for income maintenance, or the need for long-term institutionalization at government expense, is an indicator that an applicant is or has been unable to provide for himself or his dependents and could become a public charge in the future. You should take into account any past receipt of such benefits in any country in considering the totality of the applicant's circumstances. Have his circumstances significantly changed such that he is not likely to rely on such benefits at any point after admission?

29. (U) Likewise, you must consider an applicant's current or past use of any other form of public assistance, social welfare, or private charity, whether in the United States or elsewhere, intended to help low-income people. This includes but is not limited to housing assistance, food assistance (including the use of private food banks), and medical assistance. Although the current regulatory definition of public charge does not include these, use of them indicates that an applicant is or has been unable to provide for himself fully and could become a public charge in the future.

**AFFIDAVIT OF SUPPORT UNDER SECTION 213A OF THE INA**

I B 7 @5 GG÷ 98

30. (U) Most family-based IV applicants and certain employment-based IV applicants must submit an Affidavit of Support Under Section 213A of the INA (AOS).  **In such cases, a sufficient AOS that meets the minimum financial requirements is a threshold condition and one factor (but not the only) in the totality of circumstances you must consider to determine if an applicant is likely at any time to become a public charge.**

31. (U) In cases where an AOS is required, the sponsor normally is the petitioner.  In cases where the petitioner cannot submit a sufficient AOS, someone outside the petitioner's household may be considered a joint sponsor for the purpose of executing a Form I-864.  The joint sponsor must independently meet the financial requirements to support the sponsored applicant; combining the incomes of the sponsor, sponsored applicant, or joint sponsor is not permitted.

32. (SBU) The National Visa Center (NVC) reviews all AOS submissions it receives for technical completeness.  Additionally, NVC screens certain cases for fraudulent joint sponsors and individuals who may be sponsoring more applicants than claimed on the Form I-864.  For electronic cases, NVC uploads a memo into the Electronic Document Processing (eDP) system with any derogatory information on joint sponsors; a printed copy of the memo will be attached to the case file in paper IV cases.  Even when NVC makes preliminary notes about the AOS during case processing, **NVC does not "approve" the AOS or determine whether the applicant satisfies the requirements of INA 212(a)(4) - that is your responsibility as the adjudicator.**

33. (U) You must review any AOS package, including the Form I-864 and supporting documents.  In the first place, you should determine whether the sponsor or joint sponsor meets the domicile conditions outlined in 9 FAM 601.14-7(a)(3).

34. (U) You must review any AOS package to determine whether the sponsor or joint sponsor has income or assets to maintain his household and the applicant at an annual income of not less than 125 percent of the HHS

Federal Poverty Guidelines (or 100 percent if the sponsor is on active duty in the U.S. armed forces). In conducting this review, you should consider the credibility of the information presented in the AOS. For example, are the sponsor's income and assets consistent with his claimed employment? You may request documentary evidence of the sponsor's claims - for example, letters from employers or statements from financial institutions - and as appropriate verify such documents with the issuers

35. (U) You also should consider the credibility of the assurances provided by any sponsor, household member whose income is counted in the AOS, and joint sponsor. The I-864 creates a **legally-binding contract** between the applicant, their sponsors, and the U.S. government. Therefore, you should examine the nature of the relationship between the applicant and anyone involved in supporting him. Are you satisfied that they will readily make their incomes and assets available so the sponsored applicant does not seek public cash assistance or long-term institutionalized care at government expense?

36. (U) You also should consider whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance. Use of such benefits by a sponsor could indicate that he is or has been unable to provide for himself fully, thus calling into question his ability to provide for the sponsored applicant.

37. (U) **A sufficient AOS that meets the minimum financial requirements is necessary but not by itself enough to satisfy the requirements of INA 212(a)(4). In all cases, you must determine whether, considering the totality of the applicant's circumstances, such an AOS is more likely than not to prevent him from becoming a public charge.** For example, for an IV applicant who is older or has significant health concerns that might prevent him from working, you should consider whether a sponsor whose income is low or variable, or whose employment situation is tenuous, will be able to provide enough support so that IV applicant does not seek public cash assistance or long-term institutionalization at government expense at any time over his expected lifespan.

STATE00039

## DIVERSITY VISA (DV) APPLICANTS

38. (U) DV applicants may **not** use an Affidavit of Support Under Section 213A of the INA to help satisfy the requirements of INA 212(a)(4).  Consequently, many seek to use Form I-134 Declaration of Financial Support for that purpose.  You should not request it from DV applicants, however, and you must not give it any weight in DV cases.  Instead, as in all visa applications subject to INA 212(a)(4), you must consider the factors described above and determine whether the applicant's circumstances, assessed in their totality, suggest that he is more likely than not to become a public charge at any time.

| Signature: | RUBIO |
|---|---|

| XMT: | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |
|---|---|

**UNCLASSIFIED**
SBU



United States Department of State

Washington, DC 20520

SENSITIVE BUT UNCLASSIFIED    January 13, 2026

**Action Memo for CA Assistant Secretary Mora Namdar**

FROM:    CA/VO – Jessica Norris, Acting Deputy Assistant Secretary

SUBJECT:    (SBU) Updated Immigrant Visa Guidance Related to Public Charge Concerns

