**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC. (CLINIC), et al.,<br>*Plaintiffs*,<br>v.<br>MARCO RUBIO, in his official capacity as Secretary of State, and the UNITED STATES DEPARTMENT OF STATE,<br>*Defendants*. | Civil Action No. 1:26-cv-00858-JAV |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


**PRELIMINARY STATEMENT ........................................................................................ 1**

**ARGUMENT.................................................................................................................... 3**

**I. DEFENDANTS' THRESHOLD CHALLENGES FAIL. ................................................ 3**

A. THE VISA BAN IS FINAL AGENCY ACTION SUBJECT TO CHALLENGE UNDER THE APA....... 3

B. THE DOCTRINE OF CONSULAR NONREVIEWABILITY DOES NOT BAR PLAINTIFFS' CHALLENGE. ............................................................................................................ 6

**II. THE VISA BAN IS CONTRARY TO LAW AND IN EXCESS OF DEFENDANTS' AUTHORITY. .............................................................................................................. 8**

A. THE VISA BAN IS CONTRARY TO 8 U.S.C. § 1182(A)(4)............................................... 8

B. THE VISA BAN VIOLATES 8 U.S.C. § 1152. .................................................................... 9

C. THE BAN IS CONTRARY TO 8 U.S.C. §§ 1104(A) AND 1201(G)........................................ 12

D. THE VISA BAN IS CONTRARY TO THE INA'S "ADJUDICATORY FRAMEWORK". ................. 15

**III. THE VISA BAN WAS UNLAWFULLY ISSUED WITHOUT NOTICE AND COMMENT. ................................................................................................................. 16**

A. THE VISA BAN IS A LEGISLATIVE RULE. ....................................................................... 16

B. THE FOREIGN-AFFAIRS EXCEPTION DOES NOT APPLY. .................................................. 18

C. DEFENDANTS' FAILURE TO PROVIDE NOTICE AND COMMENT CANNOT BE EXCUSED AS HARMLESS ERROR ......................................................................................................... 22

**IV. THE VISA BAN VIOLATES THE APA UNDER THE *ACCARDI* DOCTRINE.... 23**

**V. PLAINTIFFS HAVE ARTICLE III STANDING. .... 25**

A. INDIVIDUAL PLAINTIFFS HAVE STANDING. .... 25

B. ORGANIZATIONAL PLAINTIFFS HAVE STANDING. .... 28

C. ASSOCIATIONAL PLAINTIFF ACT HAS STANDING. .... 29

**VI. VACATUR IS APPROPRIATE HERE .... 30**

**CONCLUSION .... 33**

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967)....................5

*Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362 (S.D.N.Y. 2025)....................29

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)....................31, 32

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014)....................22, 31

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993)....................16

*Amica Ctr. for Immigrant Rts. v. Exec. Off. for Immigr. Rev.,* 2026 WL 662494 (2026)....................28, 29

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000)....................4

*Bennett v. Spear*, 520 U.S. 154 (1997)....................2, 3, 4, 5

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024)....................30, 31

*Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 478 F. Supp. 3d 417 (E.D.N.Y. 2020)....................25

*Camp v. Pitts*, 411 U.S. 138 (1973)....................20

*Chamber of Com. v. SEC*, 443 F.3d 890 (D.C. Cir. 2006)....................23

*City Club of New York v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860 (S.D.N.Y. 2017)....................30, 31

*City of New York v. Permanent Mission of India*, 618 F.3d 172 (2d Cir. 2010)....................19

*City of Port Isabel v. FERC*, 130 F.4th 1034 (D.C. Cir. 2025)....................31

*Dep't of State v. Muñoz*, 602 U.S. 899 (2024)....................8

*Do No Harm v. Pfizer*, 126 F.4th 109 (2d Cir. 2025)....................29

*E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219 (9th Cir. 2018)....................19

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)....................19

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)....................28, 29

*Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203 (D.D.C. 2021) .......................................... 15

*Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124 (2d Cir. 2022) ........................................................ 17

*Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ............................................................... 4

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) ......................................................... 14, 15

*Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024) ............................................................ 14, 15

*Guertin v. United States.*, 743 F.3d 382 (2d Cir. 2014) ............................................................. 30

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................................. 28

*Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) ...................................... 22

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ............................................. 29

*Int'l Refugee Assistance Program v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) ...................... 26

*Int'l Union of Bricklayers Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985) ................ 6

*Kerry v. Din*, 576 U.S. 86 (2015)................................................................................................. 7

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)................................................................................ 7

*Knight v. City of New York*, 164 F.4th 173 (2d Cir. 2026) ......................................................... 26

*Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State*, 519 U.S. 1 (1996) ............ 11

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469 (D.C. Cir. 1995) ............................................................................................................................. 11

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349 (D.C. Cir. 1997) ............................................................................................................................. 11

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)........................................................................ 25

*M.S. v. Brown*, 902 F.3d 1076 (9th Cir. 2018)........................................................................... 25

*Mantena v. Johnson*, 809 F.3d 721 (2d Cir. 2015) ..................................................................... 26

*Milligan v. Pompeo*, 502 F. Supp. 3d 302 (D.D.C. 2020) .......................................................... 15

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).................................................... 26

*Montilla v. I.N.S.*, 926 F.2d 162 (2d Cir. 1991) .................... 24, 25

*Morton v. Ruiz*, 415 U.S. 199 (1974) .................... 25

*Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307 (S.D.N.Y. 2009) .................... 23

*Nat. Res. Def. Council v. Nat'l Hwy. Traffic Safety Admin.*, 894 F.3d 95 (2d Cir. 2018) .................... 19, 22

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) .................... 22

*Nat. Res. Def. Council, Inc. (NRDC) v. U.S. Dep't of the Interior*, 478 F. Supp. 3d 469 (S.D.N.Y. 2020) .................... 30, 32

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) .................... 3

*New York v. HHS*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) .................... 30, 31, 32

*Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997) .................... 12

*Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 355 (D.D.C. 2018) .................... 32

*Patel v. U.S. Citizenship & Immigration Servs.*, 732 F.3d 633 (6th Cir. 2013) .................... 26

*Pietersen v. Dep't of State, the D.C. Circuit*, 138 F.4th 552 (D.C. Cir. 2025) .................... 6, 7, 12, 15

*Rai v. Biden*, 567 F. Supp. 3d 180 (D.D.C. 2021) .................... 14

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008) .................... 19, 21

*Sackett v. EPA*, 566 U.S. 120 (2012) .................... 4, 5

*Salazar v. King*, 822 F.3d 61 (2d Cir. 2016) .................... 25

*Sangster v. Rubio, No. 3:25-CV-00447-ART-CSD*, 2026 WL 222316 (D. Nev. Jan. 28, 2026) .................... 4, 9, 16, 21

*Shalom Pentecostal Church v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 783 F.3d 156 (3d Cir. 2015) .................... 26

*Shen v. U.S. Consulate Gen.*, 866 F. Supp. 779 (S.D.N.Y. 1994) .................... 15

*Singh v. U.S. Dep't of Justice*, 461 F.3d 290 (2d Cir. 2006) .................... 25

*Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) ........ 22, 23

*Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000) ........ 16

*Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021) ........ 14

*Thein v. Trump,* No. CV 25-2369 (SLS*)*, 2025 WL 2418402 (D.D.C. Aug. 21, 2025) ........ 10

*Thein v. Trump*, No. CV 25-2369 (SLS), 2026 WL 795261 (D.C. Cir. Feb. 17, 2026) ........ 11

*Trump v. Hawaii*, 585 U.S. 680 (2018) ........ 10, 26, 27

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........ 23

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) ........ 4

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........ 27

*Vo Van Chau v. Dep't of State*, 891 F. Supp. 650 (D.D.C. 1995) ........ 11

*Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995) ........ 19, 20, 21

**STATUTES**

5 U.S.C.
§ 553 ........ 16, 22, 23
§ 553(a)(1) ........ 18
§ 553(b)(3) ........ 23
§ 706 ........ 33, 33
§ 706(2) ........ 30

8 U.S.C.
§ 1104(a) ........ 2, 12, 15
§ 1152 ........ 9
§ 1152(a) ........ 2, 10, 11, 24
§ 1152(a)(1)(A) ........ 11, 12
§ 1152(a)(1)(B) ........ 11
§ 1182 ........ 2, 8, 10, 11, 13
§ 1201(g) ........ 2, 9, 11, 12, 12, 14, 24, 27
§ 1202(b) ........ 14

**REGULATIONS**

22 C.F.R.
§ 40.6 ........ 24

§ 42.81 ........................................................................................................ 18, 24

**OTHER AUTHORITIES**

David J. Bier, *New Ban Bars Half of Legal Immigrants, Even Citizens' Spouses & Kids*, Cato at Liberty Blog (Jan. 14, 2026), https://perma.cc/QL2K-T2BM .............................. 28

## PRELIMINARY STATEMENT

Defendants' opposition and cross-motion fundamentally mischaracterizes the import of the Visa Ban and governing law. Defendants assert throughout their brief, and as the centerpiece of virtually every argument they urge, that the January 14 Visa Ban documents do not "displace[] the [INA's] existing adjudicatory structure" or effect any legal consequences because the ultimate decision to issue or refuse a visa is still made by consular officers in individual cases. Defs.' Mem. at 1, ECF No. 61; *see also id.* at 2, 4–5, 7, 11–19, 24, 29.

