**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>MARCO RUBIO, Secretary of State, et al., )<br><br>Defendants. )<br>_____ ) | Case No. 26-cv-858 (JAV) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ................................................................................................................................1

    A. Exhibits A and B Are Not Final Agency Action. ...............................................................1

    B. Plaintiffs' Statutory Merits Theories Still Fail................................................................5

    C. Plaintiffs Cannot Evade Consular Nonreviewability by Recasting This Case as a Facial Policy Challenge. ..............................................................................................................6

    D. Plaintiffs' Notice-and-Comment Challenge Fails............................................................8

        1. Exhibits A and B Are Not Legislative Rules...........................................................8

        2. Even If Exhibits A and B Were Legislative Rules, the Foreign-Affairs Exception Would Apply......................................................................................................10

        3. Alternatively, Any Procedural Error Was Harmless.............................................12

    E. Plaintiffs Lack Article III Standing. ..................................................................................13

        1. The Individual Plaintiffs' Alleged Injuries Are Not Redressable.........................13

        2. CLINIC and ACT Lack Organizational Standing. ...............................................15

        3. ACT Lacks Associational Standing. .....................................................................17

    F. Plaintiffs' Accardi Claim Fails. .......................................................................................17

    G. Plaintiffs Are Not Entitled to Vacatur or Other Relief. ...................................................19

CONCLUSION..............................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*African Communities Together v. Lyons*,
   799 F. Supp. 3d 362 (S.D.N.Y. 2025)........................................................................17

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014)...........................................................................12, 20

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993)...................................................................................19

*Am. Acad. of Religion v. Napolitano*,
   573 F.3d 115 (2d Cir. 2009)....................................................................................6, 8

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
   995 F.2d 1106 (D.C. Cir. 1993)...................................................................................9

*Amica Center for Immigrant Rights v. EOIR*,
   2026 WL 662494 (D.D.C. Mar. 8, 2026)....................................................................16

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (D.C. Cir. 2000) ..............................................................................3, 4

*Bennett v. Spear*,
   520 U.S. 154 (1997)...............................................................................................1–4

*Bridgeport Hosp. v. Becerra*,
   108 F.4th 882 (D.C. Cir. 2024)..................................................................................20

*Cacchillo v. Insmed, Inc.*,
   638 F.3d 401 (2d Cir. 2011).......................................................................................15

*City of Port Isabel v. FERC*,
   130 F.4th 1034 (D.C. Cir. 2025).................................................................................20

*Darby v. Cisneros*,
   509 U.S. 137 (1993)....................................................................................................2

*Dep't of State v. Muñoz*,
   602 U.S. 899 (2024).................................................................................................6, 8

*Do No Harm v. Pfizer Inc.*,
   126 F.4th 109 (2d Cir. 2025) .....................................................................................17

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)..............................................................................................14, 16

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...................................................................................17

*Garcia v. Baker*,
  765 F. Supp. 426 (N.D. Ill. 1990) ...............................................................................8

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002) ....................................................................................3

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) .............................................................................6

*Guertin v. United States*,
  743 F.3d 382 (2d Cir. 2014) .......................................................................................19

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ...................................................................................................16

*Heartland Reg'l Med. Ctr. v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009) ...................................................................................12

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ...................................................................................................17

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
  761 F.2d 798 (D.C. Cir. 1985) .....................................................................................7

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) .................................................................................................6, 8

*LAVAS v. Dep't of State*,
  45 F.3d 469 (D.C. Cir. 1995) .......................................................................................5

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..............................................................................................13, 15

*Lunney v. United States*,
  319 F.3d 550 (2d Cir. 2003) .........................................................................................1

*Malek-Marzban v. INS*,
  653 F.2d 113 (4th Cir. 1981) .....................................................................................12

*Mantena v. Johnson*,
  809 F.3d 721 (2d Cir. 2015) .......................................................................................14

*Matushkina v. Nielsen*,
  877 F.3d 289 (7th Cir. 2017) .......................................................................................8

*Melody Pak v. Biden*,
  91 F.4th 896 (7th Cir. 2024) ..................................................................................8

*Montilla v. INS*,
  926 F.2d 162 (2d Cir. 1991)..............................................................................17, 18

*Morton v. Ruiz*,
  415 U.S. 199 (1974)...........................................................................................18, 19

*N.Y. Legal Assistance Grp. v. Cardona*,
  2025 WL 871371 (S.D.N.Y. Mar. 20, 2025) ........................................................19

*Nat. Res. Def. Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020).................................................................................12

*Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ................................................................................3

*Olsen v. Albright*,
  990 F. Supp. 31 (D.D.C. 1997)................................................................................6

*Patel v. USCIS*,
  732 F.3d 633 (6th Cir. 2013) .................................................................................14

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)...................................................................................................9

*Pietersen v. Dep't of State*,
  138 F.4th 552 (D.C. Cir. 2025)................................................................................7

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008)............................................................................10, 11

*Sackett v. EPA*,
  566 U.S. 120 (2012)..................................................................................................4

*Salazar v. King*,
  822 F.3d 61 (2d Cir. 2016).................................................................................18, 19

*Sangster v. Rubio*,
  2026 WL 222316 (D. Nev. Jan. 28, 2026).............................................4, 5, 9, 11, 12

