# Exhibit 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC. (CLINIC), et al.,<br>*Plaintiffs,*<br>v.<br>MARCO RUBIO in his official capacity as Secretary of State; and the UNITED STATES DEPARTMENT OF STATE,<br>*Defendants*. | Civil Action No. 1:26-cv-00858-JAV<br>**DECLARATION OF AMAHA KASSA** |

**DECLARATION OF AMAHA KASSA**

I declare under penalty of perjury that the following is true and correct:

1. My name is Amaha Kassa. I am a first-generation Ethiopian immigrant and the founder and Executive Director of African Communities Together ("ACT"). As Executive Director, I have knowledge of ACT's membership, including its members' circumstances, needs, and priorities. I respectfully submit this declaration in support of Plaintiffs' Emergency Motion to Enforce the Court's August 21, 2026 Order, and for status conference.

**Background on African Communities Together and Its Membership**

2. ACT is a non-profit organization of African immigrants fighting for civil rights, opportunity, and a better life for families and communities here in the United States. ACT was incorporated in New York, New York in 2013 and is a national membership-based organization headquartered in Harlem, New York City, New York.

3. ACT's mission is to empower African immigrants to integrate socially, advance economically, and engage civically. ACT accomplishes this mission by helping African immigrant families unite and stabilize, and by supporting economic opportunity for African

families and communities in the United States. ACT offers a variety of free services to its members, including immigration legal services that include assisting with adjustment of status applications, family-based petitions, affidavits of support, and consular processing, assistance with health insurance and public-school enrollment, support in applying for identification documents, job recruitment programs, leadership development, referrals for food and housing, and more. Reuniting families through family-based immigration and connecting them to needed forms of assistance is especially important for ACT's members and clients, who are typically low-income.

4. ACT has thousands of members nationwide comprising African immigrants and their families.

5. One of the ways members join ACT is by meeting with ACT intake staff and filling out an individual membership form, which is available on our website. During the intake process, ACT staff ask new members what services they need and give them the opportunity to provide information about their immigration status.

6. Staff recruit members from within the African immigrant community by sharing information about membership with those who come to ACT seeking services, as well as hosting targeted recruitment events, tabling at community events, and hosting informational webinars.

7. Membership in ACT is voluntary and free.

8. Members set ACT's priorities and shape its work in a variety of ways. Members attend monthly membership meetings at each chapter, during which they can provide feedback and recommendations about ACT's work and its campaigns. Members can also join committees that run ACT's advocacy campaigns. Members on committees have the opportunity to

participate in various training programs, including the legislative process, organizing, and media training.

9. ACT's membership is diverse and includes people around the U.S. who are nationals of or descendants of immigrants from myriad African nations, as well as their family members. ACT's membership has diverse citizenship and immigration statuses and includes members who are from or who have family members from Algeria, Cameroon, Egypt, Ethiopia, Ghana, Liberia, Morocco, Nigeria, Democratic Republic of Congo, Rwanda, Tunisia, and Uganda, all of which have been listed among the 75 countries in the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable.

10. ACT serves thousands of members across its chapters in in New York, Virginia, Maryland, Pennsylvania and the District of Columbia, and facilitates a national network of African leaders and African immigrant-serving organizations. ACT's members include Maryland, Virginia, Pennsylvania, Washington, D.C. and New York City residents applying for and/or planning to apply for adjustment of status via consular processing for family members, ACT provides legal services to assist members petitioning on behalf of their parents, spouses, siblings and children in their service area, which can include families from Algeria, Cameroon, Egypt, Ethiopia, Ghana, Liberia, Morocco, Nigeria, Democratic Republic of Congo, Rwanda, Tunisia, and Uganda, all of which have been listed among the 75 countries in the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable.

11. As part of its mission to empower African immigrants to integrate socially, advance economically, and engage civically, ACT serves African immigrants seeking legal assistance with immigration relief, including assisting with adjustment of status applications, family-based petitions, affidavits of support, and consular processing. ACT also assists with applications for

asylum, U-Visas and T-Visas, Temporary Protected Status, Employment Authorization Documents, and renewals for lawful permanent residence.