**(SBU) Recommendation:**  That you approve the issuance of the ALDAC in Tab 2 that directs consular officers to refuse immigrant visas applicants from certain countries under section 221(g) of the Immigration and Nationality Act (INA), in order for the Department to conduct a comprehensive review of all policies, procedures, and guidance related to the public charge ground of ineligibility. (Approve/Disapprove by 01/14/26)

**Decision:**  ☑ **Approve**  ☐ **Disapprove**  ☐ **Discuss**

**Background**

(SBU) President Trump stated that his priority is to ensure that immigrants are financially self-sufficient to protect public benefits for American citizens.  In November, the Department reiterated the critical role of consular officers in assessing the totality of circumstances to determine an applicant's eligibility under section 212(a)(4) of the Immigration and Nationality Act (INA), which provides that an alien is inadmissible to the United States if, in the opinion of the consular officer at the time of the visa application, is likely at any time to become a public charge. (Ref A).  The Secretary directed on January 8 based on public assistance and welfare use statistics from the Council of Economic Advisors, that the nationalities listed below present a higher risk for reliance on public assistance and that this fact could be indicative of a need of more robust vetting of potential ineligibility under INA section 212(a)(4).  We intend for this pause to continue at least 90 days during which we will review current screening and vetting policies and guidance related to the public charge ground of ineligibility for immigrant visas.  The recommended action would apply to nationals of the following countries:

Afghanistan, Albania, Algeria, Antigua and Barbuda, Armenia, Azerbaijan, Bahamas, Bangladesh, Barbados, Belarus, Belize, Bhutan, Bosnia, Brazil, Burma, Cambodia, Cameroon, Cape Verde, Colombia, Cote d'Ivoire, Cuba,

SENSITIVE BUT UNCLASSIFIED

Democratic Republic of the Congo, Dominica, Egypt, Eritrea, Ethiopia, Fiji, The Gambia, Georgia, Ghana, Grenada, Guatemala, Guinea, Haiti, Iran, Iraq, Jamaica, Jordan, Kazakhstan, Kosovo, Kuwait, Kyrgyzstan, Laos, Lebanon, Liberia, Libya, Macedonia, Moldova, Mongolia, Montenegro, Morocco, Nepal, Nicaragua, Nigeria, Pakistan, Republic of the Congo, Russia, Rwanda, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Senegal, Sierra Leone, Somalia, South Sudan, Sudan, Syria, Tanzania, Thailand, Togo, Tunisia, Uganda, Uruguay, Uzbekistan, and Yemen

(SBU) We are currently reviewing and plans to update policies and regulations related to the implementation of INA section 212(a)(4) to ensure consular officers have the information they need at the time of the interview to determine whether an applicant is likely to become a public charge and appropriately make an ineligibility finding. ███████████████████████████████ CA has also provided webinars to consular officers in the field on the public charge ground of ineligibility, and is considering additional training as appropriate

(U) This ALDAC transmits this guidance and provides operational instructions to consular sections.

## Attachments
Tab 1 - 25 STATE 102426
Tab 2 – Draft ALDAC
Tab 3 – Truth Social Truth by President Trump
Tab 4 – Press Guidance

Approved:  CA/VO – Jessica Norris, A/DAS [JN   ]

Drafted:  CA/VO/F – PII ██████████

Cleared:

| Bureau | Name | Clearance Status |
|--------|------|------------------|
| CA | PII ██████████ | OK |
| CA | PII ██████████ | OK |
| CA | PII ██████████ | Ok |
| CA/VO | PII ██████████ | Ok |
| CA/VO | PII ██████████ | Ok |
| L/CA | PII ██████████ | Info by Request on AM (cleared on ALDAC) |

4/ FO       PII ██████████████████       OK

Cleared  after

IMMEDIATE
CLASSIFICATION: UNCLASSIFIED
ACTION ADDRESSES: ALDAC
TAGS: CVIS, CMGT
CAPTIONS: SENSITIVE

REF:
A: 25 STATE 113496
B: 25 STATE 102426      ~~new public~~
C: 25 ~~STATE~~ 113496

SUBJECT: Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge

1. (U) This is an action request. Please see paragraphs 4-7.

2. (SBU) SUMMARY and ACTION REQUEST: Effective January 21, consular officers must refuse under Section 221(g) of the Immigration and Nationality Act to **all immigrant visa applicants** who have not been refused under another ground of ineligibility, if the applicant is a national of the following countries:

Afghanistan, Albania, Algeria, Antigua and Barbuda, Armenia, Azerbaijan, Bahamas, Bangladesh, Barbados, Belarus, Belize, Bhutan, Bosnia, Brazil, Burma, Cambodia, Cameroon, Cape Verde, Colombia, Cote d'Ivoire, Cuba, Democratic Republic of the Congo, Dominica, Egypt, Eritrea, Ethiopia, Fiji, The Gambia, Georgia, Ghana, Grenada, Guatemala, Guinea, Haiti, Iran, Iraq, Jamaica, Jordan, Kazakhstan, Kosovo, Kuwait, Kyrgyzstan, Laos, Lebanon, Liberia, Libya, Macedonia, Moldova, Mongolia, Montenegro, Morocco, Nepal, Nicaragua, Nigeria, Pakistan, Republic of the Congo, Russia, Rwanda, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Senegal, Sierra Leone, Somalia, South Sudan, Sudan, Syria, Tanzania, Thailand, Togo, Tunisia, Uganda, Uruguay, Uzbekistan, and Yemen