That is patently false, as the Visa Ban documents on their face make clear and as Defendants effectively concede. The Visa Ban replaces the statutory adjudicatory structure, under which consular officers issue or refuse visas based on an individualized, case-by-case determination of whether the applicant is eligible, with a blanket command from Defendants mandating refusal of all visa applications from any of the 75 targeted countries. It effects immediate legal consequences by providing that visa issuance to applicants from the targeted countries "is paused until further notice," Blanket Visa Ban Cable, Exs. B, ECF No. 48-2, G ¶ 4, ECF No. 48-7, and by imposing a "mandatory" order that Defendants admit consular officers "must" follow, Defs.' Mem. at 4, 7. By foreclosing visa issuance in this way, the Visa Ban leaves consular officers no discretion over individual outcomes, reducing their role to the ministerial task of refusing visas as the policy preordains.

These undisputed facts doom Defendants' threshold attempts to evade judicial review. Contrary to Defendants' argument, the Visa Ban is a final agency action notwithstanding Defendants' characterization, because it reflects Defendants' actual settled and operative position—not a tentative or interlocutory step prior to implementation—and it fundamentally alters the framework governing visa adjudications for applicants from the covered countries in a manner that triggers immediate legal consequences for consular officers and for applicants and their

families alike. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). And the doctrine of consular nonreviewability does not, as courts have repeatedly held, preclude facial challenges to the lawfulness of agency policies governing the issuance or refusal of visas.

Defendants' merits arguments likewise fail. The Visa Ban violates 8 U.S.C. § 1182(a)(4) by replacing an individualized, totality-of-circumstances analysis with a mandatory, categorical visa refusal. It violates 8 U.S.C. § 1152(a) by requiring such refusals solely on the basis of the applicant's nationality. And it violates 8 U.S.C. §§ 1104(a) and 1201(g) by overriding the determinations made by consular officers and mandating refusals where the applicant is otherwise eligible for a visa under the admissibility provisions of the INA. Contrary to Defendants' argument that the Ban is exempt from notice and comment as merely "interpretative" rather than "legislative," the Ban changes the substantive legal standards for deciding whether applicants from the targeted countries receive an immigrant visa, and the Ban documents do not even purport to interpret any provision of the INA. And Defendants' post-hoc claim that notice and comment was excused by the narrow "foreign affairs" exception—unsupported by any record evidence—does not satisfy their burden of establishing that the exception applies, particularly where the Ban documents themselves make no mention of that exception.

Defendants' argument that Plaintiffs lack standing is contrary to settled case law. Individual Plaintiffs have been or stand to be directly affected by the Ban because they are deprived of the opportunity to have visa applications assessed lawfully under the proper statutory standards. And Organizational Plaintiffs have both organizational and associational standing to pursue their claims.

Finally, consistent with the plain language of the APA and case law in the Second Circuit and elsewhere, the Court should set aside and vacate the Visa Ban because it was issued without statutory authority and in violation of the fundamental requirement of notice and comment.

## ARGUMENT

## I. DEFENDANTS' THRESHOLD CHALLENGES FAIL.

### A. The Visa Ban Is Final Agency Action Subject to Challenge Under the APA.

Defendants argue that the January 14 Visa Ban documents are not final because they operate through later case-specific consular adjudications. But that does not answer the finality question. It sidesteps it. Under *Bennett v. Spear*, agency action is final when it marks the "consummation" of the agency's decision-making process and is one from which "legal consequences will flow." 520 U.S. at 177–78 (internal quotation marks omitted). The January 14 materials satisfy both requirements.

Starting with the first *Bennett* prong, the January 14 materials are not drafts, recommendations, or tentative internal musings, but Department directives that mandate specific actions by consular officials in issuing or refusing visas, as Defendants concede. Defs.' Mem. at 7. That the directive is implemented by agency officers is not an indication that the policy remains unsettled. An agency action is final if it "alter[s] the legal regime to which the action agency is subject" even if it does not "conclusively determine" the manner in which the altered regime is implemented. *Bennett*, 520 U.S. at 177–78. That is particularly true where, as here, the agency action "compels agency officials" to apply specified standards. *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) (holding that agency directive "provid[ing] firm guidance to enforcement officials about how to handle permitting decisions" was final agency action). Agencies cannot insulate their binding directives from review simply by requiring that they be implemented by agency officers.

The D.C. Circuit has made this point repeatedly. It has held that agency guidance is binding when it does not "genuinely leave[] the agency and its decisionmakers free to exercise discretion," *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (internal quotation marks omitted), and that an agency may take final action by adopting a policy that guides (much less mandates) employee decisions, *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008). Likewise, the possibility that the agency may revise or reconsider its actions does not negate finality. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."); *see also Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("mere possibility that an agency might reconsider" does not make an otherwise final action nonfinal). Indeed, another court addressing the Visa Ban found the policy final, noting that even "a temporary policy may still be the consummation of the agency's decisionmaking process" and concluding that "[l]egal consequences certainly flow from the implementation of this policy." *Sangster v. Rubio*, No. 3:25-CV-00447-ART-CSD, 2026 WL 222316, at *3 (D. Nev. Jan. 28, 2026). As that court recognized, the Visa Ban "is currently in effect, and while it is in effect, the Department of State will not approve any immigrant visas for nationals of seventy-five countries." *Id.*

Defendants' logic is circular. They argue the January 14 materials are not final because the operative consequence arises only when a consular officer later records a refusal or non-issuance. Defs.' Mem. at 6–8. But those later outcomes only occur because the January 14 announcement and cable prescribe a mandatory rule governing those cases. The Department cannot use the policy's own implementation as proof that the policy itself remains nonfinal.

The second *Bennett* prong is satisfied for the same reason. An agency action need not itself be the final step in the chain to carry legal consequences. Agencies routinely implement policy

through established administrative mechanisms. *See, e.g.*, *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 148–52 (1967) (holding FDA labeling rule reviewable even though formal sanctions would be imposed through the agency's existing enforcement regime, because the rule had an immediate and practical effect on regulated parties' conduct). What matters under *Bennett* is whether the challenged action gives rise to "direct and appreciable legal consequences." 520 U.S. at 178. For that reason, in *Sackett*, the Supreme Court rejected the argument that only self-executing sanctions count as final agency action—rather, finality can exist even if additional implementation or enforcement steps remain. 566 U.S. at 126.

Here, at minimum, the January 14 announcement and cable alter the decisional framework governing the covered visa cases. That is a present legal consequence satisfying the second *Bennett* prong. Indeed, the announcement and cable go further by imposing mandatory obligations on consular officers and purporting to prescribe categorical refusals for a defined class of applications, making the legal consequences clearer still. By Defendants' admission, the January 14 announcement and cable purports to create a new binding rule of decision: "The cable identifies itself as an 'action request' and directs that, effective January 21, 2026, consular officers 'must refuse under Section 221(g)' immigrant-visa applicants from the listed countries who have not otherwise been refused under another ground of ineligibility." Defs.' Mem. at 4. (quoting Ex. B ¶ 2).

Defendants' "ordinary adjudication" framing does not alter that conclusion. It does not show that the Department has yet to reach a definitive position, nor does it erase the legal consequences of the rule it adopted. The Department has taken a definitive position that governs the disposition of all immigrant visa applications from the covered countries. Consular officers are not exercising independent judgment in visa issuance in these cases; they are required to

implement the Department's blanket refusal directive. The straightforward conclusion is that the Visa Ban is a binding agency action that consular officers are required to apply with legal consequences for all applicants from the covered countries, and is therefore subject to judicial review.

**B. The Doctrine of Consular Nonreviewability Does Not Bar Plaintiffs' Challenge.**

Defendants argue that to the extent Plaintiffs' injury arises from a denial of visas, Plaintiffs' challenge to the Visa Ban is barred by the doctrine of consular nonreviewability. Defs.' Mem. at 9–10. But the decisions on which they rely do not support that argument—indeed, they refute it.