*Shalom Pentecostal Church v. Acting Secretary, DHS*,
  783 F.3d 156 (3d Cir. 2015)...................................................................................14

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995)....................................................................................................9

*Sharkey v. Quarantillo*,
541 F.3d 75 (2d Cir. 2008)................................................................................................1, 2

*Shinseki v. Sanders*,
556 U.S. 396 (2009)........................................................................................................12, 13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
481 F. Supp. 397 (S.D.N.Y. 1979).........................................................................................3

*Singh v. DOJ*,
461 F.3d 290 (2d Cir. 2006)..................................................................................................19

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) .............................................................................................4

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ...............................................................................................12

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).............................................................................................................17

*Sweet v. Sheahan*,
235 F.3d 80 (2d Cir. 2000)..................................................................................................8, 9

*Tate v. Pompeo*,
513 F. Supp. 3d 132 (D.D.C. 2021) ........................................................................................6

*Top Choice Distribs. v. U.S. Postal Serv.*,
138 F.3d 463 (2d Cir. 1998)....................................................................................................2

*Trump v. Hawaii*,
585 U.S. 667 (2018)...........................................................................................................5, 15

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)......................................................................................................1, 17–19

*United States v. Caceres*,
440 U.S. 741 (1979)..............................................................................................................18

*Venetian Casino Resort v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008)................................................................................................3

*Vo Van Chau v. Dep't of State*,
891 F. Supp. 650 (D.D.C. 1995)..............................................................................................5

*Yassini v. Crosland*,
618 F.2d 1356 (9th Cir. 1980) ..............................................................................................12

*Zhang v. Slattery*,
    55 F.3d 732 (2d Cir. 1995)......................................................................................10, 12

## **Statutes**

5 U.S.C. § 553........................................................................................................................12

5 U.S.C. § 706........................................................................................................................12

8 U.S.C. § 1104(a) ...................................................................................................................6

8 U.S.C. § 1152(a)(1)(A) .........................................................................................................5

8 U.S.C. § 1182(a)(4)............................................................................................................5, 9

8 U.S.C. § 1201(g) ...............................................................................................................6, 9

## **Regulations**

22 C.F.R. § 40.6....................................................................................................................9, 18

22 C.F.R. § 42.81 ..................................................................................................................9, 18

## **Other Authorities**

9 FAM 302.8-2(B) .....................................................................................................................18

9 FAM 504.11-2(A) ..................................................................................................................18

**INTRODUCTION**

Plaintiffs' reply narrows and sharpens the dispute. It presses new finality authorities, refines their notice-and-comment and harmless-error theories, recasts standing and *Accardi*, and limits the relief sought to vacatur and declaratory relief. But none of that work cures the central flaw in Plaintiffs' theory: they collapse Department-level instructions into the applicant-specific visa decisions that the INA and governing regulations reserve to individual consular adjudication.

That distinction runs through the whole analysis. Exhibits A and B operate through ordinary consular processing — interviews, review of eligibility grounds, and officer-entered decisions in individual cases. They do not issue, refuse, or revoke visas. Plaintiffs' refined framing does not change that structure. Once Department-level instructions are kept analytically distinct from the case-specific adjudications that follow, the threshold defects in Plaintiffs' theory remain.

This round of motions concerns only Counts One, Three, and Seven insofar as Plaintiffs challenge the January 14 announcement and implementing cable, Exhibits A and B. As to those materials and claims, Defendants are entitled to summary judgment.

**ARGUMENT**

**A.  Exhibits A and B Are Not Final Agency Action.**

Under *Bennett v. Spear*, agency action is final only if it both marks the consummation of the agency's decisionmaking process and is one from which "rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. 154, 177–78 (1997). In the Second Circuit, the "core question" is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008) (quoting *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003)). And where the agency has not yet "arrived at a definitive position" that

1

"inflicts an actual, concrete injury," review is unavailable. *Top Choice Distribs. v. U.S. Postal Serv.*, 138 F.3d 463, 466 (2d Cir. 1998) (quoting *Darby v. Cisneros*, 509 U.S. 137, 144 (1993)). Plaintiffs fail to demonstrate that Exhibits A and B satisfy that standard. Their finality argument collapses a Department-level instruction into the later applicant-specific adjudicatory act that alone carries the operative legal consequence.

Exhibit A presents no serious finality question. It is a public announcement stating that the Department had "paused" immigrant-visa issuances while conducting a broader review. It does not itself adjudicate any application, issue or refuse any visa, or alter any applicant's legal status. Exhibit B is the closer case. Plaintiffs are correct that it uses mandatory language: the cable directs that covered applicants "must" be refused under § 221(g) if not otherwise refused on another ground. Ex. B ¶ 2. But mandatory phrasing does not end the *Bennett* inquiry. *Bennett* asks whether the challenged action itself is the source of the legal consequence — not whether it constrains how a later adjudication will be resolved. 520 U.S. at 177–78; *see also Sharkey*, 541 F.3d at 88.