12. ACT also engages in national advocacy and community "Know Your Rights" education seeking to advance opportunities for permanent status for the more than two million African immigrants residing in the United States.

13. ACT serves members and clients who are adjusting or will seek to adjust status in the United States. ACT's clients include individuals who access Medicaid, Supplemental Nutrition Assistance Program ("SNAP") and other public benefit programs. ACT provides education to community members on public benefits programs, including on eligibility. The majority of ACT's members are low-income.

14. ACT provides immigration legal assistance by phone to members and clients from all over the country. These services consist mostly of legal information regarding immigration matters and referrals to nonprofit immigration legal service providers. Callers receive these services free of charge, regardless of which state they call from. ACT also provides immigration legal assistance to clients seeking immigration legal information or referral on behalf of family members in other states—often in immigration detention centers.

15. ACT also provides immigration information online, through video and audio recordings, infographics, "explainer" articles, and similar resources that are distributed through its website, email lists, ethnic media, social media channels, and—most frequently—are forwarded by community members to African immigrant associations and chats on WhatsApp. These files are accessed, viewed, downloaded, and shared thousands of times.

16. ACT understands that this Court's August 21, 2026 Order vacated and set aside the categorical 75-Country "Public Charge" Immigrant Visa Ban or "Pause", and that the Court has ordered the Department of State ("DOS") to lift the Ban or "Pause".

17. After learning of the Court's August 21, 2026 Order this past week, and prior to Defendants' response to the Court on August 28, 2026, ACT and its members and clients have received no direct communications or confirmation from DOS indicating whether the § 221(g) refusal or the prior immigrant "pause" has been "lifted" or that visa "refusal" letters for individual ACT members are no longer valid.

18. ACT also became aware of widespread media reports that just hours after the Court's order, DOS began canceling scheduled immigrant visa interviews en masse across the globe. *See* Edward Wong, *Trump Administration Aims to Revoke Visas of Foreign Citizens Applying for Asylum,* N.Y. Times (Aug. 24, 2026), https://www.nytimes.com/2026/08/24/us/politics/trump-mass-visa-revocation-asylum.html. The New York Times has reported that the cancellations were tied to additional training, stating that interviews would be postponed "until consular officers complete training sessions . . . on what the [D]epartment calls a public charge rule, in which consular officers are supposed to deny immigrant visas to applicants who might rely on public assistance when they are in the United States." *Id.*; *see also id.* ("When asked about the pause or postponement of visa interviews worldwide, the State Department issued a statement through an official[:] . . . 'To accommodate this in-depth training, appointments for visa services will be adjusted.'"). But DOS's public charge cable, also challenged in this lawsuit but not part of the summary judgment order, was issued nearly ten months ago, on November 6, 2025, ECF 1, ¶ 3, and has been operative during that entire period for all countries that were not subject to the 75-Country Visa Ban. Defendants

have not explained why a policy that has been operative for nearly ten months now requires the worldwide cancellation of scheduled interviews, what the new training will entail, or how long that interruption will last. The timing and scope of these actions—taken immediately after this Court vacated the Visa Ban—raise significant concerns for ACT that the government is not complying with this Court's Order and taking actions to circumvent that order under the guise of a pretextual explanation. *See also* Kanishka Singh, *Trump administration issues pause on immigrant visa appointments for applicants worldwide,* Reuters (Aug. 25, 2026, 8:21 P.M.), https://www.reuters.com/legal/government/trump-administration-issues-pause-visaappointments-applicants-worldwide-2026-08-26.

19. ACT's legal team and other staff have already received questions on the significance of the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, and the continued delay and uncertainty surrounding public media reports of a global "pause" and DOS training on "public charge," and their effect on pending immigrant visa applications. ACT legal staff will need to train further in response to DOS's latest actions to prepare for immigrant visa interviews at affected consulates, particularly with the State Department's new Consular Processing Cable's focus on the public charge ground of inadmissibility.