The Department is undergoing a full review of all policies, regulations, and guidance to ensure the highest level of screening and vetting of every visa applicant. Applicants from these countries are at a high risk for becoming a public charge and recourse to local, state, and federal government resources in the United States. Consular officers should continue to conduct interviews and fully assess

each applicant for all possible ineligibilities, including INA 212(a)(4), Public Charge. END SUMMARY AND ACTION REQUEST

3. (U) President Trump has made clear that immigrants must be financially self-sufficient to protect public benefits for American citizens. In November, the Department underscored consular officers' critical responsibility to assess the totality of circumstances to determine an applicant's eligibility under INA 212(a)(4) (Ref B). As part of its ongoing review of all visa vetting protocols and guidance to consular officers, in order to ensure robust enforcement of all U.S. immigration laws, the Department is directing consular officers to take this action based on indication of nationals from these countries having sought public benefits in the United States, and in order to allow the Department to evaluate and enhance screening and vetting procedures and guidance related to the public charge ground of ineligibility. Exceptions to this guidance will be very limited and in cases that follow appropriate procedures for establishing that an applicant is not likely to become a public charge in the United States, and ineligible under INA section 212(a)(4).

4. (SBU) **Implementation Guidance**: Immigrant Visa issuance to applications from these countries is paused until further notice. However, interview appointments for applicants from these nationalities should not be cancelled. Consular officers should continue to adjudicate all immigrant visa cases and carefully evaluate all potentially applicable grounds of ineligibility, including assessing whether an applicant is likely to become a public charge, in accordance with guidance in 9 FAM 302.8-2. If an officer believes an applicant is likely to become a public charge and ineligible under INA section 212(a)(4)(a), the officer should refuse the applicant under that ground and include detailed case notes explaining this finding. Officers should assess all other potential grounds of ineligibility first, and if an officer has not refused the applicant under any other ground, the officer should make detailed case notes explaining all aspects of the case (including the factors highlighted in Ref. B) where additional information could yield more data concerning the applicant's eligibility vis-à-vis 212(a)(4). Officers should then refuse the applicant 221(g) while the Department develops additional screening and vetting tools, polices, and operations to more accurately identify any IV applicant likely to become a public charge. **Officers should include the hashtag "#4AIVPause" in the case notes for any applicant that has**

**not already been refused under any other ground of ineligibility, including public charge.**

5. (SBU) If an officer refuses an applicant under 4(a) and then the applicant provides additional evidence that demonstrates he or she overcomes the public charge refusal, the consular officer should write detailed case notes including the hashtag "#4AIVPause", CLOK the 4(a) hit, and refuse the applicant 221(g).

6. (SBU) Like with nationalities suspended entry under INA section 212(f), posts should request any missing documents necessary to show the applicant is qualified for the visa, but time-limited documents like police clearances and medicals are not necessary for a 221(g) refusal related to the immigrant visa issuance pause, and posts may refuse an application 221(g) if the applicant declines to provide them. Posts should request all documentation necessary to resolve potential ineligibilities and enter appropriate 221(g) refusals for the missing documentation.

7. (SBU) For nationals of countries who are subject to a suspension of immigrant visas under 212(f) per Presidential Proclamation 10998, posts should refuse cases F251 per guidance in REF C. If an applicant qualifies for an exception to PP 10998, posts should refuse that applicant 221(g) consistent with the guidance in paragraphs 4 and 5 above.

8. (SBU) **Exceptions:** Dual nationals applying with a valid passport of a country that is not subject to this directive are not subject to this directive and may be processed to issuance. Clearly document the application of this exemption in case notes and continue to process the visa to conclusion. If an applicant is able to demonstrate his or her travel would serve a specific U.S. national interest, consistent with Executive Order 14150 "America First Policy Directive to the Secretary of State," which directs the Secretary of State to always put America and American citizens first, consular sections should reach out to their VO/F analyst to discuss appropriate steps to robustly assess the applicant's eligibility under INA section 212(a)(4)(a).

9. (SBU) **Already Approved Cases:** If post has print-authorized an immigrant visa for an applicant from a nationality included in the pause but the visa has not been printed, the consular officer must refuse the case under 221(g), inform the applicant, and post may not print the visa foil. For cases in which the applicant's visa was printed but has not left the consular section, the consular officer must

CWOP the foil, open the case in the system, and refuse the case under 221(g). The consular officer **must** also inform the applicant of the 221(g) refusal and that additional administrative processing is necessary to determine their eligibility for a visa under U.S. law. No action should be taken for issued visas which have already left the consular section. No visas issued previously should be revoked pursuant to this guidance. Issued visas remain valid for travel. Only DHS may make determinations on the admission of visa holders into the United States.