In *Pietersen v. Dep't of State*, the D.C. Circuit held that when plaintiffs "launch forward-looking challenges to the lawfulness of regulations or policy governing consular decisions, courts may review them." 138 F.4th 552, 555 (D.C. Cir. 2025), cited in Defs.' Mem. at 10. And it explained why the policy at issue there—State Department guidance instructing consular officers on how to assess whether visa applicants were inadmissible by virtue of willful misrepresentations—was subject to review under that standard: "Rather than contesting particular visa determinations by a consular officer, Appellants confine their challenge to the lawfulness of the State Department policy." *Id.* at 560. Likewise, in *Int'l Union of Bricklayers Allied Craftsmen v. Meese*, the court explained that consular-nonreviewability principles had "no application" where the plaintiffs did "not challenge a particular determination in a particular case of matters which Congress has left to executive discretion," and instead challenged internal agency guidelines as inconsistent with the INA. 761 F.2d 798, 801 (D.C. Cir. 1985). The court added that the complaint did "not hinge on the particular facts of one incident," but rather questioned how the instructions affected the "statutory scheme" as a whole. *Id.* at 806.

Under those cases, Plaintiffs' claims are not barred by consular nonreviewability. Here, too, Plaintiffs bring a facial challenge to "final, Department-level policies and agency actions" governing immigrant-visa adjudications across posts worldwide and "do not seek review of any consular officer's issuance or refusal of any particular visa." Compl. ¶ 24, ECF No. 1.

Defendants try to avoid *Pietersen*'s holding by treating the term "forward-looking" as though it meant "not [yet] appl[ied]." Defs.' Mem. 10. But that is not what *Pietersen* says. There, the challenged guidance had already been applied to Pietersen's prior visa denials. *Pietersen*, 138 F.4th at 554–55. Plaintiffs' claims did not challenge those prior denials, but arose instead from the "ongoing injury" they suffered due to Pietersen's exclusion from entering the country. *Id.* at 555, 559. The D.C. Circuit held that claim reviewable precisely because it was directed to the legality of the policy and its future application, rather than to the correction of any past refusal. *Pietersen* thus defeats Defendants' argument that a challenge stops being "truly forward-looking" the moment the policy has been applied in individual cases. Defs.' Mem. at 10.

Defendants' reliance on *Mandel* and *Muñoz* reveals the same flawed premise. Those cases address not a challenge to a Department policy like the Visa Ban, but rather the limited review available when a plaintiff seeks judicial review of an individual visa denial. *Mandel* held that when the Executive denies a visa "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it." *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *but see Kerry v. Din*, 576 U.S. 86, 105 (2015) (Kennedy & Alito, JJ., concurring in the judgment) (review permitted where, despite the government's assertion of a facially legitimate and bona fide reason, the petitioner makes an "affirmative showing of bad faith on the part of the consular officer who denied" the visa). *Muñoz*, similarly addressing a challenge to a specific visa denial, held that a citizen's interest in having their noncitizen spouse admitted to the

country did not qualify as a fundamental right that would allow for an exception to consular nonreviewability. *Dep't of State v. Muñoz*, 602 U.S. 899, 907–09 (2024). Neither case precludes Plaintiffs' claims here.

## II. The Visa Ban Is Contrary to Law and in Excess of Defendants' Authority.

### A. The Visa Ban Is Contrary to 8 U.S.C. § 1182(a)(4).

Defendants concede the INA does not permit categorical denials of visa applications on public-charge grounds under 8 U.S.C. § 1182(a)(4), and instead requires that a public-charge determination rest upon—in Defendants' words—"a case-specific assessment based on the applicant's circumstances at the time of adjudication." Defs.' Mem. at 11; *see also id.* at 12 (acknowledging that "public-charge determinations must be individualized and based on a totality-of-the-circumstances analysis"). That concession is fatal to the Visa Ban. As shown in Plaintiffs' moving papers, the Visa Ban disregards this statutory standard by requiring consular officers to refuse *all* visa applications from nationals of the targeted countries, irrespective of the applicant's individual circumstances, on the sole asserted basis that applicants from those countries are purportedly "at High Risk of Public Charge." *See* Pls.' Mem. at 4–5, 6–7, ECF No. 49, 12–13; Exs. B, G at 4.

Defendants' response that the Visa Ban merely "channels the operative consequences [of a visa refusal] through the INA's existing refusal mechanism" elevates form over substance and ignores the Visa Ban's entire import. Defs.' Mem. at 11–12. As Defendants acknowledge, the Visa Ban, using mandatory language, requires consular officers to refuse all immigrant visa applications from the targeted countries (unless refused on other grounds), regardless of their assessment of the applicant's circumstances and any analysis of the statutory public charge factors. Defs.' Mem. at 4 (quoting Ex. B ¶ 2) ("The cable identifies itself as an 'action request' and directs that, effective January 21, 2026, consular officers 'must refuse under Section 221(g)' immigrant-visa applicants

from the listed countries who have not otherwise been refused under another ground of ineligibility."); *see id.* at 7, 12. And while the Visa Ban cites 8 U.S.C. § 1201(g), that section, as discussed in Point I.C below, does not provide an independent basis for refusing a visa: it authorizes refusal only when an applicant is inadmissible under some other provision of the INA. The Visa Ban thus does not "operate through" existing law; it supplants it—manufacturing a categorical bar where Congress authorized only case-by-case adjudication. It is immaterial that the refusal is implemented by a consular officer, because the Visa Ban both fundamentally supplants the statutory basis for refusal and renders the officers' action in refusing a visa purely ministerial.

The court in *Sangster* reached the same conclusion. It reasoned that,

> [a]lthough the [Visa Ban] policy asks [consular] officers to go through the motions of an individualized analysis to determine whether the grounds of inadmissibility may apply, even if the officer finds no basis for inadmissibility the result is still refusal. . . . The [statutory public charge] factors are meant to have an impact on the officer's decision. In making them redundant to the outcome, the Department has contravened the clear dictates of the statute.

*Sangster*, 2026 WL 222316, at *5 (citations omitted). Defendants make no effort to distinguish *Sangster*—nor can they—and they fail to address its persuasive reasoning. As that case and other authority cited in Plaintiffs' motion makes clear, Pls.' Mem. at 12–13, Defendants cannot lawfully circumvent the statutory scheme merely by couching their actions as directions to consular officers.

**B. The Visa Ban Violates 8 U.S.C. § 1152.**

Defendants do not and cannot dispute that the Visa Ban on its face discriminates against visa applicants based solely on their nationality. They contend that the Ban is nevertheless consistent with the INA because it "do[es] not establish a freestanding nationality bar to visa issuance" outside the INA's "broader adjudicatory framework." Defs.' Mem. at 13. But that is exactly what the Visa Ban does: it creates a "nationality bar to visa issuance" by requiring consular

officers to refuse to issue visas to nationals of the targeted countries, irrespective of whether they are inadmissible on any ground specified in the INA, while permitting officers to continue issuing visas to nationals of all other countries who are otherwise similarly situated. It thus violates the prohibition in 8 U.S.C. § 1152(a) against discrimination in the issuance of a visa "[because of the applicant's] nationality." Pls.' Mem. at 14. And, as discussed above, the Visa Ban replaces the statutory adjudication process—under which visa issuances or refusals are based on the consular officer's assessment of the totality of each applicant's circumstances—with a blanket rule requiring officers to refuse visas based solely on the applicant's nationality irrespective of that assessment.

Defendant's reliance on *Trump* v. *Hawaii*, 585 U.S. 667, 695 (2018), is misplaced. Defs.' Mem. at 13. The Supreme Court there held that a presidential proclamation prohibiting nationals of certain countries from entering the United States did not violate the antidiscrimination provision in § 1152(a), reasoning that § 1152(a) by its terms applies only to visa issuance and not to the President's power under § 1182(f) to prohibit entry. *Trump*, 585 U.S. at 695 (noting § 1152 "specifies only that its protections apply to the 'issuance' of 'immigrant visas,' without mentioning admissibility or entry"). That distinction does not aid Defendants here. To begin with, the Visa Ban does not involve any invocation of § 1182(f), so *Trump v. Hawaii* is inapposite. In contrast to the presidential proclamation at issue in *Trump* v. *Hawaii*, the Visa Ban pertains only to the issuance of visas and not to admissibility or entry to the United States. And the Supreme Court made clear that when it comes to issuance of visas, § 1152(a) "prohibits discrimination in the allocation of immigrant visas based on nationality and other traits." *Trump*, 585 U.S. at 669. Moreover, nothing in § 1182(f) or any other provision of the INA authorizes Defendants to render categories of noncitizens ineligible for visas based on their nationality. *Thein v. Trump*, No. CV

25-2369 (SLS), 2025 WL 2418402, at *16 (D.D.C. Aug. 21, 2025) (collecting cases) ("[a] suspension of entry under § 1182(f) therefore has no bearing on whether the person is 'inadmissible' under § 1182(a) or ineligible to receive a visa under § 1201(g)"), *appeal dismissed as moot and request for vacatur denied*, 2026 WL 795261 (D.C. Cir. Feb. 17, 2026).