The cable's own text demonstrates that any operative legal consequence arises only through later case-specific adjudication. Exhibit B provides that interview appointments "should not be canceled," that consular officers "should continue to adjudicate all immigrant visa cases," and that officers must "assess all other potential grounds" before any refusal is entered. Ex. B ¶ 4. Officers are directed to make detailed case notes and only then enter a refusal in the individual case. *Id.* ¶¶ 4–5. For already approved but unprinted cases, the cable requires the consular officer to reopen the case and enter the § 221(g) refusal; it does not itself refuse those visas. *Id.* ¶ 9. Previously issued visas remain valid for travel. *Id.* Even accepting the cable's mandatory terms, Exhibits A and B do not themselves issue, refuse, or revoke any visa. The operative legal consequence arises only when a consular officer later records a case-specific refusal in the ordinary

2

course of adjudication.

Plaintiffs respond that because the cable prescribes the outcome for covered cases, the cable must be final. But *Bennett* does not ask whether a Department instruction strongly shapes later action; it asks whether the challenged action is itself the locus of the legal consequence. Many directives may constrain later adjudication without constituting final agency action. *See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs*, 481 F. Supp. 397, 399 (S.D.N.Y. 1979) (holding that the District Engineer's refusal to require a supplemental environmental impact statement (EIS) shaped the ongoing permit process, but was not final because the Corps still had not decided whether to issue the permits and the adequacy of the EIS depended on the agency's final recommendation). Plaintiffs' theory treats the later § 221(g) refusal as distinct enough from the cable to qualify as "implementation" yet indistinguishable enough from it that the refusal's consequences should be attributed to the cable. Pls.' Reply at 5–6. That is precisely the analytical collapse that *Bennett* prevents.

Plaintiffs' new finality authorities do not overcome this problem. Each one involved an agency act that itself fixed the operative rule of decision or directly altered the legal position of the regulated party. For example, in *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, the challenged directive itself established the framework for permitting and enforcement; its legal effect did not depend on a later applicant-specific order. 752 F.3d 999, 1007 (D.C. Cir. 2014). In *GE v. EPA* and *Appalachian Power Co. v. EPA*, the challenged documents set out the standards that regulated parties and agency staff were expected to follow in seeking and evaluating regulatory approval, with immediate effect in the approval and permitting process. *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 379–80, 385 (D.C. Cir. 2002); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021–23 (D.C. Cir. 2000). In *Venetian Casino Resort v. EEOC*, the complained-of legal

3

consequence — disclosure of the employer's confidential information without notice — inhered in the policy itself; no further adjudicatory step was needed for it to occur. 530 F.3d 925, 927, 931 (D.C. Cir. 2008). And in *Sackett v. EPA*, the compliance order itself imposed concrete obligations and exposed the landowners to immediate enforcement consequences. 566 U.S. 120, 126 (2012). Exhibits A and B are categorically different: they do not issue, refuse, or revoke any visa; they do not alter any applicant's legal status; and they impose no self-executing consequence on any applicant. They operate only through later consular adjudication — continued interviews, continued review of all grounds, and then, if appropriate, an officer-entered refusal in the individual case. *See* Ex. B ¶ 4. Plaintiffs' invocation of the principle that the possibility of future revision does not negate finality, *see Appalachian Power Co.*, 208 F.3d at 1022; *Sackett*, 566 U.S. at 127, misses the mark: that principle addresses actions that already have direct legal effect. The threshold problem here is that Exhibits A and B do not.

  *Sangster v. Rubio* warrants direct response. The court concluded that the January 14 cable was final because, while in effect, the Department "will not approve any immigrant visas" for covered nationals. 2026 WL 222316, at *3 (D. Nev. Jan. 28, 2026). But that framing treats the cable as functionally equivalent to the later refusal — precisely the analytical step that *Bennett* requires courts to resist. A Department instruction does not become a visa refusal merely because it influences the outcome of later adjudications. *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268–69 (D.C. Cir. 2018) (agency staff opinion not final where it signaled how the agency likely would proceed but bound neither the Commission nor regulated parties and had no legal effect). The cable itself preserves the intervening adjudicatory steps: continued interviews, assessment of all grounds, detailed case notes, and then officer-entered refusals in individual proceedings under § 221(g). Ex. B ¶¶ 4–5, 9. That structure is not a formality; it is the mechanism through which any

4

legal consequence arises. *Sangster*'s outcome-determinism conflates the instruction with the adjudicatory act that it instructs.

Exhibits A and B may influence how later adjudications proceed but are not themselves the final agency action from which the challenged legal consequences flow. Because the operative consequence arises only through subsequent case-specific consular action, finality is absent.

## B.  Plaintiffs' Statutory Merits Theories Still Fail.

Plaintiffs' statutory objections still fail because Exhibits A and B do not themselves issue, refuse, or revoke visas; they operate only through later, case-specific adjudications under existing INA authorities.

As to 8 U.S.C. § 1182(a)(4), Defendants do not dispute that public-charge determinations must be individualized and based on the totality of the circumstances. But Plaintiffs still do not show that Exhibits A and B displace that framework. Exhibit B directs consular officers to continue interviews, continue adjudication, and assess all potentially applicable grounds of ineligibility, including the public-charge ground, § 1182(a)(4). Ex. B ¶¶ 2, 4. Plaintiffs' contrary reading depends on treating the January 14 materials as if they supplanted the officer-specific inquiry that the statute requires. They do not. And to the extent Plaintiffs rely on *Sangster*, that decision turns on the opposite premise. *See* Pls.' Reply at 9 (quoting *Sangster*, 2026 WL 222316, at *5).