20. DOS's Blanket Visa Ban, Blanket Visa Ban Cable, and the continued delay and uncertainty surrounding public media reports of a global "pause" and DOS training on "public charge," and their effect on pending immigrant visa application burden ACT's provision of these services to clients and harm members across the country, including members who are New York City residents applying for and/or planning to apply for adjustment of status via consular processing for family members including parents, spouses, and children in Ghana, Algeria,

Cameroon, Egypt, Ethiopia, Liberia, Morocco, Nigeria, Democratic Republic of Congo, Rwanda, Tunisia, and Uganda.

21. The "public charge" ground of inadmissibility was the alleged basis for DOS's indefinite "pause" or suspension of individualized immigrant visa adjudication and approvals for nationals from 75 countries as well as the continued reported "global" pause for "public charge" training following the Court's August 21, 2026 Order. This is a critical issue for ACT and our members because of our focus on low-income, African immigrants and the strikingly disproportionate impact of the Ban and continued delay and uncertainty regarding a global "pause" for "public charge" training on U.S. Citizens, Legal Permanent Residents, and their family members from the 26 African countries listed in the Blanket Visa Ban.[1] The Ban particularly targets those seeking immigrant visas through family-based petitions, who are primarily nonwhite, or through the diversity visa, who are majority African.[2] ACT is also critically concerned about the adverse impact on African immigrants from all countries on the continent causedby an extended reported global "pause" due to "public charge" training.

---

[11] *See* David J. Bier, New Ban Bars Half of Legal Immigrants, Even Citizens' Spouses & Kids | Cato at Liberty Blog (January 14, 2026), https://www.cato.org/blog/new-ban-hits-half-legal-immigrants-even-citizens-spouses-kids; N. Kirkpatrick & Nick Mourtoupalas, Immigration visas for people from these 75 countries are paused, Washington Post (January 21, 2026), https://www.washingtonpost.com/immigration/2026/01/21/immigration-visas-75-countries-paused/ ("The countries affected span every region of the globe with countries in Africa, the Caribbean and the Middle East impacted the most.").

[2] *See* Adam Mahoney, *Ghana Helped U.S. Deport Migrants, and Now Its Own Citizens Are Shut Out*, Yahoo! News (Jan. 17, 2026), https://tinyurl.com/mdkby6vv (stating that "African nations make up a striking share of the 75 countries swept into the Trump administration's new freeze on immigrant visas," and "Last year, deportations of people from African countries roughly tripled compared with the annual average during the Biden administration, according to a Capital B analysis of government data provided by the U.S. Immigration and Customs Enforcement. Likewise, the immigration-related arrests of African-born migrants have more than doubled, despite less than 40% of those arrested having a criminal record"); *see generally* Malise Omoloye, *US Visa Pause Hits African Countries Hard*, Face2FaceAfrica.com (Jan. 14, 2026), https://face2faceafrica.com/article/us-visa-pause-hits-african-countries;; Martina Schwikowski, *Donald Trump's Latest Visa Ban Hits African Countries Hard*, Deutsche Welle (Jan. 22, 2026), https://www.dw.com/en/donald-trumps-latest-visa-ban-hits-african-countries-hard/a-75590864.

22. Prior to its filing on Friday, August 28, 2026, in response to Plaintiffs' Emergency Motion to Enforce the Court's Order and Judgment, DOS had not provided ACT members or clients any definitive timeline as to when the DOS Blanket Visa Ban or any extended global "pause" for "public charge" training will end. The absence of a defined end date prevents our members, particularly those who have Diversity Visas or family members with Diversity Visas that may be expiring soon, and our organization from planning or taking steps to mitigate these harms which will continue to accrue the longer the Ban and continued delay and uncertainty due to a global "pause" for unexplained "public charge" training remains in effect. This means spending more time monitoring case progress, responding to ongoing client concerns, and providing guidance without clear timelines. It has increased administrative workload, making it harder to advise clients and plan next steps. Overall, service delivery has become more time-intensive, less predictable and more resource demanding.