10. (U) Inquiries: Post must refer any U.S. media inquiries to CA-Press@state.gov and Congressional inquiries to ConsularOnTheHill@state.gov. Once cleared press guidance specific to this pause in DV issuance is posted on CA Web and Content Commons, posts may respond to requests from international media using those points, copying CA-Press@state.gov.

11. (U) Please contact your VO/F analyst with any questions regarding application of this guidance.

Approved:  CA – Mora Namdar, Assistant Secretary   [ ]

Drafted:    CA/VO – PII

Cleared:

| Bureau | Name | Clearance Status |
|---|---|---|
| CA | PII | Ok |
| CA | PII | Ok |
| CA | PII | Ok |
| CA/VO | PII | Ok |
| CA/VO | PII | Ok |
| L/CA | PII | Ok |
| CA/OCS | PII | Ok |
| CA/EX | PII | Ok |
| CA/P | PII | Ok |
| D | PII | Ok |
| S/P | PII | info |
| D-MR | PII | info |
| M | PII | Ok |
| C | PII | Ok |
| P | PII | Ok |
| WHA/FO | PII | Ok |
| AF/FO | PII | Ok |
| NEA/FO | PII | Ok |
| EAP/FO | PII | Ok |
| SCA/FO | PII | Ok |

L/FO     PII     Ok



# Donald J. Trump ✅ ➕
## @realDonaldTrump

| Country of birth | Percent of immigrant households receiving assistance |
|---|---|
| Bhutan | 81.4% |
| Yemen Arab Republic (North) | 75.2% |
| Somalia | 71.9% |
| Marshall Islands | 71.4% |
| Dominican Republic | 68.1% |
| Afghanistan | 68.1% |
| Congo | 66.0% |
| Guinea | 65.8% |
| Samoa, 1940-1950 | 63.4% |
| Cape Verde | 63.1% |
| Iraq | 60.7% |
| Armenia | 60.3% |
| Burma (Myanmar) | 59.2% |
| Micronesia | 58.1% |
| Zaire | 56.9% |
| Guatemala | 56.5% |
| Sudan | 56.3% |
| El Salvador | 55.4% |
| Bangladesh | 54.8% |
| Tonga | 54.4% |
| Mexico | 54.0% |
| Uzbekistan | 53.9% |
| Togo | 53.2% |
| Honduras | 52.9% |
| Americas (not specified) | 52.7% |
| Eritrea | 52.7% |
| Haiti | 52.3% |
| South Sudan | 52.0% |
| Ecuador | 51.2% |
| Cambodia (Kampuchea) | 49.9% |
| Cuba | 49.6% |

| Country of birth | Percent |
|---|---|
| Liberia | 48.9% |
| Algeria | 48.1% |
| Syria | 48.0% |
| Jordan | 47.8% |
| Libya | 47.8% |
| Ethiopia | 47.6% |
| Rwanda | 47.1% |
| Morocco | 46.6% |
| Kosovo | 46.0% |
| Western Africa (not specified) | 45.9% |
| Nicaragua | 45.5% |
| Republic of Georgia | 45.4% |
| Dominica | 45.1% |
| Sierra Leone | 43.6% |
| Vietnam | 42.9% |
| American Samoa | 42.9% |
| Ukraine | 42.7% |
| Moldavia | 42.6% |
| Antigua-Barbuda | 41.9% |
| Belize/British Honduras | 41.8% |
| Guyana/British Guiana | 41.7% |
| St. Lucia | 41.7% |
| Albania | 41.3% |
| Fiji | 40.8% |
| Grenada | 40.7% |
| Gambia | 40.5% |
| Pakistan | 40.2% |
| Senegal | 39.7% |
| Tunisia | 39.7% |
| North Africa (not specified) | 39.7% |
| Egypt/United Arab Rep. | 39.3% |
| St. Kitts-Nevis | 39.1% |
| Peru | 38.9% |
| Asia (not elsewhere classified/not specified) | 38.8% |
| Mongolia | 38.8% |

| Country of birth | Percent |
|---|---|
| Kirghizia | 38.6% |
| St. Vincent | 38.1% |
| Ghana | 37.9% |
| Bolivia | 37.8% |
| Azerbaijan | 37.8% |
| Montenegro | 37.6% |
| Cameroon | 37.6% |
| Trinidad and Tobago | 37.1% |
| Lebanon | 36.9% |
| Africa (not elsewhere classified/not specified) | 36.9% |
| Eastern Africa (not elsewhere classified/not specified) | 36.8% |
| Jamaica | 36.7% |
| Thailand | 36.7% |
| Kazakhstan | 36.5% |
| Colombia | 36.5% |
| Azores | 36.4% |
| Paraguay | 35.3% |
| Costa Rica | 35.1% |
| Other (not elsewhere classified) | 34.9% |
| Nepal | 34.8% |
| Uruguay | 34.6% |
| Bahamas | 34.0% |
| Tanzania | 34.0% |
| Barbados | 33.9% |
| Other USSR/Russia | 33.9% |
| USSR (not specified) | 33.5% |
| Nigeria | 33.3% |
| Macedonia | 33.0% |
| China | 32.9% |
| Panama | 32.7% |
| Bosnia | 32.4% |
| Brazil | 32.2% |
| Iran | 31.9% |

| Country of birth | Percent |
|---|---|
| West Indies (not specified) | 30.5% |
| Caribbean (not specified) | 30.1% |
| Iceland | 29.5% |
| Venezuela | 29.4% |
| Chile | 29.3% |
| Lithuania | 29.2% |
| Kenya | 28.5% |
| Portugal | 28.2% |
| Zambia | 28.0% |
| Korea | 27.2% |
| South America | 26.7% |
| Argentina | 26.2% |
| Israel/Palestine | 25.9% |
| Saudi Arabia | 25.7% |
| Bermuda | 25.5% |