Defendants' effort to distinguish *Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State*, 45 F.3d 469, 472–74 (D.C. Cir. 1995) ("*LAVAS I*"), *vacated on other grounds*, 519 U.S. 1 (1996), and *Vo Van Chau v. Dep't of State*, 891 F. Supp. 650, 654–55 (D.D.C. 1995), cited in Defs.' Mem. at 14–15, fares no better. The courts held in both cases that § 1152(a) prohibited the State Department from refusing to process visa applications at the U.S. consulate in Hong Kong from Vietnamese and Laotian nationals but not nationals of other countries. As the court held in *LAVAS I*, "Congress has unambiguously directed that no nationality-based discrimination shall occur." *LAVAS I*, 45 F.3d at 473.

Defendants assert that *LAVAS I* "did not hold that § 1152(a)(1)(A) overrides the INA's inadmissibility provisions," Defs.' Mem. at 14, but that is irrelevant because there is no statutory INA provision providing that visa applicants from the seventy-five targeted countries are inadmissible based on their nationality. And while the specific ruling in *LAVAS I* was later overturned by statute, *see Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349 (D.C. Cir. 1997) ("LAVAS II") (citing 8 U.S.C. § 1152(a)(1)(B)), the subsequently enacted statute narrowly provides only that "the prohibition against nationality discrimination does not apply to decisions of where to process visa applications." *LAVAS II*, 104 F.3d at 1353. The Visa Ban has nothing to do with the location of processing visa applications, and nothing in the

statute or *LAVAS II* undermines the express prohibition in § 1152(a)(1)(A) against denying visas based on the applicant's nationality.

Last, Defendants attempt to distinguish *Olsen v. Albright*, 990 F. Supp. 31, 37–39 (D.D.C. 1997), on the ground that it involved "consular 'profiles' that, on their face, required visa adjudication based on race, ethnicity, national origin, economic class, and physical appearance." Defs.' Mem. at 14–15. That is a non sequitur. The Visa Ban, like the "profiles" in *Olsen*, requires consular officers to adjudicate visa applications based on nationality. And, even more egregiously than the profiles in that case, the Visa Ban expressly requires them to deny visa applications solely on that basis.

**C. The Ban Is Contrary to 8 U.S.C. §§ 1104(a) and 1201(g).**

Defendants admit, as they must, that 8 U.S.C. § 1104(a) and other provisions of the INA grant consular officers "exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations." Defs.' Mem. at 15 (quoting *Pietersen*, 138 F.4th at 556 (internal quotation marks omitted)). Defendants' contention that the Visa Ban is consistent with § 1104(a) because it does not by itself "grant or refuse visas, or otherwise displace the consular officer from the issuance-or-refusal function that the INA assigns," Defs.' Mem. at 15, disregards the unqualified language of the statute and the holding in *Pietersen*. The question under the statute is not whether the Visa Ban by itself "grant[s] or refuse[s] visas" or entirely denies consular officers any role in issuing or refusing visas. Instead, it is whether the Visa Ban purports to exercise authority "relating to . . . those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas." 8 U.S.C. § 1104(a). The Visa Ban on its face purports to do what the statute prohibits: to exercise authority over consular officers' authority to adjudicate visa eligibility and to "control[]" their determinations whether to issue visas to nationals of the targeted countries. *Pietersen*, 138 F.4th at 556.

Defendants' formalistic argument that the Visa Ban does not itself "refuse visas" or "displace" consular officers from their statutory functions ignores the plain terms of the Visa Ban. Defs.' Mem. at 15. Defendants point to language in the Visa Ban documents directing consular officers to go through the motions of interviewing applicants, "evaluating potentially applicable grounds of eligibility," "making case notes," and refusing applications under § 1182(a)(4) when they determine that the applicant is inadmissible on that ground. Defs.' Mem. at 15–16. But—as Defendants also acknowledge—none of this matters. Regardless of whether the consular officer determines that an applicant from a targeted country is eligible for a visa, the Visa Ban overrides the consular officer's determination and "direct[s]" the officer to refuse the visa. *Id*. at 16. Thus, contrary to Defendants' assertion, the Visa Ban effectively "refuse[s] visas," and "displace[s]" consular officers from their statutorily assigned roles by stripping them of their duty to determine eligibility under the statute and requiring them instead to deny visas based entirely on Defendants' orders. Defs.' Mem. at 15.

Defendants note that the Visa Ban purports to direct consular officers to refuse visa applicants from the targeted countries under Section 1201(g) (INA Section 221(g)), Exs. B, G ¶ 2; Defs. Mem. at 4, 5, 16, but that does not preserve consular officers' authority. Section 1201(g) does not provide any independent ground of ineligibility, *see* Pls.' Mem. at 16–17, but merely provides that a visa will not be issued if the consular officer determines that the applicant is ineligible under § 1182(a) or another provision of law or if the applicant does not comply with other statutory provisions of the INA. Thus, by overriding consular officers' visa eligibility determinations under § 1182(a), the Visa Ban also displaces officers' authority under Section 1201(g).

As discussed in Plaintiffs' moving memorandum, courts have repeatedly held that the Secretary lacks authority under §§ 1104 and 1201(g) to direct consular officers not to issue visas to statutorily eligible applicants. *See* Pls.' Mem. at 16–17 (citing cases). Defendants attempt to distinguish those cases on the ground that they involved policies suspending adjudication of visa applications, while the Visa Ban at issue here purportedly "directs posts to continue interviews and continue adjudicating immigrant-visa cases . . . and any non-issuance is still reflected through an officer-entered refusal in the individual case." Defs.' Mem. at 16. But nothing in the reasoning of those cases rests on any purported distinction between suspending the adjudication of visas and denying visas. Rather, the challenged policies violated the INA because they directed consular officers not to issue visas to statutorily eligible applicants—just as the Visa Ban does here. In *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143–46 (D.D.C. 2021), for example, the court granted a preliminary injunction enjoining the State Department from following a policy of not issuing so-called O-visas to otherwise eligible applicants, agreeing with plaintiffs that the INA "does not permit the State Department to categorically suspend visa adjudications or require consular officers to refuse visa applications" to otherwise eligible applicants. *See also Gomez v. Trump*, 485 F. Supp. 3d 145, 190–94 (D.D.C. 2020) (agreeing with plaintiffs that a policy suspending processing and issuance of certain visas on the "incorrect assumption" that plaintiffs were statutorily inadmissible "unlawfully usurps consular officers' sole and express statutory authority to issue visas to qualifying applicants"); *Rai* v. *Biden*, 567 F. Supp. 3d 180, 194–95 (D.D.C. 2021) (reasoning that State Department policy directing consular officers not to adjudicate certain diversity visa applications violated INA provisions requiring visa applications to be "reviewed and adjudicated by a consular officer," 8 U.S.C. § 1202(b), and would "frustrate Congress's intent" to make diversity visas available), *rev'd on other grounds*, *Goodluck v. Biden,* 104 F.4th 920 (D.C.

Cir. 2024); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 315 (D.D.C. 2020) (following *Gomez* and characterizing it as "persuasive"); *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 233–35 (D.D.C. 2021) (holding that State Department policy not to process visas under the diversity visa program was likely contrary to the INA), *rev'd on other grounds*, *Goodluck,* 104 F.4th 920.

Moreover, contrary to Defendants' assertion, Defs.' Mem. at 16, the court in *Thein* enjoined a similar State Department policy effectuated by a direction to consular officers to refuse visas to statutorily eligible applicants. The challenged policy in that case, like the Visa Ban, directed diplomatic and consular posts that the visa applications at issue "must be refused" even if the applicant was otherwise eligible for a visa. *Id*. at *3. The court, favorably citing *Rai*, *Filazapovich*, *Milligan*, and *Gomez*, reasoned that the Department's directive "claim[ing] that visa denials are mandatory under [the INA] despite the statute appearing to say no such thing" was not in accordance with law and in excess of statutory authority. *Id*. at *17.

Finally, Defendants' assertion that *Pietersen* and *Shen v. U.S. Consulate Gen.*, 866 F. Supp. 779, 780 (S.D.N.Y. 1994), "do not hold that supervisory guidance [by the State Department] is unlawful when the [consular] officer continues to make the visa decision in the individual case," Defs.' Mem. at 16, is beside the point. As discussed above, under the Visa Ban, consular officers do not "make the visa decision in the individual case." The Visa Ban makes that decision for them. That is precisely what § 1104(a) and *Pietersen* preclude.