Plaintiffs' 8 U.S.C. § 1152(a)(1)(A) theory fares no better. As *Trump v. Hawaii* explains, §§ 1182 and 1152 "operate in different spheres." 585 U.S. 667, 695 (2018). Nothing in *LAVAS I*, *Vo Van Chau*, and *Olsen* alters that analysis. *See* Pls.' Reply at 12. Those cases involved direct nationality-based restrictions or facially discriminatory issuance rules, not internal Department guidance implemented through ordinary consular adjudication and the INA's existing refusal mechanism. *LAVAS v. Dep't of State*, 45 F.3d 469, 473–74 (D.C. Cir. 1995); *Vo Van Chau v. Dep't*

5

*of State*, 891 F. Supp. 650, 652–53 (D.D.C. 1995); *Olsen v. Albright*, 990 F. Supp. 31, 37–38 (D.D.C. 1997).

Nor do 8 U.S.C. §§ 1104(a) and 1201(g) help Plaintiffs. Defendants do not contend that § 1201(g) is itself an inadmissibility ground. The point is narrower: Exhibit B operates through the INA's existing refusal mechanism—§ 1201(g)—which a consular officer records in the individual case under existing law. That is why *Tate* and *Gomez* are inapposite. *See* Pls.' Reply at 14 (citing *Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021), and *Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020)). Plaintiffs still have not shown that Exhibits A and B create an extra-statutory system outside Congress's adjudicatory framework.

## C. Plaintiffs Cannot Evade Consular Nonreviewability by Recasting This Case as a Facial Policy Challenge.

Federal courts generally may not review consular officers' visa decisions unless Congress has authorized review or, where a visa denial allegedly burdens the constitutional rights of a U.S. citizen, the court's inquiry is limited to whether the Executive supplied a facially legitimate and bona fide reason for the denial. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 125 (2d Cir. 2009). Plaintiffs do not dispute that principle. *See* Pls.' Reply at 6–7. Instead, they characterize this suit as a forward-looking challenge to Department-wide policy governing visa adjudications— a label that, they say, takes the case out of the doctrine's reach. *Id.* But that argument fails because Plaintiffs' asserted injuries, and the relief they seek, remain tethered to immigrant-visa adjudications in individual cases.

The theory of injury that Plaintiffs advance is rooted in concrete consular outcomes: completed interviews, existing refusals, and ongoing non-issuances in identified cases. *See* Pls.' Mot. for Summ. J. ("Pls' MSJ") at 8 (citing declarations). The relief they seek would be

6

consequential only because it would disable the rule that, they say, is being applied in those adjudications. This is not a challenge to Exhibits A and B in the abstract; it is a challenge to those materials because of what Plaintiffs allege that they do in individual visa cases. As discussed in Section A, the January 14 materials operate through later, case-specific refusals entered by consular officers in individual cases. *See* Ex. B ¶ 4. That adjudication-linked structure is what makes the doctrine relevant to the claims at issue here.

*Pietersen* does not require a different conclusion. The D.C. Circuit there emphasized that the plaintiffs had affirmatively abandoned any challenge to prior visa denials as unreviewable and limited their appeal to "the improper *future* application" of allegedly unlawful guidance. *Pietersen v. Dep't of State*, 138 F.4th 552, 555, 560 (D.C. Cir. 2025). On that understanding, the court permitted a genuinely prospective APA claim to proceed. This case is different. Plaintiffs have not severed their challenge from completed adjudicatory events; they rely on such events and seek relief that would matter precisely because it would unsettle the rule allegedly being applied in them. *See* Pls.' MSJ. at 8; Pls.' Reply at 33; Compl. ¶¶ 25, 233, 246, 273. The narrow opening that *Pietersen* recognized does not extend to a challenge whose real-world stakes remain bound up with concrete visa outcomes.

*Bricklayers* does not carry Plaintiffs further. Defendants do not dispute that courts may, in appropriate circumstances, review forward-looking challenges to policies governing consular decisions "to assure that the executive departments abide by the legislatively mandated procedures." *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985). But that principle applies to challenges genuinely untethered from particular adjudications, not to a case in which Plaintiffs seek to invalidate Exhibits A and B because of the effect that those materials allegedly have in identified visa cases affecting identified applicants.

Courts have consistently rejected efforts to avoid consular nonreviewability by repackaging objections to visa outcomes as challenges to surrounding policy or procedure. *See, e.g., Melody Pak v. Biden*, 91 F.4th 896, 900–02 (7th Cir. 2024); *Matushkina v. Nielsen*, 877 F.3d 289, 295 (7th Cir. 2017); *Garcia v. Baker*, 765 F. Supp. 426, 427–28 (N.D. Ill. 1990). The same reasoning applies here.

Plaintiffs also do not fit within the narrow *Mandel*/*Muñoz* exception. They do not allege that a visa denial burdens the constitutional rights of a U.S. citizen, so that limited form of review is not implicated. *See Muñoz*, 602 U.S. at 908; *Mandel*, 408 U.S. at 770. Nor do Plaintiffs seek that limited review. They instead seek broad invalidation of the January 14 announcement and implementing cable as they operate in visa adjudications. That is not the review that *Mandel* and *Muñoz* authorize. However Plaintiffs frame their claims, their challenge remains tethered to visa refusals and non-issuances arising from individual consular adjudications, and consular nonreviewability independently bars the claims at issue here.