**<u>The DOS Blanket Visa Ban Causes Significant Harm to ACT Members</u>**

23. The suspension of the adjudication of immigrant visas has already harmed ACT's members directly.

24. ACT sues on behalf of its members. At least one identified ACT Member, Plaintiff Agnes Kyeremaa, her children and grandchildren are currently subject to the challenged policy and have already suffered and continue to suffer harm. The interests ACT seeks to protect—individualized, lawful visa adjudication and family unity under the INA—are germane to ACT's mission. The claims and requested equitable relief do not require individualized proof or participation by members.

25. Plaintiff Agnes Kyeremaa, a U.S. Citizen and member of African Communities Together ("ACT"), who lives in Harlem, New York, is petitioning on behalf of her four adult sons

and daughters and three derivative grandchildren who are nationals of and who reside in Ghana. All four of her adult sons and daughters' visa petitions were approved and visa fees paid, and they had their consular interviews on January 22, 2026, when they each received notices under 8 U.S.C. § 1201(g) advising them that their visas were refused because Ghana is one of 75 countries subject to the DOS Blanket Visa Ban and DOS Blanket Visa Ban Cable.

26. As the Court found, Ms. Kyeremaa suffered harm because the DOS Blanket Visa Ban categorically discriminated against her as a U.S. Citizen petitioning on behalf of her four children and three derivative grandchildren, and mandate the refusal of their joint visa applications on the prohibited basis of nationality, because they are from Ghana, one of the 75 nations listed in the Ban, without lawful justification. This harm continues.

27. Ms. Kyeremaa and her children already invested substantial time and expense to comply with all required steps for immigrant-visa issuance—including USCIS adjudication, National Visa Center processing, medical examinations and preparing for scheduled in-person visa interviews—only for them to be refused and her family separated from her in the United States at the final stage with no endpoint, timetable, or criteria for resolution.

28. Ms. Kyeremaa began the Form I-130 petitioning process for her four adult sons and daughters and her derivative grandchildren in June 2016, almost a decade ago, and has been anxiously waiting to be reunited with her children and grandchildren once they immigrate to New York to be with her. She petitioned for her four children and three grandchildren with the understanding that their nationality would not be the basis for a refusal of her children or grandchildren's visa applications. Instead, they all received an INA § 221(g) (8 U.S.C. § 1201(g)) refusal notice that expressly tied DOS refusal of their visa applications to the DOS Blanket Visa Ban and Blanket Visa Ban Cable. Their cases remain stuck in administrative processing with no

timetable and no individualized recourse. The last-minute unexpected refusal and denial after a decade of waiting, and on the discriminatory basis of race, ethnicity and national origin simply because they come from Ghana has been extremely upsetting and acutely distressing for her, and for her affected children and grandchildren.

29. Ms. Kyeremaa is now 81 years old, and her U.S. citizen husband (the father of her children) is now 89 years old. The need for her children and grandchildren's physical presence in New York has taken on added urgency after her husband suffered a stroke on January 27, 2026. Ms. Kyeremaa also has four additional adult sons and daughters for whom she filed Form I-130 petitions, but those cases are not yet ready for consular interviews. As she stated in her March 6, 2026 declaration she is anxious about them being able to complete the consular process and join her in New York and suffers nightmares, insomnia, and loss of appetite wondering if the DOS Consular Processing Cable will also lead to refusal of their application if the Ban is ever lifted.

30. Ms. Kyeremaa and her children have already invested significant time and resources in this process and have followed all steps of the legal process, but despite all of their efforts her children's visas still have not been issued or processed in accordance with the law. It has been more than eight months since they completed their interviews.

31. Ms. Kyeremaa and her children should be able to reasonably assume that once they completed their interviews and all other aspects of the process, DOS would move forward with processing their visas.

32. Because of the Defendants' failure to resume processing visa applications and the continued uncertainty, she does not know if her children and grandchildren will ever be reunited with her in the United States.

33. Ms. Kyeremaa and her family members are harmed by the continued delay and uncertainty about whether the Secretary of State and DOS is complying with the Court's Order and Judgment because it is unnecessary, unfair, discriminatory, and cruel, not only for Ms. Kyeremaa and her children, but for everyone who is denied the opportunity to go through the normal legal immigration visa process.