STATE00049



**Federal Register**

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1.** *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2.** *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P



| | |
|---|---|
| **MRN:** | 25 STATE 5914 |
| **Date/DTG:** | Jan 22, 2025 / 221820Z JAN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 24 STATE 21710 |
| | B) 25 STATE 4376 |
| **Subject:** | THE IMPORTANCE OF SECURITY AND VIGILANCE IN VISA ADJUDICATIONS |

1. **(SBU) SUMMARY:** "Whether we call it national security, border security, or homeland security, the protection of our nation and its citizens must be a consular officer's first consideration." 7 FAH-1 h-221(a). As the Bureau of Consular Affairs continues our critical work protecting U.S. citizens and U.S. borders, the Visa Office reiterates to posts that national security is the top priority in adjudicating visa applications. This cable underscores key resources, processes, and procedures to ensure that visa adjudications are conducted with the highest levels of security and vigilance. While the responsibility and decision-making fall directly on consular officers, all consular employees, U.S. direct hire and locally employed (LE) staff alike, must understand their vital role to keep the United States and U.S. citizens safe at home and abroad. "Every consular section must incorporate this overriding priority of protecting the United States and U.S. citizens into its organization, operations, and management. 'Workload' cannot be an excuse to ignore security concerns. Consular managers-section chiefs in particular-must resist pressures to speed up visa or passport processing at the expense of security concerns. You must protect line officers from any potential pressure, from outside or within the post, to bypass procedures or

otherwise issue visas inappropriately." 7 FAH-1 H-221(b). As we implement the policy outlined in the Executive Order "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats" enacted on January 20, 2025, posts should immediately review and continue to implement all guidance provided below. **END SUMMARY**.

2. **(SBU) Security and Vigilance in Visa Adjudications:** All visa decisions are national security decisions. The Visa Office directs posts to maintain extra vigilance in our work and to comprehensively review and screen every visa applicant for potential security- and non-security-related ineligibilities, including to assess whether the applicant poses a threat to U.S. national security. For applicants who have otherwise established their eligibility, consular officers should not hesitate to refuse a case presenting security concerns under section 221(g) of the Immigration and Nationality Act (INA) in order to ███████████████████████ ████████████████████████████████████ Any nonimmigrant visa applicant who has not established to a consular officer's satisfaction that the applicant meets all standards required in that classification, including that the applicant expects to engage in activities consistent with the visa status, should be refused under 214(b), as appropriate. At all times, the burden of proof remains on the applicant. This means the applicant must establish to the satisfaction of the consular officer that the applicant is qualified for the requested visa. If the adjudicating officer is not convinced, the applicant is not eligible for the visa.

3. **(SBU) Applying 214(b):** Under section 214(b), most nonimmigrant visa applicants are presumed to be intending immigrants, unless an applicant establishes to the satisfaction of the consular officer that the applicant is entitled to the claimed nonimmigrant status. The most common reasons that applicants fail to qualify under 214(b) are a failure to convince consular officers that the applicants are not intending immigrants or a

failure to prove to consular officers that the applicants expect to engage in activities in the United States consistent with the claimed nonimmigrant visa classification or purpose of travel.  (For example, many nonimmigrant visa classifications require that applicants have residences abroad that they do not intend to abandon.)  While certain nonimmigrant visa classifications are not subject to 214(b) (see 9 FAM 302.1-2 9 FAM 302.1), all applicants must establish their identity and eligibility for their requested visa classifications to the satisfaction of a consular officer.

4. **(U) More Than Just Ties:**  A refusal under 214(b) is not limited to immigrant intent or inadequate "ties" to an applicant's home country.   214(b) requires the visa applicant to establish to the officer's satisfaction that the applicant is entitled to nonimmigrant status under INA 101(a)(15).  This means the NIV applicant must prove to the adjudicator that the applicant meets the standards required by the visa classification for which the applicant is applying, to include the correct qualifications and resources for any petition-based visas, student or exchange visitor visas, or any tourism or business travel inside the United States.  In other words, the applicant must make a credible showing to the adjudicator that all activities in which the applicant is expected to engage while in the United States are consistent with the claimed nonimmigrant status.  A visa adjudication requires a consular officer to assess the credibility of the applicant and of the evidence submitted in support of the application, including oral answers to interview questions.  Under INA 291, the burden of proof is on the applicant to establish qualification for the visa.