**D. The Visa Ban Is Contrary to the INA's "Adjudicatory Framework."**

Defendants sum up their statutory arguments by claiming that the Visa Ban is consistent with "Congress's adjudicatory framework," Defs.' Mem. at 17, but that recap carries with it the same flaws that defeat Defendants' arguments in regard to each individual statutory provision. As discussed above, Defendants blink reality by asserting that the Visa Ban "do[es] not create a new ground of inadmissibility, establish a parallel refusal mechanism, or substitute a different

decisionmaker for the consular officer." *Id*. That is exactly what the Visa Ban does. It purports to create a new binding rule of decision—one that is neither set forth in the statute nor reconcilable with it—for nationals of the 75 targeted countries. By Defendants' admission, it mandates that consular officers must refuse visas on that ground. Defs.' Mem. at 4. ("The cable identifies itself as an 'action request' and directs that, effective January 21, 2026, consular officers 'must refuse under Section 221(g)' immigrant-visa applicants from the listed countries who have not otherwise been refused under another ground of ineligibility." (quoting Ex. B ¶ 2)). And in doing so it establishes a "parallel refusal mechanism" and substitutes a different decisionmaker for the consular officer by overriding the officer's determination, based on the officer's assessment of the totality of the applicant's circumstances, whether a visa should be issued or refused. The Visa Ban is thus squarely contrary to the INA.

## III. THE VISA BAN WAS UNLAWFULLY ISSUED WITHOUT NOTICE AND COMMENT.

### A. The Visa Ban Is a Legislative Rule.

As the Second Circuit has held, a rule is legislative—and thus subject to the notice-and-comment requirements of 5 U.S.C. § 553—if "in the absence of the rule there would not be an adequate legislative basis for . . . agency action." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000) (quoting *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1110–12 (D.C. Cir. 1993)). That is just the case here. As the court explained in *Sangster*, absent the Visa Ban,

> a consular officer would not have sufficient reason to refuse every single application from the affected countries, especially not on the basis of their nationality alone. Because no authorization for blanket denial exists besides the Policy, it is legislative. It is accordingly a legislative rule that required notice and comment.

*Sangster*, 2026 WL 222316, at *7. Contrary to Defendants' unsupported assertion that "the legal basis for issuance, refusal, and further processing would still come from the INA and its

implementing regulations," Defs.' Mem. at 18, the Visa Ban purports to mandate an entirely new ground for refusing visas nowhere found in the INA. *See* Pls.' Mem. at 17–18.

Defendants characterize the Visa Ban as a mere "interpretive rule" reflecting their "construction" of the INA and the rules thereunder, Defs.' Mem. at 17–18, but they point to nothing in the Visa Ban documents that purports to interpret or construe the statute or any regulation. Exs. A, B, G. Nor could they do so. Neither the INA nor any preexisting regulation refers to the seventy-five targeted countries subject to the Visa Ban or authorizes Defendants to refuse visas to all nationals of any country.

On the contrary, the Visa Ban documents on their face make clear that they are not intended merely to interpret existing law. Both the Visa Ban Cable, Exs. B, G, and the public announcement of the Ban, Ex. A, provide that the Visa Ban operates only prospectively, and that "[n]o visas issued previously should be revoked pursuant to this guidance" and that previously issued visas "remain valid for travel." Exs. B, G ¶ 9; *see also* Defs.' Mem. at 4–5 (acknowledging prospective-only nature of the Ban). And both documents make clear that the Visa Ban does not go into effect until a week *after* they were issued. Exs. A, B, G (providing for effective date of January 21, 2026, one week after issuance). Such prospective-only application indicates that the Visa Ban is intended to "change[] the existing legal landscape," rather than merely restate preexisting law, and accordingly is legislative. *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 142 (2d Cir. 2022).

Defendants assert that the Visa Ban is not a legislative rule because its legal consequences arise "only when a consular officer, in an individual case, enters a refusal." Defs.' Mem. at 18. This argument is a non sequitur; nothing in any case Defendants cite suggests that a rule should not be deemed legislative merely because the rule (like virtually every agency action) operates through implementing actions by agency employees. Defendants' assertion that the Visa Ban itself

has no operative legal effect is inconsistent with the Visa Ban Cable itself, which provides without qualification that "Immigrant Visa issuance to applications from these [targeted] countries *is paused until further notice*." Exs. B, G ¶ 4 (emphasis added). Moreover, contrary to Defendants' suggestion that the Visa Ban does not "create binding legal obligations," Defs.' Mem. at 19, the Ban has the immediate legal effect of mandating consular officers to refuse visas, as Defendants concede, *id*. at 4–5, 16.

In response to Plaintiffs' showing that notice-and-comment rulemaking was required because the Visa Ban purports to modify or suspend the operation of regulations that were themselves issued with notice and comment, including 22 C.F.R. § 42.81, Pls.' Mem. at 19–20, Defendants do not and cannot dispute that § 42.81 was adopted through notice-and-comment rulemaking. Instead, they assert that the Visa Ban documents do not "suspend" § 42.81 but merely "operate through preexisting statutory and regulatory channels." Defs.' Mem. at 18–19. Again, that is not so. Section 42.81 provides in relevant part that a consular officer "must" issue the visa unless the application is not properly completed or executed or the visa can be refused under "applicable law." Neither the Visa Ban nor Defendants' brief cites any "applicable law" authorizing blanket refusal of visas from the targeted countries, even when the applicant is determined to be eligible, and there is none. Indeed, the entire import of the Visa Ban is to require consular officers to refuse visas to applicants whom the officers otherwise determined to be eligible. Accordingly, the Visa Ban plainly modifies or suspends the operation of § 42.81. For that reason as well, the Visa Ban required notice and comment.

**B. The Foreign-Affairs Exception Does Not Apply.**

Contrary to Defendants' contention, Defs.' Mem. at 19–20, their failure to undertake notice-and-comment rulemaking is not excused by the narrow exception for rules involving a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). The Second Circuit has

emphasized that exceptions to the notice-and-comment requirement, including the foreign-affairs exception, must be "narrowly construed and only reluctantly countenanced," *City of New York v. Permanent Mission of India*, 618 F.3d 172, 201 (2d Cir. 2010). It is Defendants' burden to establish that notice-and-comment is excused. *Nat. Res. Def. Council v. Nat'l Hwy. Traffic Safety Admin*., 894 F.3d 95, 113–14 (2d Cir. 2018). And to satisfy that burden, Defendants must present "evidence for the view that subjecting the [challenged rule] to notice and comment would have had any undesirable consequences." *Zhang v. Slattery*, 55 F.3d 732, 745 (2d Cir. 1995).

The Second Circuit has made clear that the foreign-affairs exception does not apply merely because a rule implicates foreign affairs. *City of New York*, 618 F.3d at 202; *Zhang*, 55 F.3d at 744. Defendants accordingly acknowledge that the exception does not apply to all immigration rules even though "immigration often implicates foreign affairs." Defs.' Mem. at 19–20 (citing *Zhang*, 55 F.3d at 744). Rather, as the Second Circuit has explained, the exception applies only where the rule "implicates matters of diplomacy directly" (such as, in *City of New York*, rules regulating foreign government missions located in the United States) or where the Government can show that public notice and comment would provoke "definitely undesirable international consequences." *Id*. (quoting *Rajah v. Mukasey*, 544 F.3d 427, 437–38 (2d Cir. 2008)); *accord E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018), *superseded*, 932 F.3d 742 (9th Cir. 2018) ("[C]ourts have approved the Government's use of the foreign affairs exception where the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule.").

The Visa Ban does not directly implicate matters of diplomacy (and Defendants do not argue otherwise), and Defendants have offered no evidence that notice and comment would have definitely undesirable international consequences. Neither Defendants' announcement of the Visa

Ban nor their cable makes any mention of foreign affairs or asserts that the Ban implicates any foreign-affairs function of the United States. On the contrary, the sole focus of the Visa Ban documents is the supposed "risk" that immigrants from the targeted countries will "be a financial burden to Americans" and will "utilize welfare in the United States." Exs. A, B, G at 4.

Defendants' invocation of the foreign-affairs exception rests on the unsupported and *post hoc* speculation that public comment on the Visa Ban "could reveal . . . sensitive screening or vetting rationales, impair relations with foreign governments, or delay implementation of measures tied to ongoing external screening or vetting concerns." Defs.' Mem. at 20. Such *post hoc* rationales—to say nothing of actual evidence—do not appear in the Visa Ban documents, and Defendants cannot cure that omission through counsel's unsupported assertions in litigation. *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (APA review does not permit agency to rely on "some new record made initially in the reviewing court"). In any event, Defendants offer no evidence to support their speculation, and the purported risks Defendants cite scarcely rise to the level of "definitely undesirable international consequences." Defendants fail to explain why public notice and comment about the Visa Ban would reveal "sensitive screening or vetting rationales," or why relations with foreign governments would be impaired due to public debate over "country-specific risk judgments," where the only purported "risk" is that immigrants from the targeted countries may become "public charges" in the United States. That is particularly so in light of the years of efforts by the current Administration and the prior Trump Administration to limit immigration on public-charge grounds.