## D.  Plaintiffs' Notice-and-Comment Challenge Fails.

Plaintiffs' notice-and-comment theory rests on the premise that Exhibits A and B made new law rather than directing how the Department administers existing visa statutes and regulations. That premise is wrong. And even if the January 14 announcement and implementing cable qualified as legislative rules, the foreign-affairs exception would apply. In any event, Plaintiffs do not show prejudice.

### 1.  Exhibits A and B Are Not Legislative Rules.

In this Circuit, legislative rules "create new law, rights, or duties, in what amounts to a legislative act," while interpretive rules merely "clarify an existing statute or regulation." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000). Interpretive rules are issued to "advise the public of the

agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). Under the *American Mining* framework that *Sweet* endorsed, the critical inquiry is whether the agency action itself supplies the legal basis for enforcement or instead operates within preexisting law. *See Sweet*, 235 F.3d at 91; *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1110–12 (D.C. Cir. 1993).

Exhibits A and B fall into the latter category. They do not create a new ground of inadmissibility, establish a freestanding refusal authority, or amend the INA or implementing regulations. The legal basis for any refusal entered under Exhibit B remains what it was before January 14: 8 U.S.C. § 1201(g) and the regulations governing visa refusals, including 22 C.F.R. §§ 40.6 and 42.81. Exhibit B does not create a new refusal authority; it directs officers to use the INA's existing refusal mechanism in individual cases. *See* Ex. B ¶ 4. *American Mining* asks whether, absent the guidance, there would be no adequate legislative basis for agency action. 995 F.2d at 1112. In this case there would be — the INA's adjudicatory framework supplies it. Plaintiffs' contrary contention simply repackages their statutory merits theory as a notice-and-comment argument. Even if Plaintiffs were correct that the Department has misread the INA, that would not mean Exhibits A and B are legislative rules. It would mean, at most, that the Department allegedly misapplied existing law. Nor does *Sangster* require a different result. To the extent *Sangster* reasoned that "no authorization for blanket denial exists besides the Policy," that analysis assumes Plaintiffs' merits premise that the January 14 materials displaced the INA's preexisting refusal framework. *Sangster v. Rubio*, 2026 WL 222316, at *7 (D. Nev. Jan. 28, 2026). But the legislative-rule inquiry asks whether the guidance itself created new law or instead directed

9

officers how to proceed under existing law. Here, Exhibits A and B operate through preexisting statutory and regulatory authorities rather than supplying an independent source of legal power.

Plaintiffs' reliance on the cable's mandatory phrasing does not change the analysis. Mandatory instructions to subordinates do not themselves transform internal guidance into a legislative rule. Nor does the January 14 materials' prospective operation. The fact that the guidance took effect on January 21 and left previously issued visas undisturbed does not show that the Department created new law. Interpretive guidance ordinarily operates going forward, and the cable's statement that previously issued visas "remain valid for travel" is fully consistent with the distinct posture of visas already issued, as opposed to applications still pending in the adjudicatory pipeline. Ex. B ¶ 9. Prospectivity alone does not show that Exhibits A and B altered the governing legal standard rather than directed how the Department would administer it in future cases.

Guidance also does not become legislative merely because it binds subordinates; what matters is whether it amends prior law or creates obligations for the public that the existing framework does not supply. Exhibits A and B do neither. They operate through the preexisting statutes and refusal regulations, not alongside them or in place of them.

## 2. Even If Exhibits A and B Were Legislative Rules, the Foreign-Affairs Exception Would Apply.

Even if Exhibits A and B were legislative rules, the foreign-affairs exception would exempt them from notice and comment. The exception is narrow. The Second Circuit has warned against reading it so broadly that immigration's ordinary foreign-relations implications eliminate public participation across the field. *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995). But the exception does apply where public rulemaking would provoke "definitely undesirable international consequences." *Id.*; *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

10

This case fits within that exception. Exhibits A and B govern overseas consular operations, establish country-specific treatment of foreign nationals abroad, and direct how visa screening and processing proceeds at United States diplomatic posts. Ex. A; Ex. B ¶¶ 2, 4. This is not a rule about domestic enforcement priorities or immigration-court procedure. Rather, it is a directive about how American consular posts handle immigrant-visa cases involving nationals of designated countries while the Department reviews screening and vetting measures. Requiring public notice and comment on such measures would publicly preview country-specific consular action before implementation, giving affected governments and applicants an opportunity to react to or seek to undermine the Department's planned action before it took effect, with attendant risks to bilateral relations and the efficacy of the screening effort. It would also delay implementation while covered cases continued to move forward before the reviewed measures were in place—precisely the kind of "definitely undesirable international consequences" that *Rajah* contemplates. 544 F.3d at 437.

Plaintiffs argue that *Rajah* is limited to its post-September 11 facts and that the absence of a terrorism-specific record defeats the exception. Pls.' Reply at 21. But *Rajah* did not hold that only terrorism-related rules supported by sensitive intelligence qualify for the exception. It identified a broader principle: public rulemaking may be inappropriate where it would impair foreign relations or delay implementation of measures bound up with country-specific vetting judgments. *Rajah*, 544 F.3d at 437. The principle is not confined to the most dramatic facts of its application, and Plaintiffs are wrong to read it that way.