34. The ongoing uncertainty and delay regarding DOS's Blanket Visa Ban, Blanket Visa Cable and whether DOS is complying with the Courts' Aug. 21, 2026 Order and Judgment burden ACT's provision of consular processing services to clients and harm members across the country, including members who are New York City residents applying for and/or planning to apply for adjustment of status via consular processing for family members including parents, spouses and children in Ghana, Algeria, Cameroon, Egypt, Ethiopia, Liberia, Morocco, Nigeria, Democratic Republic of Congo, Rwanda, Tunisia, and Uganda, as well as ACT members applying for family members or Diversity Visas from any African nation in light of the recent public media reports of a "global" pause for "public charge" training.

35. Although we seek to provide service to our members pro bono, members may incur significant expenses to secure birth certificates, other required documentation and may also need to purchase tickets for travel to their relatives' country of residence for consular interviews and complete their application. They suffer harm when they overcome all grounds of statutory inadmissibility, only to be categorically refused because their family member lives in or was born in a country listed in the DOS Blanket Visa Ban, or because they are subject to the related unexplained global "pause" or adverse treatment due to media reports of DOS "public charge" training. This will also harm members who would have benefited from their family members who may have been awaiting job opportunities upon approval of their immigrant visa to join them in

the United States that could help their family make economic ends meet and contribute to economic growth and development for their family, community, and the broader U.S. economy.

36. Plaintiff Kyeremaa and ACT, on behalf of its members, challenge final, Department-level policies and agency actions promulgated by Defendants, including the DOS Blanket Visa Ban, DOS Blanket Visa Ban Cable, the Consular Processing Cable, recent public media reports of a global "pause" for "public charge" training, and any Implementing Actions by DOS that govern immigrant visa adjudications across posts worldwide. Plaintiffs do not seek review of any consular officer's issuance or refusal of any particular visa. Rather, Plaintiffs bring a facial challenge under the Administrative Procedure Act ("APA") to final agency rules and directives that are unlawful both on their face and as applied to Plaintiffs and their members and clients. *See* 5 U.S.C. §§ 702, 704, 706.

**The DOS Blanket Visa Ban Causes Significant Harm to ACT**

37. Defendants' promulgation of these Consular Rules and related Implementing Actions without notice and comment deprived ACT members of the opportunity to provide comments detailing the extensive harms created by these Consular Rules.

38. Defendants' actions substantially impede ACT's core mission, have already directly harmed ACT, and threaten ongoing and future harm to ACT. In the last week alone, since the Court's August 21, 2026 Order vacating and setting aside the DOS Blanket Visa Ban, ACT has experienced an increased volume of questions from members about the DOS Blanket Visa Ban, accompanying Cable and whether DOS is complying with the Court's Order given the the publicly reported global "pause" for "public charge" training that was announced in its wake. ACT has had no choice but to apply its resources to address the situation precipitated by the DOS Blanket Visa Ban, accompanying Cable and related Implementing Actions along with the

delay and uncertainty they have caused, to the detriment of its prior work addressing other substantive immigration law matters for its members. This impairs ACT's ability to engage in activities that are necessary to achieve its mission, which include helping immigrant families unite and stabilize and connecting them to government services and benefits for which they are eligible as an additional means of support. The DOS Blanket Visa Ban, its accompanying Cable and Implementing Actions together also affect ACT's ability to link clients with the benefits and services they need due to clients' warranted fear that receiving such benefits today will be held against them in the future when they pursue their goals of seeking LPR status through consular processing or when they help a family member or loved one to do so by serving as a petitioner or a sponsor.

39. The Blanket Visa Van, Blanket Visa Ban Cable and continued delay and uncertainty around global suspension of the adjudication of immigrant visas impairs ACT's core organizational activities and mission because it causes the unnecessary separation of African families and impairs their access to social integration, job opportunities, economic integration and access to services in the United States.

Dated: August 29, 2026

AMAHA KASSA, Executive Director

African Communities Together