5. **(SBU) Adjudicators are the Finders of Fact**:  If an adjudicator is not satisfied that the applicant meets the standards required by the visa classification for which the applicant is applying, the adjudicator must refuse the applicant under INA 214(b).  This is true even when the applicant has convinced an adjudicator that the applicant is not an

intending immigrant, and even in cases where the applicant is also ineligible under another section of the law (for example, INA 212(a)(2)(C), INA 212(a)(3), INA 212(a)(6)(C), or INA 212(a)(6)(E)).

6. **(SBU) Third-Country National Applicants (TCNs):** It is imperative that adjudicators understand key security considerations for any applicant before finalizing an adjudication. Therefore, consular officers should refuse under 221(g) for further review any applicant who otherwise qualifies and to whom the adjudicator intends to issue a visa *if the adjudicator is not familiar with that nationality or facts relevant to the adjudication.* Consular officers should reach out to their VO/F analysts, FPP/ID liaisons, and/or L/CA attorneys who stand by to assist. All applicants have the burden of proof to demonstrate that they are qualified for the visas for which they are applying, and consular officers should request if any information indicates that the applicant poses a potential threat to U.S. national security or public safety. Additionally, reviewing officers at posts with a high volume of TCNs should consider additional reviews of nationals from countries with high overstay rates (9 FAM 403.12-1).

7. **(U) Ongoing Training is Critical to National Security:** Effective consular managers make training a central part of their work and establish an ongoing program of training and professional development for USDH,

EFM, and LE staff. Consular managers should maintain robust onboarding and training programs for all visa staff. Daily adjudication review per 9 FAM 403.12, ongoing shadowing by managers, and frequent adjudication norming sessions with adjudicators form cornerstones of this critical training. Consular managers and other reviewing officers must review NIV issuances and refusals in accordance with the Secretary of State's guidance to protect national security, to ensure compliance with laws and procedures, to protect against fraud, and to help maintain the highest professional standards of adjudication. The Adjudication Norming Tool is a useful tool to identify NIV adjudication trends and outliers to inform individualized adjudicator feedback and training needs, and to guide team norming conversations (Ref A). Please see the Visa Office's Training Materials on CAWeb, the Consular Training Division's website, and CA/CST's Visa Applications Training page for additional resources.

8. **(SBU) Special Clearances and Vetting:** The Department of State conducts comprehensive unclassified and classified vetting on all visa applicants to ensure that visas and other travel documents are only issued to individuals who meet eligibility requirements and do not pose a threat to U.S. national security. All visa applicants undergo an ███████ ████████████████████████████████████████████ ████████████████████████████ After visa issuance, all applicants continue to be vetted by ████████████████ throughout the validity of their visa. It is essential that consular staff ensure that all NIV and IV case records contain the most accurate and most complete applicant information, including robust and diligent screening of visa applications. 9 FAM 403.6 and 9 FAM 504.8 outline consular officers' responsibilities related to clearances, including manually entering aliases in the IVO or NIV systems. 9 FAM 303.2 provides guidance on Proper Names and Name Citing, and guidance on entry of applicant's names in NIV and IVO is provided in 9 FAM 403.2-5(B)(1) and 9 FAM 504.10-2(C) respectively. For any questions regarding vetting operations, please

contact your VO/SAC analyst using the appropriate collective email address found on <u>Who's Who in CA/VO/SAC</u>.

9. **(SBU) The National Vetting Center:** The interagency National Vetting Center (NVC), established by National Security Presidential Memorandum 9 (NSPM-9) in 2018,  The NVC broadened and deepened in response to evolving global threats.

10. **(SBU) Adjudicator Resources and Special Clearances:** Before issuing any visa, adjudicators must confirm they have completed all additional vetting requirements listed in special clearance procedures. Post should consult the country-specific special clearance procedures listed in <u>9 FAM 304.5</u> and <u>CA Web</u>'s Portal page. The visa portal pages hold a repository of country-specific guidance such as FAM references, cable references, and a list of POCs to contact with questions. Adjudicators should give additional scrutiny to applicants who hold nationality from any country of concern, including but not limited to: Afghanistan, China, Iran, Libya, North Korea, Russia, Syria, and Yemen. Nationals from these countries may be subject to additional vetting and processing requirements based on their countries of birth or residence, even if they are applying as a dual national of a different country. Adjudicators are advised to use resources including this cable, <u>9 FAM 304.5 Special clearances and issuance procedures</u>, and FPP's Travel Trends Dashboard (Ref B) to carefully assess applicants.

11. **(U) Talking Points:**  Posts should refer to CA's cleared [talking points on visa screening/security and administrative processing](#).  Key points include the following:

- National security is our top priority when adjudicating visa applications.
- Every prospective traveler to the United States undergoes extensive security screening.  Prohibiting travel to the United States by those who might pose a threat is key to protecting U.S. citizens at home.
- Visa applicants are continuously screened, both at the time of their application and afterwards, to ensure they remain eligible to travel to the United States.
- This screening draws on information from the full range of U.S. government agencies including thorough screening against U.S. law enforcement and counterterrorism databases.
- No visas are issued until all concerns raised through the screening process are fully adjudicated.
- Whenever we uncover information that might suggest an individual is a potential threat, the Department shares that information with all appropriate U.S. government agencies.
- Maintaining robust screening standards for visa applicants is a dynamic practice that must adapt to emerging threats.  We are constantly working to find mechanisms to improve our screening processes and to support legitimate travel and immigration to the United States while protecting U.S. citizens.