The Second Circuit's decision in *Zhang* is analogous. The court there held that the foreign-affairs exception did not apply to a rule permitting asylum for Chinese nationals who expressed fear of compelled abortion or sterilization pursuant to China's "one-child" policy. The court

reasoned that the exception did not apply because the Government had not presented record evidence showing that notice and comment would have had any undesirable consequences, and that such consequences were "not obvious, particularly since the focus of the . . . rule . . . had been at the center of a national debate for more than six months prior to the issuance of the rule." *Zhang*, 55 F.3d at 745.

The district court in *Sangster* similarly rejected the Government's argument that notice and comment was excused by the foreign-affairs exception, concluding that "[t]he agency here has not explained or brought evidence showing the international consequences of a notice-and-comment period, nor is it obvious." *Sangster*, 2026 WL 222316, at *7. The same rationale defeats Defendants' argument here.

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), does not support Defendants' position. The court there held that the foreign-affairs exception excused notice-and-comment requirements for a program adopted in the wake of the terrorist attacks of September 11, 2001, pertaining to non-immigrant noncitizens from specified countries with potential links to the attacks. The court reasoned that public notice and comment would risk the disclosure of "sensitive foreign intelligence" explaining why some of a particular nation's citizens were regarded as a threat, impair relations with foreign countries whose citizens were deemed security risks, and potentially "diminish[] our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists." *Id.* at 437. Here, Defendants do not and cannot contend that a public debate about the Visa Ban would risk disclosure of "sensitive foreign intelligence" or diminish the ability of the United States to anticipate and defend against terrorist attacks or anything remotely analogous. *Rajah* is therefore entirely inapposite.

### C. Defendants' Failure to Provide Notice and Comment Cannot Be Excused as Harmless Error

Defendants argue that any failure to provide notice and comment was harmless because, they contend, Plaintiffs cannot show that any public comment "could have changed the Department's interpretation of existing visa statutes and regulations or its foreign-affairs judgments and vetting determinations." Defs.' Mem. at 21. But the APA's notice-and-comment requirements "are basic to our system of administrative law," *Nat. Res. Def. Council*, 894 F.3d at 115, and an agency's failure to provide required notice and comment is "a fundamental flaw that normally requires vacatur of the rule," *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (internal quotation marks omitted); *see also Nat. Res. Def. Council*, 894 F.3d at 113–16 (vacating rule promulgated without notice and comment). Indeed, "the entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties through those procedures." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020).

The cases Defendants cite reject arguments materially similar to the ones Defendants advance here. In *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 96–97 (D.C. Cir. 2002), the agency sought to excuse its failure to comply with notice-and-comment obligations because the challengers allegedly could not identify any arguments they would have made in a notice-and-comment procedure that they did not make to the agency informally. The D.C. Circuit rejected that argument, reasoning that it "would have [the court] virtually repeal [5 U.S.C. §] 553's requirements." In *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), the court likewise rejected the government's argument that a violation of § 553 was harmless, and characterized circumstances—such as those here—in which the government "evad[es] altogether the notice and comment requirement" as "[t]he most egregious" type of such violation. *Id.* In both

cases, the court ultimately vacated the challenged rules that were promulgated in violation of § 553.

Defendants' insistence that Plaintiffs identify information or arguments that "could have changed the Department's view," Defs.' Mem. at 21, is untenable given their own failure to identify or explain the Ban's legal or factual basis—not in the Visa Ban documents themselves and certainly not in any prior published notice. The APA requires an agency conducting notice-and-comment rulemaking to disclose "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and any underlying data and methodology upon which the agency relies. *Chamber of Com. v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006); *Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307, 313–14 (S.D.N.Y. 2009). And any final rule must be accompanied by a statement of the basis and purpose of the rule, "which needs to take account of the major comments—and often is a major focus of judicial review." *Sugar Cane Growers*, 289 F.3d at. 96–97.

Defendants' harmless-error argument thus begs the question. It assumes public comment would not have meaningfully affected the agency's reasoning, even though the Department never undertook the very process by which interested parties could have tested, challenged, or refined the basis for the rule. Defendants cannot evade their statutory obligation to disclose the rule's factual and legal basis and then fault Plaintiffs for not showing what difference notice and comment might have made.

## IV. THE VISA BAN VIOLATES THE APA UNDER THE *ACCARDI* DOCTRINE.

As shown in Plaintiffs' moving papers, the Visa Ban should also be set aside under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and its progeny, which require government agencies to follow their own "existing valid regulations," *id.* at 268, and published

and unpublished internal procedures, *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991). *See* Pls.' Mem. at 20–22.

Contrary to Defendants' assertion, the Visa Ban squarely conflicts with 22 C.F.R. §§ 40.6 and 42.81. As Defendants acknowledge, § 40.6 "provides that a visa may be refused only on a ground set out in law or implementing regulations." Defs.' Mem. at 22; *see also id.* at 3 (same). Section 42.81 likewise provides that a visa may be refused only under an applicable provision of the INA or other law. But, as discussed above and in Plaintiffs' moving brief, Pls.' Mem. at 16, nothing in the INA or existing regulations provides for automatic refusal of visa applications from all nationals of the 75 targeted countries. In particular, the only statute Defendants invoke here—8 U.S.C. § 1201(g), *see* Defs.' Mem. at 22—does not provide a substantive basis for deeming all nationals of the 75 targeted countries ineligible based solely upon their nationality. If anything, such nationality-based discrimination violates the clear command of 8 U.S.C. § 1152(a).

Defendants' argument that the Visa Ban complies with the Foreign Affairs Manual ("FAM") simply because it culminates in a "formal refusal" by a consular officer fails for similar reasons. Defs.' Mem. at 22. The FAM requires that any refusal of a properly submitted visa application be based on the consular officer's determination that the applicant is ineligible under the INA. 9 FAM 504.11-2(A). A refusal entered solely to implement a blanket, Department-level directive, rather than the officer's own eligibility determinations, does not satisfy that requirement. Nor do Defendants address Plaintiffs' showing that under the FAM a visa cannot be refused on public-charge grounds based on the applicant's nationality, but must instead be based on an assessment of the "totality of [the applicant's] circumstances," 9 FAM 302.8-2(B)(1)(a)(3), (B)(2), (B)(3). Defendants' dismissal of the FAM as mere "internal executive guidance" gets them no further. As the Supreme Court and the Second Circuit have made clear, the requirement under

*Accardi* that agencies comply with their own procedures "is not limited to rules attaining the status of formal regulations." *Montilla*, 926 F.2d at 167; *see Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (holding that, where "rights of individuals are affected, it is incumbent upon agencies to follow their own procedures," "even where the internal procedures are possibly more rigorous than otherwise would be required").For similar reasons, Defendants' effort to distinguish the Supreme Court and Second Circuit precedent cited in Plaintiffs' brief falls short. Pls.' Mem. at 20–21 (citing *Montilla*, 926 F.2d at 167; *Morton*, 415 U.S. at 235–36; *Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296–97 (2d Cir. 2006); and *Salazar v. King*, 822 F.3d 61, 82–83 (2d Cir. 2016)). Defendants assert that these cases involved "alleged departures from specific regulations or mandatory procedures governing the claimant's adjudication or rights" or "an asserted failure to comply with mandatory regulatory duties." Defs.' Mem. at 23. But the same is true here. As discussed above, the Visa Ban on its face departs from specific regulations in Title 22 of the C.F.R. and mandatory procedures in the FAM.

## V. PLAINTIFFS HAVE ARTICLE III STANDING.

### A. Individual Plaintiffs Have Standing.

Defendants do not dispute that the Individual Plaintiffs have suffered an injury in fact and that their injuries are traceable to Defendants' actions. Defs.' Mem. at 24. Defendants contest only redressability, but their arguments fail because a favorable decision will redress Individual Plaintiffs' injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Defendants mischaracterize Individual Plaintiffs' burden by suggesting that Plaintiffs can demonstrate redressability only by showing that they will ultimately be awarded visas should the Visa Ban be lifted. Defs.' Mem. at 24. To the contrary, their burden is "'relatively modest.'" *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 478 F. Supp. 3d 417, 431 (E.D.N.Y. 2020) (quoting *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018)). The "'lost opportunity'" to obtain

a visa "'is itself a concrete injury—and a favorable decision would redress it.'" *Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015) (quoting *Patel v. U.S. Citizenship & Immigr. Servs*., 732 F.3d 633, 638 (6th Cir. 2013)); *see also Shalom Pentecostal Church v. Acting Sec'y, U.S. Dep't of Homeland Sec*., 783 F.3d 156, 162 (3d Cir. 2015) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 151–53 (2010)) (stating that in *Monsanto*, the Supreme Court "analyzed redressability in the context of multi-part proceedings based on the availability of relief at a given step, rather than the likelihood of achieving the ultimate goal.").