*Sangster* is not binding, and its foreign-affairs analysis should not control here. The court reasoned that the agency "has not explained or brought evidence showing the international consequences of a notice-and-comment period, nor is it obvious." 2026 WL 222316, at *7. That logic fits poorly here, because Exhibits A and B on their face are directed to consular posts abroad,

11

apply on a country-specific basis, and concern visa screening and processing of foreign nationals outside the United States. Ex. A; Ex. B ¶¶ 2, 4. That is a stronger foreign-affairs case than the refugee-status rule at issue in *Zhang*, which did not direct consular posts abroad or prescribe country-specific screening and processing instructions for foreign nationals outside the United States. Courts have applied the foreign-affairs exception to nationality-specific immigration measures taken in response to the Iranian hostage crisis as well, reinforcing the basic point that country-specific measures tied to foreign-policy judgments can fall within the exception. *See Yassini v. Crosland*, 618 F.2d 1356, 1360–61 (9th Cir. 1980); *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981). Here, the foreign-affairs nexus is evident from the guidance itself, and *Sangster* does not justify treating the absence of extra-record proof as dispositive.

### 3. Alternatively, Any Procedural Error Was Harmless.

Even assuming notice and comment was required, Plaintiffs do not show prejudice. The APA directs reviewing courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Courts are appropriately cautious about treating a total bypass of § 553 as harmless, *see Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96–97 (D.C. Cir. 2002); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), but those cases do not establish automatic prejudice or automatic vacatur in every notice-and-comment case.

Neither *Heartland* nor *NRDC* changes that. Those decisions underscore the importance of notice-and-comment procedures, *see Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020), but the operative question under § 706 is whether Plaintiffs can show that the lack of notice-and-comment could plausibly have made a difference. *See Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

Plaintiffs still do not show that the missing procedure plausibly deprived them of any submission that could have mattered. Instead, they argue that Defendants' prejudice argument is circular because the Department never exposed the January 14 materials' full legal or factual basis, underlying data, or methodology to public comment. Pls.' Reply at 23. But that point does not establish prejudicial error. This is not a rulemaking whose validity turns on hidden technical modeling or empirical assumptions that commenters might have tested or corrected. Plaintiffs' objection is instead a legal one: that Exhibits A and B exceeded the Department's authority and should have gone through notice and comment because they purportedly changed the governing legal standard. *Id.* at 16–17. That contention does not depend on undisclosed data or methodology.

Nor do Plaintiffs identify any concrete factual submission, technical comment, or alternative proposal that plausibly could have changed the Department's interpretation of the governing visa statutes and regulations or its foreign-affairs and vetting judgments. Their objections are legal objections and are now fully before the Court. *Shinseki* provides the governing principle: procedural error is not presumed prejudicial simply because error occurred. 556 U.S. at 409–10. Any procedural error was therefore harmless.

## E.  Plaintiffs Lack Article III Standing.

### 1.  The Individual Plaintiffs' Alleged Injuries Are Not Redressable.

Defendants do not dispute that the individual Plaintiffs have alleged injury in fact or that their injuries are traceable to the challenged materials. The defect is redressability. Article III requires a plaintiff to show not only injury and traceability, but also that the particular relief sought is likely to redress the asserted injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And where the concrete benefit that a plaintiff seeks depends on the subsequent decisions of third parties exercising case-specific judgment, the plaintiff must show a predictable, non-speculative

13

chain from judicial relief to the outcome sought. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383–85 (2024).

That chain is missing here. Even if the Court were to vacate Exhibits A and B, it could not order the issuance of any particular visa. Facial relief would remove one asserted constraint and return the affected applications to renewed, individualized adjudication under the INA's ordinary framework. Consular officers would still have to reassess each applicant's circumstances, could still seek additional evidence, and could still refuse on existing statutory grounds. The outcomes that Plaintiffs invoke — visa issuance, family reunification, and entry for employment-based beneficiaries — would remain contingent on further applicant-specific determinations that the requested relief leaves entirely unresolved.

The cases that Plaintiffs invoke do not fill that gap. In *Mantena v. Johnson*, USCIS moved to revoke a portable I-140 petition without giving notice either to the beneficiary or to her successor employer, even though that upstream revocation automatically doomed her pending adjustment application; relief there would have restored a specific procedural opportunity to respond before USCIS decided that threshold petition issue. 809 F.3d 721, 723–25, 731 (2d Cir. 2015). *Patel v. USCIS* likewise involved the denial of an employer-filed immigrant-visa petition that cut off the beneficiary's ability to proceed through the employment-based petition stage at all; the injury was the loss of that statutory opportunity to continue along that path. 732 F.3d 633, 638 (6th Cir. 2013). And *Shalom Pentecostal Church v. Acting Secretary, DHS* recognized redressability on the same logic in the I-360 context: where adjudication unfolds in multiple steps, requested relief can satisfy redressability because it restores the plaintiff to the proper position at the petition stage, even if further agency action would be required before the ultimate immigration benefit could issue. 783 F.3d 156, 161–63 (3d Cir. 2015). Here, by contrast, vacatur of Exhibits A and B would not restore

14

any similarly discrete gateway opportunity whose reinstatement is itself the redress. It would only return Plaintiffs to renewed consular adjudication, where consular officers could still request more evidence or refuse on existing grounds. Plaintiffs' own framing confirms the point: they say that vacatur would restore "individualized adjudications," not visa issuance. Pls.' MSJ at 22. That is not enough.