12.  **(U) Additional guidance and contacts:**  Executive Orders and related guidance can be found on [CAWeb](#).  State Department personnel can also join the [CA/VO Transition Coordination Team](#) to review official guidance and submit questions to VO subject matter experts regarding Executive Orders.

13. (U) Minimize considered.

**MINIMIZE CONSIDERED**

| | |
|---|---|
| **Signature:** | RUBIO |
| **Drafted By:** | CA/VO/F PII |
| | CA/VO/SAC PII |
| **Cleared By:** | PII |
| | CA PII |
| | CA PII |
| | CA/VO PII |
| | CA/VO PII |
| | CA/VO/F/OI PII |
| | CA/VO/I PII |
| | CA/P: PII |
| | CA/EX PII |
| | CA/FPP PII |
| | L/CA: PII |
| | PII |
| | PII |
| | PII |
| | PII |
| **Approved By:** | CA: Stufft, Julie |
| **Released By:** | CA_FO PII |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

**UNCLASSIFIED**

SBU



| | |
|---|---|
| **MRN:** | 25 STATE 59756 |
| **Date/DTG:** | Jun 18, 2025 / 181737Z JUN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914 |
| | B) 25 STATE 26168 |
| | C) 25 STATE 50220 |
| **Subject:** | Action Request:  Expanding Screening and Vetting for FMJ Applicants |

1. (U) This is an action request.  See paras. 26-29.

**INTRODUCTION AND SUMMARY**

2. (SBU) In ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security.  In ref B, consular officers were instructed to conduct expanded social media screening and vetting for certain F, M, and J nonimmigrant visa (FMJ) applicants.  In ref C, the Department directed consular sections to temporarily suspend scheduling FMJ cases pending further guidance on FMJ vetting.  This guidance supersedes ref B, which was limited to social media vetting for certain FMJ applicants.

3. (SBU) This updated guidance requires consular officers to conduct a comprehensive and thorough vetting of all FMJ applicants, including online

presence, to identify applicants who bear hostile attitudes toward our citizens, culture, government, institutions, or founding principles; who advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security; or who perpetrate unlawful antisemitic harassment or violence.  <u>Consular sections should resume scheduling FMJ appointments but should consider the effect of this guidance on workload and schedule accordingly</u>.  **Posts should prioritize expedited FMJ appointment requests as described in para 29.**  Posts should implement these vetting procedures within five business days.

**WHY ARE WE DOING THIS?**

4. (U) E.O. 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, directs us to ensure that foreign nationals admitted to the United States do not bear hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States, and that they do not advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security.  E.O. 14188, Additional Measures to Combat Anti-Semitism, establishes U.S. policy to combat antisemitism vigorously, using all available legal tools to hold to account perpetrators of unlawful antisemitic harassment and violence, including on university campuses.

5. (U) Removing foreign nationals from the United States, even when they have clearly violated our laws, is a lengthy, expensive, and difficult process.  Therefore, we must be vigilant during the visa issuance process.  We must ensure that aliens seeking admission to the United States are screened and vetted to the maximum extent possible and that they will respect the terms of their admission to the United States.  As Secretary Rubio said, "a visa is a privilege, not a right."

6. (SBU) Such pre-admission vetting is particularly important for long-stay NIV holders, and acutely for FMJ cases. The FBI has long warned that foreign powers seek access to American higher education institutions to, among other things, steal technical information, exploit U.S. research and development, and spread false information for political or other reasons. In addition, a recent CA/FPP study suggested that almost half of international students seek to remain in the United States, whether legally or illegally.

**WHICH CASES ARE COVERED?**

7. (SBU) This guidance for consular officers covers **all FMJ applicants,** new or returning. This updated guidance supersedes that in ref B, which was limited to social media vetting for certain FMJ applicants.

**HOW DO I HANDLE THESE CASES?**

8. (SBU) Post should conduct intake and interviews in accordance with standard procedures. Once you determine an FMJ applicant is otherwise eligible for the requested nonimmigrant status, you must refuse the case



**WHO DOES THE VETTING?**

STATE00063

9. (SBU) The <u>same</u> consular officer who interviews the applicant should perform the vetting described below. This "caseworker" approach is a best practice that allows a single decisionmaker to consider the whole applicant and the totality of facts surrounding the application. It also permits better detection of potentially derogatory information and inconsistencies. Other consular staff may perform discrete portions of the vetting that cannot be performed by the interviewing officer. For example, ███████████████

10. (SBU) **Vetting is not a fraud assessment.** ███████████

11. (SBU) To promote thorough vetting of visa applicants, and to promote quality decision-making generally, consular managers shall not maintain or establish any formal or informal production or processing quotas or targets for consular officers or those involved in administrative processing of visa cases. Rather consular officers shall take the time necessary to satisfy themselves that visa applicants qualify for the visas they seek, and personnel involved in back-office processing shall take the time necessary to perform their tasks thoroughly.