Individual Plaintiffs meet this burden. The Visa Ban mandates the indefinite refusal of Individual Plaintiffs and their family members' visa applications and therefore forecloses the possibility of their receiving a visa in accordance with the statute and any lawful, timely process. Vacatur of the Visa Ban would restore their opportunity to seek a visa by removing a categorical, nationality-based obstacle that otherwise forecloses it. That is sufficient to establish redressability. *See Mantena*, 809 F.3d at 731 (holding that restoring plaintiff's opportunity to seek a green card would redress plaintiff's injury "even if USCIS ultimately decides not to grant [it]"); *see also, e.g.*, *Knight v. City of New York*, 164 F.4th 173, 179 (2d Cir. 2026) ("To satisfy Article III, a plaintiff must show that his requested relief would provide meaningful redress for *an* injury, not that it would relieve him of *every* injury."). Thus, in *Trump v. Hawaii*, the Supreme Court held that the three individual plaintiffs—U.S. citizens with relatives applying for immigrant visas—had standing based on the concrete injury of family separation. 585 U.S. at 680–81. As in this case, the plaintiffs were seeking "facial relief" against the travel ban at issue in that case, "not review of any particular consular adjudication." *See, e.g.*, *Int'l Refugee Assistance Program v. Trump*, 241 F. Supp. 3d 539, 553–60 (D. Md. 2017). The Supreme Court found it unnecessary to even mention redressability, much less suggest that the plaintiffs would lack standing if they could not establish

with certainty that their family members would obtain visas absent the travel ban. *Hawaii*, 585 U.S. at 697–99.

In any event, even if Individual Plaintiffs had to demonstrate "likely visa issuance" as Defendants urge, they could readily meet that burden. As the January 14 documents make clear and as Defendants concede, the Visa Ban requires refusal under § 1201(g) only after the consular officer determines that no other ground of inadmissibility applies. Defs.' Mem. at 5, 7. Thus, Individual Plaintiffs and their family members who have received refusal notices have not been deemed inadmissible on any other ground. *See* Kyeremaa Decl. Ex. P ¶ 13 (refusal under INA § 221(g) due to Visa Ban, for each of her four adult children); Mitchell Decl. Ex. U ¶ 15 (same); Andred Aguirre Decl. Ex. R ¶¶ 16–18 (same); Medina Ramirez Decl. Ex. X ¶ 9 (same); Buitrago Cagua Decl. Ex. V ¶¶ 9–10 (same); Angulo Penaranda Decl. Ex. Z ¶ 8 (same); Lizcano Losada Decl. Ex. Y ¶ 7 (same). Further, Individual Plaintiffs include intending immigrants whose skills USCIS has already decided would benefit the United States to such an extent that it granted them national interest waivers (Medina Ramirez Decl. ¶ 6; Buitrago Cagua Decl. ¶¶ 5–6; Angulo Penaranda Decl. ¶¶ 6–7; Alcendra Moscote Decl. Ex. W ¶¶ 5–6) or whom USCIS has recognized as having extraordinary ability (Lizcano Losada Decl. ¶ 5). Thus, contrary to Defendants' speculation, the undisputed evidence establishes a substantial likelihood that the Individual Plaintiffs or their family members will receive visas once the "absolute barrier" erected by the Visa Ban is lifted. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 261–62 (1977). At the very least, Defendants have not pointed to any reason why these applications would be refused, and the Court is not required to engage in "undue speculation" about the applications' outcome. *Id*.

**B. Organizational Plaintiffs Have Standing.**

CLINIC and ACT have standing because Defendants' actions "directly affect[] and interfere[] with [their] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an organizational plaintiff had standing where the defendants' actions "perceptibly impaired" its activities).

The Visa Ban directly impairs CLINIC's and ACT's common core business activities of providing visa application assistance to U.S.-based individuals and their relatives. CLINIC carries out this activity by providing technical assistance to its affiliate organizations across the nation, 79 percent of whom provide consular processing services. Wheeler Decl. Ex. N ¶¶ 6–7, 14. ACT performs this activity by providing pro bono legal services, including consular processing, to its members. Kassa Decl. Ex. O ¶¶ 3, 10–11. The Visa Ban excludes an extraordinary number of people: up to 324,000 legal immigrants, including approximately 100,000 spouses and minor children of U.S. citizens and lawful permanent residents. *See* David J. Bier, *New Ban Bars Half of Legal Immigrants, Even Citizens' Spouses & Kids*, Cato at Liberty Blog (Jan. 14, 2026), https://perma.cc/QL2K-T2BM. Because of the Ban, CLINIC's and ACT's consular processing services for covered clients are not merely made more expensive or more difficult; the organizations are directly obstructed at the point where those services are meant to fulfill their core function of assisting clients through the adjudication process in securing the outcome those services exist to achieve. The Ban's impact on CLINIC and ACT is not speculative: CLINIC's affiliates and ACT have clients and members who have been refused due to the Ban. *See* Wheeler Decl. ¶¶ 12–13; Kassa Decl. ¶ 22.

Nor is this injury voluntary or self-inflicted. CLINIC and ACT are not "spending their way into standing." *See All. for Hippocratic Med.*, 602 U.S. at 394. Rather, as in *Amica Ctr. for*

*Immigrant Rts. v. Exec. Off. for Immigr. Rev.*, the Visa Ban "directly affect[s] and interfere[s] with" CLINIC and ACT's 'core . . . activities' of providing legal services in the context of" consular processing. 26-CV-696, 2026 WL 662494, at *17 (D.D.C. Mar. 8, 2026) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). The interference with CLINIC and ACT's consular processing services is even more severe than in *Amica Center*. While the changes to BIA's practice rules meant that the *Amica Center* plaintiffs would need to dramatically overhaul their operations to continue representing and achieving positive outcomes for their clients, 2026 WL 662494, at *13–16, the Visa Ban makes it impossible for CLINIC—through its affiliates—and ACT to obtain a positive outcome for many of their clients and members. CLINIC and ACT "are in the business of representing clients [who are applying for visas] and effectively closing that [] door will interfere with their ability to engage in that core aspect of their business." *Id*. at 17.

*Afr. Communities Together v. Lyons* is inapposite. In that case, which challenged Immigration and Customs Enforcement's arrests in immigration courthouses, the Court found that ACT did not have standing for purposes of a stay under section 705 of the APA because its declaration did not describe a diversion of resources. 799 F. Supp. 3d 362, 382 (S.D.N.Y. 2025). Here, ACT has detailed how the Visa Ban directly impairs its core business activities.

**C. Associational Plaintiff ACT Has Standing.**

ACT has standing as an associational plaintiff because at least one identified member, Plaintiff Agnes Kyeremaa, "would otherwise have standing to sue in [her] own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer*, 126 F.4th 109, 118 (2d Cir. 2025). As explained above, Ms. Kyeremaa has standing to sue in her own right because she alleges that the Visa Ban separates her from her family members, and, but for the Visa Ban, she would have the opportunity to reunite her family. Indeed, four of Ms. Kyeremaa's children received refusal notices under INA § 221(g), meaning that the consular officer completed

a review of their applications and found no other ground to reject them. *See* Defs.' Mem. at 5, 7; Section V.A, *supra*. Because ACT member Ms. Kyeremaa has standing, so does ACT.

## VI. VACATUR IS APPROPRIATE HERE.

As Defendants concede, vacatur is the usual remedy mandated for unlawful agency action under the APA. *See* 5 U.S.C. § 706(2) (directing reviewing courts to "hold unlawful and set aside" agency action that is arbitrary, capricious, contrary to law, in excess of statutory authority, procedurally defective, or unsupported by substantial evidence); Defs.' Mem. at 27 (quoting *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014)); *see also Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890–91 (D.C. Cir. 2024). That default rule controls here.

Vacatur is particularly appropriate here because the APA violations alleged in Counts One, Three, and Seven present purely legal defects that cannot be cured on remand. Courts in this Circuit have repeatedly held that where violations are clear as a matter of law, there is no need to depart from the APA's command or to engage in futile efforts to remand for further explanation. *See Nat. Res. Def. Council, Inc. (NRDC) v. U.S. Dep't of the Interior*, 478 F. Supp. 3d 469, 488–89 (S.D.N.Y. 2020) (citing *Guertin* and finding application of *Allied-Signal* test unnecessary where the agency action plainly violates the APA and the case does not present one of the "rare circumstances in which a court should deviate from the general rule that vacatur is the appropriate remedy"); *City Club of New York v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 872 (S.D.N.Y. 2017) (same). As multiple courts have emphasized, "that vacatur is appropriate follows from the text of the APA itself," particularly where the agency's errors are fundamental and not susceptible to cure through additional reasoning or explanation. *New York v. HHS*, 414 F. Supp. 3d 475, 576, 577–79 (S.D.N.Y. 2019).

Despite the clear statutory mandate under 5 U.S.C. § 706(2), Defendants urge the Court to adopt the *Allied-Signal* framework to determine whether vacatur is proper. Defs.' Mem. at 28,

citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,* 988 F.2d 146, 150–51 (D.C. Cir. 1993). But the Second Circuit has never adopted that framework or "articulated a test for deciding" when a court may decline to vacate an agency action. *City Club of New York,* 246 F. Supp. 3d at 872 (finding vacatur appropriate notwithstanding parties' use of the *Allied-Signal* framework).

In any event, even under the *Allied-Signal* framework, remand without vacatur is unavailable here because the agency cannot cure on remand the absence of statutory authority for the Visa Ban. *See Bridgeport Hosp*., 108 F.4th at 890 (explaining that remand occurs under *Allied-Signal* only when, among other factors, the agency's error is "curable," and is "unavailable" when an "agency can't 'cure' the fact that it lacks authority to take a certain action"). Defendants attempt to distinguish *Bridgeport Hospital* on the ground that it involved an "agency [that] lacked authority to take the action at all." Defs.' Mem. at 29. But as described above, the Visa Ban is contrary to the INA and existing regulations, and thus exceeds Defendants' statutory authority. *Supra* at 7-17. This absence of authority cannot be cured on remand and thus requires vacatur. *See New York v. HHS*, 414 F. Supp. 3d at 517, 540, 575–76 (holding that vacatur of challenged rule was warranted, and reasoning that "counsel's *post hoc* rationalizations for federal agency action are not a valid basis to uphold" agency action determined to be "in excess of statutory authority").

There is thus no occasion here to consider "whether the seriousness of the [agency actions'] deficiencies… outweigh[] the disruptive effects of the vacatur," *City of Port Isabel v. FERC*, 130 F.4th 1034, 1038 (D.C. Cir. 2025). But even if there were, the deficiencies here are significant and severe, as the agency action exceeded Defendants' authority and conflicts with the INA, and the agency failed to engage in notice-and-comment rulemaking. *Allina Health Servs. v. Sebelius*, 746 F.3d at 1110 (under *Allied-Signal*, "deficient notice is a 'fundamental flaw' that almost always requires vacatur").

By contrast, Defendants identify no concrete disruption that would result from vacatur. Unlike the agency in *City of Port Isabel*, which articulated specific disruptive consequences, 130 F.4th at 1038, Defendants here provide no facts supporting a claim that setting aside the challenged action would impair enforcement, create regulatory chaos, or undermine significant reliance interests. Courts routinely order vacatur under *Allied-Signal* where, as here, the agency commits substantive legal errors and fails to demonstrate meaningful disruption. *See NRDC*, 478 F. Supp. 3d at 489 (quoting *Allied-Signal*, 988 F.2d at 151); *Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 355, 378 (D.D.C. 2018). Indeed, far from being disruptive, vacatur here would merely undo a recent and unlawful "departure from the agency's prior longstanding position and enforcement practices." *NRDC*, 478 F. Supp. 3d at 489. Under any application of *Allied-Signal*, the balance decisively favors vacatur.

Defendants assert that Plaintiffs are improperly seeking "wholesale facial relief," highlighting that the Visa Ban Cable contains directives to which Plaintiffs do not object, such as a "confirm[ation] that previously issued visas are not to be revoked pursuant to the guidance and remain valid for travel." Defs.' Mem. at 28. But where, as here, APA violations are "numerous, fundamental, and far-reaching," courts properly vacate the action in its entirety, even if discrete provisions are not independently unlawful. *New York*, 414 F. Supp. 3d at 577–78 (declining to sever the lawful portions because "a decision to leave standing isolated shards of the Rule that have not been found specifically infirm would ignore the big picture: that the rulemaking exercise here was sufficiently shot through with glaring legal defects").

Finally, Defendants mischaracterize the relief Plaintiffs are seeking on this motion. Defendants incorrectly assert that Plaintiffs "seek … declarations of unlawfulness, a stay under APA § 705, a permanent injunction, and an order directing Defendants to 'resume case-by-case

adjudications, processing approvals and issuance'…." Defs.' Mem. at 29. But Plaintiffs moved only for vacatur and declaratory relief on Counts One, Three, and Seven of the Complaint pursuant to 5 U.S.C. § 706. Pls.' Mem. at 2 n.2. To the extent Defendants argue that other equitable relief that Plaintiffs might seek in the future is categorically barred or precluded by law, that question is not currently before the Court on this motion, and Defendants do not show that such relief is unavailable as a matter of law. And contrary to Defendants' overwrought claims, Plaintiffs' request that the Court "hold unlawful and set aside" the Visa Ban does not call for "the Court to take over the operation of the immigrant-visa system," Defs.' Mem. at 2, or to issue an "order requiring the issuance of any particular visa," *id.* at 29. Plaintiffs do not seek such relief, *see* Compl. ¶ 24; *id.* at ¶¶ 233, 246, 273; Pls.' Mem. at 17, 20, 24-25, but seek to vacate the Visa Ban and declare it unlawful to remove Defendants' unlawful nationality-based barrier to the fair and lawful visa adjudication and issuance process that the INA mandates.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for partial summary judgment on Counts One, Three, and Seven; deny Defendants' cross-motion for partial summary judgment; declare that the Blanket Visa Ban—both the announcement and cable—is contrary to law, in excess of Defendant's statutory authority, and procedurally invalid; and hold unlawful and set aside the Blanket Visa Ban under 5 U.S.C. § 706.

//

//

Dated: April 10, 2026

Respectfully submitted,

*/s/ Joanna Elise Cuevas Ingram*
Joanna Elise Cuevas Ingram
Tanya Broder*
Efrén C Olivares*
Elizabeth Choo**
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
(213) 377-5258
cuevasingram@nilc.org
broder@nilc.org
olivares@nilc.org
choo@nilc.org

*/s/ Erez Reuveni*
Erez Reuveni*
Catherine M.A. Carroll*
Elena Goldstein
Jonathan H. Hurwitz
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 316-9538 (Reuveni)
ereuveni@democracyforward.org
ccarroll@democracyforward.org
egoldstein@democracyforward.org
jhurwitz@v.democracyforward.org

*/s/ Hasan Shafiqullah*
Hasan Shafiqullah
Susan Welber
Evan Henley
Emily Lundgren
THE LEGAL AID SOCIETY
49 Thomas St., 5th Floor
New York, NY 10013
(212) 577-3300
hhshafiqullah@legal-aid.org
sewelber@legal-aid.org

ewhenley@legal-aid.org
elundgren@legal-aid.org

*/s/ Baher Azmy*
Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445
bazmy@ccrjustice.org
aguisado@ccrjustice.org

*/s/ Antionette Dozier*
Antionette Dozier*
David Kane*
Joy Dockter*
WESTERN CENTER ON LAW & POVERTY
3701 Wilshire Blvd. Suite 208
Los Angeles, CA 90010
(213) 487-7211
adozier@wclp.org
dkane@wclp.org
jdockter@wclp.org

*/s/ Sarah Wilson*
Sarah Wilson*
David Kim*
COLOMBO & HURD
301 E. Pine Street, Suite 450
Orlando, Florida 32801
(407) 478-1111
swilson@colombohurd.com
dkim@colombohurd.com

* *Admitted Pro Hac Vice*

** *Petition for Attorney Admission Pending*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Erez Reuveni, hereby certify that on April 10, 2026, I filed the foregoing Document with the Clerk of the Court for the United States District Court for the Southern District Court of New York using the CM/ECF system. Notice of this filing is being sent by operation of the Court's electronic filing system to all counsel of record who are registered CM/ECF users. I have also emailed counsel of record for Defendants.

*/s/ Erez Reuveni*
Erez Reuveni

## CERTIFICATE OF COMPLIANCE

I, Erez Reuveni, hereby certify that this document complies with the word count limitations imposed by the Court's order of March 19, 2026, as it is less than 12,000 words.

*/s/ Erez Reuveni*
Erez Reuveni