Plaintiffs' fallback fares no better. They point to applicants who, they say, received § 221(g) refusal notices expressly tied to the January 14 announcement and implementing cable, rather than to any separately identified individualized inadmissibility ground. Compl. ¶¶ 167, 202. But the absence of a second stated ground at the time of the prior refusal does not establish that renewed adjudication would likely end in approval. It shows only that no additional ground had yet been entered. Officers conducting fresh adjudications could reassess the record, request further information, and apply the existing statutory framework anew. Redressability cannot rest on the assumption that they will not.

*Trump v. Hawaii* does not resolve this problem. That decision recognized family separation as a concrete injury. 585 U.S. 667, 698 (2018). It did not address whether facial APA relief against Department-level guidance would likely redress a given applicant's visa non-issuance when further individualized adjudication still stands between vacatur and visa issuance. Plaintiffs ask the Court to treat the restoration of a lawful process as equivalent to the likely achievement of the substantive outcome they seek. Article III does not permit that move.

### 2. CLINIC and ACT Lack Organizational Standing.

Plaintiffs' reply also fails to establish organizational standing. At summary judgment, standing must rest on specific facts in affidavits or other evidence. *Lujan*, 504 U.S. at 561; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). An organization may show injury

through a concrete diversion of resources that perceptibly impairs its activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). But the Supreme Court has made clear that organizations cannot manufacture standing simply by spending money to oppose, respond to, or educate others about a policy they disfavor. *FDA*, 602 U.S. at 394–96. The required showing is a concrete, defendant-caused interference with the organization's own operations, not a setback to abstract mission interests or a voluntary reallocation of resources in response to a policy affecting third parties.

That is all Plaintiffs show here. They contend that Exhibits A and B "directly impair" CLINIC's and ACT's core activities because those organizations assist clients with consular processing and seek favorable outcomes for them. Pls.' Reply at 28. But Exhibits A and B regulate consular adjudications by government officers. They do not require CLINIC or ACT to do anything, forbid them from doing anything, alter the legal rules governing their own operations, or deny them access to any information or redress mechanism that federal law otherwise makes available. The evidence instead describes increased inquiries, additional consultations, more training, new educational materials, and related service burdens arising from a policy that affects third-party applicants and their families. *See* Wheeler Decl. ¶ 12, Ex. N; Kassa Decl. ¶ 16, Ex. O; *see also* Compl. ¶¶ 13-14, 21. Those are mission-consistent responses to a policy affecting others, not the kind of direct operational interference that supports organizational standing.

*Amica Center for Immigrant Rights v. EOIR* does not change that conclusion. There, the challenged rule directly disrupted the plaintiff organizations' Board of Immigration Appeals-centered appellate practice by compressing the appeal stage and shifting work toward federal-court review, with corresponding consequences for staffing, training, funding, and case intake. 2026 WL 662494, at *15–16 (D.D.C. Mar. 8, 2026). Exhibits A and B do nothing of the sort. They do not

16

restructure CLINIC's or ACT's internal operations or the legal framework under which those organizations function. The alleged effects are derivative of how consular officers adjudicate third-party applications.

*African Communities Together v. Lyons* reinforces the point. One of the same plaintiffs as here failed to establish organizational standing based on assertions about added service burdens and resource demands. 799 F. Supp. 3d 362, 382 (S.D.N.Y. 2025). Plaintiffs' description of those same burdens as "direct impairment" does not change their character. Nor does the asserted loss of an opportunity to comment. A procedural omission does not supply a concrete organizational injury where none otherwise exists. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

### 3. ACT Lacks Associational Standing.

ACT's associational-standing theory fails for the same reason. An association must show, among other things, that at least one identified member "would otherwise have standing to sue in [her] own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025). ACT identifies Agnes Kyeremaa as the relevant member. But for the reasons set out above, Ms. Kyeremaa has not shown that the facial relief sought here would likely redress the injury she alleges. Because ACT cannot satisfy *Hunt*'s first requirement, it lacks associational standing as well.

### F. Plaintiffs' *Accardi* Claim Fails.

*Accardi* and its progeny require an agency to follow its own binding regulations and mandatory procedures—but they do not supply a remedy for every disagreement about how an agency has read or applied those materials. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954); *Montilla v. INS*, 926 F.2d 162, 167–68 (2d Cir. 1991); *United States v.*

17

*Caceres*, 440 U.S. 741, 752–55 (1979). The relevant question is whether Plaintiffs have identified a binding regulation or mandatory procedure affecting their rights or interests that the Department failed to follow. *Montilla*, 926 F.2d at 167–68; *Caceres*, 440 U.S. at 755.

Plaintiffs still have not shown that Exhibits A and B required consular officers to disregard the regulations and FAM provisions that they cite. Plaintiffs rely on 22 C.F.R. §§ 40.6 and 42.81, together with 9 FAM 504.11-2(A) and 9 FAM 302.8-2(B). Read together, those provisions require that any refusal rest on a ground supplied by law and that, once an application is properly completed and executed, the consular officer either issue the visa or enter a refusal in the individual case. Plaintiffs' strongest point is that the FAM's public-charge guidance calls for a totality-of-the-circumstances assessment and states that no one factor should be dispositive. But that premise advances their *Accardi* theory only if the January 14 materials are properly read to displace that individualized framework with a nationality-only rule. Properly read, Exhibit B does not do so on its face. The cable directs officers to continue interviewing applicants, adjudicating cases, and assessing all possible grounds of ineligibility, Ex. B ¶ 4, and it expressly refers back to the Department's November 2025 public-charge guidance, which "underscored consular officers' critical responsibility to assess the totality of circumstances," *id.* ¶ 3. On that reading, Plaintiffs' objection is still that the Department adopted the wrong legal interpretation of the governing standards, not that it disregarded a separate procedural command of the kind *Accardi* polices.

Plaintiffs' cited cases do not require a different result. *Accardi*, *Montilla*, *Morton*, *Singh*, and *Salazar* involved alleged failures to comply with specific binding rules or mandatory procedures governing the agency's decisionmaking. *Accardi*, 347 U.S. at 267–68 (Attorney General allegedly dictated a Board of Immigration Appeals decision despite regulations requiring the Board to exercise its own judgment); *Montilla*, 926 F.2d at 167–69; *Singh v. DOJ*, 461 F.3d

18

290, 296 (2d Cir. 2006); *Morton*, 415 U.S. at 235–36; *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016). Plaintiffs say the same is true here, but that only restates the dispute. The threshold problem for Plaintiffs is that Exhibit B does not, on its face, direct officers to abandon the issue-or-refuse framework or the totality guidance on which Plaintiffs rely.

At bottom, Plaintiffs' *Accardi* theory rises or falls with their merits reading of Exhibits A and B. Because they have not shown that the Department disregarded a binding procedural command, their *Accardi* claim fails.

## G.  Plaintiffs Are Not Entitled to Vacatur or Other Relief.

Vacatur is the usual APA remedy, but the rule "is not absolute." *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014). In deciding whether remand without vacatur is appropriate, courts in this Circuit have applied the familiar two-part framework drawn from *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). *See N.Y. Legal Assistance Grp. v. Cardona*, 2025 WL 871371, at *2–3 (S.D.N.Y. Mar. 20, 2025). Under that test, courts consider "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–51.

Those considerations do not support wholesale vacatur here. Even assuming some defect, Plaintiffs have not shown that the alleged deficiency requires treating Exhibits A and B as a single indivisible unit that must be vacated wholesale. Exhibit B preserves ongoing consular processing: officers are to continue interviews, continue adjudicating cases, assess other grounds of eligibility and ineligibility, and previously issued visas remain valid for travel. Ex. B ¶¶ 4, 9. That structure undermines any claim that the January 14 materials operate as a self-contained rule whose invalidity necessarily compels vacatur.

19

Plaintiffs' authorities do not establish that vacatur is required here. *Bridgeport* involved agency action alleged to be unlawful in its entirety because the agency lacked authority to adopt it at all. *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890–91 (D.C. Cir. 2024). And *City of Port Isabel v. FERC* confirms that the remedy inquiry remains contextual, turning on the nature of the defect and the consequences of vacatur. 130 F.4th 1034, 1038 (D.C. Cir. 2025). *Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014), does not compel a different result. Plaintiffs invoke it for the proposition that deficient notice often favors vacatur, Pls.' Reply at 31, but that proposition does not resolve the remedy question here, where Exhibits A and B preserve ongoing adjudication and do not operate as a single self-contained rule.

Plaintiffs now say they seek only vacatur and declaratory relief on this motion, not § 705 relief, an injunction, or an order directing resumed approvals or issuances. *Id.* at 32–33. Even on that narrower framing, however, relief does not follow automatically. Vacatur and declaratory relief would not themselves entitle any plaintiff or family member to a visa, and any ultimate visa outcome would still depend on applicant-specific adjudication under the INA's ordinary framework. *See supra*, Section D.1.

### CONCLUSION

Plaintiffs' reply does not overcome the barriers to the relief that they seek against Exhibits A and B. For the foregoing reasons, the Court should deny Plaintiffs' motion for partial summary judgment and grant Defendants' cross-motion.

Dated:  April 24, 2026

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation
General Litigation and Appeals Section

MATTHEW SEAMON
Acting Assistant Director

Respectfully Submitted,

*/s/ Julian Kurz*
JULIAN KURZ
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 598-7283
julian.m.kurz@usdoj.gov

ANGEL FLEMING
Trial Attorney

21

**CERTIFICATE OF SERVICE**

I, Julian Kurz, hereby certify that on April 24, 2026, I filed the foregoing brief with the Court's electronic court filing system, which electronically served this brief on all counsel of record.

/s/ Julian Kurz
JULIAN KURZ
Trial Attorney
U.S. Department of Justice

**CERTIFICATE OF COMPLIANCE**

I, Julian Kurz, hereby certify that this brief complies with the 6,250-word limit. It contains 6,209 words.

/s/ Julian Kurz
JULIAN KURZ
Trial Attorney
U.S. Department of Justice