**WHERE DO I LOOK?**

12. (SBU) You must conduct a comprehensive and thorough vetting of each FMJ applicant who is otherwise issuable (i.e. overcomes 214(b)). Vetting means examining all aspects of the case, including the application, supporting evidence, and information you gather during the interview. You should review these in light of your personal knowledge, your expertise, and all sources of information available to you. ███████████

█████████████████████████████████

13. (SBU) Consular sections may consult LE staff and Public Diplomacy sections to understand the social media environment at post and which search engines and techniques are best for comprehensively exploring an applicant's online presence.  LE staff can help provide context, ████████████████████████████████████████████████████████████

14.

15. ████████████████████████

**WHAT AM I LOOKING FOR?**

16. (U) During the vetting, you simply are looking for any potentially derogatory information about the applicant.  You must review any such information to ensure it does not indicate an ineligibility under INA 212(a) or 214(b).  For example, ███████████████████████████████ ████████████████████████████████████████ ███████████  In such a case, you could request additional information from the applicant to help you determine whether he is ineligible.

17. (U) You should consider as potentially derogatory █████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████  You must review any such indicators to ensure they do not indicate an ineligibility under INA 212(a).  For example, ██████████████████ ████████████████████████████████████████ ███████████████████

18. (SBU) You also should be alert to any inconsistencies between what you discover during vetting and how the applicant presented himself in his application, in his supporting evidence, or during the interview.  You must explore all such inconsistencies to ensure they do not indicate visa ineligibilities.  **Even when such inconsistencies do not point to an INA 212(a) ineligibility, they can call into question the applicant's credibility.**

19. (U) You must document the results of your vetting in detailed case notes, including all potentially derogatory information and inconsistencies. ████  ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████

**DOES THE APPLICANT STILL OVERCOME INA 214(B)?**

20. (U) INA 214(b) requires an applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification. That is, **if you are not completely satisfied (1) that the applicant is credible and (2) that, during his time in the United States, the applicant will engage only in activities consistent with his nonimmigrant visa status, you should refuse the visa under INA 214(b).** That is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

21. (SBU) Even if inconsistencies or potentially derogatory information you uncover during vetting do not rise to the level of an INA 212(a) ineligibility, you must consider whether they undermine the applicant's credibility or suggest that the applicant will not respect the terms of his admission to the United States. For example, ███████████████████████████

22. (SBU) In the same way, ██████████████████████████

23. (SBU) Likewise, for applicants who demonstrate a history of political activism, especially when it is associated with violence or with the views and activities described above, you must consider the likelihood they would continue such activity in the United States and, if so, whether such activity is consistent with the nonimmigrant visa classification they seek. As Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities.

**IS THE APPLICANT INELIGIBLE UNDER INA 212(a)(3)?**

24. (SBU) If you uncover information that might lead to an INA 212(a)(3) ineligibility, you should follow the instructions in 9 FAM 304.2 ████████ ████. This includes but is not limited to ineligibilities under:

- INA 212(a)(3)(A)(ii), where an applicant is traveling solely, principally, or incidentally to engage in any unlawful activity (9 FAM 302.5-4).
- INA 212(a)(3)(A)(iii), where an applicant seeks to engage solely, principally, or incidentally in any activity, a purpose of which is the opposition to, or the control or overthrow of, the U.S. government by force, violence, or other unlawful means (9 FAM 302.5-5).
- INA 212(a)(3)(B), where an applicant engages in certain terrorist activities, including espousing such activities, or has provided any form of material support to a terrorist organization (9 FAM 302.6).

25. (SBU) In any case where an applicant:

- ████████████████████████████████████
- ████████████████████████████████████
- ████████████████████████████████████



- 
- 
- 

**ACTION REQUESTS**

26. (U) Posts should implement these vetting procedures within five business days.

27. (U) In addition, posts should work with their Public Diplomacy Sections on any public announcements for appropriate social media platforms and/or in local press.  Cleared social media content for posts to translate for this purpose will be available on the Consular Affairs Outreach Hub, and cleared press guidance will be available on CAWeb.  The GSS Program Team will instruct vendors to update GSS websites.

**RESUMING FMJ SCHEDULING**

28. (U) Posts should resume regular scheduling of FMJ visa applications once these actions requests are implemented.  However, posts should consider overall scheduling volume and the resource demands of appropriate vetting; posts might need to schedule fewer FMJ cases than they did previously.

29. (SBU) Posts may resume processing of FMJ Referrals and Priority Appointment Requests (PARs), as well as FMJ expedited appointment requests.  However, among expedited appointment requests for FMJs, posts should prioritize the following groups:
- J-1 physicians
- F-1 students seeking to study at a U.S. university where international students constitute 15 percent or less of the total student population,

according to the U.S. Department of Education.  CA will post a list of such schools on [CAWeb](#).

**APPLICATION PROCESS CONSIDERATIONS**

30. (U) For FMJ cases currently in "open" status that have not yet been interviewed or, in the case of interview waiver cases, otherwise adjudicated, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

31. (U) For FMJ cases that were interviewed before the release of ref C and are otherwise approvable but currently in INA 221(g) status, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable.  If no potentially derogatory information is found, post can adjudicate the case to completion.  If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU