UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC. (CLINIC), AFRICAN COMMUNITIES TOGETHER (ACT), WAEL ALI, TIMOLYN EBONY CARNEJA HOLT, AGNES KYEREMAA, WEBAZA NICHOLAS, HANAN RAMI, JOSHUA WHITNEY, ANGELA DURO, SABAH KALSOOM JAVAID, SALMAN HOSSAIN KHAN, YESSICA LINARES, MARU MAHMUD HASSEN, MUNTHAZ MAHMUD HASSEN, ALESSANDRA MARQUES LIMA, ADRIAN MITCHELL, CHRISTINA MULLIGAN, PATRICIA RICHARDSON, LINA MARGARITA ANGULO PEÑARANDA, FERNANDO LIZCANO LOSADA and ANDRES ALFONSO MEDINA RAMIREZ, Plaintiffs, | Civil Action No. 1:26-cv-00858-JAV |
| -against- | FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR VACATUR, DECLARATORY, AND INJUNCTIVE RELIEF |
| MARCO RUBIO, in his official capacity as Secretary of State, and the UNITED STATES DEPARTMENT OF STATE, Defendants. | |

Plaintiffs Catholic Legal Immigration Network, Inc. (“CLINIC”), African Communities Together (“ACT”), Wael Ali, Timolyn Ebony Carneja Holt, Agnes Kyeremaa, Webaza Nicholas, Hanan Rami, Joshua Whitney, Angela Duro, Sabah Kalsoom Javaid, Salman Hossain Khan, Yessica Linares, Maru Mahmud Hassen, Munthaz Mahmud Hassen, Alessandra Marques Lima, Adrian Mitchell, Christina Mulligan, Patricia Richardson, Lina Margarita Angulo Peñaranda,

Fernando Lizcano Losada, and Andres Alfonso Medina Ramirez,[1] for their First Amended and Supplemental Complaint against Defendants Marco Rubio, in his official capacity as Secretary of State, and the United States Department of State, allege as follows:

**INTRODUCTION**

1. For centuries, the United States has welcomed immigrants seeking opportunity, family unity, and a chance to contribute to their communities. Congress gave effect to these principles in the Immigration and Nationality Act ("INA"), sharply circumscribing when the government may exclude intending immigrants. The "public charge" ground of inadmissibility is one such limited exception—but it has never been a sweeping bar. As Congress and the courts have long recognized, "public charge" refers only to an individualized determination that a noncitizen is likely to become primarily and permanently dependent on the government for subsistence, as demonstrated by reliance on cash assistance or long-term institutional care at public expense. The law has never deemed a person inadmissible merely because they have received, or may one day need, non-cash public benefits or private charitable assistance; indeed, such temporary support has always been understood as part of the lawful process of integration and economic growth. But the Department of State ("DOS") has attempted to rewrite Congress's carefully crafted provisions governing public charge and visa issuance.

2. First, on January 21, 2026, DOS imposed a *categorical* nationality-based ban on legal immigration for nationals of 75 countries—nearly half of all visa applicants—based on an

[1] Plaintiffs Cesar Andred Aguirre, Mayra Alejandra Alcendra Moscote, and Juan David Buitrago Cagua have withdrawn from this action as of the filing of the Amended Complaint. Wael Ali, Timolyn Ebony Carneja Holt, Webaza Nicholas, Hanan Rami, Joshua Whitney, Angela Duro, Sabah Kalsoom Javaid, Salman Hossain Khan, Yessica Linares, Alessandra Marques Lima, and Christina Mulligan have joined as Plaintiffs.

unsupported and demonstrably false claim that nationals of the covered countries migrate to the United States to rely on cash welfare and are likely to become "public charges." *See* Ex. A, U.S. Dep't of State, *Immigrant Visa Processing Updates for Nationalities at High Risk of Public Benefits Usage* (Jan. 14, 2026) ("Blanket Visa Ban" or "Ban"); Exs. B & G, U.S. Dep't of State Visa Cable, *Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge*, 26 STATE 3740 (Jan. 14, 2026)("Visa Ban Cable").[2] In fact, the majority of applicants for immigrant visas are not eligible for cash welfare and remain ineligible for years. The Court correctly declared unlawful and vacated the Blanket Visa Ban and Visa Ban Cable on August 21, 2026. Ex. AA, ECF 83, 84.

3. Second, DOS has issued sweeping new discriminatory rules governing public-charge determinations that depart dramatically from decades of settled legal precedent and practice. DOS issued the first of these rules, the "Consular Processing Cable," on November 6, 2025. Exs. C and AB.[3] Like the Blanket Visa Ban, the Consular Processing Cable purports to implement the public charge ground of inadmissibility. But it does far more than restate existing standards. Instead, the Consular Processing Cable unlawfully attempts to authorize consular

---

[2] The 75 countries listed included Afghanistan, Albania, Algeria, Antigua and Barbuda, Armenia, Azerbaijan, Bahamas, Bangladesh, Barbados, Belarus, Belize, Bhutan, Bosnia and Herzegovina, Brazil, Cambodia, Cameroon, Cape Verde, Colombia, Congo, Cuba, Dominica, Egypt, Eritrea, Ethiopia, Fiji, Gambia, Georgia, Ghana, Grenada, Guatemala, Guinea, Haiti, Iran, Iraq, Ivory Coast, Jamaica, Jordan, Kazakhstan, Kosovo, Kuwait, Kyrgyzstan, Laos, Lebanon, Liberia, Libya, Moldova, Mongolia, Montenegro, Morocco, Myanmar, Nepal, Nicaragua, Nigeria, North Macedonia, Pakistan, Republic of the Congo, Russia, Rwanda, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Senegal, Sierra Leone, Somalia, South Sudan, Sudan, Syria, Tanzania, Thailand, Togo, Tunisia, Uganda, Uruguay, Uzbekistan and Yemen. Exs. A, B & G.

[3] Subsequent to the filing of the complaint, Defendants produced an official version of the Consular Processing Cable as part of the administrative record. Ex. AB, *also available* at ECF 63. Exhibits A through C, D and E were filed with the original Complaint on February 2, 2026 and Exhibits F through Z (ECF 0048-06 to 0048-25) were also produced as part of the case record on Partial Summary Judgment on March 11, 2026. These Exhibits are included and incorporated by reference into Plaintiffs' First Amended and Supplemental Complaint. There is no Exhibit X, as the original Exhibit lettering produced on Partial Summary Judgment proceeds directly from W to Y.

officers to consider a broad array of public benefits outside the longstanding definition of public charge, without any meaningful limit. It rewrites how officers evaluate affidavits of support. And it injects new, discriminatory considerations into the statutory five-factor analysis Congress prescribed, contrary to the language and intent of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 (1996) ("PRWORA"), the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) ("ACA") and the Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. No. 111-3, 123 Stat. 8 (2009) ("CHIPRA"), all of which reflect Congress's intent to extend certain public benefits to eligible and lawfully present immigrants and citizens in the United States. In so doing, DOS replaces the INA's narrow, individualized public charge inquiry with a generalized, overbroad, and exclusionary regime that Congress never authorized.

4. Building on the Consular Processing Cable, as described further below, after the Court's August 21, 2026 ruling declaring the Blanket Visa Ban unlawful and vacating it, Defendants issued multiple additional directives to consular officers ("Public Charge Directives")[4] including on September 1, 2026 (26 STATE 86164) and September 10, 2026 (26 STATE 88862), directing posts in all immigrant visa cases to complete a burdensome new public charge worksheet and undergo comprehensive training on new public-charge tools, encouraging unnecessary and inefficient re-interviews and document submissions from remanded applicants using these tools, and imposing an impermissibly high bar for inadmissibility determinations based on the Consular

[4] These include but are not limited to 26 STATE 80666 (Aug. 15, 2026) (Ex. AC); 26 STATE 86164 (Sept. 1, 2026) (Ex. AD); 26 STATE 88862 (Sept. 10, 2026) (Ex. AE at 3) (directing posts in all immigrant visa cases to complete a new public charge worksheet, comprehensive training on new public-charge tools, and encouraging re-interviews of remanded applicants); and 26 STATE 89798 (Sept. 14, 2026) (Ex. AF).

Processing Cable, along with significant and unprecedented new cost, time, and delay burdens on consular officers, applicants, and their legal representatives.

5. In tandem with new rules designed to fundamentally reshape the "public charge" ground of admissibility, DOS instituted another new policy after this Court's August 21, 2026 decision, on September 14, 2026 (26 STATE 89798) and September 21, 2026 (via an email "Message to Posts: Updated Guidance on IV and DV Pause Vacatur." Ex. AG, ECF 114-3. Defendants' "Review and Override Policy"[5] mandates expanded centralized supervisory and managerial review globally, constrains consular officer discretion, and overrides consular officer decisions after a consular officer has already determined the individual applicant is not inadmissible and not likely to become a public charge under 8 U.S.C. § 1182(a)(4)). The Review and Override Policy mandates managerial review of every case in which an applicant has overcome a public-charge refusal and imposes an additional layer of centralized review even after a consular officer has determined that an applicant is eligible and the visa has been print-authorized. This additional review, conducted through the Immigrant Visa Adjudication Review ("IVAR") process using a centralized electronic application, may prompt consular officers to reconsider favorable determinations, including whether to spoil a visa or, if already issued, revoke it.

6. The Public Charge Directives not only implement the Consular Processing Cable but go beyond its framework to invent a new, arbitrary, and dramatically harsher and unlawful visa-processing regime designed to needlessly impose significant new cost, time, review layers and delay

[5] This policy is described in 26 STATE 89798 (Sept. 14, 2026) (Ex. AF); *id.,* at ¶¶ 1–3 & 6–8; September 8, 2026 Armstrong Decl. (Ex. AH *also available at* ECF 96-1 ¶¶ 12-17); September 21, 2026 Armstrong Decl. (Ex. AI, *also available at* ECF 107-6 ¶¶ 8–9); October 5, 2026 Armstrong Decl. (Ex. AJ, *also available* at ECF 114-1, ¶¶ 4-7); *see also Medani v. Trump,* No. 26-cv-06332 (EJD) (Ex. AK, *also available* at ECF 126 at 3-4); September 21, 2026 "Message to Posts: Updated Guidance on IV and DV Pause Vacatur" (Ex. AG, *also available* at ECF 114-3).

burdens on consular officers, applicants, their legal representatives, and the public, while enabling broader public charge refusals under the guise of a totality-of-the-circumstances analysis.

7. The Review and Override Policy provides multiple mechanisms for visa refusals via a centralized, automatic supervisory review and screening system in conflict with statutory authority. It removes statutorily mandated discretion from consular officers and impermissibly overrides officer discretion in order to achieve visa refusals.

8. The combined result of the Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy is the deprivation of the discretionary case-by-case adjudication by consular officers mandated by Congress in favor of a centralized, automated and standardized regime intended to increase the likelihood of visa refusal significantly. CLINIC's clients, ACT's members, the individual named Plaintiffs, and all immigrant visa ("IV") applicants are subject to this framework. This includes IV applicants from the 75 countries previously subject to the Blanket Visa Ban, even though this framework did not apply when consular officers first reviewed these applicants under 8 U.S.C. § 1182(a)(4) for public charge and determined them otherwise admissible for visas. Now, they have been refused or are likely to be refused and placed right back into administrative processing due to Defendants' illegal cables, policies, and directives.

9. The Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy are designed to advance an unlawful conception of public charge to exclude as many otherwise admissible intending immigrants as possible. By issuing and implementing the Blanket Visa Ban, the Visa Ban Cable, the Consular Processing Cable, the Public Charge Directives, including a new public charge "worksheet", "questionnaire", checklist and new documentary requirements related to "public charge" that impose new legal obligations and new time, cost and delay burdens on applicants, their family members, sponsors and legal

representatives, and the Review and Override Policy (collectively referred to as the "Consular Rules"), DOS attempts to eviscerate decades of settled immigration law and practice with the stroke of a pen—stripping families of dignity, denying working people fair consideration, and supplanting Congress's carefully calibrated framework with its own unlawful regime.

10. On August 21, 2026, the Court issued an order granting partial summary judgment in Plaintiffs' favor on the ground that the Blanket Visa Ban and the Visa Ban Cable were contrary to law and in excess of Defendant Rubio's authority. The Court entered a judgment vacating the Blanket Visa Ban on August 24, 2026. ECF 83, 84. To the extent Defendants' Consular Processing Cable, Public Charge Directives, and Review and Override policy are designed in any way to evade the force of the Court's August 24, 2026 judgment or to pursue a global public-charge-related "pause" by another name, these actions are contrary to law and arbitrary and capricious for the same reasons as the Visa Ban. Plaintiffs' First Amended and Supplemental Complaint maintains the Counts that were the subjects of the Court's August 21, 2026 order and August 24, 2026 judgment,[6] updates the remaining Counts based on post-filing factual developments, and adds new Counts related to agency actions taken after the Court entered partial summary judgment in Plaintiffs' favor.

11. This case seeks to preserve what Congress intended: an individualized immigration system that honors the INA's statutory commitment to family unity and bars the Executive Branch

---

[6] To the extent Defendants continue to implement the Blanket Visa Ban and Visa Ban Cable (Exs. A & B) in whole or in part, or implement a similar policy as to additional nationalities, irrespective of the form that such implementation takes, Plaintiffs reserve all rights to challenge such action as violative of the Court's judgment and independently unlawful.

from rewriting immigration law by fiat or overriding statutorily-mandated individual officer discretion.

12. Defendants' radical rewriting of longstanding law, practice, and policy through the Consular Rules violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and the *Accardi* doctrine articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which requires government agencies to follow their own existing valid regulations and controlling guidance.

13. This case challenges final, Department-level policies and agency actions issued by Defendants—including the Consular Rules—that govern immigrant visa adjudications across posts worldwide. Plaintiffs do not seek the Court's review of any consular officer's issuance or refusal of any particular visa. Rather, Plaintiffs bring a challenge under the APA to final agency rules and directives that are unlawful on their face and as applied to Plaintiffs and their members and clients. *See* 5 U.S.C. §§ 702, 704, 706.

14. Plaintiffs are individuals facing exclusion from the United States; their petitioning United States citizen relatives; and nonprofit organizations that advise, assist, advocate for, and serve hundreds of thousands of low-income noncitizens and their families in New York City and nationwide. They bring this action under the INA and the APA and request the Court to enjoin and vacate the Consular Rules (the Blanket Visa Ban, Blanket Visa Cable, Consular Processing Cable, and related Public Charge Directives and Review and Override Policy), and additional actions taken since the Court entered partial summary judgment in Plaintiffs' favor, declare them unlawful and ultra vires, and to set them aside.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this case arises under the United States Constitution and federal statutes, including the APA, 5 U.S.C. § 551 et seq., and the INA, 8 U.S.C. § 1101 et seq. Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202. Injunctive relief is authorized by the Court's equitable powers and 5 U.S.C. §§ 705–706.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiffs Agnes Kyeremaa and Patricia Richardson reside in this district, Plaintiff ACT's principal place of business is in this district, and Plaintiffs ACT and CLINIC serve clients in this district.

## PARTIES

### A. Plaintiffs

17. Plaintiffs are Catholic Legal Immigration Network, Inc. ("CLINIC"), African Communities Together ("ACT"), Wael Ali, Timolyn Ebony Carneja Holt, Agnes Kyeremaa, Webaza Nicholas, Hanan Rami, Joshua Whitney, Angela Duro, Sabah Kalsoom Javaid, Salman Hossain Khan, Yessica Linares, Maru Mahmud Hassen, Munthaz Mahmud Hassen, Alessandra Marques Lima, Christina Mulligan, Adrian Mitchell, Patricia Richardson, Lina Margarita Angulo Peñaranda, Fernando Lizcano Losada and Andres Alfonso Medina Ramirez. Plaintiffs Wael Ali, Timolyn Ebony Carneja Holt, Agnes Kyeremaa, Webaza Nicholas, Hanan Rami, and Joshua Whitney are members of ACT.

18. Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a national nonprofit organization that provides training, resources, and support to a network of immigration law providers to support the provision of comprehensive immigration representation. CLINIC's network includes more than 415 affiliate Catholic and community-based immigration law

programs, supporting approximately 3,000 network employees in 49 states including New York, and the District of Columbia.

19. CLINIC currently employs a staff of seventy-seven (77). Twenty (20) staff members devote their time to substantive immigration law matters including family-based immigration as members of CLINIC's Training and Technical Assistance section. Approximately 70 percent of the budget of CLINIC's Training and Technical Assistance Team is allocated to address substantive immigration law matters including family-based immigration. CLINIC staff are located throughout the country with staff presence in states including California, Maryland, Virginia, Ohio, Florida, Texas, and New York. CLINIC now serves 32 affiliate organizations in New York, including 14 affiliates in New York City.

20. As a direct result of the Defendants' issuance and implementation of the Consular Rules, CLINIC already has had to divert its human and financial resources from previously scheduled legal trainings and technical support for immigrant visa applications. CLINIC has received and expects to continue receiving an overwhelming increase in daily requests for legal consultations and technical assistance on the significance of the State Department's actions in imposing the Consular Rules, and their effect on pending immigrant visa applications, to which CLINIC staff are required to respond. Currently, approximately 73 percent of CLINIC affiliates offer consular processing services. CLINIC has had to and must continue to develop new trainings, written guidance, and operational protocols specifically addressing how affiliates should counsel clients and prepare applications in light of the mandates imposed by the Consular Rules, including, but not limited to: (1) whether documentarily qualified (DQ'd) immigrant visa applicants may have prior public charge determinations automatically reversed through the Consular Electronic Application Center (CEAC), or face refusals and be placed back into administrative processing with

further delays after completing new, lengthy questionnaires, uploading new documents and attending repeated re-interviews; (2) whether the DOS and consular officers are complying with the INA and Foreign Affairs Manual (FAM); (3) whether visa decisions are increasingly driven by automated systems, centralized review of worksheets, checklists, secondary "IVAR" and/or "Visa Integrity Unit" review, or nationality-based restrictions rather than individual consular officer discretion; (4) whether factors such as receipt of any charity or public benefits from the previous 30 years for the U.S. citizen petitioner, family status, or nationality are being weighed heavily against applicants; and (5) whether these changes are causing new, increased documentation requirements, cost burdens, longer processing times or higher refusal rates for applicants, their family members, and legal representatives; and (6) whether these policy changes are returning a majority of applicants to indefinite administrative processing amid widespread global uncertainty in the application of the public charge ground.

21. The Consular Rules also threaten CLINIC with economic harm. CLINIC's affiliates operate on limited budgets and provide low-cost or free representation. The increased complexity, duration, and uncertainty of consular processing caused by the Consular Rules make representation more time-consuming and less sustainable. This frustrates the mission of CLINIC, which is focused on enabling affiliates to keep costs down and serving as many low-income immigrants as possible. If fewer low-income immigrants pursue immigrant visa applications due to the Consular Rules—as CLINIC reasonably anticipates—affiliates will experience reduced revenue, potential staff reductions, and pressure to cut costs. This, in turn, may lead some affiliates to cancel their memberships with CLINIC, directly harming CLINIC's financial stability and ability to carry out its mission.

22. Plaintiff African Communities Together ("ACT") is a national nonprofit membership organization of African immigrants fighting for civil rights, economic opportunity, and a better life for African immigrant families residing in the United States. ACT serves thousands of members across its chapters in New York, Virginia, Maryland, Pennsylvania, and the District of Columbia, and facilitates a national network of African leaders and African immigrant-serving organizations. ACT's members include Maryland, Virginia, Pennsylvania, Washington, DC, and New York residents applying for and/or planning to apply for adjustment of status via consular processing for family members. ACT provides legal services to assist members petitioning on behalf of their parents, spouses, siblings, and children in its service area, which can include families from Algeria, Cameroon, Cape Verde, Egypt, Ethiopia, Ghana, Liberia, Morocco, Nigeria, Democratic Republic of Congo, Rwanda, Tunisia, and Uganda, all of which are listed among the 75 countries in the Blanket Visa Ban and Visa Ban Cable and are subject to the Consular Rules.

23. As part of its work, ACT serves African immigrants seeking legal assistance with immigration relief, including assisting with adjustment of status applications, family-based petitions, affidavits of support, and consular processing. ACT also assists with applications for asylum, U-Visas and T-Visas, Temporary Protected Status, Employment Authorization Documents, and renewals of lawful permanent residence cards. ACT engages in national advocacy and community "Know Your Rights" education, seeking to advance opportunities for permanent status for the more than two million African immigrants residing in the United States. ACT serves members and clients who are adjusting or will seek to adjust status in the United States. ACT's clients include individuals who qualify for and legally receive Medicaid, Supplemental Nutrition Assistance Program ("SNAP"), and other public benefit programs. ACT provides education to

community members on available public benefits programs. The majority of ACT's members are low-income.

24. ACT provides legal assistance in person where it is located and by phone to members and clients from all over the country. These services consist mostly of legal information related to immigration matters and referrals to nonprofit immigration legal service providers. ACT provides these services free of charge, regardless of the caller's state of residence. ACT also provides legal assistance to clients seeking immigration legal information or referrals on behalf of family members in other states—sometimes in immigration detention centers.

25. ACT also provides immigration legal information online, through video and audio recordings, infographics, "explainer" articles, and similar resources that are distributed through its website, email lists, ethnic media, social media channels, and—most frequently—through forwarding by community members to African immigrant associations and chats on WhatsApp. These files are accessed, viewed, downloaded, and shared thousands of times. While it is not possible to track exactly which states this information is distributed to, ACT believes that they are disseminated throughout the United States.

26. As a direct consequence of the Consular Rules, ACT will need to conduct additional trainings and produce new resources regarding these rules. ACT's Legal Team has already received questions on the significance of the Consular Rules and their impact on pending immigrant visa applications. ACT's Legal Team will need to conduct further trainings in response to the Consular Rules to prepare for immigrant visa consular interviews, particularly regarding the Consular Rules' focus on the public charge ground of inadmissibility.

27. Organizational Plaintiff CLINIC and Associational Plaintiff ACT represent and support immigrants and U.S. family members affected by the Consular Rules and have standing in

their own right. They provide direct legal services, training, and technical assistance concerning family-based immigration and consular processing nationwide, including within this District.

28. ACT also sues on behalf of its members. At least six identified ACT members (Plaintiffs Wael Ali, Timolyn Ebony Carneja Holt, Agnes Kyeremaa, Webaza Nicholas, Hanan Rami, and Joshua Whitney) and their immediate family members are currently subject to the Consular Rules. The Consular Rules have injured them through arbitrary—and on information and belief, discriminatory—visa refusals that return them to indefinite and prolonged delays via administrative processing. These injuries would be redressed by the vacatur and injunctive relief that ACT seeks by this action. The interests ACT seeks to safeguard through this lawsuit—lawful visa adjudications and family unity—are germane to its mission as an organization of African immigrants fighting for civil rights, opportunity, and a better life for families here in the U.S. and worldwide, along with its objective of securing family unification, dignity, and economic opportunity for African families and communities in the United States. The claims and requested equitable relief do not require individualized proof or participation by members.

29. Plaintiff Wael Ali is a 48-year-old U.S. citizen who resides in Seattle, Washington, and is a member of ACT. His wife, Doaa Fathy Aly Elmazoul, age 46, and their 16-year-old daughter are Egyptian citizens who reside in Egypt. Their two sons, now 18 and 11 years old, were born in Egypt and reside with Mr. Ali in Seattle. They became U.S. citizens after immigrating in 2026. All four members of his family were interviewed and approved for visas together on January 20, 2026, by the consular officer who interviewed them that day. They were all asked to take the oath together on the eve of the effective date of the Blanket Visa Ban, and they received a congratulation letter acknowledging their approval after the interview that day. His sons' immigrant visas were issued that same day. Later that same day, Ms. Elmazoul received a call from "SLS",

the delivery company contracted with the U.S. Embassy in Cairo, to pick up their sons' passports, but when she asked about her own and her daughter's passports, SLS responded "we don't know." On January 21, Ms. Elmazoul went to Cairo to pick up the family's passports, and she asked SLS again where her and her daughters' passports were; SLS again replied, "we don't know." On January 25, 2026, Ms. Elmazoul received another call from SLS that her and daughters' passports were ready for pickup. She asked again, "With visa stamps inside?" and SLS replied, "we don't know, they are inside closed envelopes." On January 26, 2026, Mr. Ali went with Ms. Elmazoul and his daughter to pick up the passports. Their passports contained refusal notices under INA § 221(g) because Egypt was one of the 75 countries subject to the Blanket Visa Ban. After the Court declared the Blanket Visa Ban unlawful and vacated it, on September 30, 2026, the U.S. Embassy in Cairo instructed them to provide updated documents, including photos, medical exams, and a police certificate, only days before a secondary re-interview on October 4, 2026. They did so, but they were subjected to new burdensome questions about "public charge," health insurance and their finances at that interview, and those visas were again refused under INA § 212(a)(4) without explanation, despite the fact that they were previously told by the consular officer that their visas would have been approved, but for the Blanket Visa Ban. They are subject to the Consular Rules.

30. Timolyn Ebony Carneja Holt is a 32-year-old U.S. citizen who lives in Sanford, Florida. Ms. Holt has petitioned on behalf of her 33-year-old husband, Adam Afah Adam, who resides in and is a national of Ghana. Ms. Holt is an ACT member. They share a three-year-old daughter together, who was born a U.S. citizen in the United States, and who lives together with Ms. Holt and her nine-year-old U.S. citizen son, Mr. Adam's stepson. Because of consular backlogs and closures, his application was ultimately transferred from the U.S. Embassy in Accra, Ghana, to the U.S. Embassy in Johannesburg, South Africa, almost 3,000 miles from Accra. Mr. Adam

attended an immigrant-visa interview in Johannesburg on February 26, 2026, where he was told by the consular officer that his application looked good, they just needed updated prenatal records for Ms. Holt and a police report translation, but that he could not receive a visa due to the Blanket Visa Ban. At the interview he received a refusal under INA § 221(g) because Ghana was one of the countries covered by the Blanket Visa Ban. After the Ban was vacated on August 24, 2026, Ms. Holt repeatedly contacted the U.S. Embassy in Johannesburg and promptly updated their financial, medical, police report and employment evidence. Mr. Adam was called for a secondary re-interview on October 9, 2026, where he was required to answer additional burdensome questions about his education, certifications, finances, and public charge. The consular officer then told him that she had to refuse the visa on public-charge grounds, issued another refusal under both INA §§ 221(g) and 212(a)(4), and informed him that the case was placed again in administrative processing under INA § 221(g). Mr. Adam is subject to the Consular Rules.

31. Plaintiff Agnes Kyeremaa is an 81-year-old U.S. citizen who resides in the Bronx, New York. She has petitioned on behalf of four of her adult children. Three grandchildren are derivative beneficiaries of those petitions. Her four adult children, Francis Kumi, Richard Kumi, Anthony Amankwaa, and Janet Yeboaa are all nationals of and reside in Ghana. They had immigrant visa interviews at the consulate in Ghana on January 22, 2026. After the interviews, they received INA § 221(g) refusal notices pursuant to the Blanket Visa Ban despite the fact that they were told by the consular officer that their applications looked good and that their visas would have been approved, but for the Blanket Visa Ban. After the Ban was vacated, Francis, Richard, Anthony and Janet received notices to appear for a second re-interview. They attended the re-interviews on October 7, 2026 and provided updated documents including medical evaluations and financial information for their sponsors. They were told their visas were approved. On October 15, 2026,

their CEAC accounts were updated to inform them the visas had changed to "Issued." The next day their CEAC account status reverted back to "Administrative Processing" and on October 21, 2026 to "Ready" informing them that their cases were ready for a second re-interview. All four children were ultimately notified that they needed to attend a third re-interview. Richard has already completed his third re-interview and was again told that his visa was approved; however, his CEAC status was last updated on November 5, 2026, and indicates his visa was refused. On November 6, 2026, Richard was notified that he needed to attend a fourth re-interview at the Embassy to re-interview with his siblings on November 9, 2026. Ms. Kyeremaa has also filed I-130 petitions for her four other adult children, but they have not had a consular interview yet. Francis, Richard, Anthony, and Janet are subject to the Consular Rules.

32. Webaza Nicholas is a 33-year-old U.S. citizen who lives in Seattle, Washington and is a member of ACT. Mr. Nicholas has petitioned on behalf of his wife, Mutesi Miriam, who resides in and is a national of Uganda. Ms. Miriam attended an interview at the U.S. Embassy in Nairobi, Kenya on February 9, 2026. After the interview, the Embassy requested additional documents which the couple provided. On March 11, 2026, Ms. Miriam received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. After the Ban was vacated, Mr. Nicholas emailed the embassy multiple times but received no response. On November 3, 2026, Ms. Miriam received an email requesting that she attend a second re-interview at the U.S. Embassy in Nairobi on November 10, 2026. Ms. Miriam's CEAC account continues to show that her visa status is "Refused." Ms. Miriam is subject to the Consular Rules.

33. Plaintiff Hanan Rami is a 31-year-old U.S. citizen who lives in Newark, Delaware and is a member of ACT. Ms. Rami has petitioned on behalf of her 36-year-old husband, Youness Laasri, who currently resides in and is a national of Morocco. Ms. Rami and Mr. Laasri share a

newborn U.S. citizen child, born just nine weeks ago in Delaware. Mr. Laasri attended his immigrant visa interview at the U.S. Consulate in Casablanca, Morocco, on August 4, 2026. At the interview, he received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban, despite the fact that he was told by the consular officer that his application looked good and that his visa would have been approved, but for the Blanket Visa Ban. Since then, the couple has monitored the DOS Consular Electronic Application Center ("CEAC") website and contacted the U.S. Consulate, including to request expedited processing following the birth of their child on August 28, 2026, but have received no further instructions regarding a re-interview or visa processing. Since the Blanket Visa Ban was vacated, both Ms. Rami and Mr. Laasri have checked their case status every day in CEAC. They noticed what appeared to be automatic case status updates on September 30, 2026 and October 30, 2026, but the case status continues to read "Refused," without further explanation. The couple have received nothing other than generic emails in September and October acknowledging that the Blanket Visa Ban was no longer in effect and stating that interviews were being adjusted due to "global training initiatives," including a generic email sent on October 15, 2026, after multiple attempts by the couple to contact the consulate seeking expedited review that "[t]he circumstances described may support an exception to expedite review of this case", yet the general email instructed them to wait to hear back from the Consulate without further explanation, and they have heard nothing since. Mr. Laasri is subject to the Consular Rules.

34. Plaintiff Joshua Whitney is a 41-year-old U.S. citizen who resides in Charleston, South Carolina and is a member of ACT. He petitioned for his 27-year-old wife, Zineb Bate, who is a national of and resides in Morocco. At his wife's initial consular interview on January 22, 2026, Ms. Bate was told by the consular officer that her application looked good and that her visa would have been approved, but for the Blanket Visa Ban. At the interview, their immigrant visa application

was refused under INA § 221(g) pursuant to the Blanket Visa Ban. Since the Court vacated the Blanket Visa Ban, Mr. Whitney and Ms. Bate have repeatedly attempted to contact the U.S. Consulate in Morocco for updates on their case but have received no response. Since the Blanket Visa Ban was vacated, both Mr. Whitney and Ms. Bate have checked their case status every day in CEAC and noticed what appeared to be automatic updates on October 29, 2026, but the case status continues to read "Refused," without further explanation. The couple have made repeated inquiries into their case but have received nothing other than generic emails in September and October 2026 acknowledging that the Blanket Visa Ban was no longer in effect and stating that interviews are being adjusted due to "global training initiatives." The emails instructed them to wait to hear back from the Consulate without further explanation. Ms. Bate is subject to the Consular Rules.

35. Plaintiff Angela Duro is a 37-year-old U.S. citizen who lives in Middlesex, New Jersey. She has petitioned on behalf of her 44-year-old husband, Wilian Nelson Hernandez Morales, who is a national of Guatemala. They are the parents of 4-year-old and 6-year-old U.S. citizen sons, who live with Ms. Duro in their family home in New Jersey. Ms. Duro's 11-year-old U.S. citizen daughter of whom she has shared custody, and Mr. Hernandez Morales' 13-year-old U.S. citizen daughter also live in the family home with Ms. Duro. Mr. Hernandez Morales lived in New Jersey with his family until he traveled to Guatemala for his visa interview. After attending his visa interview on January 21, 2026, Mr. Hernandez Morales received a notice of refusal under INA § 221(g) pursuant to the Blanket Visa Ban despite the fact that he was told by the consular officer that his application looked good, that no further documentation was needed and that his visa would have been approved, but for the Blanket Visa Ban. The officer further advised him to look for the email when they would ask him to send in his passport for the visa. Since the Blanket Visa Ban was vacated, Ms. Duro has checked their case status every day in CEAC and noticed what

appeared to be automatic case status updates on September 2, October 7, 8, and 14, and November 2, 2026. The case status continues to read "Refused," without further explanation. The couple have made repeated inquiries into their case but have received nothing other than generic emails in September and October 2026 acknowledging that the Blanket Visa Ban was no longer in effect and that interviews are being adjusted due to "global training initiatives." The emails instructed them to wait to hear back from the Embassy without further explanation. Mr. Hernandez Morales is subject to the Consular Rules.

36. Plaintiff Sabah Kalsoom Javaid is a 30-year-old U.S. citizen who resides in Morrisville, North Carolina. Ms. Javaid has petitioned on behalf of her 30-year-old husband, Muhammad Ehsan Nissar Chaudhry[7], who currently resides in and is a national of Pakistan. He attended his immigrant visa interview at the U.S. Embassy in Islamabad, Pakistan, on August 3, 2026. At the interview, he received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban despite the fact that he was told by the consular officer that his application looked good, that no further documentation was needed and that his visa would have been approved, but for the Blanket Visa Ban. Since the Blanket Visa Ban was vacated, Ms. Javaid has continued to check their case status every day in CEAC and noticed what appeared to be automatic case status updates on September 30, but the case status continues to read "Refused," without further explanation. The couple has received no other updates regarding Mr. Chaudhry's visa, and they have received no communication from the U.S. Embassy in Islamabad. Mr. Chaudhry is subject to the Consular Rules.

[7] Mr. Chaudhry's full name is Muhammad Ehsan Nissar Chaudhry, however due to a character limit on official school forms in Pakistan, Mr. Chaudhry was required to abbreviate his last name using the first two letters "Ch". This abbreviated name was registered for use on school and government documents.

37. Plaintiff Salman Hossain Khan is a 27-year-old U.S. citizen who lives in Woodside, New York. He has petitioned on behalf of his 26-year-old wife, Tamanna Akter Tuli, who currently resides in and is a national of Bangladesh. Ms. Tuli attended her immigrant visa interview on August 17, 2026. Ms. Tuli was told at her visa interview by the consular officer that her application looked good and that her visa would have been approved, but for the Blanket Visa Ban. At the interview, she received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. After the Court vacated the Blanket Visa Ban, the couple received a generic email in September 2026 stating that the "pause" was no longer in effect and that they would be contacted but have received no further updates or instructions. Since the Blanket Visa Ban was vacated, Mr. Khan has continued to check their case status every day in CEAC and noticed what appeared to be automatic case status updates on October 22and November 2, 2026, but the case status continues to read "Refused," without further explanation. Ms. Tuli is subject to the Consular Rules.

38. Plaintiff Yessica Linares is a 25-year-old U.S. citizen who lives in Long Beach, California. Mrs. Linares filed an I-130 petition for her 27-year-old husband, Freddy Anibal Linares, who is a national of Guatemala and is currently residing there. They share two children together, both U.S. citizens, a 5-year-old son and a 5-month-old daughter, who live with Mrs. Linares. He attended his immigrant-visa interview on April 16, 2026, after which he received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. Mr. Linares was told at his visa interview by the consular officer that his application looked good and well-prepared, but the consular officer told him that unfortunately she was prohibited from issuing a visa due to the Blanket Visa Ban. Since the Blanket Visa Ban was vacated, both Mr. and Mrs. Linares have continued to check their case status every day in CEAC and noticed what appeared to be automatic case status updates on August 25, September 30, October 16, 22, and 27, 2026, but the case status continues to read "Refused,"

without further explanation. They have received very little communication from the U.S. Embassy in Guatemala despite submitting multiple inquiries about the status of their case, other than generic emails in September and October stating that the Blanket Visa Ban was no longer in effect and instructing them to wait to hear back from the Embassy, without further explanation. Mr. Linares is subject to the Consular Rules.

39. Plaintiff Maru Mahmud Hassen is a 40-year-old U.S. citizen who resides in Rochester, New York. He petitioned for his 35-year-old wife, Tigist Asmare Mekonnen, who is a citizen of and resides in Ethiopia. Ms. Mekonnen was prohibited from receiving a visa while the Blanket Visa Ban was in effect. After the Court declared the Ban unlawful and vacated it, Mr. Hassen has not received any notice from DOS other than generic updates in October that the Ban was no longer in effect and that interviews are being adjusted due to "global training initiatives." The emails instructed them to wait to hear back from the Embassy without further explanation. The consular interview for Ms. Mekonnen has not been scheduled. Mr. Hassen and his wife only learned they are "in the scheduling queue" through the October 5, 2026 Armstrong Declaration. *See* Ex. AJ, *also available* at ECF 114-1. Ms. Mekonnen is subject to the Consular Rules.

40. Plaintiff Munthaz Mahmud Hassen is a 42-year-old U.S. citizen who resides in Rochester, New York. He petitioned for his two minor children, ages 12 and 14, who are citizens of and reside in Ethiopia. His children were prohibited from receiving visas during the pendency of the Blanket Visa Ban. After the Court vacated the Blanket Visa Ban, Mr. Munthaz Hassen has not received any notice from DOS other than a generic update in September 2026 about the Ban or 'pause' no longer being in effect and in October 2026 that interviews are being adjusted due to "global training initiatives," instructing them to wait to hear back from the Embassy without further explanation. Mr. Munthaz Hassen only learned his children's cases are "in the scheduling queue"

through the Armstrong Declaration filed on October 5, 2026. *See* Ex. AJ, *also available* at ECF 114-1. Mr. Munthaz's children are subject to the Consular Rules.

41. Plaintiff Alessandra Marques Lima is a 36-year-old Brazilian national and accountant who resides in Lisbon, Portugal, with her four-year-old child. She owns an accounting business in Brazil and provides accounting services to clients in Portugal. Ms. Marques Lima filed an employment-based second preference ("EB-2") "exceptional ability" immigrant visa petition, requesting a national interest waiver, on December 19, 2023, seeking to establish a U.S. business developing software to improve tax compliance and prevent financial fraud. USCIS approved her petition on July 23, 2025, finding that her proposed endeavor in the United States would advance the national interest. As part of consular processing, she attended an immigrant-visa interview at the U.S. Embassy in Paris on February 4, 2026, where her application was refused under INA § 221(g) because of the Blanket Visa Ban. She was informed that the Ban was the only obstacle to visa issuance. After this Court vacated the Ban, the U.S. Embassy in Paris scheduled her for a telephonic secondary re-interview for October 15, 2026, and she uploaded her answers and supplemental documents in response to a burdensome "public charge" questionnaire addressing housing, employment, and health insurance beforehand. Although she was not instructed to submit her answers beforehand, Ms. Marques Lima proactively provided extensive financial records, tax documentation, evidence of continuing income, and information concerning health insurance coverage in the United States. The consular officer was aware of her supplemental financial documentation and responses but interrupted and refused to consider Ms. Marques Lima's responses to all questions posed, ending the telephone re-interview abruptly before Ms. Marques Lima could finish answering the questions. On October 16, 2026, she received written refusals under INA § 212(a)(4) for herself and her four-year-old daughter, neither of which identified any

specific financial deficiency or explained the public-charge determination. More than eight months after her initial refusal under the Blanket Visa Ban, Ms. Marques Lima and her daughter remain unable to immigrate, delaying her plans to establish a U.S. business. Ms. Marques Lima and her daughter are subject to the Consular Rules.

42. Plaintiff Christina Mulligan is a 45-year-old U.S. citizen who resides in Virginia Beach, Virginia. She petitioned on behalf of her 44-year-old husband, Ramon Reyes Guerrero, who is a national of and currently resides in Mexico. They share an 11-year-old U.S. citizen daughter, who lives with Ms. Mulligan and her mother. After approval of the I-130 petition and a subsequently approved I-212 waiver of inadmissibility, Mr. Reyes submitted updated documents requested by the U.S. Consulate in Ciudad Juárez and received a confirmation that all requisite documents had been received on August 11, 2026. On August 21, 2026, his CEAC was updated to indicate that his visa had been issued, but neither his visa nor his passport was returned. He saw no other updates on CEAC until October 7, 2026, when his status reverted to "Ready." The CEAC was updated again on October 26, 27 and November 3 and 4, but his status remained "Ready." On multiple occasions, Ms. Mulligan received a generic email from the DOS in response to her specific case inquiries asking for an explanation for the reversion through the online Immigrant Visa Navigator. The email informed her that they were launching a global training initiative that was causing appointments to be adjusted and that they would be contacted if further processing was required. Mr. Reyes is subject to the Consular Rules.

43. Plaintiff Adrian Mitchell is a 32-year-old U.S. citizen who resides in Palm Bay, Florida. He petitioned for his 71-year-old mother, Carol Marie Baugh, who is a Jamaican citizen who normally resides in Port St. Lucie, Florida, with her U.S. citizen husband. After a consular interview in Kingston, Jamaica on January 12, 2026, his mother's visa application was refused

pursuant to the Blanket Visa Ban, leaving her stranded in Jamaica, although the consular officer shared with her that her application looked good and her visa would have been approved, but for the Blanket Visa Ban. After the interview, she received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. After the Court vacated the Blanket Visa Ban, Ms. Baugh was required to answer a new burdensome "public charge" questionnaire about her finances, her health insurance, and "public charge" and called to re-interview on October 16, 2026. She was ultimately refused under INA § 212(a)(4) or "4a" without explanation, although she had already been deemed admissible at her earlier interview. Ms. Baugh is subject to the Consular Rules.

44. Plaintiff Patricia Richardson is a 69-year-old U.S. citizen who resides in the Bronx, New York. She petitioned for her 61-year-old sister, Andrea Anderson, who is a citizen of and resides in Jamaica. On March 17, 2026, Ms. Anderson attended a consular interview in Kingston, Jamaica. At that interview, the consular officer told Ms. Anderson that her application looked good and that her visa would have been approved, but for the Blanket Visa Ban. At the interview, Ms. Anderson received a refusal letter under INA § 221(g) because Jamaica was one of the 75 countries subject to the Blanket Visa Ban. After the Ban was vacated, Ms. Anderson was required to provide an updated medical exam, answer a new burdensome "public charge" questionnaire requiring answers and documentation regarding finances, health insurance and public benefits, and re-interview on October 22, 2026. At the second re-interview on October 22, 2026, her visa was refused, and she received a refusal worksheet which listed "Other: 4a," without further explanation. Ms. Anderson is subject to the Consular Rules.

45. Plaintiff Lina Margarita Angulo Peñaranda is a Colombian national and professional architect specializing in residential architecture and interior design. She submitted her EB-2 national interest waiver petition on November 1, 2023, and it was approved on January 10, 2025.

She then appeared for her immigrant visa interview at the U.S. Embassy in Bogotá, Colombia. After the interview, she received a refusal under INA § 221(g) based on the Blanket Visa Ban. After the Court vacated the Ban, Ms. Angulo Peñaranda was required to re-interview on October 2, 2026, at which she was required to provide updated documentation and answer detailed questions according to a burdensome new "public charge questionnaire," including about her financial circumstances. Consular officials also informed her that additional medical examinations would be required before her immigrant visa could be issued. On November 5, 2026, the Embassy informed Ms. Angulo Peñaranda that it would return her case to USCIS with a request to revoke her approved EB-2 national interest waiver petition. The Embassy provided no explanation for the requested revocation and advised that it could take several months for her case to reach USCIS.

46. Plaintiff Fernando Lizcano Losada is a Colombian physician-scientist specializing in endocrinology, diabetes, and metabolic disorders. USCIS approved his employment-based first preference ("EB-1A") extraordinary-ability petition on January 22, 2025. He attended his immigrant visa interview in Bogotá, Colombia, on January 22, 2026, and received an INA § 221(g) refusal based on the Blanket Visa Ban. Following the Ban's vacatur, he was required to re-interview on September 30, 2026, during which he was subjected to extensive new questioning about financial support and public-charge-related matters. His application was again refused under INA § 221(g), and no immigrant visa has been issued. Mr. Lizcano Losada is subject to the Consular Rules.

47. Plaintiff Andres Alfonso Medina Ramirez is a Colombian national and architect whose EB-2 national interest waiver petition was approved on April 16, 2025. His proposed endeavor involves developing weather-resistant and sustainable housing for disadvantaged communities in the United States. He attended his immigrant visa interview in Bogotá, Colombia, on January 22, 2026, and received an INA § 221(g) refusal based on the Blanket Visa Ban. At a

required re-interview on October 2, 2026, he received a visa-approval document but was informed that additional medical examinations and processing were required. His visa has not been issued, and he continues to await further instructions from the Embassy. Mr. Medina Ramirez is subject to the Consular Rules.

**B. Defendants**

48. Defendant Marco Rubio is the Secretary of State. He is responsible for overseeing the enforcement and implementation of the Consular Rules for all consular officers and DOS staff and is charged by statute with the administration and enforcement of immigration laws, including those related to the powers, duties, and functions of consular officers, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas. 8 U.S.C. § 1104(a). Defendant Rubio is sued in his official capacity.

49. Defendant Department of State ("DOS") is a cabinet department of the United States federal government. Among other things, DOS oversees consular processing for applications for immigrant visas for lawful permanent residence and nonimmigrant visas for limited durations.

## FACTUAL ALLEGATIONS

**A. The INA's Statutory Scheme and Public Charge Determinations.**

50. The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., establishes a comprehensive and controlling statutory scheme governing the admissibility of immigrants. Congress has consistently prioritized family unity, ensuring that U.S. citizens and lawful permanent residents ("LPRs") can reunite with close family members through the immigrant visa petition and consular processing system.

51. Family and employment-based applicants for LPR status, whether adjusting their status within the United States under the purview of the Department of Homeland Security ("DHS")

or undergoing consular processing abroad under the purview of DOS, must demonstrate that none of the grounds of inadmissibility set forth in section 212(a) of the INA apply. 8 U.S.C. § 1182(a)(1)–(10) (including, e.g., grounds related to health, unlawful presence, criminal convictions, national security, and others). One such ground, as explained further below, relates to whether the applicant is likely to become a public charge. The public charge ground of inadmissibility is set forth in 8 U.S.C. § 1182(a)(4), which provides that a noncitizen applicant who, "in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General[8] at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A).[9] Where any ground of inadmissibility is present and not waived, the application for admission or adjustment of status will be denied. If the applicant is found eligible and no ground for refusal applies, the consular officer issues an immigrant visa. The applicant generally becomes a lawful permanent resident upon admission to the United States, after which the physical green card is issued.

---

[8] Several INA functions formerly vested in the Attorney General have been transferred to the Secretary of the Department of Homeland Security, including general responsibility for administering and enforcing immigration and naturalization laws. *See* 8 U.S.C. § 1103(a)(1) (establishing that assignment of responsibility, "except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling"). Some residual statutory references to the Attorney General that pertain to those functions are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 251, 271(b), 542 note, 557; 8 U.S.C. § 1551 note; *see also Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019).

[9] A separate provision of the INA renders "deportable" noncitizens who, within five years after the date of entry, have "become a public charge from causes not affirmatively shown to have arisen since entry." 8 U.S.C. § 1227(a)(5). Regulations governing this provision would be promulgated by the Department of Justice and are not at issue here.

52. Some intending immigrants who are ineligible to adjust status in the United States must instead seek immigrant visas through consular processing, typically in their country of origin, subject to various statutory waiting periods. Certain applicants may obtain provisional unlawful-presence waivers on Form I-601A before departing. After receiving an I-601A waiver of inadmissibility, these intending immigrants must depart the U.S. to seek an immigrant visa through consular processing, typically in their country of origin, subject to various statutory waiting periods. At the consular interview, the DOS consular officer must evaluate all the possible bases for denying admission codified in 8 U.S.C. § 1182(a), including the public charge provision.

53. Congress has never authorized categorical bans, wealth tests, centralized re-reviews, consular officer overrides, automated refusals, or nationality-based presumptions regarding public charge risk. To the contrary, the public charge determination is inherently individualized and, in the context of petitions for immigrant visas sought abroad, is expressly delegated to consular officers: immigration officers at the consular post must evaluate the totality of the applicant's circumstances on a case-by-case basis, including the five factors listed in the INA that a consular officer must consider when making a determination regarding whether the applicant is likely to become a public charge: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. 8 U.S.C. § 1182(a)(4)(B)(i). The INA also permits a consular officer to "consider any affidavit of support" from a financial sponsor. 8 U.S.C. § 1182(a)(4)(B)(ii); *see also* 8 U.S.C. § 1183a (defining requirements for a sponsor's affidavit of support).

54. The INA also creates a narrow exception to the public charge ground of inadmissibility: if someone is denied solely because of the "public charge" ground under 8 U.S.C. § 1182(a)(4), a visa can still be issued if the person provides a financial bond approved by the government. 8 U.S.C. §§ 1183, 1201(g); 8 C.F.R. § 213.1(b).

55. The INA expressly prohibits categorical nationality or country-level discrimination in the issuance of immigrant visas, providing that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

56. The current DOS Foreign Affairs Manual ("FAM"), at 9 FAM 302.8-2 ("PUBLIC CHARGE - INA 212(A)(4)," last updated on Sept. 25, 2024), provides guidance to consular officers on how to apply the public charge ground of inadmissibility when reviewing applications for lawful permanent residence and defines "public charge" to mean primary dependence on the U.S. government for subsistence by receipt of cash assistance for income maintenance or institutionalization for long-term care at U.S. government expense. The FAM, at 9 FAM 302.8-2(B)(1)(a)(1) –(2), instructs consular officers that:

> (1) When determining ineligibility under INA 212(a)(4), the term 'public charge' means that an individual, after admission into the United States, is likely to become primarily dependent on the U.S. Government for subsistence. This means either: (a) Receipt of public cash assistance for income maintenance (see paragraph b below); or (b) Institutionalization for long-term care at U.S. Government expense (see paragraph d below). Short-term confinement in a medical institution for rehabilitation does not constitute primary dependence on the U.S. Government for subsistence.
>
> (2) When considering the likelihood of an applicant becoming a 'public charge,' you look at the totality of the applicant's circumstances at the time of visa application. See 9 FAM 302.8-2(B)(3) below).

57. In determining ineligibility under 8 U.S.C. § 1182(a)(4), the FAM instructs consular officers that "many factors are relevant, including age, health, family status, assets, resources, financial status, education, and skills. No single factor, other than the lack of a qualifying affidavit of support, in accordance with [8 U.S.C. § 1183a], INA 213A, if required, will determine whether an individual is a public charge." 9 FAM 302.8-2(B)(1)(a)(3). The consular process is governed by a detailed statutory and regulatory scheme. While 8 U.S.C. § 1104(a) gives the Secretary of State supervisory responsibility over the administration of immigration laws, it expressly withholds

authority over the "powers, duties, and functions conferred upon the consular officers relating to the granting or refusals of visas."

58. When the applications are "properly completed and executed before a consular officer," that officer "must issue the visa" or "refuse the visa under INA 212(a) or 221(g) or other applicable law." 22 C.F.R. § 42.81(a).

59. A consular officer may only refuse an application for an immigrant visa if the officer, based on their own review of individual application or the applicant's documents, believes the person is legally ineligible under one of the specific grounds listed in the INA, such as the health-related grounds, certain criminal issues, or national-security concerns. 8 U.S.C. § 1201(g). Thus, "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6.

60. If not refused on an appropriate ground, the officer "must issue" the visa. *Id.* § 42.81. (a consular officer considering an application for an immigrant visa "must issue the visa" once the application is properly completed and executed unless it may be refused under the INA or other applicable law). The FAM reflects the same rule. It instructs consular officers that there are no exceptions to the requirement that a properly completed immigrant visa application must either be issued or refused, and that any refusal must rest on the officer's determination that the applicant is ineligible under the INA. 9 FAM 504.11-2(A)(a). The FAM also requires that any refusal be accompanied by, among other things: (1) the statutory basis for refusal, (2) the factual basis for refusal (other than in circumstances not relevant here), (3) any missing documents or other evidence required, (4) what procedural steps must be taken by the applicant or DOS, and (5) any relief available to overcome the refusal. 9 FAM 504.11-2(A)(1)(b).

61. In addition, the regulations establish procedures for supervisory and Department-level review of immigrant visa *refusals* in certain circumstances. *See* 22 C.F.R. § 42.81(c), (d). Although the FAM contemplates supervisory review of immigrant visa issuances, it recognizes that the regulations do not mandate such review and leaves to consular supervisors' discretion which issuances warrant review. *See* 9 FAM 504.11-3(A)(2)(a)(2). By contrast, the regulations expressly require supervisory review of *nonimmigrant* visa issuances. *See* 22 C.F.R. § 41.113(i); *see also* 9 FAM 403.12-4.

62. In certain situations—when additional evidence is presented or administrative processing is completed—an applicant can overcome the refusal of a visa application. 9 FAM 306.2-2(A); *see also* 22 C.F.R. § 42.81(e). For immigrant visas, the "applicant has one year from the date of refusal to produce additional evidence 'to overcome the ground of ineligibility on which the refusal was based.'" 9 FAM 306.2-2(A)(a)(1)(c)(i) (quoting 22 C.F.R. § 42.81(e)). When the applicant presents additional evidence to attempt to overcome a visa refusal, the consular officer reopens and re-adjudicates the application to determine whether the applicant is eligible for a visa. 9 FAM 306.2-2(A)(a)(1).

**B. DOS's and DHS's Prior Unsuccessful Efforts to Expand Public Charge Inadmissibility**

63. During the first Trump Administration, DOS and DHS each separately sought to expand the scope of public charge inadmissibility, and multiple courts, including the Second Circuit, held that these efforts were unlawful. These actions trace back to an April 2016 policy proposal from the Center for Immigration Studies ("CIS")."[10] CIS's origins reflect the views of its

---

[10] *See* Center for Immigration Studies, S. Poverty L. Ctr., https://www.splcenter.org/fighting-hate/extremistfiles/group/center-immigration-studies (last visited Nov. 5, 2026).

founder, a white supremacist who asserted that "that for European-American society and culture to persist, it requires a European-American majority and a clear one at that."[11] CIS advanced multiple proposals to restrict immigration by low-income individuals and asylum seekers from non European countries, including leveraging "the public charge doctrine to reduce the number of welfare-dependent foreigners living in the United States."[12]

64. On August 14, 2019, DHS published a final rule (the "DHS 2019 Rule")[13] purporting to redefine public charge to include the use of a broad range of public benefits (such as SNAP and Medicaid) directing DHS officers to determine that a prospective LPR was likely to become a public charge based upon past use of such benefits.

65. In lawsuits challenging the DHS 2019 Rule, each district court preliminarily enjoined the rule.[14] On appeal, the Second, Seventh, and Ninth Circuits agreed with the district courts that the DHS 2019 Rule likely departed from the settled meaning of "public charge" and was accordingly contrary to law and arbitrary and capricious.[15] Collectively, these decisions confirmed the settled meaning of "likely at any time to become a public charge": a prediction that a person is

---

[11] *See* Matt Schudel, *John Tanton, architect of anti-immigration and English-only efforts, dies at 85*, Wash. Post, July 21, 2019, https://www.washingtonpost.com/local/obituaries/john-tanton-architect-of-anti-immigration-andenglish-only-efforts-dies-at-85/2019/07/21/2301f728-aa3f-11e9-86dd-d7f0e60391e9_story.html.

[12] Ctr. for Immigr. Studies, *A Pen and A Phone* 8 (Apr. 6, 2016), https://cis.org/sites/cis.org/files/79actions_1.pdf.

[13] *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41292 (Aug. 14, 2019).

[14] *See City and Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019), *Washington v. DHS*, 408 F. Supp. 3d 1191 (E.D. Wash. 2019), *aff'd in relevant part*, 981 F.3d 742 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 1292 (2021); *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019), *aff'd as modified sub nom. New York v. DHS,* 969 F.3d 42 (2d Cir. 2020); *Cook Cnty. v. McAleenan*, 417 F. Supp. 3d 1008 (N.D. Ill. 2019), *aff'd as modified sub nom. Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020); *CASA de Md., Inc. v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019), *rev'd*, 971 F.3d 220 (4th Cir. 2020), *reh'g on banc granted*, 981 F.3d 311 (4th Cir. 2020).

[15] *New York,* 969 F.3d 42; *City and Cnty. of S.F.*, 981 F.3d 742; *Cook Cnty.*, 962 F.3d 208; *but see CASA de Md.*, 971 F.3d 220, *reh'g on banc granted and vacated*, 981 F.3d 311 (4th Cir. 2020).

likely to become primarily dependent on the government for subsistence, not merely receive supplemental, short term, or noncash benefits.[16]

66. While the Supreme Court stayed preliminary injunctions against the DHS 2019 Rule, the Government subsequently abandoned its defense of the rule, requested and obtained dismissal of its still-pending Supreme Court appeals (thereby allowing a lower court decision vacating the rule to take effect), and removed the rule from the Code of Federal Regulations.[17] In 2022, following notice and comment, DHS promulgated a new public charge rule ("DHS 2022 Rule").[18] The DHS 2022 Rule reversed the DHS 2019 Rule and brought DHS back into alignment with the longstanding meaning of "public charge."

67. DOS also attempted to expand public charge inadmissibility during the first Trump Administration, and these efforts were likewise enjoined. These efforts included (1) revisions to 9 FAM 302.8; (2) an Interim Final Rule ("DOS 2019 IFR"), *Visas: Ineligibility Based on Public Charge Grounds*, 84 Fed. Reg. 54996 (Oct. 11, 2019); and (3) a proclamation entitled *Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans*, Presidential Proclamation 9945, 84 Fed. Reg. 53991 (Oct. 4, 2019) ("Health Care Proclamation"), requiring immigrants to provide proof of qualifying health insurance within 30 days of entry.[19] On July 29, 2020, a district court

---

[16] *See City and Cnty. of S.F.*, 981 F.3d at 756–62; *Cook Cnty.,* 962 F.3d at 227–33; *New York*, 969 F.3d at 70–85; *see also* 64 Fed. Reg. at 28692–93 (1999 Immigration and Naturalization Service Field Guidance on public charge).
[17] *See 2019 Public Charge Rule Vacated and Removed; DHS Withdraws Proposed Rule Regarding the Affidavit of Support* (Mar. 11, 2021), https://www.dhs.gov/archive/news/2021/03/11/2019-public-charge-rule-vacated-and-removed-dhs-withdraws-proposed-rule-regarding..
[18] Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55472 (Sept. 9, 2022).
[19] *See generally* Compl., *Make the Road N.Y. v. Pompeo*, No. 19-cv-11633 (S.D.N.Y. Dec. 19, 2019), ECF No. 1.

issued a nationwide preliminary injunction barring DOS from enforcing the 2018 FAM revisions, the DOS 2019 IFR, and the Health Care Proclamation.[20]

68. DOS subsequently rescinded these actions. On March 25, 2021, it updated the FAM to restore the pre-2018 public charge standard: primary dependence on the government for subsistence, not mere receipt of supplemental, short term, or noncash benefits.[21] On May 14, 2021, President Biden issued Proclamation 10209, 86 Fed. Reg. 27015, revoking the Health Care Proclamation. DOS later confirmed that the DOS 2019 IFR remained enjoined and had never been implemented, and on October 6, 2023, it formally restored the regulation governing public charge visa inadmissibility to the version in effect before October 11, 2019, realigning DOS policy with DHS's framework at that time.[22]

**B. The Consular Processing Cable**

69. The Consular Processing Cable challenged in this case was issued to all consular officers worldwide on November 6, 2025. *See* Ex. AB. While the Consular Processing Cable states that officers should follow the statutory and regulatory definition of public charge and apply the public charge grounds consistent with the current FAM, 9 FAM 302.8-2, it radically transforms the public charge evaluation by adding new, substantive elements.

---

[20] *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020).

[21] *See* CLINIC, *State Department Restores Pre-2018 Public Charge Guidance* (Apr. 8, 2021) https://www.cliniclegal.org/resources/ground-inadmissibility-and-deportability/public-charge/state-department-restores-pre-2018; 9 FAM § 302.8-2.

[22] *See* Visas: Ineligibility Based on Public Charge, 88 Fed. Reg. 60574 (Sept. 5, 2023); Nat'l Immigr. L. Ctr., *Case Overview: Make the Road New York v. Pompeo*, https://www.nilc.org/litigation/make-the-road-new-york-v-pompeo/ (last updated Aug. 24, 2024).

70. First, the Consular Processing Cable mandates that consular officers consider not only a visa applicant's current or past use of cash assistance and long-term institutional care at government expense, but also whether the applicant has received:

> *any other form of public assistance, social welfare, or private charity*, whether in the United States or elsewhere, intended to help low-income people. This includes but is not limited to housing assistance, food assistance (including the use of private food banks), and medical assistance.
>
> Ex. AB at 10, ¶ 29 (emphasis added).

71. DOS concedes that the use of such benefits is not part of the definition of public charge:

> Although the current regulatory definition of public charge does not include these, use of them indicates that an applicant is or has been unable to provide for himself fully and could become a public charge in the future.
>
> *Id.*

72. Second, the Consular Processing Cable authorizes officers to go behind the face of the Form I-864 Affidavit of Support and assess the credibility of the sponsor, including "whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance." Ex. AB at 12, ¶¶ 35–36. This mandate here in the Consular Processing Cable conflicts directly with 9 FAM 601.14-10 and 9 FAM 601.14-13(f); the latter requires only an evaluation of the 1-864 and supporting evidence of the sponsor and joint-sponsors' income and assets sufficient to overcome federal poverty guidelines and explicitly states:

> (i) **(U)** We and USCIS have determined that, as a matter of policy, the sponsor is not required to disclose their receipt of means-tested public benefits and not consider the fact that a sponsor has received such means-tested public benefits in the past in evaluating a Form I-864 or Form I-864EZ; and
> (ii) The sponsor may not include any means-tested public benefits currently being received in calculating the household income. *See* 9 FAM 601.14-10 above.
>
> 9 FAM 601.14-13(f).73.

73. Third, the Consular Processing Cable directs officers to consider a number of discriminatory factors under the guise of evaluating the statutorily mandated five factors, including hypothesizing about possible future effects of a visa applicant's and their family members' health conditions, (Ex. AB at 6–7, ¶¶ 15–18), and English-language proficiency (*id.* at 9, ¶¶ 24 ("For an applicant who intends to support himself and his dependents through employment, lack of the necessary English language proficiency could call into question his ability to become or remain self-sufficient within a reasonable time after entry into the United States . . . ."); *id.* ¶ 25). English-language proficiency is not listed in the FAM, nor is it listed among the five statutory factors a consular officer may consider.

74. On information and belief, Defendants issued the Consular Processing Cable to impose a new framework for all visa applicants subject to the public charge ground of inadmissibility that subjects them to heightened scrutiny and is a weighted against admission.

75. Although the Consular Processing Cable was never formally published or otherwise released to the public prior to its publication in the administrative record in this case, and was not issued subject to notice-and-comment rulemaking, it is a final agency action that took effect the day it was issued and establishes mandatory standards and procedures for consular officers. *See* Exs. C & AB. It has been implemented by consular officers worldwide and has adversely impacted the rights of nearly all immigrant visa applicants subject to 8 U.S.C. § 1182(a)(4).

**B. The Blanket Visa Ban**

76. On January 14, 2026, DOS announced a sweeping suspension of all immigrant visa issuance for nationals of 75 countries, effective January 21, 2026, on the stated ground that applicants from these countries pose a heightened risk of becoming "public charges." Exs. A & G.

77. The DOS announcement confirmed that: (i) the freeze was limited to immigrant visas; (ii) nonimmigrant (e.g., tourist/business) visas were not covered; (iii) applicants could still apply and attend interviews, and others may even have already been print-authorized for visas, but "no immigrant visas [would] be issued" to affected nationals during this indefinite "pause"; (iv) dual nationals applying with a passport from a non-listed country were exempt; and (v) no revocations of already issued immigrant visas were to occur. Ex G.

78. Contemporaneous coverage by national outlets confirmed DOS's characterizations of the suspension as necessary to prevent the immigration of those who might "extract wealth"[23] or "take welfare and public benefits"[24] from the United States. Further, this coverage reported that the Visa Ban Cable confirmed that DOS explicitly tied the suspension to assumptions about "public charge."[25]

79. The Visa Ban Cable (Ex. G) operationalized the freeze and immediately affected applicants from all 75 listed countries, mandating refusal of immigrant visas to those applicants, indefinitely restricting applicants' rights, and straightjacketing consular officers' execution of their statutory obligations. In multiple statements, DOS framed the final agency action policy as taken

---

[23] Miriam Khan, *US to Suspend Visa Processing for 75 Countries Starting Next Week*, ABC News (Jan. 14, 2026), https://abcnews.go.com/US/us-suspend-visa-processing-75-countries-starting-week/story?id=129210370 ("'The Trump administration is bringing an end to the abuse of America's immigration system by those who would extract wealth from the American people.'" (quoting State Department Principal Deputy Spokesman Tommy Pigott)).

[24] Matthew Lee, *US Will Suspend Immigrant Visa Processing from 75 Countries over Public Assistance Concerns*, Associated Press (Jan. 14, 2026), https://apnews.com/article/trump-immigration-visas-79909bd01e9e1e3dedde144f865a1b9d ("'Immigrant visa processing from these 75 countries will be paused while the State Department reassess immigration processing procedures to prevent the entry of foreign nationals who would take welfare and public benefits.'" (quoting State Department statement)).

[25] *See* Simon Lewis & Humeyra Pamuk, *Trump Administration to Suspend Immigrant Visa Processing for 75 Nations*, Reuters (Jan. 15, 2026), https://www.reuters.com/world/us/us-suspend-visa-processing-75-nations-next-week-fox-news-reports-2026-01-14/.

"under existing immigration law,"[26], while it "reassesses" procedures.[27] It did not claim that it took the action pursuant to any presidential proclamation or any other independent suspension authority. *See* Ex. G.

80. The Blanket Visa Ban created an entirely new ground of inadmissibility not authorized by Congress. It immediately foreclosed visa issuance to tens of thousands of applicants for every type of immigrant visa, including those with pending interviews, otherwise approved petitions, and expiring statutory eligibility (including those selected for Diversity Visas).

81. DOS offered no factual findings, no data, and no explanation for why all nationals of these 75 countries categorically pose any unique risk and cited no statutory authority for a categorical ban based on national origin. Ex. G. DOS cited only INA § 212(a)(4) (codified at 8 U.S.C. § 1182(a)(4)) (the public charge ground of inadmissibility) and INA § 221(g) (codified at 8 U.S.C. § 1201(g)) (individual immigrant visa refusals), neither of which permits a categorical ban.

82. Although the Visa Ban Cable allowed applicants to submit evidence to rebut a public charge allegation under 8 U.S.C. § 1182(a)(4), it instructed officers to categorically refuse and deny the visa under 8 U.S.C. § 1201(g) based on applicants' nationality alone. Ex. G, ¶¶ 2–5 & 9. The Visa Ban Cable provided no exceptions, even where, after applying heightened scrutiny (Ex. G, ¶¶ 3–4 [appearing to incorporate the directives of the Consular Processing Cable]), the officer found that an applicant was not likely to become a public charge (Ex. G, ¶¶4–5), and even if an applicant had already been approved and "print-authorized" for a visa, (Ex. G, ¶ 9).

83. DOS's official website announcement and the Visa Ban Cable characterized the action as part of a broader review to ensure immigrants from "high risk countries" did not access

---

[26] Khan, *supra* note 23.
[27] Lee, *supra* note 24.

U.S. public benefits, but provided no evidentiary basis for the classification, no explanation of the methodology used, and no timeframe by which the Ban will expire. (Exs. A & G.)

84. News reports and analysts described the "pause" as a "freeze," "suspension," or a functional immigrant visa "ban," noting both its dramatic expansion beyond other "travel bans" and its alignment with the administration's simultaneous efforts (discussed below) to rescind DHS's 2022 Public Charge Rule.[28]

85. The Blanket Visa Ban departed from longstanding public charge definitions and standards under the INA and controlling regulations and the individualized inquiry mandated by statute. In past global disruptions (*e.g.*, COVID-19 related suspensions), DOS issued time-bound, criteria-based guidance, and articulated exceptions calibrated to operational realities. Here, DOS instead adopted an open-ended, categorical, nationality-wide embargo without any stated criteria or sunset. Exs. A & G.

86. Per the Visa Ban Cable, consular posts were required to continue accepting and interviewing applicants but could not issue immigrant visas during the pause and were instead required to refuse them under 8 U.S.C. § 1201(g). Ex. G, ¶ 2. As noted above, however, 8 U.S.C. § 1201(g) mandates that a consular officer may refuse a visa only if the officer, based on the individual application or the applicant's documents, believes the person is legally ineligible under one of the specific grounds listed in the INA, such as public charge, specific health-related grounds,

---

[28] *See* David J. Bier, *New Ban Bars Half of Legal Immigrants, Even Citizens' Spouses & Kids*, Cato Blog (Jan. 14, 2026), https://www.cato.org/blog/new-ban-hits-half-legal-immigrants-even-citizens-spouses-kids; Mariel Ferragamo, *A Guide to the Countries on Trump's Travel Ban List*, Council on Foreign Relations (Jan. 14, 2026), https://www.cfr.org/articles/guide-countries-trumps-travel-ban-list; Ctr. on Budget & Pol'y Priorities, *State Department Unjustifiably Invokes "Public Charge" to Freeze Immigrant Visa Processing for 75 Countries* (Jan. 21, 2026), https://www.cbpp.org/blog/state-department-unjustifiably-invokes-public-charge-to-freeze-immigrant-visa-processing-for.

certain criminal issues, or national security concerns. *See also* 22 C.F.R. §§ 40.6, 42.81, 40.201. The Blanket Visa Ban thus compelled consular officers to refuse a visa without a case-specific admissibility determination, stripping officers of their statutory discretion and converting INA § 221(g) into a categorical suspension mechanism the statute does not provide.

87. Neither 8 U.S.C. § 1201(g) nor 8 U.S.C. § 1182(a)(4) (nor their implementing regulations) authorizes the government to refuse visas for broad, categorical reasons—and certainly not based on nationality alone. Yet that is precisely what Defendants ordered consular officers to do (Ex. A; Ex. G, ¶ 2), in direct violation of the INA's prohibition that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). The Blanket Visa Ban unlawfully replaced that statutorily mandated individualized inquiry with a blanket, nationality-based embargo of indefinite duration.

88. The Blanket Visa Ban also contradicted Congress's deliberate decision to maintain the longstanding definition of public charge and to ensure that eligible immigrants and mixed-status families have access to critical noncash services.

89. On January 27, 2026, 75 Members of Congress sent a letter to Defendant Rubio and then-DHS Secretary Kristi Noem, condemning the Administration's "unilateral move to pause issuing all immigrant visas for 75 countries." *See* Jan. 27, 2026, Ltr. from Members of Congress to Secretary Rubio and Secretary Noem, attached hereto as Exhibit D. The Members noted that it was "stunning that such a drastic policy change impacting hundreds of thousands of people a year would be announced not only by tweet, but also without offering any meaningful information about the 'pause.'" Ex. D. They declared that "[t]his discriminatory policy will have a devastating impact on our constituents." *Id.*

90. The Consular Processing Cable and the Blanket Visa Ban are not the only efforts by the current Administration to distort and expand the longstanding statutory meaning of public charge and thereby exclude large numbers of intending immigrants. On July 20, 2026, DHS and the U.S. Citizenship and Immigration Services ("USCIS") published a radical new final rule, effective September 18, 2026, rescinding the DHS 2022 Rule, jettisoning the longstanding statutory meaning of public charge, and adopting new rules regarding public charge bonds.[29] The DHS 2026 Rule applies only to public charge determinations by DHS and does not purport to revise any standards or processes for applying the public charge ground of inadmissibility by the Department of State. 91 Fed. Reg. at 45330 n.17; *see also id.* at 45339 (referring to the Consular Processing Cable as an issue for DOS); *id.* at 45378 (stating that DHS 2026 Rule "has no effect on adjudications of nonimmigrant or immigrant visa applications by DOS consular officers"). It is nonetheless emblematic of the Administration's aggressive efforts to weaponize the public charge ground of inadmissibility.

91. States, municipalities, and nonprofits have challenged the DHS 2026 Rule, and their lawsuits are pending. *See, e.g., State of New York, et al. v. Dep't of Homeland Sec., et al.*, No. 1:26-cv-7978 (RA) (S.D.N.Y.); *City of New York, et al. v. Dep't of Homeland Sec., et al.*, No. 1:26-cv-7982 (RA) (S.D.N.Y.); and *Make the Road N.Y., et al. v. Dep't of Homeland Sec., et al.*, No. 1:26-cv-8129 (RA) (S.D.N.Y.).

### C. The Court Grants Partial Summary Judgment and Vacates the Blanket Visa Ban and Visa Ban Cable.

92. After Plaintiffs filed their complaint on February 3, 2026, the parties agreed to a schedule for briefing cross-motions for partial summary judgment on the Complaint's Counts One,

---

[29] Public Charge Ground of Inadmissibility, 91 Fed. Reg. 45324 (Jul. 20, 2026) ("DHS 2026 Rule").

Three, and Seven (to the extent it pertained to the Blanket Visa Ban and Visa Ban Cable). ECF 44. The parties further agreed to hold the remaining counts in abeyance pending the Court's decision on the cross-motions. *Id.* Plaintiffs filed their motion for partial summary judgment on March 10, 2026, and Defendants filed their cross-motion on March 26, 2026. *Id.*

93. On August 21, 2026, the Court issued an opinion and order holding that the Blanket Visa Ban and Visa Ban Cable (referred to in the opinion as the "Policy") were contrary to law and were issued in excess of Defendant Rubio's authority. ECF 83 at 2. The Court therefore vacated the Policy under the APA. ECF 84.

94. First, the Court held that the Policy's "categorical ban on the issuance of immigrant visas" to nationals of the 75 targeted countries violated 8 U.S.C. § 1152(a)(1)(A)'s prohibition on nationality-based discrimination in the immigrant visa process. ECF 83 at 34–37.

95. Second, the Court held that the Policy violated 8 U.S.C. § 1201(g) and 22 C.F.R. § 40.6, whether "construed as mandating a finding of ineligibility, thus overriding the consular officer's contrary determination, or as requiring consular officers to refuse visas to eligible applicants where no grounds exist in the law." ECF 83 at 40. Because the Policy was contrary to 22 C.F.R. § 40.6, it also violated the *Accardi* doctrine. ECF 83 at 52.

96. Third, the Court found that the Policy exceeded the statutory authority that the INA vests in the Secretary of State. ECF 83 at 53. The Court concluded that the Visa Ban Cable, in which Defendant Rubio directed that consular officers "must refuse" immigrant visas to nationals of 75 countries, violated 8 U.S.C. § 1104(a), which precludes the Secretary of State from "controlling consular officers' determinations relating to the granting or refusal of visas." ECF 83 at 43 (citation and internal quotation marks omitted).

97. On these bases, the Court granted partial summary judgment in Plaintiffs' favor on Counts One and Seven of the complaint as to the Policy. ECF 83 at 60.[30]

98. Finally, the Court held that the Policy was not a legislative rule for which notice and comment was required and thus granted partial summary judgment to Defendants on Count Three of the complaint. ECF 83 at 47–50, 60.

99. The Court entered a partial final judgment setting aside and vacating the Policy, setting aside and vacating any refusal of an immigrant visa based solely on the Policy and remanding those refusals for further proceedings consistent with the opinion and order, and declaring that the Policy violated 8 U.S.C. § 1201(g), 8 U.S.C. § 1152(a)(1)(A), and 22 C.F.R. § 40.6 and exceeded Defendant Rubio's authority under 8 U.S.C. § 1104(a). *Id.* at 60; ECF 84.[31]

100. As described further below, since the Court's entry of partial summary judgment in Plaintiffs' favor, Defendants have repeatedly sought to frustrate and undermine the order and judgment.

**D. Defendants Implement the Consular Processing Cable and Issue the Public Charge Directives Following Partial Summary Judgment.**

101. Beginning shortly before the Court's August 21, 2026, judgment, DOS issued additional instructions governing public-charge determinations at consular posts worldwide, which collectively constitute the **Public Charge Directives**. First, DOS issued the "**August 15 Cable**." On August 15, 2026, via cable, DOS directed officers, effective immediately, to use a public-charge

---

[30] The Court found that the Policy did not violate 8 U.S.C. § 1182(a)(4). ECF 83 at 31–33.

[31] Defendants appealed this judgment. *CLINIC v. Rubio*, No. 26-2573 (2d Cir.). The record on appeal on that proceeding consists of all the papers and exhibits before the district court when it entered its order and judgment, including Plaintiffs' original complaint and the exhibits and other materials they submitted in support of their motion for partial summary judgment. *See* Fed. R. App. P. 10(a)(1). Plaintiffs' First Amended and Supplemental Complaint does not alter the record on appeal.

worksheet to evaluate immigrant visa cases subject to 8 U.S.C. § 1182(a)(4). Ex. AC, 26 STATE 80666 (Aug. 15, 2026). Pursuant to the August 15 Cable, Officers must enter individualized case notes concerning the applicant's health, finances, and other statutory factors, as well as any required affidavit-of-support review and LexisNexis report. *Id.* ¶ 3. The August 15 Cable cites the Consular Processing Cable as Reference B. *Id.* ¶ 2. Upon information and belief, the public-charge worksheet reflects the public charge standards set forth in the Consular Processing Cable and thereby mandates consular officers to apply those standards.

102. Second, DOS issued the "**September 1 Cable**." On September 1, 2026, DOS directed all overseas consular officers and managers to complete mandatory public-charge training within 60 days, purportedly to ensure a "rigorous" assessment of public-charge inadmissibility. Ex. AD, 26 STATE 86164 ¶¶ 3, 5 (Sept. 1, 2026). The training module likewise reflects Defendants' effort to implement the unlawful standards for public charge set forth in the Consular Processing Cable. Thus, it covers seven factors for assessing public-charge ineligibility, which the September 1 Cable identifies by reference to § 1182(a)(4) and the Consular Processing Cable, again designated Reference B. *Id.* ¶ 5. The September 1 Cable also announced expanded managerial review of immigrant visa adjudications, with details to follow in a separate cable, *id.* ¶ 6, and that the Bureau of Consular Affairs would provide further in-person training and certify both individual officers and consular sections upon completion, *id.* ¶ 7. DOS subsequently reported that posts that had not completed the required public-charge training were generally not permitted to resume immigrant-visa processing, subject to exceptions for certain applicants affected by the vacated pauses. *See* Ex.

AK, Defs.' Sept. 18, 2026 Status Report at 2, *Medani v. Trump*, ECF No. 10532 (filed in this action at ECF No. 107-3); Ex. AJ, Armstrong Decl. ¶ 5 (filed in this action at ECF No. 114-1).

103. Third, DOS issued the "**September 10 Cable**." On September 10, 2026, following this Court's judgment and orders in related cases, DOS rescinded the Blanket Visa Ban and Visa Ban Cable and instructed posts to reconsider affected applications. Ex. AE, 26 STATE 88862 ¶ 2, (Sept. 10, 2026). The September 10 Cable, however, also required completion of the new public-charge worksheet in immigrant visa cases, including those being reconsidered after the pause, and reiterated the training requirement. *Id.* ¶¶ 6, 8, 9. It also encouraged consular officers to re-interview applicants who were previously determined admissible but refused solely due to the Blanket Visa Ban for a comprehensive reassessment of eligibility, citing the amount of time that had passed since their initial interviews. *Id.* ¶ 6.

104. Fourth, DOS issued the "**September 21 Message to Posts**." On September 21, 2026, DOS advised consular managers that officers must complete the online public-charge training before resuming processing of remanded cases and may re-interview applicants to complete the worksheet. Ex. AG, September 21, 2026 Message to Posts, ECF No. 114-3, at 1–2. As DOS subsequently explained in an October 5 declaration, officers "must follow mandatory immigrant visa adjudication review guidelines transmitted in 26 STATE 89798 [the Sept. 14 Cable]" and although the prior record remains in the file, an officer reassessing a remanded application does not simply adopt the earlier eligibility determination but instead must "complete the worksheet" using

---

[32] In *Medani*, the district court temporarily vacated another so-called visa issuance "pause" implemented by Defendants—in that case, for diversity visa applications. *See Medani v. Trump*, 2026 WL 2547287, *13 (N.D. Cal. Aug. 28, 2026).

the existing record and any updated information and may require applicants to appear for an additional "interview as needed." Ex. AJ, Armstrong Decl. ¶ 6, ECF No. 114-1.

105. As explained further below, the Public Charge Directives have harmed Plaintiffs not only by subjecting them to an unlawful public charge standard, but also by subjecting them to monetary, administrative delay, and time burdens, among other injuries.

**E. Defendants Institute the Review and Override Policy.**

106. In addition to the Public Charge Directives, on September 14, 2026, DOS instituted the **Review and Override Policy**. As specified in the "**September 14 Cable**," 26 STATE 89798, the Review and Override Policy expanded the managerial review that was first addressed in the September 1 Cable. Ex. AF, 26 STATE 89798 (Sept. 14, 2026). The Review and Override Policy requires consular managers to review certain immigrant-visa adjudications, modeled on the existing review procedures for nonimmigrant visas. September 14 Cable ¶¶ 2, 3. The Review and Override Policy applies to any case in which an adjudicating officer has determined that the applicant has overcome a refusal under § 1182(a)(4) or certain other refusals, certain issued cases, and random samples of both issuances and refusals. *Id.* ¶ 3. DOS revised the Consular Consolidated Database to identify cases for review. *Id.* ¶ 1.

107. For each case subject to the Review and Override Policy, the September 14 Cable directs reviewing managers to confirm that the consular officer thoroughly analyzed the applicant's ability to overcome public-charge ineligibility. *Id.* ¶¶ 4, 5. It requires reviewing managers to ensure that consular officers' case notes address, among other matters, English proficiency, any current or past receipt of "public welfare" of any type in the applicant's home country, and whether the petitioner, joint sponsors, and household members are in financial arrears. *Id.* ¶¶ 4, 5. The September 14 Cable also requires consular officers to document in their case notes how they

addressed Category I and II hits in the Consular Lookout and Support System ("CLASS"), which flag potential grounds of visa ineligibility, even though such hits are ordinarily addressed elsewhere in the consular system. *Id.* ¶ 4. For that inquiry, the September 14 Cable expressly cites the Consular Processing Cable. *Id.* ¶ 5. It also requires deputy chiefs of mission or principal officers to review senior consular officers' adjudications when no other reviewer is assigned. *Id.* ¶¶ 2, 7. An official without a consular commission may review an adjudication but may not adjudicate the visa. *Id.* ¶ 6.

108. The September 14 Cable also directs managers to ensure that officers' case notes address the qualifying petitioner-beneficiary relationship in family-based cases and the applicant's employment qualifications in employment-based cases. *See id.* ¶ 4. Substantial parts of the September 14 Cable have been entirely redacted in the version of the Cable provided to Plaintiffs and the Court.

109. On September 21, 2026, to further implement the Review and Override Policy, the Visa Office sent consular managers worldwide additional instructions for cases affected by the "pauses" vacated by this Court and in *Medani*. Ex. AG ("**September 21 Email**"). The September 21 Email states that all immigrant visa and diversity visa cases must undergo further screening through an enhanced standardized immigrant-visa adjudication review ("IVAR") process at the final stage of consular review for all immigrant and diversity visas that have already been approved and "print-authorized." *Id.* at 1. When a consular officer at the consular post has determined that an applicant is eligible post-interview, the case must be print-authorized, and a consular manager must complete an adjudication review. *Id.* at 2. The manager must then enter a case note marked "#IVAR" and submit the case for additional adjudication review through an electronic application. *Id.* at 2; Ex. AK, Armstrong Dec. ¶ 9, *Medani v. Trump*, No. 26-cv-06332 (EJD), ECF No. 115-1

(filed in this action as ECF No. 107-6). The consular section then receives a worksheet identifying further information that may bear on eligibility; the September 21 Email states that the IVAR report "is not itself an adjudication and that the consular officer must assess and document any concerns." Ex. AG [Sept. 21 Email] at 2.

110. DOS later clarified that a print-authorized visa may be issued before the additional review is complete, although information identified through that review may warrant further action by the consular officer. Ex. AK, ECF No. 115-1 at 4. Separately, news reports reported that diversity visa applicants had been told their cases were referred to a "Visa Integrity Unit" in Washington, D.C. María Luisa Paúl, *They Won the Diversity Visa Lottery. Now Their American Dream Is on Hold*, USA Today (Sept. 23, 2026), www.aol.com/articles/won-diversity-visa-lottery-now-150403000.html. Upon information and belief, DOS is establishing Visa Integrity Units staffed by consular officers to facilitate additional USCIS review of immigrant visa cases, including favorable public charge determinations. Under this process, USCIS would return written assessments to the adjudicating consular officers. Although DOS has represented that visas may issue before the additional review is completed, some consular posts have reportedly interpreted the guidance as requiring them to withhold visa printing until the assessment is returned through the electronic application. The possibility of subsequent visa revocation further discourages officers from issuing visas before that review is complete, even where they have already determined that the applicant is eligible.

### F. All Immigrant Visa Applicants, Including Plaintiffs, Subject to Consular Rules

111. Since the Ban was vacated and declared unlawful on August 24, 2026, Plaintiffs, ACT Members, and CLINIC clients are all now subject to Consular Rules, including Defendants' newly issued Public Charge Directives and the Review and Override Policy. *See* Exs. AC-AK; AE,

26 STATE 88862 (Sept. 10, 2026) at 3 (directing posts in all immigrant visa cases to complete a new public charge worksheet, comprehensive training on new public-charge tools, and encouraging re-interviews of remanded applicants).

112. All Plaintiffs have repeatedly checked the DOS CEAC system since August 24, 2026, and many have noted what appear to be automated status updates in the CEAC system on September and October 2026. In these online updates, applicants who were previously determined admissible yet still refused under the Blanket Visa Ban Cable continue to see their application status listed again as "Refused" on these dates as a status update. Some Plaintiffs[33] have received a generic notice that their case has been reviewed and may be in administrative processing, without reference to which officer may have adjudicated their visa application, nor any grounds for its refusal.

113. Plaintiffs who have been contacted personally by their consular post or Embassy after the Court vacated the Ban have received either: (1) an electronic or written request to complete a lengthy and burdensome "public charge" questionnaire and upload new documents related to public benefits, health insurance, and financial, and employment prior to a secondary, and in some cases tertiary, re-interview, or (2) a secondary re-interview at which they are asked those same questions from the questionnaire or worksheet and required to submit extensive additional financial, health insurance, and employment information. Upon information and belief, these questions have doubled the length and duration of the standard consular interview, and the bulk of the questions asked at any interview are now about public charge, based on the training and worksheet mandated by Defendants in the August 15 Cable, September 10 Cable, and September 21 Message to Posts. DOS has explained that officers "must follow mandatory immigrant visa adjudication review

---

[33] *See infra* ¶¶ 214-226 (Plaintiffs Rami (Mr. Laasri), Whitney (Ms. Bate), Duro (Mr. Hernandez Morales), Linares (Mr. Linares), Javaid (Mr. Chaudhry), and Khan (Ms. Tuli) received this notice.

guidelines transmitted in 26 STATE 89798," Ex. AJ, ECF 114-1, Oct. 5 Armstrong Declaration), and although the prior record remains in the file, an officer reassessing a remanded application does not simply adopt the earlier eligibility determination but must "complete the worksheet" using the existing record and any updated information and may require applicants to appear for an additional "interview as needed.").[34]

114. Plaintiffs' family members have also experienced unexplained reversals of favorable visa determinations reflected in CEAC. For example, upon information and belief, Plaintiff Agnes Kyeremaa's adult children have been subject to both the Review and Override Policy and the enhanced public charge screening contemplated by the Public Charge Directives, in the form of a third re-interview and a requirement to provide extensive financial and employment information as outlined in the worksheet. After completing their secondary re-interview at the U.S. Embassy in Accra on October 7, 2026, Plaintiff Agnes Kyeremaa's adult children were informed that their visas had been approved. They received instructions for visa pick up and were told to wait for notification that they were ready. Their visas appear to have been print-authorized. They received a CEAC update approximately one week later on October 15, 2026, notifying them their visas had issued and they would be mailed or ready for pick up soon. But on October 16, 2026, less than 24 hours later, the approval was revoked without explanation and according to CEAC their cases were placed back in administrative processing. Shortly thereafter, on October 21, 2026, CEAC was updated again to inform the family that their cases were now ready for a second re-interview. On October 22, 2026, one of Ms. Kyeremaa's children, Richard Kumi, received an email from the Embassy

---

[34] *See infra* ¶¶ 209-10, 231-36 (Plaintiffs Holt (Mr. Adam), Mitchell (Ms. Baugh), Richardson (Ms. Anderson), Ali (Ms. Elmazoul), and Ms. Marques Lima, who received refusals after re-interview and were placed in administrative processing after receiving these questions).

requiring him to appear for a third re-interview four days later, on October 26, 2026. Richard attended the third re-interview and was again told that his visa was approved and that he would be contacted to pick it up. However, his CEAC account was updated on November 5, 2026 to indicate that his visa was refused. The day after Richard's third re-interview, the Embassy contacted the other three children and told them they had missed their third re-interviews. None of the other children had received an email informing them of a third re-interview. They learned later that the scheduling emails were erroneously sent to their sister and joint sponsor. On November 6, 2026, Richard was notified that he needed to attend a fourth re-interview at the Embassy to re-interview with his siblings on November 9, 2026.

115. Similarly, CEAC reflected the immigrant visa of Plaintiff Christina Mulligan's husband, Ramon Reyes Guerrero, as "Issued" on August 21, 2026, after he submitted updated documents requested by the U.S. Consulate in Ciudad Juárez. But neither his visa nor his passport was returned, and on October 7, 2026, his CEAC status reverted to "Ready." Despite repeated inquiries by the family and a U.S. Senator's office, the government has provided no substantive explanation for that regression. These reported CEAC changes followed favorable determinations, and appear, on information and belief, to have been implemented due to the Public Charge Directives and Review and Override Policy.

116. As a result of the new mandates imposed by the Consular Rules, Plaintiffs CLINIC and ACT must now develop new trainings, written guidance, and operational protocols specifically addressing how their staff attorneys, accredited representatives, and affiliates should counsel clients, prepare applications, and manage expectations. Plaintiff ACT must also now do the same for its members and clients.

## THE CONSULAR RULES ARE UNLAWFUL

### A. The Consular Processing Cable Radically Alters the Historical Definition of "Public Charge" to Explicitly Include Limitless Consideration of Complementary Benefits That Provide Support to Working People.

117. Since the public charge inadmissibility provision first became part of federal immigration law in 1882, courts and administrative agencies have consistently interpreted the term "public charge" to mean noncitizens who rely primarily on the government for subsistence. The first Trump Administration's unlawful and short-lived efforts were the lone exception. Over the same period, Congress has repeatedly considered and rejected efforts to alter the meaning of the term in many of the ways the Consular Processing Cable and Public Charge Directives do here.

118. Defendants' radical new approach to public charge determinations in the Consular Processing Cable, which authorizes officers to consider "any other form of public assistance, social welfare, or private charity" used to "help low-income people," whether used in the United States or anywhere else, dramatically alters the public charge ground of inadmissibility, which, as confirmed by multiple courts, has long been understood as the likelihood that a person will receive recurring cash assistance and government-funded long-term institutional care. Exhibits C & AB ¶ 29. Defendants' new definition goes beyond even the now defunct DHS 2019 Rule, which expanded benefits consideration to include SNAP, Medicaid, and federal housing assistance. The Consular Processing Cable references these categories of benefits, but notes that the benefits subject to consideration extend well beyond them. *See id.* ("This includes but is not limited to housing assistance, food assistance (including the use of private food banks), and medical assistance.").

119. By redefining "public charge" in this way, the Consular Processing Cable will drastically increase the number of persons potentially refused visas on public charge grounds.[35]

120. As the Second Circuit and other courts recognized in determining that the DHS 2019 Rule was likely contrary to law, three of the most salient public benefits programs—SNAP, Medicaid, and federal housing assistance—are generally used by working families, like several of the individual plaintiffs herein, to complement or supplement their income. And they are, by design, available to people with incomes well above the poverty line and, in some cases, to people with significant assets. For example, the SNAP program provides only limited supplemental assistance, requires many recipients to meet strict work requirements, and excludes many significant assets from the eligibility determination.[36] Similarly, many Medicaid recipients work, and in many states, Medicaid is available to people with no resources cap and with earnings above the poverty level, precisely because access to affordable health care promotes people's ability to obtain and maintain

---

[35] *See* Morgan Phillips, *Trump Admin Enforces 'Public Charge' Visa Rules at US Embassies Worldwide*, Fox News (Nov. 6, 2025), https://www.foxnews.com/politics/trump-state-department-orders-global-visa-crackdown-under-revived-public-charge-rule ("Although both agencies apply the same immigration law, the State Department's guidance governs consular officers overseas, giving them broad discretion to deny visas on public charge grounds."); Migration Policy Institute Post, *The Trump Administration's Announcement That It Will Pause All Issuance of Permanent Visas for Would-be Immigrants from 75 Countries Could Dramatically Reduce Permanent Legal Immigration to the U.S,.*| Migration Pol'y Inst., LinkedIn, https://www.linkedin.com/posts/migration-policy-institute_the-trump-administrations-announcement-that-activity-7417634959739416576-F9_I?utm_source=share&utm_medium=member_desktop&rcm=ACoAAAVfQEwBwtF65Xg1w6dMOXTB9pyXWIVWaDE; *see also* Bier, *supra* note 28.

[36] *See SNAP Eligibility*, Food & Nutrition Serv. (Sept. 30. 2025), U.S. Dep't of Agriculture, https://www.fns.usda.gov/snap/recipient/eligibility; *see also A Quick Guide To SNAP Eligibility and Benefits*, Ctr. On Budget and Pol'y Priorities (Oct. 3, 2025), https://www.cbpp.org/research/food-assistance/a-quick-guide-to-snap-eligibility-and-benefits.

employment.[37] And federal housing assistance programs—including public housing and Section 8 programs—support work by enabling low-income households to live in stable homes. Indeed, of the non-elderly, non-disabled households receiving federal housing assistance, approximately sixty percent are headed by working adults.[38] That number is even higher for households containing noncitizens, where approximately three-quarters of non-elderly, non-disabled households report earning wages.[39]

121. Like the DHS 2026 Rule, the Consular Processing Cable places no limit on the public benefits officers may consider when making public charge determinations. Indeed, the Consular Processing Cable expands the scope of inquiry beyond even the DHS 2026 Rule by considering the use of private community or charitable resources like food banks and the use of benefits at any time and for any duration, without any meaningful limits or temporal scope.

---

[37] Kaiser Family Found., Medicaid Income Eligibility Limits for Adults as a Percent of the Federal Poverty Level (Jan. 2025), https://www.kff.org/affordable-care-act/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level/; Renuka Tipirnenim et al., *Longitudinal Trends in Enrollees' Employment and Student Status after Medicaid Expansion*, BMC Health Serv. Res. (February 19, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8857876/ ("Medicaid expansion, absent a community engagement requirement, was associated with increased employment and related activities."); Minal R. Patel, et al., *Employment and Health Burden Changes Among Medicaid Expansion Enrollees*, JAMA Health Forum (October 31, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12579339/ ("Medicaid expansion beneficiaries reported employment gains across health burden. Among those unemployed in 2016, those with improved health burden were more likely to experience employment gains."); Ohio Dep't of Medicaid, Ohio Medicaid Group VIII Assessment 4 (Aug. 2018), https://medicaid.ohio.gov/wps/wcm/connect/gov/2468a404-5b09-4b85-85cd-4473a1ec8758/Group-VIII-Final-Report.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_K9I401S01H7F40QBNJU3SO1F56-2468a404-5b09-4b85-85cd-4473a1ec8758-nAUQnlt ("A large majority of [Medicaid] enrollees (83.5%) reported that Medicaid made it easier to work; most unemployed enrollees (60.0%) reported that Medicaid made it easier to look for work.")

[38] *See* Ctr. for Budget and Pol'y Priorities, *Federal Rental Assistance Fact Sheets* (Jan. 23, 2025), https://www.cbpp.org/research/federal-rental-assistance-fact-sheets#US.

[39] *Id.*

122. Early judicial interpretations of the original public charge provisions confirmed that Congress intended the public charge exclusion not to apply broadly to noncitizens who relied on any outside assistance, but to instead require a substantial level of lengthy or permanent dependence on the public for subsistence. *New York v. U.S. Department of Homeland Security*, 969 F.3d 42, 66-67 (2d Cir. 2020) (citing *Gegiow v. Uhl*, 239 U.S. 3, 8-10 (1915); *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917)); *City and Cnty. of S.F. v. USCIS*, 981 F.3d 742, 751 (9th Cir. 2020), *Cook Cnty. v. Wolf,* 962 F.3d 208, 224 (7th Cir. 2020) (citing, *inter alia, Gegiow,* 239 U.S. 3 (1915)).

123. Consistent with this traditional understanding of public charge, federal immigration officials in the early 20th century excluded only a minuscule percentage of arriving immigrants on public charge grounds. According to DHS's own data, of the approximately 21.8 million immigrants seeking admission to the United States as lawful permanent residents between 1892 and 1930, approximately 205,000—less than one percent—were deemed inadmissible as likely to become public charges. The same has been true in subsequent years: between 1931 and 1980 (the last year for which DHS published such data), only 13,798 intending immigrants were excluded on public charge grounds out of more than 11 million immigrants admitted as legal permanent residents—an exclusion rate of approximately one-tenth of one percent.[40]

---

[40] *See* DHS, *Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016*, (Dec. 18, 2017), https://www.dhs.gov/immigrationstatistics/yearbook/2016/table1 (last accessed Feb. 2, 2026); INS, *2001 Statistical Yearbook of the Immigration and Naturalization Service* 258 (2003), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2001.pdf (last accessed Feb. 2, 2026); *see also* Mae Ngai, Impossible Subjects: Illegal Aliens and the Making of Modern America 18 (2004). Similarly, during the Great Depression, the INS did not consider immigrants who were "victims of the general economic depression" deportable simply because they received public relief. *Id.* at 72.

124. The original interpretation of "public charge" by Congress and the courts persisted in the mid-twentieth century, largely through decisions of the Board of Immigration Appeals ("the Board") and the Attorney General, which narrowly limited the circumstances in which an immigrant could be deported or denied admissibility or adjustment of status on public charge grounds. In the leading case of *Matter of B-*, 3 I. & N. Dec. 323, 324 (BIA 1948), the Board held that "acceptance by an alien of services provided by a State . . . to its residents, services for which no specific charge is made, does not in and of itself make the alien a public charge." Rather, the Board held, a noncitizen was removable as a public charge only if (1) the noncitizen was "charged" for receipt of a public benefit under the law, (2) a demand for payment was made, and (3) the noncitizen or a family member failed to pay. *Id.* at 326. *Matter of B-* has remained the law for more than seventy years.

125. In 1952, four years after *Matter of B-* was decided, Congress reenacted the public charge provision in the Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 (the "1952 Act," also known as the McCarran-Walter Act). The 1952 Act did not define the term or purport to change existing administrative interpretations. *See* 1952 Act, 66 Stat. 163, 183. This seminal administrative decision and its progeny continued to define "public charge" narrowly, despite the increasingly broad array of public benefits that had become available for low-income people since the 1882 Immigration Act, including the Aid to Dependent Children program (1935), public housing (1937), food stamps (1964), Medicaid (1965), Supplemental Security Income (1972), and Section 8 housing vouchers (1974).[41]

---

[41] The holding in *Matter of B-* that mere receipt of public benefits does not render a person a public charge has been applied in the context of admissibility as well as removal. *Matter of Martinez-*

126. In the past forty years, Congress has repeatedly confirmed the public charge provisions of the INA without material change. Congress left the provisions virtually unchanged when passing the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. The legislative history of the 1990 Act recognized that something more than mere receipt of benefits was required to label an immigrant as a public charge.[42] In the debate leading to enactment of the 1990 Act, one member of Congress characterized someone who "would become a public charge" as a person "who gets here who is helpless."[43]

127. In 1996, Congress passed two major pieces of legislation: PRWORA, colloquially called the "Welfare Reform Act," and the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"). Neither statute purported to redefine "public charge" or to alter the settled rule that mere receipt of means-tested benefits is not a basis for branding someone a public charge. In fact, PRWORA and subsequent legislation confirmed that certain classes of immigrants remained eligible to receive federally funded government benefits.[44] PRWORA also authorized states to choose to cover a broader group of

---

*Lopez*, 10 I. & N. Dec. 409, 422 (BIA 1962) (collecting cases); *see also Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974) ("The fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge."); *Matter of Harutunian*, 14 I. & N. Dec. 583, 590 (BIA 1974) (finding that a 70-year-old noncitizen who was reliant on state old age assistance was inadmissible on public charge grounds where she "lacks means of supporting herself, . . . has no one responsible for her support and . . . expects to be dependent for support on old age assistance ...... ").

[42] A 1988 House report explained that courts associated the likelihood of becoming a public charge with "destitution coupled with an inability to work," H. Report Series 7, 100th Cong., 2d Sess., at 121 (Sept. 1988) (citing *Gegiow*, 239 U.S.).

[43] 135 Cong. Rec. S14,291 (July 12, 1989) (statement of Mr. Simpson).

[44] These benefits included Medicaid, Food Stamps (now SNAP), Supplemental Security Income ("SSI") and Temporary Assistance for Needy Families ("TANF," a form of cash assistance), the Children's Health Insurance Program ("CHIP"), and the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). *See generally* 8 U.S.C. §§ 1612–1613, 1615.

noncitizens in state or local public benefits programs. 8 U.S.C. § 1621(d). And IIRIRA—which Congress passed the month after PRWORA—codified the existing standard for determining whether a noncitizen is inadmissible as a public charge. Pub. L. No. 104-208 § 531, 110 Stat. 3009 (1996) (amending 8 U.S.C. § 1182).[45]

128. In the debate leading up to IIRIRA's enactment, Congress specifically considered and rejected a proposal to label as a public charge anyone who received certain means-tested public benefits, including Aid to Families with Dependent Children, Medicaid, food stamps, SSI, and other programs "for which eligibility for benefits is based on need." Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996). The express purpose of this proposed provision was to overturn the settled understanding of "public charge." See 142 Cong. Rec. S4401, S4408–09 (1996). That effort was met with substantial criticism and failed. *See, e.g.,* S. REP. 104-249, 63–64 (1996) (statement of Sen. Leahy); 142 Cong. Rec. S11872, S11882 (statement of Sen. Kyl).

---

[45] In legislation following the enactment of PRWORA, Congress expanded the availability of certain benefits, particularly SNAP and Medicaid, to qualified immigrants. *See* Agricultural Research, Education and Extension Act of 1998 ("AREERA"), Pub. L. No. 105-185, 112 Stat 523, June 23, 1998 (restoring eligibility for certain elderly, disabled and child immigrants who resided in the United States when PRWORA was enacted); The Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171,116 Stat 134, May 13, 2002 (restoring eligibility for food stamps (now SNAP) to qualified immigrant adults who have been in the United States at least five years, and immigrants receiving certain disability payments and for children, regardless of how long they have been in the country); Children's Health Insurance Reauthorization Act of 2009 ("CHIPRA"), Pub. L. No. 111-3, 123 Stat 8, February 4, 2009 (providing an option for states to cover lawfully present immigrant children and pregnant women, regardless of their date of entry into the U.S., under the federal Medicaid and Children's Health Insurance Program ("CHIP") matching programs).

129. IIRIRA thus specifically rejected this proposed redefinition of "public charge" and retained the longstanding INA public charge policy relating to admission and status adjustment. *See* 8 U.S.C. § 1182(a)(4).

130. In 2013, Congress again rejected a proposed amendment to redefine public charge to include anyone receiving means-tested public benefits when the Senate debated the proposed Border Security, Economic Opportunity, and Immigration Modernization Act, a bill that sought to create a path to citizenship for noncitizens who could show they were not "likely to become a public charge." S. 744, 113th Cong. § 2101 (2013).[46]

131. Congress has thus repeatedly rejected efforts to alter the definition of public charge along the lines DOS appears to adopt in its reference to vague "indications that nationals from these countries having sought public benefits in the United States." Ex. A; Ex. B & G, ¶ 3. In so doing, it has demonstrated its clear intent to continue applying the historical definition of public charge that has endured for over 140 years.

**B. The Consular Rules Violate the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A)-(D)**

**1. The Consular Rules Violate the Procedural "Notice and Comment" Requirements of the APA.**

132. The Blanket Visa Ban and Visa Ban Cable violate the APA because they were issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). DOS's haphazard process for promulgating dramatic changes to the immigration system is deficient because DOS issued the indefinite categorical 75-country Blanket Visa Ban without any opportunity for notice

---

[46] During committee deliberations, Senator Jeff Sessions sought to amend the definition of public charge to include receipt of "noncash employment supports such as Medicaid, the SNAP program, or the Children's Health Insurance Program." S. Rep. No. 113-40, at 42 (2013). The committee rejected the proposed amendment by voice vote. *Id.*

and comment—despite its unprecedented scope and sweeping legal consequences—absent any permitted exception to the notice-and-comment procedures required by the APA.

133. Labeling the Ban a "pause" does not alter its legally binding effect on applicants and consular officers alike. It is a substantive rule and final agency action determining the rights and obligations of applicants and consular officers and therefore must comply with the APA. *See* Exs. A, B & G.

134. Indeed, DOS announced the Blanket Visa Ban on January 14, 2026, as "U.S. Visas News" on the DOS website with absolutely no notice or opportunity for comment. Ex. A. The general public was alerted via press reports and a screenshot of a Visa Ban Cable apparently issued the same day, which gave more information about how the Ban would operate in practice and bind consular officers, but did not provide any reasoned explanation or justification.[47] Ex. B. DOS provided no opportunity for comment on what are unquestionably final agency actions that impose direct and material legal consequences on those affected—matters that should quintessentially be subject to proper rulemaking, as they would if such changes were made through any other vehicle, including the FAM.

135. Likewise, the Consular Processing Cable was not published for notice and comment. In fact, it was not externally published at all. Instead, it was circulated directly to consular officers around the world. The same is true of the documents comprising the Public Charge Directives and announcing the Review and Override Policy.

---

[47] Ken Klippenstein, *U.S. Freezes Visas to 75 Countries* (Jan. 14, 2026), https://www.kenklippenstein.com/p/trump-freezes-visas-to-75-countries.

136. Each of these policies is a legislative rule requiring notice and comment rulemaking because they impose new duties and obligations and limit the rights of applicants, petitioners, sponsors, their family members, and legal representatives.

137. In addition, the Consular Processing Cable, Public Charge Directives, and Review and Override Policy required notice and comment to the extent that they conflict with 22 C.F.R. §§ 42.81 and 40.6. As discussed above, § 42.81 provides that when a visa application has been properly completed and executed, the officer "must" either issue the visa, refuse the application based on one of the statutory grounds for inadmissibility (including on public-charge grounds), or discontinue the grant pursuant to an outstanding order under 8 U.S.C. § 1253(d) (which does not apply here).

138. Section 42.81 is substantively identical to prior 22 C.F.R § 42.130, which was substantially revised pursuant to notice-and-comment rulemaking before being renumbered in 1987. *See* Visas; Regulations and Documentation Pertaining to Both Nonimmigrants and Immigrants Under the Immigration and Nationality Act, 52 Fed. Reg. 42590 (1987) (noting effective date of renumbering); *id*. at 42591 (redesignation table showing "old section" 42.130 redesignated as "new section" 42.81); *id*. at 42590 (stating that renumbering made "no substantive changes"); Visas: Documentation of Immigrants and Nonimmigrants Under the Immigration and Nationality Act, as Amended, 52 Fed. Reg. 43894 (1987) (final rule effective November 17, 1987, describing notice-and-comment process followed); *id*. at 43896–97 (showing revisions to § 42.130).

139. The Consular Processing Cable, Public Charge Directives, and Review and Override Policy also effectively modify 22 C.F.R. § 40.6, under which "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6. Unlike the Consular Processing Cable, Public Charge Directives, and Review and Override Policy, § 40.6 was

promulgated pursuant to notice-and-comment rulemaking. These policies thus cannot modify or suspend these legislative regulations without notice and comment.

**2. The Consular Rules Are Contrary to Law under the APA, 5 U.S.C. § 706(2)(A)-(C).**

140. The Consular Rules are contrary to law for four reasons. *First*, they contravene the INA's long-settled definition of "public charge." *Second*, the Blanket Visa Ban and Visa Ban Cable conflict with 8 U.S.C. §§ 1182(a)(4), 1201(g), and 1152(a)(1)(A) by replacing the statutorily mandated individualized evaluation with an impermissible nationality-based refusal. *Third*, certain of the Consular Rules contravene PRWORA, the ACA, and CHIPRA, which authorize and encourage access to public benefits and health care. *Fourth*, the Review and Override Policy violates 8 U.S.C. §§ 1104(a) and 1202(b) by intruding on the authority Congress reserved for consular officers.

141. *First*, the Consular Rules contravene the definition of public charge as used in the INA. As alleged above, the Consular Processing Cable explicitly directs officers to consider the use of an expanded range of benefits beyond cash assistance and government-funded long-term institutional care, including even private charity, and extends the geographic scope of benefits use beyond the United States to anywhere in the world. *See supra* ¶¶ 69-131. Likewise, the Blanket Visa Ban and Visa Ban Cable's vague references to "indication of nationals from these countries having sought public benefits in the United States," (Exs. B & G, ¶ 3), and "that immigrants must be financially self-sufficient and not be a financial burden to Americans" in order "to ensure that immigrants from these high-risk countries do not utilize welfare in the United States or become a public charge," (Ex. A), appear to refer to individuals who may at some time in the future receive even a minimal amount of noncash public benefits. The adoption of such a "test" is contrary to the definition of public charge that has endured for 140 years: an individual primarily dependent on the

government for subsistence. The statutory meaning of the term "public charge" is evident from, among other things: (i) the plain meaning of the phrase, (ii) the judicial and administrative interpretation of the term since it first became part of federal immigration law; (iii) Congress' approval of that interpretation in repeatedly reenacting the statute; and (iv) Congress' rejection of efforts to expand that interpretation in the manner DOS now seeks to accomplish.

142. Even without expressly defining public charge, the Blanket Visa Ban denied admission to intending immigrants based on an overbroad, erroneous interpretation inconsistent with the INA. Specifically, the Blanket Visa Ban substituted blanket refusal of all covered visas in place of the case-by-case considerations and criteria that Congress directed consular officers to rely on in adjudicating visas. Because the Ban categorically refused admission to all immigrants from 75 countries on the basis of nationality or "based on indication of nationals from these countries having sought public benefits in the United States" or that they may be a "high risk for becoming a public charge," without any individualized assessments (Exs. B & G, ¶¶ 2 & 3), it contravened acts of Congress and is contrary to law.

143. After the vacatur of the Blanket Visa Ban, the Public Charge Directives and Review and Override Policy have now operationalized the Consular Processing Cable, leading to refusals of individuals who are not at all likely depend on the government for subsistence.

144. Thus, the Consular Rules are not in accordance with law and exceed DOS's statutory authority. 5 U.S.C. § 706(2)(A), (C). Even without expressly defining "public charge," the Blanket Visa Ban denied admission to intending immigrants based on an overbroad, erroneous interpretation inconsistent with the INA. Specifically, the Blanket Visa Ban substituted blanket refusal of all covered visas for the case-by-case considerations and criteria that Congress directed consular officers to rely on in adjudicating visas. Because the Ban categorically refused admission

to all immigrants from 75 countries on the basis of nationality or "based on indication of nationals from these countries having sought public benefits in the United States" or that they may be a "high risk for becoming a public charge," without any individualized assessments (Exs. B & G, ¶¶ 2 & 3), it contravened acts of Congress and is contrary to law.

145. *Second,* the Blanket Visa Ban and Visa Ban Cable directly conflicted with 8 U.S.C. § 1182(a)(4) by effectively seeking to erase the statutorily mandated individualized evaluation, excluding all other statutorily mandated factors, and arbitrarily adopting one sole, dispositive, and impermissible factor: nationality.

146. According to the Visa Ban Cable, consular posts must continue accepting and interviewing applicants but are categorically prohibited from issuing immigrant visas during the indefinite pause and must refuse them under 8 U.S.C. § 1201(g) on the basis of nationality. Ex. A; Exs. B & G, ¶ 2.

147. As noted *supra* at ¶¶ 51-86, however, 8 U.S.C. § 1201(g) mandates that a consular officer may refuse a visa only if the officer, based on their own review of the individual application or the applicant's documents, believes the person is legally ineligible under one of the specific grounds listed in the INA, such as the health-related grounds, certain criminal issues, or national-security concerns. If someone is denied solely due to the public charge ground under 8 U.S.C. § 1182(a)(4), a visa can still be issued if the person provides a financial bond approved by the government. 8 U.S.C. § 1201(g); 8 C.F.R. § 213.1.

148. This nationality-based ban also directly conflicted with 8 U.S.C. § 1152(a)(1)(A), which prohibits preferences or discrimination in the issuance of immigrant visas on the basis of nationality, among other protected grounds.

149. *Third*, certain of the Consular Rules contravene PRWORA, the ACA, and CHIPRA, because all three statutes authorize and encourage access to public benefits and health care, the use of which the Consular Processing Cable and Public Charge Directives directly[48]. All three statutes reflect Congress' intent to expand access to affordable health insurance coverage to some immigrants who are lawfully present in the United States, along with U.S. citizens. The Consular Rules frustrate this intent.

150. *Fourth*, the Review and Override Policy violates 8 U.S.C. § 1104(a) and § 1202(b). Section 1104(a) limits the Secretary of State's authority over consular officers' visa-issuance determinations, while § 1202(b) requires immigrant visa applications to be reviewed and adjudicated by consular officers. As this Court held, the "INA unambiguously 'preclude[es] *[sic]* . . . the Secretary of State from controlling [consular officers'] determinations' relating to the granting or refusal of visas." ECF 83 at 43 (quoting *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021)). Although supervisory review is permitted, the INA reserves the ultimate determination whether to grant or refuse a visa to the consular officer. Although consular managers already conducted adjudication reviews, the September 14 Cable newly requires such re-review for every case in which an applicant has overcome a public charge refusal. Ex. AF [26 STATE 89798] ¶¶ 2–3. Moreover, even after a consular officer finds an applicant eligible and completes the

---

[48] In 2025, Congress passed a Budget Reconciliation bill, An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14., 139 Stat. 72, P.L. 119-21 (July 4, 2025), that limited immigrant eligibility for several public benefits, but declined to alter the public-charge statute or its legal standards. Congress also preserved ACA eligibility for certain groups (including Compact of Free Association residents and specified Cuban and Haitian nationals) and retained states' option to extend Medicaid and CHIP to lawfully residing children and pregnant individuals, some of whom would now be affected by Defendants' attempt to rewrite the longstanding definition of public charge.

required managerial review, the case must be submitted for additional adjudication review through a centralized electronic application. Ex. AG [Sept. 21 email] at 2; ECF No. 107-6 ¶ 9. The officer must then review the resulting report and assess whether further action is warranted, including spoiling or revoking a visa. Armstrong Decl. ¶ 9, ECF No. 107-6. Separately, applicants have reported being told that their cases were referred to a Washington D.C.-based "Visa Integrity Unit" for further review, although Defendants have not disclosed whether that unit conducts the additional app-based review. María Luisa Paúl, *They Won the Diversity Visa Lottery. Now Their American Dream Is on Hold*, *supra* ¶ 110.

151. Although Defendants maintain that additional review does not prevent visa issuance or constitute a basis for refusal, the Review and Override Policy subjects favorable consular determinations—reflecting the adjudicating officer's individualized, fact-intensive assessment of the applicant's evidence and statutory eligibility—to further centralized scrutiny, even after issuance has been authorized. Because the Review and Override Policy permits officials who did not conduct that assessment to control or override the officer's favorable determination, it intrudes upon the authority Congress reserved for consular officers.

**3. The Consular Rules are Arbitrary and Capricious.**

152. Defendants' Consular Rules are arbitrary and capricious for multiple reasons, including that DOS has failed to articulate a reasoned explanation for its decision to issue each of the Consular Rules; has relied on factors which Congress has not intended it to consider; entirely failed to consider important aspects of noncitizens' use of government benefits; offered an explanation for Defendants' decisions that runs counter to the evidence before the agency and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise; and has departed from prior agency policy without explanation.

153. In the Consular Rules, Defendants have failed to explain their departure from the individualized totality of circumstances public charge test codified at 8 U.S.C. § 1182(a)(4) and expressed in decades of consistent statutory interpretation. Similarly, Defendants have failed to justify the Blanket Visa Ban in light of 8 U.S.C. § 1201(g), which does not permit categorical visa refusals on the basis of nationality or the implementation of an indefinite "pause" untethered to a case-specific inadmissibility determinations.

154. The Blanket Visa Ban and Visa Ban Cable did not explain why the case-by-case statutory framework for assessing public charge inadmissibility, as established by Congress, is insufficient to satisfy their purported goals. The Blanket Visa Ban conspicuously omitted an explanation as to why a categorical, indefinite bar to immigrant visa processing for nationals of 75 countries was necessary to achieve Defendants' purported goals. For example, the statutory mechanism established by Congress provides for case-by-case assessment by a consular officer of whether an immigrant visa applicant may become a public charge in the United States. It further provides that even if an applicant is likely to become a public charge, the consular officer may nonetheless grant the visa "if such alien is otherwise entitled to receive a visa or other documentation, upon receipt of notice by the consular officer from the Attorney General of the giving of a bond or undertaking providing indemnity as in the case of aliens admitted under section 1183 of this title." 8 U.S.C. § 1201(g). The Blanket Visa Ban and Visa Ban Cable did not address or even acknowledge why the statutory bond or indemnity provisions in 8 U.S.C. § 1201(g) were insufficient to address the problem Defendants purportedly seek to solve.

155. The Blanket Visa Ban and Visa Ban Cable offered no evidence or reasoned justification for selecting the affected 75 countries or why the Ban must be indefinite in duration. DOS asserted, without evidence, that there is an "indication of nationals from these countries having

sought public benefits in the United States" and that nationals from these countries are "high risk for becoming a public charge." Exs. B & G, ¶¶ 2 & 3. Defendants failed to identify, let alone discuss, country-specific data for each of the 75 countries whose nationals the Blanket Visa Ban alleged are likely to become public charges upon being admitted to the United States. The Blanket Visa Ban and Visa Ban Cable were devoid of *any* reference to any instance of *any* visa applicant becoming a public charge, let alone specific categories of visa applicants.

156. In fact, many of the 75 countries are "high family admissions countries"[49] for immigration to the United States. Only 1.6% of a group of immigrants from high family admissions countries received public assistance income between 2021 and 2023.[50] Immigrants from these countries have high labor force participation rates and significant earnings growth.[51] The vast majority of immigrants, including from the 75 countries, do not receive any type of welfare benefits, including SNAP (which are not cash benefits relevant to public charge).[52] Therefore, the assertion that nationals from these countries are "high risk for becoming a public charge" is not only unsupported but incorrect.

---

[49] Mark Regets, *The Economic Advancement, Adaptation, and Integration of Family Immigrants in America*, Nat'l Found. for Am. Policy (Nov. 2025) at 2, https://nfap.com/research/new-nfap-policy-brief-the-economic-advancement-adaptation-and-integration-of-family-immigrants-in-america/. (High family admissions countries, "in alphabetical order, are Antigua-Barbuda, Bahamas, Bangladesh, Barbados, Belize/British Honduras, Cambodia, Cape Verde, Costa Rica, Czechia, Dominica, Dominican Republic, Ecuador, El Salvador, Grenada, Haiti, Honduras, Hong Kong, Jamaica, Jordan, Lebanon, Lithuania, Mexico, Nicaragua, Pakistan, Panama, Paraguay, Peru, Philippines, Poland, Portugal, Syria, Tonga, Trinidad and Tobago, Uruguay, Vietnam and Yemen.")

[50] *Id.* at 10.

[51] *Id.* at 5–7.

[52] Dallin Overstreet, *Immigrant Welfare Participation by the Numbers*, PoliMetrics (Jan. 5, 2026), https://polimetrics.substack.com/p/immigrant-welfare-participation-by. As this article notes, only Afghanistan has a welfare participation rate of over 50%, but that is because Afghan immigrants are overwhelmingly refugees who receive assistance through the United States refugee resettlement program.

157. The Blanket Visa Ban and Visa Ban Cable were devoid of any explanation that could justify a wholesale, indefinite suspension of *all* immigrant visa processing for the covered countries. Nor did Defendants explain why all categories of immigrant visa applicants are equally likely to become public charges.

158. The Defendants failed to consider or promulgate less restrictive alternatives to the Blanket Visa Ban and Visa Ban Cable that would comply with the INA's public charge mandate and existing statutory mechanisms in 8 U.S.C. §§ 1182(a)(4), 1201(g), and 1152(a)(1)(A), including the requirement of individualized case-by-case adjudication.

159. In issuing the Blanket Visa Ban and Visa Ban Cable, Defendants also considered factors that Congress did not authorize. Congress provided that public charge inadmissibility determinations are to be made case by case, considering "age, health, family status, assets, resources, and financial status," among other factors. 8 U.S.C. § 1182(a)(4)(B)(i). Congress further provided that in addition to those factors, "the consular officer or the Attorney General may also consider any affidavit of support under section 1183a of this title for purposes of exclusion under this paragraph." *Id.* § 1182(a)(4)(B)(ii). Congress also provided that individuals found likely to be public charges but otherwise entitled to receive a visa may still receive a visa if they post "bond or undertak[e] providing indemnity as in the case of [noncitizens] admitted under section 1183 of this title." 8 U.S.C. § 1201(g).

160. DOS ordered consular officers to categorically refuse visas—even where individual officers have determined that the applicants were unlikely to become a public charge—"while the Department develop[ed] additional screening and vetting tools, policies, and operations to more accurately identify any IV applicant likely to become a public charge." (Exs. B & G ¶ 4.) Congress did not provide that the development of "additional screening and vetting tools, policies, and

operations to more accurately identify any IV [immigrant visa] applicant likely to become a public charge," (Exs. B & G ¶ 4), were a basis to find someone inadmissible as a public charge or to refuse issuance of a visa under 8 U.S.C. § 1201(g) to someone otherwise eligible to receive a visa.

161. In issuing the Blanket Visa Ban and Visa Ban Cable, Defendants failed to consider the reliance interests of applicants, petitioners, U.S. families,[53] and employers[54] who have submitted visa applications and paid necessary fees with the reasonable expectation that Defendants would not arbitrarily and capriciously change or halt their procedures.

162. Defendants also failed to provide any acknowledgment or explanation for their substantial alterations to prior, longstanding agency positions.

163. In issuing the Blanket Visa Ban and Visa Ban Cable, Defendants failed to consider or address significant harms to the U.S. economy, as well as to state and local economies, that may be directly and indirectly caused by the indefinite suspension.[55]

---

[53] *E.g.*, David J. Bier, *supra* note 28 ("[T]his ban will target even close family members of US citizens and legal permanent residents. Approximately 100,000 of their spouses and minor children will be barred by this policy, one of the most extreme legal immigration policies in US history.")

[54] *See* Drishti Pillai & Samantha Artiga, *Potential Impact of the Federal Pause on Immigrant Visas From 75 Countries on the U.S. Health Care Workforce*, KFF (Jan. 29, 2026), https://www.kff.org/immigrant-health/potential-impact-of-the-federal-pause-on-immigrant-visas-from-75-countries-on-the-u-s-health-care-workforce/ (observing that foreign-born workers from 69 of the 75 countries impacted by the DOS Blanket Visa Ban comprise nearly one in ten U.S. health care workers).

[55] David J. Bier, *supra* note 28 ("[I]mmigrants reduce the deficit by paying more taxes than they use in benefits. [The Blanket Visa Ban] will also reduce economic growth, increasing America's debt-to-GDP."); Alex Nowrasteh et al., *The Fiscal Impact of Immigration in the United States*, Cato Inst. (Mar. 21, 2023), https://www.cato.org/white-paper/fiscal-impact-immigration-united-states#executive-summary ("Immigrants have a more positive net fiscal impact than that of native-born Americans in most scenarios in the Updated Model and in every scenario in the Cato Model…."); David J. Bier, *Manhattan Institute's "Lifetime Fiscal Impact of Immigrants" Report Shows Upside to Immigration*, Cato Inst. (Nov. 13, 2024); *Trump's 2025 Travel Ban: Who Is Affected and What It Could Cost the U.S.*, Am. Immigr. Council (Aug. 6, 2025),

164. In issuing the Blanket Visa Ban and Visa Ban Cable, Defendants provided no criteria or articulable standard for when or how the suspension would end. DOS did not identify any changed circumstances that would necessitate categorical denial for an indefinite duration, and it imposed final agency action without having first undertaken notice and comment rulemaking for such a legislative rule.

165. In promulgating the Ban and Visa Ban Cable, Defendants relied on conclusory assertions about "utiliz[ing] welfare," without explanation or articulable evidence, methodology, or defined criteria. Ex. A.

166. The Ban and Visa Ban Cable are also arbitrary and capricious because they had a disparate impact on people of color seeking immigrant visas and their U.S. citizen and lawful permanent resident family members seeking to reunite with them in the U.S.: over 85 percent of the countries covered by the Ban are non-European countries with significant nonwhite populations; the small number of European countries that are listed are southeastern European nations with significant ethnic minority populations.[56] *See* Exs. A–B & G.

167. The Consular Processing Cable is arbitrary and capricious for multiple reasons, including, among other things, because Defendants failed to provide a reasoned explanation for the changed standards announced in the Consular Processing Cable, failed to consider reliance interests of individuals and families who, in the past, participated in government programs or received charitable donations based on their well-founded understanding that such actions would not bear

---

https://www.americanimmigrationcouncil.org/report/trump-2025-travel-ban/ ("At least 298,600 nationals of the 19 countries named in the most recent travel ban arrived in the United States in 2022. These new arrivals made significant contributions to the U.S. economy. In 2023 alone, households led by these recent arrivals earned $3.2 billion in household income, paid $715.6 million in federal, state, and local taxes, and held $2.5 billion in spending power.")

[56] *See also* Bier, *supra* note 28.

on a public charge determination, and because the changed standards in the Consular Processing Cable are a pretext for Defendants' goal of reducing lawful immigration, especially by non-white individuals and families.

168. The Consular Processing Cable's mandate to consider the "applicant's current or past use of any other form of public assistance, social welfare, or private charity either in the United States or elsewhere intended to help low-income people," (Exs. C & AB ¶ 29), directly contradicts the FAM, which instructs that "[n]either the past nor possible future receipt of such non-cash or supplemental assistance is relevant when determining whether an applicant is likely to become a public charge." 9 FAM 302.8-2(B)(1)(c). The Consular Processing Cable's direction that consular officers "should consider whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance," (Exs. C & AB ¶ 36), directly contradicts 8 CFR § 213a.2(c)(2)(ii), which enumerates the only factors to be considered: (A) income, (B) number of persons to be supported, and (C) sufficiency of income. In turn, 8 C.F.R. § 213a.2(c)(2)(i)(C)(1) provides conclusively that "[t]he sponsor's ability to meet the income requirement will be determined based on the sponsor's household income," without any allowance for consideration of prior use of public assistance. And its charge that a "sufficient [I-864 Affidavit of Support] that meets the minimum financial requirements is a threshold condition and one factor (but not the only) in the totality of circumstances you must consider to determine if an applicant is likely at any time to become a public charge," (Exs. C & AB ¶ 30), again directly conflicts with the FAM, which informs consular officers that "a properly filed, non-fraudulent Form I-864 in those cases where it is required, is normally sufficient to meet the INA 212(a)(4) requirements and satisfy the 'totality of the circumstances' analysis," 9 FAM 302.8-2(B)(3)(a)(2).

169. The same flaws in the Consular Processing Cable are present in the Public Charge Directives and Review and Override Policy that Defendants have used recently to operationalize the Consular Processing Cable's framework and standards. For example, the September 14 Cable requires reviewing managers to ensure that consular officers consider applicants' past receipt of "public welfare" of any kind in their home countries, notwithstanding the FAM's express exclusion of noncash and supplemental benefits from public-charge consideration. Ex. AF, ¶¶ 4–5; 9 FAM 302.8-2(B)(1)(c). And the September 10 Cable requires new public-charge assessments even for applicants previously found eligible apart from the vacated Blanket Visa Ban, without explaining why those prior assessments were inadequate or accounting for the additional burdens imposed on applicants and their families. Ex. AE ¶ 6. The September 10 Cable affirmatively urges comprehensive, in-person re-interviews of applicants whose prior refusals rested solely on the Blanket Visa Ban, citing the passage of time since their initial interviews, even where those interviews occurred only months earlier. *See id.* This approach departs from the State Department's April 2024 guidance aimed at reducing repeat interviews, unnecessary document requests, § 221(g) refusals, and processing delays. *See* Ex. AL, 24 STATE 41484 ¶¶ 2, 5–6 (Apr. 18, 2024), filed in *Medani v. Trump*, No. 5:26-cv-06332-EJD (N.D. Cal. Sept. 21, 2026), ECF No. 115-4. That guidance specifically instructed officers not to routinely require updated financial documentation merely because time had passed and explained how reducing unnecessary follow-up would lessen consular workloads and backlogs. *Id.* Defendants have not explained this departure from their own guidance, what additional eligibility or security information comprehensive re-interviews are expected to yield when more limited inquiries or requests for updated documents would suffice, or whether they considered the additional costs, burdens, and delays imposed on applicants and consular posts. For example, the September 14 Cable requires reviewing managers to ensure that

officers consider applicants' past receipt of public welfare in their home countries and other factors prescribed by the Consular Processing Cable. Ex. AF ¶¶ 4–5. The September 10 Cable requires officers to complete new public-charge worksheets when reconsidering previously adjudicated applications and encourages repeat interviews, thus increasing consular workloads and imposing additional documentation, travel, time costs and other expenses on applicants. Ex. AE, 26 STATE 88862 ¶ 6. The September 21 instructions add another layer of centralized review after consular adjudication and managerial review, requiring additional processing and potentially further follow-up by consular staff, while creating additional burdens and risks of delay for applicants. Ex. AG [Sept. 21 email]. Together, these directives do more than prescribe internal review procedures. They make the Cable's expanded substantive criteria mandatory components of immigrant visa adjudications, including for applicants previously found eligible under the prior standards, while imposing additional administrative burdens, costs, and delays on consular posts, officers, and applicants, without explanation.

**4. The Consular Rules Originate in and Are Designed to Effectuate and Perpetuate Racial Animus Towards Low-Income, Nonwhite Noncitizens.**

170. The Trump Administration's immigration policy has been characterized by hostile regulatory and sub-regulatory actions accompanied by false and inflammatory rhetoric. The significant changes the Administration has proposed, and implemented, to transform the family-based immigration system[57] do not represent neutral policy choices, but rather a radical reversal of the nation's immigration laws—often in clear violation of Congressional mandate—in order to exclude immigrants from predominately nonwhite countries from admission and lawful status.

---

[57] *See* Muzaffar Chisti et al., *Unleashing Power In New Ways: Immigration in the First Year of Trump 2.0*, Migration Information (Jan. 13, 2026), https://www.migrationpolicy.org/article/trump-2-immigration-1st-year.

171. High-level administration officials subscribe to a conspiratorial "Great Replacement Theory" or "White Replacement Theory," which falsely imagines there has been an orchestrated plot to replace white Americans with nonwhite immigrants—a theory that animates this and other racist exclusionary immigration policies. Recent recruitment videos for Immigration and Customs Enforcement feature white supremacist slogans such as "Defend the Homeland" (with heroic depictions of white men from a bygone era) and "We Will Have Our Homeland Again," parroting a mantra from the white supremacist Proud Boys.[58]

172. In pursuit of this broader racially discriminatory aim, the Ban overwhelmingly targets nonwhite and limited-English-proficient immigrants from nations across Africa, Asia, Latin America, and the Caribbean. No reasonable, factual, or empirical basis has been offered for why nationals of these specific countries categorically pose any heighted public charge "risk."

173. The INA prohibits categorical nationality or country-level discrimination in the issuance of immigrant visas, and "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

---

[58] On January 9, 2026, "the White House and the Department of Homeland Security jointly posted a recruitment ad for Immigration and Customs Enforcement on Instagram, Facebook and X, overlaid with the words 'WE'LL HAVE OUR HOME AGAIN'" and playing the song's chorus "[t]hat's also the name of a song, written by members of a self-described 'pro-White fraternal order,' that has been embraced by the Proud Boys and other white-nationalist groups." Evan Gorelick, *Administration Social Media Posts Echo White Supremacist Messaging*, NY Times (Jan. 27, 2026), https://www.nytimes.com/2026/01/27/us/politics/white-supremacy-trump-administration-social-media.html. On January 10, 2026, the Department of Labor posted a video with the caption "One Homeland. One People. One Heritage," which intentionally echoes the Nazi slogan "*Ein Volk, ein Reich, ein Führer*" ("One people, one realm, one leader"). *Id.* On December 31, 2025, the White House posted a photo of Trump with the word "remigration," which is "a decades-old European concept centered on the expulsion of nonwhite people and immigrants deemed 'unassimilated,'" and which Germany's "far-right Alternative für Deutschland party secretly met with neo-Nazis to discuss plans to implement . . . ." *Id.*

174. Defendants' stated rationale for issuing the Blanket Visa Ban mirrors earlier rhetoric rooted in racialized stereotypes and debunked narratives portraying immigrants and people of color as "taking welfare" and "extracting wealth," (Exs. A & B), and aligns with prior efforts by the Trump Administration to restrict immigration from nonwhite countries.

175. Defendants' stated rationales, to ensure that immigrants are "self-sufficient," and to guard against "wealth extraction" and "use of public benefits," (Exs. A & B),[59] are a pretext for discrimination against immigrants from predominately nonwhite countries, even those who are complying with the country's long-standing rules for obtaining lawful permanent residence.[60]

176. Individually and together, the Consular Rules target people from countries where most residents are persons of color. The Ban and Visa Ban Cable affect nearly half of all legal visa applicants.[61] The Ban categorically bars approval and issuance of immigrant visas to nearly 90% of all African immigrant visa applicants, including nationals of over 30 countries in Africa, with nearly 70% of African nationalities represented; 8 countries in the Middle East, with half of the Middle Eastern nationalities represented; 15 countries in Latin America and the Caribbean, with over 42% of the Latin American and Caribbean nationalities represented; and 14 countries in Asia and Oceania.[62] At the same time, it suspends visas from a small minority of European nations, with only 7 countries affected in southeastern Europe, representing less than 14% of European nationalities.[63] Over 85 percent of the countries covered by the Blanket Visa Ban are non-European countries with

---

[59] *See also* Khan, *supra* note 23; Lee *supra* note 24; Simon Lewis & Humeyra Pamuk, *supra* note 25.

[60] *See* Heba Gowayed, *Racial Quotas for Immigration are Back*, The Guardian, (Jan. 17, 2026), https://www.theguardian.com/commentisfree/2026/jan/17/racial-quotas-for-immigration-are-back.

[61] Bier, *supra* note 28.

[62] *Id.*

[63] *Id.*

significant nonwhite populations. In addition, the 7 southeastern European nations have significant ethnic minority populations.[64] *See* Exs. A, B & G.

177. The Ban particularly targets people seeking immigrant visas through family-based petitions, who are primarily non-white, or through the diversity visa, who are primarily African.[65] On information and belief, the Consular Processing Cable also targets immigrants seeking visas through family-based petitions or through the diversity visa in an attempt to reduce the immigration of persons of color.

178. The Consular Rules deliberately target non-white immigrants. Reducing immigration by people of color has been a consistent policy thread uniting each of the Trump Administration's numerous attempts to change existing immigration regulations. President Trump has a long and well-documented history of disparaging and demeaning immigrants, particularly those from Latin American, Caribbean, African, and predominately Muslim nations. Using racist and white-supremacist rhetoric, President Trump has referred to such immigrants as coming from "shithole countries," countries that are "filthy, dirty, disgusting," "a disaster," and "hellholes," and

---

[64] *Id.*

[65] *See* Adam Mahoney, *Ghana Helped U.S. Deport Migrants, and Now Its Own Citizens Are Shut Out*, Yahoo!News (Jan. 17, 2026), https://tinyurl.com/mdkby6vv (stating that "African nations make up a striking share of the 75 countries swept into the Trump administration's new freeze on immigrant visas,"); *see generally* Malise Omoloye, *US Visa Pause Hits African Countries*, Face2FaceAfrica.com (Jan. 14, 2026), https://face2faceafrica.com/article/us-visa-pause-hits-african-countries; Martina Schwikowski, *Donald Trump's Latest Visa Ban Hits African Countries Hard*, Deutsche Welle (Jan. 22, 2026), https://www.dw.com/en/donald-trumps-latest-visa-ban-hits-african-countries-hard/a-75590864.

stated that such immigrants are "trash" and "garbage," are "poisoning the blood of our country," and are "non-compatible with Western Civilization."[66]

179. Moreover, there is a revealing pattern uniting the countries on the 75-country Blanket Visa Ban list: nearly all were restricted through the racial quotas mandated by the 1924 Immigration Act, also called the Johnson-Reed Act,[67] which were driven largely by policy makers with racist and eugenicist beliefs.[68] Senator Albert Johnson, one of the authors of the now defunct Act, boasted about participating in Ku Klux Klan violence against South Asians,[69] and openly wrote the 1924 Immigration Act to exclude anyone who was not a "white Anglo-Saxon Protestant."[70] The Immigration and Nationality Act of 1965 abolished the racial quotas at the heart of the Johnson-Reed Act,[71] and created uniform rules and standards for family-based immigration and visa processing, *see* 8 U.S.C. § 1151(b)(2)(A). Now, the nationality-based Blanket Visa Ban and Visa Ban Cable seek to reverse the race-neutral 1965 Act and revert to its racially discriminatory predecessor.

---

[66] *Donald Trump's 'Racist Slur' Provokes Outrage*, BBC (Jan. 12, 2018), https://www.bbc.com/news/world-us-canada-42664173; Amna Nawaz & Jonah Anderson, *Trump's Affordability Speech Turns into a Rant against Immigrants*, PBS News (Dec.10, 2025), https://www.pbs.org/newshour/show/trumps-affordability-speech-turns-into-a-rant-against-immigrants; Josh Boak, *Trump Says He Wants to 'Permanently Pause' Migration to the U.S. from Poorer Countries*, Associated Press (Nov. 28, 2025), https://apnews.com/article/trump-national-guard-shooting-migration-17bc0655f4544cc702623574ed08eb62; Ginger Gibson, *Trump Says Immigrants Are 'Poisoning the Blood of our Country.' Biden Campaign Likens Comments to Hitler*, NBC News (Dec. 17, 2023), https://www.nbcnews.com/politics/2024-election/trump-says-immigrants-are-poisoning-blood-country-biden-campaign-liken-rcna130141.

[67] U.S. Dep't of State Office of the Historian, *The Immigration Act of 1924 (The Johnson-Reed Act*), https://history.state.gov/milestones/1921-1936/immigration-act.

[68] Gowayed, *supra* note 60.

[69] *Id.* (citing Trevor Griffey, *Citizen Klan: Electoral Politics and the KKK in WA*, Seattle Civ. Rts. & Labor History Project (2007), https://depts.washington.edu/civilr/kkk_politicians.htm).

[70] *Id.*

[71] *The Immigration Act of 1924 (The Johnson-Reed Act)*, *supra* note 67.

180. In addition to explicit statements by DOS to the press about the motive for the 75-country Blanket Visa Ban, prior and contemporaneous statements made by President Trump demonstrate that the Consular Rules are motivated by racialized stereotypes and discriminatory animus against immigrants of color. On information and belief, his statements influenced and manipulated the decision by other officials to implement the Consular Rules challenged here. (*See* Exs. A, B & G.)

181. President Trump has exhibited a profound and unrelenting racial animus toward nonwhite immigrants for years. President Trump has routinely described regular immigration from nonwhite countries[72] as an "invasion"[73] meriting military or paramilitary action.[74] During his prior administration, President Trump infamously referred to countries designated for Temporary Protected Status ("TPS"), most of which have majority nonwhite populations, as "shithole" countries in a conversation with legislators about TPS. He still harbors these racist views. On December 9, 2025, President Trump repeated his "shithole countries" comment, and "boasted about pausing immigration applications from what he called 'third-world countries' including 'hellholes like Afghanistan, Haiti, Somalia and many other countries.'"[75]

---

[72] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. Times (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html ("The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East . . . .").
[73] *See Protecting the American People Against Invasion*, Executive Order (Jan 20. 2025) https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.
[74] *DoW Support to U.S. Border Security,* U.S. Northern Command (last accessed Jan. 24, 2026), https://www.northcom.mil/BorderSecurity/ (last accessed Jan. 24, 2026) ("Over 10,000 service members are deploying / have deployed to the southern border to augment the approximately 2,500 service members already deployed supporting CBP's southern border mission.").
[75] Lalee Ibssa & Karen Travers, *Trump Ramps up Anti-Immigrant Rhetoric, Embraces 'S---hole Countries' Phrase*, ABC News (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166.

182. President Trump has routinely dehumanized nonwhite immigrants,[76] describing many as "animals,"[77] even comparing some immigrants to a "snake" that would bite and kill anyone foolish enough to shelter them.[78] For months in late 2024, President Trump repeated and amplified the false claim that Haitian TPS holders were "eating the dogs," "eating the cats," and "eating the pets of the people that live" in Springfield, Ohio.[79]

183. Last year, President Trump targeted Somalis with racist statements. On or about December 9, 2025 in Mount Pocono, Pennsylvania, he described Somalia— which is one of the countries subject to the Blanket Visa Ban—as "filthy, dirty, [and] disgusting," and expressed his desire for white immigrants from Denmark, Norway, and Sweden, all countries which were spared from the Blanket Visa Ban.[80] During a December 2025 Cabinet meeting, President Trump made disparaging remarks regarding Somalia, Somali immigrants, and Somali Americans, saying he did

---

[76] For example, President Trump said about some undocumented immigrants during a March 2024 rally, "I don't know if you call them people. In some cases, they're not people, in my opinion, but I'm not allowed to say that[.]" Scott Detrow, *Trump Says Some Migrants Are 'Not People' and Warns of a 'Bloodbath' if He Loses*, NPR (Mar. 17, 2024), https://www.npr.org/2024/03/17/1239078695/trump-says-some-migrants-are-not-people-and-warns-of-a-bloodbath-if-he-loses.

[77] Miriam Valverde, *In Context: Donald Trump's Comments about Immigrants, 'Animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/truth-ometer/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals."); *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[78] *See, e.g.,* Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, Vox (Feb. 23, 2018), www.vox.com/policy-andpolitics/2018/2/23/17044744/trump-snake-speech-cpac.

[79] *See, e.g.,* CBS NEWS, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024) at approx. 29:26, https://www.c-span.org/program/campaign-2024/simulcast-abc-newspresidential-debate/648383.

[80] Amna Nawaz & Jonah Anderson, *Trump's Affordability Speech Turns into a Rant against Immigrants*, PBS News (Dec. 10, 2025), https://www.pbs.org/newshour/show/trumps-affordability-speech-turns-into-a-rant-against-immigrants.

not "want them in our country," the country "stinks," that among Somali immigrants, the rate of "welfare is eighty-eight percent"[81] and that Somali-American Congresswoman Ilhan Omar was "garbage."[82] On December 31, 2025, President Trump posted on his social media platform, Truth Social:

> Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia. 'Congresswoman' Omar, an ungrateful loser who only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth. MAKE AMERICA GREAT AGAIN!!!"[83]

In January 2026, President Trump went even further, posting,

> There is 19 Billion Dollars in Minnesota Somalia Fraud. Fake 'Congresswoman' Illhan [sic] Omar, a constant complainer who hates the USA, knows everything there is to know. She should be in jail, or even a worse punishment, sent back to Somalia, considered one of the absolutely worst countries in the World.[84]

184. Other members of President Trump's Cabinet share these sentiments. His Vice President, J.D. Vance, trafficked the myth that Haitian immigrants ate household pets.[85] Stephen Miller, Deputy Chief of Staff to the President, has long expressed support for White Nationalism,

---

[81] D'Angelo Gore, *Probing Trump's Verbal Attack on Somalis*, (last updated Dec. 17, 2025) https://www.factcheck.org/2025/12/probing-trumps-verbal-attack-on-somalis/.

[82] Anna Betts, *From 'Criminals' to 'Garbage', Trump is Ramping up Anti-Immigrant Language,* The Guardian (Dec. 6, 2025), https://www.theguardian.com/us-news/2025/dec/06/trump-anti-immigrant-language.

[83] Donald J. Trump (@realDonaldTrump), Truth Soc. (Dec. 31, 2025, 10:55 AM), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464.

[84] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 18, 2026, 10:43 PM),https://truthsocial.com/@realDonaldTrump/posts/115919697262007872; *see also, e.g., id.* (Dec. 31, 2026, 10:55 AM).

[85] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sept. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv ("The American media totally ignored this stuff until Donald Trump and I started talking about cat memes. If I have to create stories so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do.").

"promoted white nationalist literature," and "pushed racist immigration stories" to the media.[86] Former DHS Secretary Noem also habitually described Venezuelans in the United States as "dirtbags,"[87] a belief that informed the Trump Administration's decision to restrict immigration from that country.[88]

185. President Trump has expressed a preference, instead, for immigrants from predominantly white countries "such as Norway."[89] While campaigning in 2023 and 2024, President Trump explicitly adopted those racist views, and said that nonwhite, non-European immigrants "from Africa" and Asia are "poisoning the blood of our country."[90] During his recent campaign, President Trump defended these remarks, reiterating comparisons between "nice

---

[86] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SS. Poverty Law Ctr. (Nov. 12, 2019), https://www.splcenter.org/resources/hatewatch/stephen-millers-affinity-white-nationalism-revealed-leaked-emails/.

[87] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings, *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, (Jan. 29, 2025) at approx. 1:10,https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country.").

[88] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025) at approx. 1:00, https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad68603 .

[89] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

[90] *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country,"* C-SPAN (Dec. 16, 2023) at approx. 00:15, https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 ; Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YOUTUBE (Sep. 2023) at approx. 1:34 to 1:45, https://www.youtube.com/watch?v=v283kLQbe1M&t=89s.

countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[91]

186. This racist ideology has clearly influenced the Trump Administration's immigration policy. In March 2025, President Trump posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country to reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[92] In October 2025, President Trump announced that the refugee cap for the coming year would be reduced from 125,000 for 2025, to just 7,500 people for 2026—the majority of whom will be white South Africans,[93] on the patently false assertion that these white landholders from the former Apartheid state now face persecution by the Black majority population. Prior to that announcement, on February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious*

---

[91] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries,* N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[92] Donald J. Trump (@realDonaldTrump), Truth Soc. (Mar. 7, 2025, at 9:05 AM). *See also* Shane Croucher, *Trump Invites South African Farmers to US: 'Rapid Pathway to Citizenship' - Newsweek,* (Mar. 7, 2025), https://www.newsweek.com/trump-south-africa-farmers-us-citizenship-2041178. Though only 7 percent of the population of South Africa is white, white farmers own 80 percent of the country's commercial farmland—that which generates $55,396 annually or more—and President Trump has frequently expressed his belief that white Afrikaner famers are being subjected to a 'genocide' at the hands of the Black majority. *See* Mogomotsi Magome, *Trump Says There's a "Genocide" in South Africa, but White Afrikaner Farmers Reject that Claim*, PBS News (May 21, 2025), https://www.pbs.org/newshour/world/trump-says-theres-a-genocide-in-south-africa-but-white-afrikaner-farmers-reject-that-claim.

[93] Rebecca Santana, *Trump Limits Annual U.S. Refugees to 7,500. It'll be Mostly White South Africans,* PBS News (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

*Actions of the Republic of South Africa*,[94] which directed then-Secretary Noem (among others) to "take appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."

187. In 2025, despite President Trump's professed desire to restrict immigration, DOS launched a program to expressly grant asylum to white residents of South Africa, primarily Afrikaners.[95] Defendant Rubio indicated publicly that DOS would welcome more white Afrikaner South Africans to come to the United States, stating, "[W]e welcome them to the United States, and I think there may be more coming soon."[96]

188. As it did in 2016, the Trump Administration appears to be relying on CIS' unsubstantiated allegations regarding immigrants' use of public benefits (*see supra* ¶¶ 63-68), to justify reducing legal immigration by people of color, including from Somalia.[97] In January 2026,

---

[94] The American Presidency Project (Feb. 7, 2025), https://www.presidency.ucsb.edu/documents/executive-order-14204-addressing-egregious-actions-the-republic-south-africa.

[95] *See* U.S. Embassy & Consulates in Addressing Egregious Actions of the Republic of South Africa, 90 Fed. Reg. 9497, *Refugee Admissions Program for South Africans* (Feb. 7, 2025); *see also* U.S. Mission South Africa, *Refugee Admissions under E.O 14204 "Addressing Egregious Actions of the Republic of South Africa*," U.S. Embassy & Consulates in South Africa (Nov. 4, 2025), https://za.usembassy.gov/refugee-admissions-program-for-south-africans/.

[96] Kaia Hubbard, *Rubio Says 'There May Be More Coming Soon' amid Afrikaner Resettlement Controversy*, CBS News (May 18, 2025), https://www.cbsnews.com/news/marco-rubio-afrikaner-refugee-resettlement/.

[97] Gore, *supra* note 81 ("In a disparaging attack on Somalia in which he said he didn't want people of Somali descent in the United States, President Donald Trump said Somalis 'ripped off' Minnesota 'every year' for 'billions of dollars,' an apparent reference to a fraud investigation, and suggested that 'like 88%' of Somalis receive 'welfare' benefits. But the White House didn't provide us with evidence for either of those figures. *Update, Dec. 10: We updated this article to include information the Center for Immigration Studies published on Dec. 10 about 81% of Somali immigrant households in Minnesota receiving "some form of welfare." We had reached out to CIS*

President Donald Trump also "claimed that about 33.3 per cent of Nigerian immigrant households receive some form of public assistance in the United States" sharing an unverified chart on his Truth Social platform detailing welfare participation rates among immigrant households by country of origin.[98] Both Somalia and Nigeria are listed among the 75 countries in the DOS Blanket Visa Van and Visa Ban Cable.

189. Even after the Ban was later vacated and declared unlawful, recent statements coming from the White House and State Department continue to reflect the discriminatory intent and animus behind the policies. On October 18, 2026, the "Rapid Response 47" X social media account administered by White House Staff included a "white thumbs up" emoji on a post with the caption "NYT: Legal Immigration Fell Sharply Under Trump Policies Adopted Early This Year," a graphic, taken from a *New York Times* report, showing the "change in visas for immigrants each month" (i.e., the percentage change in monthly visa issuance) after Defendants implemented restrictive immigration policies. The average number of visas issued each month dropped 99% for immigrants from Central Asia, 89% for immigrants from Africa, 81% for immigrants from the Middle East, 60% for immigrants from South America, 30% for immigrants from Central America, 53% for immigrants from the Caribbean, 33% for immigrants from East Asia, and 17% for

---

*for such information prior to the publication of our article but did not receive a response.*") (emphasis in original); *see also* Jason Richwine, Somali Immigrants in Minnesota, Ctr. For Immigr. Studies, (Dec. 10, 2025), https://cis.org/Report/Somali-Immigrants-Minnesota.

[98] Michael Adesina, "*One-Third of Nigerian Immigrant[s] 'on US Welfare'" - Trump* (Jan. 2026), PMNews/MSN, https://www.msn.com/en-xl/africa/nigeria/one-third-of-nigerian-immigrant-on-us-welfare-trump/ar-AA1TBdM6?ocid=BingNewsVerp.

immigrants from Southeast Asia, among other regions, notwithstanding a 142% increase in visas issued to people from Canada.[99]

190. The October 18, 2026 New York Times reported:

> The State Department issued just 26,000 immigrant visas, which grant a green card and legal permanent resident status, in February, compared with an average of 52,000 a month in the years before Trump took office, according to the most recent available government data.
>
> The policies, which took effect late last year and early this year, made it all but impossible to immigrate from 91 countries and reduced the number of immigrant visas available in another 61. Africa and the Middle East were hit particularly hard, and immigration from Muslim-majority countries plunged by more than 90 percent.[100]

191. The White House social media account posted data on September 29, 2026, showing that legal immigration and refugee admissions from majority-Muslim countries had fallen approximately 96% compared with earlier periods. The post highlighted reductions affecting countries across the Middle East, South Asia, and Africa,[101] with the White House touting "discriminatory and white supremacist policies as it moves to increase immigration from white

---

[99] Sean James, *Trump White House Celebrates NY Times Report on Admin Slashing Legal Immigration in Half,* YahooNews (Oct. 18, 2026), https://www.yahoo.com/news/politics/articles/trump-white-house-celebrates-ny-235300326.html; Rapid Response 47 on X: *"NYT: Legal Immigration Fell Sharply Under Trump Policies Adopted Early This Year 👍"* / X (Oct. 18, 2026) (including NYT graphic from Albert Sun, *Legal Immigration Fell Sharply Under Trump Policies Adopted Early This Year*, N.Y Times (Oct. 18, 2026), https://www.nytimes.com/interactive/2026/10/18/us/trump-immigrant-visas-decline.html.

[100] Sun, *supra* note 99.

[101] Sharon Zhang, *White House Openly Brags About Islamophobic Efforts to Cut Legal Immigration,* Truthout, (Sept. 30, 2026), https://truthout.org/articles/white-house-openly-brags-about-islamophobic-efforts-to-cut-legal-immigration; Stuart Anderson, *Trump Administration Boasts Of Reducing Immigration And Naturalization,* Forbes (Oct. 5, 2026), https://www.forbes.com/sites/stuartanderson/2026/10/05/trump-administration-boasts-of-reducing-immigration-and-naturalization.

populations" including white South Africans.[102] On September 22, 2026, "The State Department informed congressional officials that the Trump administration is planning to allocate 17,500 refugee spots for fiscal year 2027, and that they will 'primarily' go to Afrikaners, who[m] President Trump has claimed are being oppressed for being White. Fiscal year 2027 starts in October."[103]

192. As one State Department staffer wrote after DOS's Bureau of Population, Refugees, and Migration turned into the Office of Remigration, "It seems like the definition of remigration is 'ethnic cleansing via the mass deportation or promoted voluntary return of non-white immigrants.'"[104]

193. The Consular Rules also departed from normal administrative procedures in multiple ways: Defendants failed to issue notice and comment for final agency action for each of the Consular Rules; the Blanket Visa Ban and Visa Ban Cable directly conflicted with the INA's statutory mandates for individualized public charge assessments and visa refusals under 8 U.S.C. §§ 1182(a)(4) and 1201(g); the Blanket Visa Ban and Visa Ban Cable directly conflicted with the INA's statutory prohibitions against categorical nationality or country-level discrimination in the issuance of immigrant visas under 8 U.S.C. § 1152(a)(1)(A); Defendants issued the Ban via a website announcement with little advance notice; and the Ban was unprecedented in its breadth and indefinite duration. Upon information and belief, the Consular Processing Cable, the Public Charge

---

[102] *Id.*; Camilo Montoya-Galvez, *Trump Administration to Welcome up to 17,500 More White South Africans as Refugees,* CBS News (Sept. 22, 2026), https://www.cbsnews.com/news/trump-administration-white-south-africans-refugees-afrikaners/

[103] Montoya-Galvez, *supra* note 102.

[104] David Nakamura & Adam Taylor, *How Trump turned a refugee bureau into a $410 milliodeportation operation*, Washington Post (Sep. 21, 2026), https://www.washingtonpost.com/politics/interactive/2026/09/21/how-trump-turned-refugee-bureau-into-410-million-deportation-operation/

Directives, and the Review and Override Policy operationalizing the Consular Processing Cable were each issued directly to consular offices without general publication prior to implementation. These irregularities, in combination with contemporaneous rhetoric and social media posts employed by Defendants and other Executive officials and the absence of country-specific evidence, demonstrate an impermissible purpose.

194. On information and belief, Defendants' actions were each motivated, in whole or in part, by a discriminatory motive and/or a desire to harm a particular group: nonwhite immigrants, with a particular discriminatory animus towards Black, African, and Muslim immigrants. The Blanket Visa Ban and Visa Ban Cable targeted individuals for discriminatory treatment on the basis of race, ethnicity, or national origin because the vast majority of nations targeted are majority nonwhite, with the greatest percentage of impacted immigrants identifying as Black, Muslim, and from African nations, and the Ban was based on an unsupported pretext that individuals from the listed countries may "extract wealth"[105] or "take welfare and public benefits"[106] from the United States by settling here permanently. Exs. A & B. They are therefore not rationally related to a legitimate government interest. The Consular Processing Cable, Public Charge Directives, and Review and Override Policy target family-based and diversity visa applicants, the vast majority of whom are nonwhite, and is based on the unsupported pretext that individuals seeking such visas are coming to the United States to use government benefits. Exs. C, AB & AC-AF.

195. In sum, the Consular Rules use a false pretext as cover for impermissible decision-making. The decision to enact a rule that is purportedly based on one rationale but that is, in reality, based on a separate rationale (anti-non-white, and in particular, anti-Black, anti-African, and anti-

---

[105] Khan, *supra* note 23.
[106] Lee, *supra* note 24.

Muslim immigrant animus) is arbitrary and capricious. Reliance on racial or national origin animus is arbitrary and capricious as race or national origin-based decision-making is inherently illegitimate and irrational.

### 5. The Consular Rules are *Ultra Vires* and Violate the Constitution.

196. The Consular Rules exceed DOS's authority under the immigration laws established by Congress.[107] Their purposes are inconsistent with, and openly conflict with, Congress' individualized approach for determining inadmissibility. The Ban conflicted with Congressional mandates by ordering consular officers to categorically refuse visas to nationals of 75 countries without presenting any explanation or underlying data related to national security or public safety. The Ban applied even where individual officers had determined that individuals are unlikely to become a public charge under the FAM at 9 FAM 302.8-2, "while the Department develop[ed] additional screening and vetting tools, policies, and operations to more accurately identify any IV applicant likely to become a public charge." Exs. B & G, ¶ 4. And it failed to address the possibility of posting of a public charge bond under 8 U.S.C. § 1201(g) and 8 C.F.R. § 213.1 in the event an

---

[107] The statute that authorizes, in certain circumstances, the President to suspend "the entry of any aliens or of any class of aliens into the United States . . . by proclamation," 8 U.S.C. § 1182(f), is not at issue in this case. The President has not issued any proclamation, and DOS does not purport to rely on such authority in issuing the agency actions at issue in this complaint. Even if there were such a proclamation, it would exceed the scope of executive authority under 8 U.S.C. § 1182(f). Unlike *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 82 Fed. Reg. 45161 (Sept. 27, 2017), better known as the "Muslim Ban," there is no foreign policy or national security interest articulated by the DOS website announcement/news post, DOS Cable, or any other public Implementing Action issued to date by DOS. *Compare Trump v. Hawaii,* 585 U.S. 667 (2018). And unlike the country-specific approach the government ultimately took, purporting to "encourage foreign governments to improve their . . . practices" in vetting and information sharing as a national security matter, 82 Fed. Reg. at 45162, the challenged actions here contain no such country-specific actions, let alone any such actions or findings.

intending immigrant is found to be inadmissible as a public charge. To justify this unprecedented action, Defendants presented only the unsupported assertions that there was an "indication of nationals from these countries having sought public benefits in the United States" and that nationals from these countries are "high risk for becoming a public charge." Ex. B & G, ¶¶ 2 & 3.

197. The Consular Rules attempt to address domestic matters on which Congress has already spoken and contravene Congress's mandate. The Ban was unmoored from 8 U.S.C. § 1182(a)(4) or any authority delegated to DOS in the INA. It was unprecedented in its subject matter and its scope: it swept hundreds of thousands of immigrants into a blanket embargo exclusively on the basis of their country of origin and unexplained "indications" and assumptions about nationals "having sought public benefits in the United States." Without articulating any foreign policy or national security interest, Defendants attempted to rewrite the longstanding definition of "public charge" and Congress' individualized approach to determining admissibility under the INA via an indefinite Ban. The Consular Processing Cable, Public Charge Directives, and Review and Override Policy likewise change the meaning of public charge in a manner contrary to the INA, as repeatedly ratified by Congress. They dramatically expand the universe of what consular officers may consider and count adversely when making public charge determinations; officers are now directed to consider supplemental, non-cash public benefits, private "charity," and indeed benefits of any kind and amount received by the petitioning family member and their children, wherever and whenever received.

198. The Consular Rules do not even attempt to set forth factual findings to justify these changes. In the case of the Blanket Visa Ban, there were no factual findings to support the sweeping refusal and suspension of nearly half of all prospective immigrants seeking admission to the United States. The Ban was unsupported by findings explaining how the entry of an immigrant from any

individual country listed could be detrimental to the United States or how the Ban would effectively reduce the number of individuals likely to become a public charge. Most visa applicants are ineligible for public benefits programs and indeed remain ineligible for at least their first five years after being granted lawful permanent residence. In cases where visa applicants are eligible for public benefits, Congress has determined that such benefit use is not detrimental to the interests of the United States. Defendants' actions are thus patently unreasonable.

199. To the extent the Consular Rules focus on preventing entry to applicants with U.S.-based family members who have already received public benefits, such an objective undermines DOS's stated goal of preventing the admission of immigrants "who would extract wealth"[108] from the United States. Ex. A. For mixed-status families where members receive noncash assistance, the resulting long-term productivity and access to economic opportunity increase the family's opportunities to invest and build wealth in local communities and the U.S. economy and tax base more broadly.[109]

200. Moreover, the Consular Rules violate the constitutional separation of powers. The stated intent, terms, and effect of the Consular Rules contravene Congress's goal of family unification, codified at 8 U.S.C. § 1151(b)(2)(A), the INA's mandated totality of circumstances public charge test, 8 U.S.C. § 1182(a)(4); the INA's mandated individualized visa issuance process, 8 U.S.C. § 1201(g); the INA's prohibition on categorical discrimination on the basis of race,

---

[108] Khan, *supra* note 23.

[109] Julia Gelatt, *Explainer: Immigrants and the U.S. Economy*, Migration Policy Inst. (Oct. 2024), https://www.migrationpolicy.org/content/explainer-immigrants-and-us-economy; Alex Nowrasteh, *The Fiscal Impact of Immigration in the United States*, Cato Inst. (Mar. 21, 2023), https://www.cato.org/blog/fiscal-impact-immigration-united-states; *New Data: Immigrants Keep Economy Strong, As Congress Considers Wasting Billions on Mass Deportation*, Am. Immigr. Council (Feb. 25, 2025), https://www.americanimmigrationcouncil.org/press-release/immigrants-keep-economy-strong-as-congress-debates-mass-deportation/.

nationality, place of birth or place of residence in visa issuance, 8 U.S.C. § 1152(a)(1)(A); 8 U.S.C. § 1104(a)'s prohibition on the Secretary of State's usurping consular officers' powers, duties and functions relating to the granting or refusal of visas; as well as the express language and intent of PRWORA, ACA and CHIPRA, designed by Congress to extend certain health-care related public benefits to all eligible immigrants and citizens in the United States. Congress has not authorized Defendants to contravene the INA or any other statutes.

**6. The Consular Rules, including the Blanket Visa Ban, Consular Processing Cable, Public Charge Directives, and Review and Override Policy Harm Plaintiffs.**

201. Defendants admit that all immigrant visa ("IV") applicants worldwide are now subject to the Consular Rules, including the Consular Processing Cable, Public Charge Directives, and the Review and Override Policy. *See* Exs. AC-AK. The Consular Rules have invented and imposed an entirely new and arbitrary conception of the public charge ground of inadmissibility, altering the rights, duties and responsibilities of all immigrant visa applicants and petitioning U.S. citizen family members, sponsors, and legal representatives. The Consular Rules have also imposed significant new time and cost burdens in addition to prolonged indefinite processing delays on immigrant visa applicants, their petitioning U.S. citizen family members, sponsors, and legal representatives, via an unprecedented blanket public charge refusal, review and override regime in conflict with the mandates of the INA. The Consular Rules have harmed Plaintiffs, as detailed below, including by requiring multiple re-interviews and layers of supervisory review and override along with additional required written submissions when a consular officer has already found them admissible, only to be placed right back into administrative processing, causing prolonged delays and family separation due to multiple additional layers of burdensome public charge review, required "questionnaires", additional document submissions and uploads that impose entirely new

time and cost burdens on applicants, their families, and legal representatives, and the risk of repeated refusal under an unlawful standard, without explanation.

***Plaintiff Catholic Legal Immigration Network, Inc.***

202. Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") provides training and support to a network of more than 3,000 attorneys and accredited representatives in 49 states, including New York and Washington, D.C., who, in turn, serve hundreds of thousands of low-income immigrants each year, including by aiding them with applications for adjustment of status. In seeking to further its mission of embracing the Gospel value of welcoming strangers, CLINIC supports its network by hosting in-person and multi-day trainings on immigration-related matters; providing e-learning courses and webinars; publishing newsletters, fact sheets, and reports detailing developments in the immigration landscape; and, in some instances, providing direct funding to affiliates working with immigrant communities.

203. Defendants deprived CLINIC of an opportunity to comment on the Consular Rules, something DHS provided CLINIC an opportunity to do on both the 2025[110]and the 2018[111] public charge NPRMs published by the Trump Administration.

204. Defendants' actions threaten to impede CLINIC's core mission, have already directly harmed CLINIC, and threaten ongoing and future harm to CLINIC, including by forcing it to divert resources from other substantive immigration law matters in order for it to expend resources to respond to and address the Consular Rules and their impact. Attorneys and accredited representatives from affiliates submit inquiries to CLINIC regarding individual immigration

---

[110] *See* CLINIC, Comment on Public Charge Ground of Inadmissibility (Dec. 19, 2025), comment ID USCIS-2025-0304-3889, https://www.regulations.gov/comment/USCIS-2025-0304-3889.
[111] *See* CLINIC, Comment on Public Charge Ground of Inadmissibility (Dec. 9, 2018), comment ID USCIS-2010-0012-43255, https://www.regulations.gov/comment/USCIS-2010-0012-43255.

matters that are particularly complex and rely on CLINIC staff to provide expert consultations. CLINIC has experienced an overwhelming increased demand for consultations since the Consular Rules were promulgated. CLINIC has had to and must continue to develop new trainings, written guidance, and operational protocols specifically addressing how affiliates should counsel clients and prepare applications in light of the mandates imposed by the Consular Rules, including, but not limited to: (1) whether documentarily qualified (DQ'd) immigrant visa applicants may have prior public charge determinations automatically reversed through the Consular Electronic Application Center (CEAC), or face refusals and be placed back into administrative processing with further delays after completing new, lengthy questionnaires, uploading new documents and attending repeated re-interviews; (2) whether the DOS and consular officers are complying with the INA and Foreign Affairs Manual (FAM); (3) whether visa decisions are increasingly driven by automated systems, centralized review of worksheets, checklists, secondary "IVAR" and/or "Visa Integrity Unit" review, or nationality-based restrictions rather than individual consular officer discretion; (4) whether factors such as receipt of any charity or public benefits from the previous 30 years for the U.S. citizen petitioner, family status, or nationality are being weighed heavily against applicants; and (5) whether these changes are causing new, increased documentation requirements, cost burdens, longer processing times or higher refusal rates for applicants, their family members, and legal representatives; and (6) whether these policy changes are returning a majority of applicants to indefinite administrative processing amid widespread global uncertainty in the application of the public charge ground.

205. CLINIC has had no choice but to apply its resources to address the situation precipitated by the Consular Rules, both by advising on individual cases brought to it by its affiliates and dispensing accurate information to its network, to the detriment of its prior work addressing

other substantive immigration law matters. This diversion of resources impairs CLINIC's core mission, which is focused on enabling affiliates to keep costs down and serving as many low-income immigrants as possible. If fewer low-income immigrants pursue immigrant visa applications due to the Consular Rules—as CLINIC reasonably anticipates—affiliates will experience reduced revenue, potential staff reductions, and pressure to cut costs. This, in turn, may lead some affiliates to cancel their memberships with CLINIC, directly harming CLINIC's financial stability and ability to carry out its mission.

***Plaintiff African Communities Together***

206. ACT's members suffer direct harm. At least six identified ACT members (Plaintiffs Wael Ali, Timolyn Ebony Carneja Holt, Agnes Kyeremaa, Webaza Nicholas, Hanan Rami, and Joshua Whitney) and their immediate family members are currently subject to the Consular Rules. The Consular Rules have injured them through arbitrary—and on information and belief, discriminatory—visa refusals that result in prolonged and indefinite administrative processing delays. These injuries would be redressed by vacatur and declaratory and injunctive relief. The interests ACT seeks to protect—individualized, lawful visa adjudication and family unity under the INA—are germane to its mission of securing family unification, dignity, and economic opportunity for African families and communities in the United States. The claims and requested equitable relief do not require individualized proof or participation by members.

207. Defendants' promulgation of the Consular Rules without notice and comment deprived ACT members of the opportunity to provide comments detailing the extensive harms created by the Consular Rules.

208. Defendants' actions substantially impede ACT's core mission, have already directly harmed ACT, and threaten ongoing and future harm to ACT. ACT has experienced an increased

volume of questions from members about the impact of the Consular Rules since they were promulgated. ACT has had no choice but to apply its resources to address the situation precipitated by the Consular Rules, to the detriment of its prior work addressing other substantive immigration law matters for its members. This impairs ACT's ability to accomplish its mission and related organizational objectives, which include helping immigrant families unite and stabilize and connecting them to government services and benefits for which they are eligible as an additional means of support. Reuniting families through family-based immigration and connecting them to needed forms of assistance is especially important for ACT's members and clients, who are vulnerable due to chronic health conditions and usually lack private health insurance. The Consular Rules together affect ACT's ability to link clients with the benefits and services they need due to clients' warranted fear that receiving such benefits today will be held against them in the future when they pursue their goals of seeking LPR status through consular processing or when they help a family member or loved one to do so by serving as a petitioner or a sponsor.

***Plaintiff Timolyn Holt***

209. Timolyn Ebony Carneja Holt is a 32-year-old U.S. citizen who lives in Sanford, Florida. Ms. Holt has petitioned on behalf of her 33-year-old husband, Adam Afah Adam, who resides in and is a national of Ghana. Ms. Holt is an ACT member. They share a three-year old daughter, who is a U.S. citizen born in the United States, and who lives with Ms. Holt and her nine-year-old U.S. citizen son, Mr. Adam's stepson. Because of consular backlogs and closures, his application was ultimately transferred from the U.S. Embassy in Accra, Ghana, to the U.S. Embassy in Johannesburg, South Africa, almost 3,000 miles from Accra. Mr. Adam attended an immigrant-visa interview in Johannesburg on February 26, 2026, where he was told by the consular officer that his application looked good, they just needed updated prenatal records for Ms. Holt and a police

report translation, but that he could not receive a visa due to the Blanket Visa Ban. At the interview, he received a refusal under INA § 221(g) because Ghana was one of the countries covered by the Blanket Visa Ban. After the Ban was vacated on August 24, 2026, Ms. Holt repeatedly contacted the U.S. Embassy in Johannesburg and promptly updated their financial, medical, police report and employment evidence. Mr. Adam was called for a re-interview on October 9, 2026, where he was questioned about his education, certifications, finances, and public charge. The consular officer then told him that she had to refuse the visa on public-charge grounds, issued another refusal under both INA §§ 221(g) and 212(a)(4), and informed him that the case was placed again in administrative processing under INA § 221(g). Ms. Holt is employed as a Staff Accountant for a company based in Florida and earns approximately $75,507 annually. Ms. Holt maintains private health insurance for herself and her children. Mr. Adam has never been institutionalized at government expense or been primarily dependent on the government for subsistence. He is licensed as a forklift operator and also sells shoes and clothing in Ghana; the family estimates that his U.S. earning potential would materially increase their household income. Mr. Adam has not seen their daughter in person since she was 6 months old.

210. Because Mr. Adam is subject to the Consular Rules, both Ms. Holt, Mr. Adam, and their children continue to experience harm and have experienced additional time, financial and emotional burdens imposed by the Consular Rules, including the Public Charge Directives, Questionnaire, and Review and Override Policy, which led to the secondary public charge interview and 212(a)(4) and 221(g) refusal. Their prolonged separation due to the Consular Rules has adversely affected the children, including Ms. Holt's son becoming angry and withdrawn, and their 3-year-old daughter experiencing greater difficulty learning and focusing, with emotional dysregulation and increasingly erratic behavior. The refusal and continued separation have caused

significant emotional, physical and financial harm: Ms. Holt reports severe sleep disruption, frequent crying, irritability, withdrawal, weight gain, difficulty concentrating at work, and the strain of financially managing two households and parenting alone. Mr. Adam reports anxiety, panic symptoms, elevated blood pressure during periods of stress, weight loss, poor sleep, and an inability to make long-term plans in Ghana because his life remains on hold. Both Ms. Holt and Mr. Adam believe that the Consular Rules appear to discriminate against African families, based on national origin.

***Plaintiff Agnes Kyeremaa***

211. Plaintiff Agnes Kyeremaa is an 81-year-old U.S. citizen who resides in Bronx, New York. She has petitioned on behalf of four of her adult children. Three grandchildren are derivative beneficiaries of those petitions. Her four adult children, Francis Kumi, Richard Kumi, Anthony Amankwaa, and Janet Yeboaa ("the children") are all nationals of and reside in Ghana. They have never been institutionalized at government expense or been primarily dependent on the government for subsistence. Ms. Kyeremaa is retired. Her daughter Angelina Asante serves as joint sponsor, bolstered by Angelina's daughter and household member Princella Asante. Angelina works as a home health aide and Princella is a nurse. The children attended immigrant visa interviews at the consulate in Ghana on January 22, 2026. After the interviews, they all received INA § 221(g) refusal notices pursuant to the Blanket Visa Ban, despite the fact that they were told by the consular officer that their applications looked good and that their visas would have been approved, but for the Blanket Visa Ban. In late September 2026, the U.S. Embassy in Ghana contacted the children. The embassy informed them that they needed to appear for a second re-interview and update their medical and police records. They updated their records and attended the second re-interview on October 7, 2026. After the second re-interview, they were informed that their visas had been

approved and given instructions for visa pick up. On October 15, 2026, their CEAC accounts were updated to indicate that their visas had been issued and were ready for pick up. On October 16, 2026, before they could arrange to travel to the Embassy to pick up their visas, their CEAC accounts were updated again to reflect that the cases had been placed back into administrative processing. On October 21, 2026, all of their CEAC accounts were updated again to indicate that the cases were ready for additional re-interviews. One of the children, Richard, received an email asking him to appear for a third re-interview on October 26, 2026. He appeared and was again told that his visa was approved and that he would be contacted to pick it up. However, his CEAC status was last updated on November 5, 2026 and indicates that his visa was refused. The day after Richard's third re-interview, the Embassy contacted the other three children by phone and told them they had missed their third re-interviews. None of the other children had received an email informing them of a third re-interview. They learned later that the scheduling emails were erroneously sent to their sister and joint sponsor. On November 6, 2026, Richard was notified that he needed to attend a fourth re-interview at the Embassy to re-interview with his siblings, Francis, Janet, and Anthony, for November 9, 2026.

212. The children are subject to the Consular Rules. Ms. Kyeremaa has been harmed by the Consular Rules. The process has also taken an emotional toll. The joy she experiences each time the children are told their visas are approved evaporates when she then learns that the goal post has moved again. The family has received no explanation for the repeated re-interviews. The constant up and down is exhausting and has caused Ms. Kyeremaa stress and anxiety. Ms. Kyeremaa also worries for her children because each trip to Accra for a subsequent re-interview is expensive and requires significant travel time from their hometown. She is depressed when she thinks about everything they must go through without an end in sight.

***Plaintiff Webaza Nicholas***

213. Webaza Nicholas is a 33-year-old U.S. citizen who lives in Seattle, Washington and is a member of ACT. Mr. Nicholas has petitioned on behalf of his wife, Mutesi Miriam, who resides in and is a national of Uganda. Mr. Nicholas works in law enforcement as a custody officer and earns approximately $91,000 per year. Mr. Nicholas maintains private employer-sponsored health insurance. Ms. Miriam has never been institutionalized at government expense or been primarily dependent on the government for subsistence. In Uganda, she owns and operates a convenience store. Mr. Nicholas' spousal petition was approved, and the consular application became documentarily complete on April 1, 2025. Ms. Miriam attended an immigrant visa interview at the U.S. Embassy in Nairobi, Kenya on February 9, 2026. After the interview, the Embassy requested additional documents which the couple provided. On March 11, 2026, Ms. Miriam received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. Since then, the couple has not received any updates from the Embassy. Mr. Nicholas has emailed the embassy multiple times but has received no response. On November 3, 2026, she received an email requesting that she attend a second re-interview at the U.S. Embassy in Nairobi on November 10, 2026. Ms. Miriam's CEAC account continues to show that her visa status is "Refused." Ms. Miriam is subject to the Consular Rules. The Consular Rules have caused significant harm to Mr. Nicholas and his wife. He has not seen her in over 3 months. They desperately want to start a family but have been unable to do so because they are separated. The separation has also caused Mr. Nicholas to delay his plan of becoming a police officer. Mr. Nicholas believes the government's actions are discriminatory and are based on the idea that people from Uganda and the other seventy-five countries have nothing to offer the United States.

***Plaintiff Hanan Rami***

214. Plaintiff Hanan Rami is a 31-year-old U.S. citizen who lives in Newark, Delaware and is a member of ACT. Ms. Rami has petitioned on behalf of her 36-year-old husband, Youness Laasri, who currently resides in and is a national of Morocco. Ms. Rami and Mr. Laasri share a newborn U.S.-citizen child, born just nine weeks ago. Ms. Rami works as a teaching assistant for a childcare provider in Delaware, where she expects to earn $37,000 this year. Mr. Laasri works as a Team Manager in data analytics for a multinational company in Morocco, has over $20,000 in combined savings and assets in Morocco, and has received a certification in fiberoptic engineering. They also have a co-sponsor, a family friend who earned $85,000 in 2025, and have uploaded an updated form I-864 Affidavit of Support. Mr. Laasri has never been institutionalized at government expense or been primarily dependent on the government for subsistence.

215. Mr. Laasri attended his immigrant visa interview at the U.S. Consulate in Casablanca, Morocco, on August 4, 2026. At the interview, he received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. The consular officer told him that his visa would have been approved but for the Blanket Visa Ban. Since then, the couple has monitored CEAC and contacted the consulate multiple times, including to request expedited processing following the birth of their child, but has received no further instructions regarding a re-interview or visa processing. Ms. Rami and Mr. Laasri have continued to check their case status every day in CEAC and noticed what appeared to be automatic case status updates each newly reading "Refused," along with a generic notice that their case has been reviewed and may be in administrative processing, without any further information.

216. Ms. Rami and Mr. Laasri have received no communication from the U.S. Consulate in Casablanca other than a generic letter on October 15, 2026, in response to their repeated inquiries.

Mr. Laasri feels tortured because he is missing milestones for his newborn daughter. He has never been able to hold his daughter, and he and his wife have not seen each other in person since January 1, 2026. Mr. Laasri is subject to the Consular Rules. Due to the Consular Rules, Ms. Rami has suffered significant emotional distress and exhaustion as she navigates new motherhood entirely on her own, leaving her chronically sleep deprived and overwhelmed. She also endured a difficult pregnancy and childbirth, and now faces the daily stress of balancing work, childcare, and basic household tasks alone, often crying from the strain and isolation. Day by day, Ms. Rami feels more overwhelmed and emotionally exhausted. She has been struggling to eat properly and nurse their daughter consistently.

217. Both Ms. Rami and Ms. Laasri believe that the Consular Rules are not only anti-African but also anti-Muslim, as they have seen recent posts from the White House on X boasting that the administration's recent policies have reduced legal immigration from Muslim countries.

***Plaintiff Joshua Whitney***

218. Plaintiff Joshua Whitney is a 41-year-old U.S. citizen who resides in Charleston, South Carolina and is a member of ACT. His wife, Zineb Bate, 27 years old, is a national of and resides in Morocco. In March 2024, Mr. Whitney filed an I-130 petition for his wife. The immigrant visa application was refused under INA § 221(g) pursuant to the Blanket Visa Ban. Mr. Whitney is employed as a web developer for the County of Charleston, South Carolina, where he earns approximately $88,000 annually. Ms. Bate has never been institutionalized at government expense or been primarily dependent on the government for subsistence. At his wife's initial consular interview on January 22, 2026, Ms. Bate was told by the consular officer that her application looked good and that her visa would have been approved, but for the Blanket Visa Ban. After Ms. Bate's interview, Mr. Whitney and his wife have checked their case status every day in CEAC and noticed

what appeared to be automatic updates on October 29, 2026, but the case status continues to read "Refused," without further explanation; their repeated attempts to contact the U.S. Embassy in Morocco have yielded no further information. Ms. Bate is subject to the Consular Rules. The Consular Rules have caused severe harm to Mr. Whitney and Ms. Bate. As an example, Mr. Whitney suffered testicular cancer last year and, though in remission now, he is desperate to reunite with his wife for support. Further, these policies have denied the pair the ability to start a family and begin their lives together. The emotional toll has been significant, as both individuals suffer panic attacks, sleep deprivation, and prolonged bouts of anxiety.

***Plaintiff Angela Duro***

219. Plaintiff Angela Duro is a 37-year-old U.S. Citizen who lives in Middlesex, New Jersey. She has petitioned on behalf of her 44-year-old husband, Wilian Nelson Hernandez Morales, who is a national of Guatemala. They are the parents of 4-year-old and 6-year-old U.S.-citizen sons, who live with Ms. Duro in New Jersey. Ms. Duro's 11-year-old U.S.-citizen daughter, of whom she has shared, custody, and Mr. Hernandez Morales' 13-year-old U.S. citizen daughter also live with Ms. Duro. Mr. Hernandez Morales lived with his family until he traveled to Guatemala for his visa interview in January 2026. Ms. Duro works as a supervisor at a utility locator company in New Jersey, where she earns over $82,995, with $1,000/month bonuses, and she has employer-sponsored private health insurance for herself and her family, including her husband. Her husband worked as a roofer, and together they earned approximately $150,000 in joint annual income. Mr. Hernandez Morales plans to return to his previous job when he is back in New Jersey. Mr. Hernandez Morales has never been institutionalized at government expense or been primarily dependent on the government for subsistence.

220. After attending his visa interview on January 21, 2026, Mr. Hernandez Morales received a notice of refusal under INA § 221(g) pursuant to the Blanket Visa Ban despite the fact that he was told by the consular officer that his application looked good, that no further documentation was needed and that his visa would have been approved, but for the Blanket Visa Ban. The officer further advised him to look for the email when they would ask him to send in his passport for the visa. Since then, Ms. Duro has noticed what appeared to be automatic updates on, on CEAC, but the case status continues to read "Refused." The couple has received very little communication from the U.S. Embassy in Guatemala other than generic emails in September and October acknowledging that the ban or "pause" was no longer in effect and that interviews are being adjusted due to "global training initiatives," instructing them to wait to hear back from the Embassy without further explanation. Mr. Hernandez Morales is subject to the Consular Rules. Ms. Duro and her family are harmed by the indefinite separation imposed by the Consular Rules. Ms. Duro and her children have not seen Mr. Hernandez Morales in over 2 months. He missed his youngest sons' fourth and sixth birthdays in September and October. Ms. Duro was diagnosed with anxiety and depression after being separated from her husband due to the Ban. She also suffers from insomnia and is experiencing nightmares. Her husband also experiences depression after being separated from his children, and her children have also developed anxiety.

***Plaintiff Sabah Kalsoom Javaid***

221. Plaintiff Sabah Kalsoom Javaid is a 30-year-old U.S. citizen who resides in Morrisville, North Carolina. Ms. Javaid has petitioned on behalf of her 30-year-old husband, Muhammad Ehsan Nissar Chaudhry, who currently resides in and is a national of Pakistan. Ms. Javaid works as a senior product services and management analyst for Northwell Health and earns approximately $130,000 annually. Mr. Chaudhry just accepted a 12-month contract position as a

senior software engineer. He previously worked remotely as a senior software engineer for a U.S.-based company. Mr. Chaudhry has never been institutionalized at government expense or been primarily dependent on the government for subsistence. Mr. Chaudhry attended his immigrant visa interview at the U.S. Embassy in Islamabad, Pakistan, on August 3, 2026. At the interview, he received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban despite the fact that he was told by the consular officer that his application looked good, that no further documentation was needed and that his visa would have been approved, but for the Blanket Visa Ban. Since the Ban was vacated, the couple has monitored his case through CEAC, which continues to list his application as "Refused," with a last update of September 30, 2026. The couple has received no other updates regarding Mr. Chaudhry's visa, and they have received no communication from the U.S. Embassy in Islamabad. Mr. Chaudhry is subject to the Consular Rules.

222. The Consular Rules have harmed Ms. Javaid. Ms. Javaid experiences anxiety attacks and has suffered stress-related hair shedding and weight gain. Mr. Chaudhry also experiences stress. Due to the separation, Mr. Chaudhry and Ms. Javaid have had to put a hold on growing their family.

***Plaintiff Salman Hossain Khan***

223. Plaintiff Salman Hossain Khan is a 27-year-old U.S. citizen who lives in Woodside, New York. He has petitioned on behalf of his 26-year-old wife, Tamanna Akter Tuli, who currently resides in and is a national of Bangladesh. Mr. Khan works as a Parks Enforcement Patrol Officer for the New York City Parks Department and also drives for Uber and Lyft. His annual salary at the Parks Department is $58,843, and after combining it with his income from Uber and Lyft, he expects to earn approximately $84,000 in 2026.

224. A family friend serves as a joint sponsor. Ms. Tuli operates a small cake bakery business in Bangladesh and plans to work and open a cake or catering business in New York upon

arriving in the United States. Mr. Khan maintains private health insurance coverage. Mr. Khan also recently uploaded documents to the NVC online portal, showing proof of his employment and recent salary payments, demonstrating that his wife would be covered under his health insurance plans if she is admitted to the United States, and confirming his wife's anticipated enrollment in English language classes. Ms. Tuli has never been institutionalized at government expense or been primarily dependent on the government for subsistence. Ms. Tuli attended her immigrant visa interview on August 17, 2026. Ms. Tuli was told at her visa interview by the consular officer that her application looked good and that her visa would have been approved, but for the Blanket Visa Ban. At the interview, she received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. After the Court vacated the Visa Ban, the couple received a generic email in September 2026 stating that the "pause" was no longer in effect and that they would be contacted, but have received no further substantive update or instructions. Ms. Tuli is subject to the Consular Rules. Mr. Khan has monitored his wife's case through CEAC and observed what appeared to be automated updates on October 22 and November 2, 2026, but the case status continues to read "Refused," without explanation. Mr. Khan and his wife have not seen each other in person since July 14, 2026. Mr. Khan has developed anxiety and insomnia because of the prolonged separation from his wife due to the Consular Rules.

***Plaintiff Yessica Linares***

225. Plaintiff Yessica Linares is a 25-year-old U.S. citizen who lives in Long Beach, California. Mrs. Linares filed an I-130 petition for her 27-year-old husband, Mr. Freddy Anibal Linares, who is a national of Guatemala and is currently residing there. They share two children, both U.S. citizens, a 5-year-old son and a 5-month-old daughter, who live with Mrs. Linares. Mr. Linares attended his immigrant-visa interview on April 16, 2026. Mr. Linares was told at his visa

interview by the consular officer that his application looked good and well-prepared, but the consular officer told him that unfortunately she was prohibited from issuing a visa due to the Blanket Visa Ban. At the interview, he received an INA § 221(g) refusal notice pursuant to the Blanket Visa Ban. Since the Blanket Visa Ban was vacated, both Mr. and Mrs. Linares have noticed what appeared to be automatic case status updates in CEAC, but the case status continues to read "Refused," without further explanation. They have received very little communication from the U.S. Embassy in Guatemala despite submitting multiple inquiries about the status of their case, other than generic emails.

226. Mrs. Linares works as the store manager for her family's grocery store in Lynwood, California, and earns approximately $40,000 a year. Mr. Linares previously worked as a butcher, making around $50,000 per year. Mr. Linares has never been institutionalized at government expense or been primarily dependent on the government for subsistence. Mr. Linares is subject to the Consular Rules, and the family has been harmed by them. Mrs. Linares was eight months pregnant when Mr. Linares left for his interview in April 2026. He has been stuck in Guatemala since then, while their daughter was born in California with kidney/reflux complications which required surgery and a six-week intensive stay in the NICU. Mrs. Linares and their son have not seen Mr. Linares in person since April 2026. Their newborn daughter has never met her father in person, and he is missing daily milestones in her development. As a result, Mr. Linares has become depressed and anxious, and suffers from insomnia. Mrs. Linares also suffers from worsening anxiety, panic attacks, sleep disruption, depressive symptoms, and is seeking counseling support. Their five-year-old son also suffers from worsening anxiety due to the separation. Mrs. Linares has worries every day for Mr. Linares' safety in Guatemala.

***Plaintiff Maru Mahmud Hassen***

227. Plaintiff Maru Mahmud Hassen is a forty-year-old U.S. citizen who resides in Rochester, New York. His 35-year-old wife, Tigist Asmare Mekonnen, is a citizen of and resides in Ethiopia. Mr. Maru Hassen is employed as an environmental services worker and works in a warehouse. He earns approximately $101,050 per year. Ms. Mekonnen has never been institutionalized at government expense or been primarily dependent on the government for subsistence. Ms. Mekonnen is still awaiting the scheduling of her consular interview. She and Mr. Maru Hassen only learned they are "in the scheduling queue" through the Armstrong Declaration filed on October 5, 2026. *See* Ex. AJ, *also available* at ECF 114-1. In response to inquiries about their case, she and Mr. Maru Hassen have only received generic updates from the consular post. Mr. Maru Hassen has not seen his wife in person since 2022. Mr. Maru Hassen is depressed and withdrawn; he has suffered and continues to suffer from heightened anxiety, stress, frequent nightmares, and insomnia.

***Plaintiff Munthaz Mahmud Hassen***

228. Plaintiff Munthaz Mahmud Hassen is a forty-two-year-old U.S. citizen who resides in Rochester, New York. His two minor children, ages 12 and 14, are citizens of and reside in Ethiopia. Mr. Munthaz Hassen is employed in the bakery department of a major grocery chain and he earns approximately $83,600 per year. His children have never been institutionalized at government expense or been primarily dependent on the government for subsistence. After the Ban was declared unlawful and vacated, Mr. Munthaz Hassen sent multiple inquiries to the embassy and the NVC but has not received any communications except for a generic update. Mr. Munthaz Hassen's children are awaiting the scheduling of their consular interviews. Mr. Munthaz Hassen only learned his children's cases are "in the scheduling queue" through the Armstrong Declaration

filed on October 5, 2026. *See* Ex. AJ, *also available* at ECF 114-1. Mr. Munthaz Hassen's children are subject to the Consular Rules. Mr. Munthaz Hassen has not seen his children in person since 2022. Mr. Munthaz Hassen feels hopeless and depressed; he has suffered and continues to suffer from heightened anxiety and stress, difficulty concentrating, frequent nightmares, and insomnia.

***Plaintiff Christina Mulligan***

229. Plaintiff Christina Mulligan is a 45-year-old U.S. citizen who resides in Virginia Beach, Virginia. She petitioned on behalf of her 44-year-old husband, Ramon Reyes Guerrero, who is a national of and resides in Mexico. They share an 11-year-old U.S.-citizen daughter, who lives with Ms. Mulligan and her mother. Ms. Mulligan is employed as a graphic designer, and her annual adjusted gross reported income is approximately $87,737. After approval of a Form I-212 application for permission to reapply for admission on May 7, 2026, Mr. Reyes submitted updated documents requested by the U.S. Consulate in Ciudad Juárez and received a confirmation that all requisite documents were received by the Consulate on August 11, 2026. On August 21, 2026, his CEAC was updated to indicate that his visa had been issued, but neither his visa nor his passport was returned. He saw no other updates on CEAC until October 7, 2026, when his status reverted to "Ready." The system was updated again on October 26 and 27, and November 3 and 4, but his status remained "Ready." In October, Ms. Mulligan made specific case inquires through the Immigrant Visa Navigator, asking for an explanation for the reversion. She received general generic emails from the DOS in response, informing her that DOS was launching a training initiative that was causing appointments to be adjusted and that they would be contacted if further processing was required. Despite repeated inquiries, the government has provided no substantive explanation. Mr. Reyes is subject to the Consular Rules.

230. Mr. Reyes has never been institutionalized at government expense or been primarily dependent on the government for subsistence. Ms. Mulligan maintains private health insurance coverage for herself and her daughter. Mr. Reyes also maintains private health insurance in Mexico. The Consular Rules, including the Review and Override Policy, have injected new uncertainty and have imposed substantial emotional, educational, and financial burdens on the family. Ms. Mulligan suffers constant stress and anxiety. She has been forced to delay purchasing a home while her husband's admission remains uncertain and in limbo. The family believed reunification was imminent when CEAC displayed "Issued," making the subsequent reversal especially distressing.

***Plaintiff Adrian Mitchell***

231. Plaintiff Adrian Mitchell is a 32-year-old U.S. citizen who resides in Palm Bay, Florida. His 71-year-old mother, Carol Marie Baugh, is a Jamaican citizen who normally resides in Port St. Lucie, Florida with her U.S.-citizen husband. Mr. Mitchell is employed as a construction worker, and his annual salary is approximately $31,000 after taxes. Ms. Baugh has never been institutionalized at government expense or been primarily dependent on the government for subsistence. After a consular interview at the U.S. Embassy in Kingston, Jamaica, on January 12, 2026, Ms. Baugh's petition was refused pursuant to the Blanket Visa Ban, leaving her stranded in Jamaica. After the Court vacated the Blanket Visa Ban, Ms. Baugh was required to complete a new "public charge questionnaire" and upload her answers and any supporting documentation to CEAC before a second re-interview at the U.S. Embassy in Kingston, Jamaica on October 16, 2026. Ms. Baugh's visa was again refused without explanation, even though she had already been deemed admissible at the earlier interview. Ms. Baugh is subject to the Consular Rules. Mr. Mitchell has not seen his mother in person since December 2025. Mr. Mitchell suffers from anxiety, nightmares, difficulty sleeping, and unintentional weight loss due to a loss of appetite. Normally, Ms. Baugh is

the caregiver for her U.S. citizen husband. However, while she remains out of the country, Mr. Mitchell is responsible for caring for his 92-year-old stepfather, who suffers from multiple health conditions.

***Plaintiff Patricia Richardson***

232. Plaintiff Patricia Richardson is a 69-year-old U.S. citizen who resides in the Bronx, New York. Her 61-year-old sister, Andrea Anderson, is a citizen of and resides in Jamaica. In March 2007, Ms. Richardson filed an I-130 petition for her sister. Ms. Richardson is employed as a social worker and earns approximately $68,000 per year. Ms. Anderson has never been institutionalized at government expense or been primarily dependent on the government for subsistence. On March 17, 2026, Ms. Anderson attended a consular interview in Kingston, Jamaica. At that interview, the consular officer told Ms. Anderson that her application looked good and that her visa would have been approved, but for the Blanket Visa Ban. At the interview, Ms. Anderson received a refusal letter under INA § 221(g) because Jamaica was one of the 75 countries subject to the Blanket Visa Ban. After the Court vacated the Blanket Visa Ban, Ms. Anderson received a request that she update her medical exam. However, although she was already determined admissible under INA § 212(a)(4), she was required to complete a new "public charge questionnaire" and upload her answers and any supporting documentation to CEAC before a second re-interview at the U.S. Embassy in Kingston, Jamaica on October 22, 2026. Ms. Anderson's visa was again refused without explanation. Ms. Anderson is subject to the Consular Rules. Ms. Richardson has not seen her sister in person since 2023. Ms. Richardson suffers from anxiety, difficulty sleeping, loss of appetite, and stress due to their prolonged separation and the burden the Consular Rules have placed on her family.

***Plaintiff Wael Ali***

233. Plaintiff Wael Ali is a 48-year-old U.S. citizen who resides in Seattle, Washington, and is a member of ACT. His wife, Doaa Fathy Aly Elmazoul, age 46, and their 16-year-old daughter are Egyptian citizens who reside in Egypt. Their two sons, now 18 and 11 years old, were born in Egypt and reside with Mr. Ali in Seattle. They became U.S. citizens by operation of law after immigrating in 2026. Mr. Ali worked as a driver for Uber at the time of the family's interviews in January 2026, and as a mechanic for Boeing from June through October 2026, including at the time of his wife and daughter's second re-interviews on October 4, 2026. He anticipates earning over $50,000 this year, and has a 401k plan and over $140,000 in assets. A family friend and his wife, a truck driver trash collector and nurse, respectively, serve as their joint co-sponsors. They earned $103,260 in the past year. Neither Ms. Elmazoul nor any of their children has ever been institutionalized at government expense or been primarily dependent on the government for subsistence.

234. At the time of their January 20, 2026 interview, Mr. Ali was enrolled in Washington State Medicaid. He spent two years on Medicaid. At the time of his wife and daughter's re-interview in October 2026, Mr. Ali had enrolled himself and his sons in a private employer-sponsored health insurance plan. His oldest son recently applied for scholarships and federal financial aid for college. At their interview on January 20, 2026, the visas for all four family members were approved, and they received a congratulation letter, yet only the two visas for Mr. Ali's sons were ultimately issued that day. The visas for Mr. Ali's wife and daughter were not issued that day, but instead refused a day later pursuant to the Blanket Visa Ban. After the Court vacated the Blanket Visa Ban, Mr. Ali's wife and daughter attended a second re-interview and were again refused visas under INA § 212(a)(4) on October 4, 2026, although they had already been deemed admissible at earlier

interviews. At their initial interview on January 20, Mr. Ali's children were all exempt from the affidavit of support requirement, as minors eligible for derivative citizenship under the Child Citizenship Act, INA § 320. Mr. Ali's wife and daughter are subject to the Consular Rules. The Consular Rules, including the Review and Override Policy, recent public-charge refusal, and prolonged family separation have caused severe harm to Mr. Ali and his family. Mr. Ali and his sons have not seen his wife and daughter in person since January 2026. Mr. Ali's 16-year-old daughter has become distressed and tearful; his 11-year-old son has become withdrawn, does not smile anymore, cries frequently, has trouble sleeping and concentrating at school, has lost his appetite and weight, and has received school support letters documenting the emotional, psychological, academic, and mental-health strain caused by the separation. Mr. Ali himself has trouble sleeping, nightmares, anxiety, and difficulty concentrating. Ms. Elmazoul cries multiple times a day, has lost her appetite, has lost significant weight, and now suffers from insomnia as a result of the incessant anxiety and stress caused by the prolonged family separation.

235. The prolonged family separation and resultant emotional toll interfered with Mr. Ali's ability to focus at work and contributed to the loss of his employment at Boeing. Mr. Ali has been forced to resume driving for Uber and to enroll both his sons and himself in Washington State Apple Health (Medicaid) to ensure health coverage while he works with his union to regain his position and private employer-sponsored healthcare benefits.

***Plaintiff Alessandra Marques Lima***

236. Plaintiff Alessandra Marques Lima is an accountant and business owner with approximately $72,000 in combined annual earnings from her businesses in Portugal and Brazil, with continuing client income she projects at approximately $9,000 per month. She is a Brazilian national who currently resides in Lisbon, Portugal with her four-year-old daughter. Ms. Marques

Lima has over $200,000 in liquid savings and investments, has never received public benefits, reports no significant health problems, and maintains private health insurance. Neither she nor her derivative four-year-old daughter have ever been institutionalized at government expense or been primarily dependent on the government for subsistence. USCIS approved her EB-2 national interest waiver petition in July 2025, but her immigrant-visa application was refused under INA § 221(g) in February 2026 because of the Blanket Visa Ban. After this Court vacated the Ban, the U.S. Embassy in Paris scheduled a second re-interview by telephone for October 15, 2026, and provided a questionnaire addressing housing, employment, and health insurance. Although not required to submit her answers beforehand, Ms. Marques Lima proactively provided extensive financial records, tax documentation, evidence of continuing income, and information concerning health insurance coverage in the United States. According to Ms. Marques Lima, the consular officer was aware of her bank balance but interrupted her attempts to explain her financial circumstances and ended the telephone interview before she could finish. On October 16, 2026, she received written refusals under INA § 212(a)(4) for herself and her four-year-old daughter, neither of which identified any specific financial deficiency or explained the public-charge determination. Ms. Marques Lima and her daughter are subject to the Consular Rules. More than eight months after her initial refusal under the Blanket Visa Ban, Ms. Marques Lima and her daughter remain unable to immigrate, delaying her plans to establish a U.S. business developing software to improve tax compliance and prevent financial fraud.

***Plaintiff Lina Margarita Angulo Peñaranda***

237. Plaintiff Lina Margarita Angulo Peñaranda is a Colombian national and professional architect specializing in residential architecture and interior design. She submitted her EB-2 national interest waiver petition on November 1, 2023, and it was approved on January 10, 2025.

She is subject to the Consular Rules. As a result, her visa issuance has been delayed and remains uncertain. Ms. Angulo Peñaranda reached the final stage of the immigrant-visa process before her case was halted. She proceeded through consular processing and appeared for her immigrant-visa interview at the U.S. Embassy in Bogotá on January 21. 2025. After the interview, she received an INA § 221(g) refusal notice referencing the Blanket Visa Ban. Almost a year later, after the Court vacated the Visa Ban, the Embassy scheduled a follow-up consular appointment for October 2, 2026.

238. At that follow-up appointment, the Embassy required updated documents, asked detailed questions, including about her financial circumstances, and indicated that additional medical examinations would be required. Despite her compliance with all procedural requirements, Ms. Angulo Peñaranda still was not approved for a visa. On November 5, 2026, the Embassy informed Ms. Angulo Peñaranda that it would return her case to USCIS with a request to revoke her approved petition, without identifying any grounds for the request. The Embassy warned that the case could take several months just to reach USCIS.

239. Ms. Angulo Peñaranda has never been institutionalized at government expense or been primarily dependent on the government for subsistence.

240. Ms. Angulo Peñaranda's proposed endeavor depends on her physical presence in the United States. That work requires her to develop relationships with U.S.-based suppliers of locally sourced building materials and oversee residential design and production projects, including coordinating employment opportunities for local workers, with a focus on employment for single mothers. These activities require in-person coordination with suppliers, workers, and project partners.

241. More than two months after this Court vacated the Ban, and despite a second consular appointment on October 2, 2026, Ms. Angulo Peñaranda remains unable to relocate to the United States and pursue the work USCIS determined would serve the national interest. She now also faces potential revocation of her previously approved immigrant petition and further prolonged delays while USCIS considers the Embassy's request.

***Plaintiff Andres Alfonso Medina Ramirez***

242. Plaintiff Andres Alfonso Medina Ramirez is a Colombian national and architect. He has been harmed because the Blanket Visa Ban delayed his ability to relocate to the United States to pursue work determined by USCIS to be in the national interest. Mr. Medina Ramirez pursued a lengthy, lawful path to U.S. permanent residence through the EB-2 National Interest Waiver process. He filed his national interest waiver petition on December 11, 2023, and USCIS approved it on April 16, 2025. He thereafter completed consular processing and appeared for his immigrant visa interview in Bogotá, Colombia, on January 22, 2026.

243. Following that interview, Mr. Medina Ramirez received a refusal under INA § 221(g) based on the Blanket Visa Ban. The refusal delayed his planned relocation and U.S. housing development work for more than eight months. His case later resumed, and at a follow-up interview on October 2, 2026, a consular officer determined that he was eligible for a visa.

244. Since then, Mr. Medina Ramirez has remained subject to delay and additional requirements. At his follow-up interview, he was asked detailed questions, including about his finances, and was told he would have to complete medical examinations and additional steps before a visa could be issued. Mr. Medina Ramirez has never been institutionalized at government expense or been primarily dependent on the government for subsistence.

245. These events have imposed concrete burdens even after the initial refusal. Mr. Medina Ramirez had already invested substantial time, effort, and resources in petition approval and consular processing, yet still has had to navigate additional requirements and prolonged uncertainty even after being found eligible for a visa. Mr. Medina Ramirez is subject to the Consular Rules.

***Plaintiff Fernando Lizcano Losada***

246. Plaintiff Dr. Fernando Lizcano Losada suffers ongoing harm as a result of the Blanket Visa Ban and Consular Rules.

247. Dr. Lizcano Losada pursued a lawful pathway to U.S. permanent residence through the employment-based visa category for individuals with “extraordinary ability” in the sciences. 8 U.S.C. § 1153(b)(1)(A). USCIS approved his EB-1A petition on January 22, 2025, confirming that he met the demanding statutory criteria and could proceed toward immigrant-visa issuance.

248. After his immigrant-visa interview in Bogotá on January 22, 2026, Dr. Lizcano Losada received an INA § 221(g) refusal based on the Blanket Visa Ban and was put in administrative processing. After the Court issued its order vacating the Ban, he appeared for a follow-up interview on September 30, 2026, as instructed.

249. At that follow-up interview, consular officials asked extensive questions, including about financial support and public-charge-related issues. The officer then required an additional medical examination and passport submission for continued review. Dr. Lizcano Losada has never been institutionalized at government expense or been primarily dependent on the government for subsistence. The officer again refused his application under INA § 221(g), citing the lack of a valid medical examination and the unavailability of an EB-1 visa number. DOS subsequently reported

that EB-1 visa numbers had become available, but his application remained refused under § 221(g), and no immigrant visa has been issued. Dr. Lizcano Losada is subject to the Consular Rules.

250. Dr. Lizcano Losada's case is especially striking because USCIS already determined that he qualifies under the demanding EB-1A extraordinary-ability standard. He is a physician-scientist who specializes in endocrinology, diabetes, and metabolic disorders, with concrete plans to contribute to clinical care, biomedical research, and training other medical professionals in the United States. Yet more than nine months after his initial consular interview, and more than two months after this Court vacated the Visa Ban, he still has not received an immigrant visa based on his approved petition. His plans to bring his medical and research expertise to the United States remain delayed, notwithstanding his compliance with the Embassy's additional requirements.

251. As Plaintiffs' experiences demonstrate, the Consular Rules have caused widespread and significant harm. Visa applicants are not the only ones harmed by the Consular Rules. The Trump Administration's 2019 public charge rule caused a severe and demonstrable chilling effect, with many immigrant families declining to seek health coverage and other essential services for which they were eligible. Many immigrant families disenrolled from or avoided noncash benefits, even for their citizen children. On information and belief, the same negative impacts and chilling effect will follow from the Consular Rules.[112] The Consular Rules also will cause broad economic harms, particularly to the health care workforce, by barring a significant number of skilled health care workers from admission.[113]

---

[112] *See* Samantha Artiga et al., *Potential "Chilling Effects" of Public Charge and Other Immigration Policies on Medicaid and CHIP Enrollment*, KFF (Dec. 2, 2025), https://www.kff.org/medicaid/potential-chilling-effects-of-public-charge-and-other-immigration-policies-on-medicaid-and-chip-enrollment/.

[113] Pillai & Artiga, *supra* note 54 (observing that foreign-born workers from 69 of the 75 countries impacted by the DOS Blanket Visa Ban comprise nearly one in ten U.S. health care workers).

## CAUSES OF ACTION

## COUNT ONE

### (Blanket Visa Ban—Violation of Administrative Procedure Act—5 U.S.C. § 706(2)(A)-(C) —Contrary to Law and Constitutional Right and Excess of Statutory Authority)

252. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

253. The Administrative Procedure Act (APA), 5 U.S.C. § 706(2), prohibits federal agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

254. DOS is an "agency" under the APA. 5 U.S.C. § 551(1). In instituting a blanket ban on the issuance of immigrant visas to nationals of 75 countries, Defendants took unconstitutional and unlawful actions, in violation of the APA, by, among other things: (a) barring the issuance of visas without statutory authority; (b) seeking to alter the definition of public charge and override the INA by repudiating its requirement of an individualized public charge determination for each visa applicant and replacing it with a blanket ban on nationals of 75 countries; (c) barring the issuance of a visa to an individual based solely on their nationality without any consideration of their individual financial circumstances and other circumstances that demonstrate that they are not likely to become a public charge; (d) barring the issuance of visas to the nationals of 75 countries without evidence that nationals of these countries are at "high risk" of becoming a public charge; (e) barring the issuance of visas to the nationals of 75 countries based on a rationale that runs counter to the evidence; (f) instituting a visa ban motivated by animus against nonwhite immigrants; and (g) substituting blanket refusal of all covered visas for the case-by-case considerations and criteria that Congress directed consular officers to rely on in adjudicating visas.

255. *First,* Defendant's Blanket Visa Ban and Visa Ban Cable impose rules that contravene the definition of public charge and longstanding approach to public charge inadmissibility determinations. As alleged above, the Blanket Visa Ban and Visa Ban Cable also appear to incorporate the Consular Processing Cable (Ex. G at 2 ¶ 4, "Ref. B"), which explicitly directs officers to consider benefits use beyond cash assistance and government-funded long-term institutional care, newly extends the definition to include charity as a negative factor, and extends the scope of benefits use that is to be considered beyond use in the United States to use anywhere in the world. Exs. C & AB, ¶ 29. Likewise, the Blanket Visa Ban and Visa Ban Cable's vague references to "indications that nationals from these countries having sought public benefits in the United States," (Ex. A; Ex. B & G, ¶ 3), and "that immigrants must be financially self-sufficient and not be a financial burden to Americans" in order "to ensure that immigrants from these high-risk countries do not utilize welfare in the United States or become a public charge," (Ex. A), appear to refer to individuals who may at some time in the future receive even a minimal amount of noncash public benefits. The adoption of such a "test" is contrary to the definition of "public charge" that has endured for 140 years: an individual primarily dependent on the government for subsistence. The statutory meaning of the term "public charge" is evident from, among other things: (i) the plain meaning of the phrase, (ii) the judicial and administrative interpretation of the term since it first became part of federal immigration law; (iii) Congress' approval of that interpretation in repeatedly reenacting the statute; and (iv) Congress' rejection of efforts to expand that interpretation in the manner DOS now seeks to accomplish.

256. *Second,* the Blanket Visa Ban and Visa Ban Cable conflict with 8 U.S.C. § 1182(a)(4) by seeking to effectively erase the statutorily mandated individualized evaluation,

excluding all of the statutorily mandated factors, and arbitrarily adopting one sole, dispositive, and irrelevant factor: nationality.

257. *Third,* the Blanket Visa Ban and Visa Ban Cable also violate 8 U.S.C. § 1201(g), which permits visa refusal only where a consular officer determines, based on an individual application, that an applicant is ineligible under a specific INA ground. Neither § 1201(g) nor § 1182(a)(4) authorizes a categorical, nationality-based refusal of visas, nor a suspension without exception or end date.

258. *Fourth,* by directing consular officers to refuse visas categorically under 8 U.S.C. § 1201(g) based on nationality alone, Defendants have ordered conduct expressly forbidden by the INA's nondiscrimination provision, which provides that "no person shall be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

259. *Fifth,* the Blanket Visa Ban and Visa Ban Cable, independently and together with the Consular Processing Cable that they appear to incorporate in their directives, conflict with and frustrate Congress's objectives in PRWORA, Pub. L. No. 104193, 110 Stat. 2105 (1996), the ACA, Pub. L. No. 111148, 124 Stat. 119 (2010), and CHIPRA, Pub. L. No. 1113, 123 Stat. 8 (2009), each of which reflects the congressional intent to preserve or expand access to lawfully available benefits and affordable health coverage for lawfully present immigrants and their families. By penalizing or deterring the lawful use of such benefits, the Blanket Visa Ban and Visa Ban Cable are not in accordance with law.

260. Defendants' violations have harmed and will continue to harm Plaintiffs and the general public. Accordingly, the Blanket Visa Ban is not in accordance with the law and exceed

DOS's statutory authority. 5 U.S.C. § 706(2)(A), (C). Therefore, the Court should hold Defendants' actions unlawful and vacate and set them aside pursuant to 5 U.S.C. § 706(2).

**COUNT TWO**

**(Consular Processing Cable, Public Charge Directives, and Review and Override Policy—5 U.S.C. § 706(2)(A)-(C) —Contrary to Law and Constitutional Right and Excess of Statutory Authority)**

261. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

262. In issuing the Consular Processing Cable and instructing diplomatic and consular posts to institute a new framework and new standards for making public charge determinations, and by operationalizing the Consular Processing Cable's framework and standards through the Public Charge Directives and Review and Override Policy, Defendants took unconstitutional and unlawful actions, in violation of the APA, by, among other things, as set forth herein: (a) expanding the definition of "public charge" in a manner contrary to the settled statutory meaning of the term under 8 U.S.C. § 1182(a)(4)(A); (b) seeking to establish a framework for public charge determinations that will deny admission to large numbers of intending immigrants who would be approved for admission to the U.S. as immigrants under an approach consistent with the INA; (c) establishing a scheme that is so confusing, vague, and broad that it fails to give applicants notice of the conduct to avoid, and inviting arbitrary, subjective, and inconsistent enforcement; (d) seeking to establish a framework for public charge determinations that undermines the Congressional goal of promoting family unity; (e) seeking to establish a framework that applies retroactively by directing consular officers to consider the past use of benefits by visa applicants and their family members; (f) seeking to establish a framework that is motivated by animus against nonwhite immigrants; and (g)

subjecting applicants to renewed consular scrutiny of USCIS-approved immigrant petitions, including requests for revocation, notwithstanding the FAM's limitations on such review.

263. The Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy conflict with and frustrate Congress's objectives in PRWORA, ACA, and CHIPRA, each of which reflects the congressional intent to preserve or expand access to lawfully available benefits and affordable health coverage for lawfully present immigrants and their families. By penalizing or deterring the lawful use of such benefits, the Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy are not in accordance with law. 5 U.S.C. § 706(2)(A).

264. Defendants' actions are not in accordance with law and are contrary to constitutional rights, in violation of the APA. Defendants' violations have harmed and will continue to harm Plaintiffs and the general public. Therefore, the Court should hold the Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy unlawful and vacate and set them aside pursuant to 5 U.S.C. § 706(2).

**COUNT THREE**

**(Blanket Visa Ban—Violation of Administrative Procedure Act—Failure to Follow Notice-and-Comment Procedures, 5 U.S.C. § 553)**

265. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

266. A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

267. The Blanket Visa Ban is a legislative rule under the APA for which notice and comment was required. 5 U.S.C. §§ 551(4), 553(b), (c); *Sweet v. Sheahan*, 235 F.3d 80, 90–91 (2d

Cir. 2000). Defendants failed to provide notice and an opportunity for public comment on the Blanket Visa Ban in any manner prior to its issuance on January 14, 2026.

268. The INA provides that rules governing the processing of visas, including immigrant visas, may be promulgated by "regulations issued" to implement the controlling statutes. *Cf.* 8 U.S.C. § 1201(a) (stating that consular officers may issue visas subject to limitations prescribed by regulations issued pursuant to the INA).

269. In issuing the Blanket Visa Ban, Defendants have effectively amended prior rules governing visa issuance that were previously issued as legislative rules, including in some cases through notice-and-comment rulemaking; altered the rights and obligations of noncitizens; constrained consular discretion that previously existed through a categorical and indefinite prohibition on granting visa applications; encoded a substantive value judgment; and created new, additional grounds upon which an immigrant visa application can be refused under 8 U.S.C. § 1201(g) that exist nowhere in the statute or implementing regulations. The Blanket Visa Ban restricts and affects the substantive rights and obligations of Plaintiffs and all immigrant visa applicants covered by the policy.

270. In addition, the Blanket Visa Ban indefinitely pauses the operation of regulations that were previously issued as legislative rules, including in some cases through notice-and-comment procedures. *See* 22 C.F.R. §§ 40.6, 42.81(a) (governing the grounds for refusing visas and requiring consular officers to issue or refuse properly completed immigrant visa applications in accordance with applicable law). Pausing the operation of rules that were issued through notice-and-comment procedures is itself a legislative rule subject to the procedural requirements of the APA.

271. The APA also presumptively requires that a substantive rule be published "not less than 30 days before its effective date." *Id.* § 553(d). Defendants failed to publish the Blanket Visa Ban as required by law.

272. No exception to notice-and-comment procedures applies to the Blanket Visa Ban.

273. The Blanket Visa Ban therefore violates the APA for failure to comply with required procedures and must be vacated and set aside.

**COUNT FOUR**

**(Consular Processing Cable, Public Charge Directives, and Review and Override Policy—Violation of Administrative Procedure Act—Failure to Follow Notice-and-Comment Procedures, 5 U.S.C. § 553)**

274. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

275. The Consular Processing Cable is also a legislative rule under the APA for which notice and comment was required. See 5 U.S.C. §§ 553(b), (c). It imposes new duties and obligations and limits the rights of applicants, petitioners, sponsors, their family members, and legal representatives. Defendants failed to provide notice and an opportunity for public comment on the Consular Processing Cable in any manner prior to its issuance on November 6, 2025. Further, Defendants failed to provide notice and an opportunity for comment prior to issuing the Public Charge Directives, including the Review and Override Policy.

276. In issuing the Consular Processing Cable, Defendants have changed the substantive criteria for evaluating whether an individual is a public charge by altering the framework established by statute at 8 U.S.C. §§ 1182(a)(4) and 1201(g) and by regulations at 8 C.F.R. § 212.22, 22 C.F.R. § 40.41, and 22 C.F.R. Part 42, particularly 22 C.F.R. § 42.81 (regarding refusal of visas and grounds of inadmissibility), which was issued with notice and comment procedures; altered the

rights and obligations of noncitizens; encoded a substantive value judgment; and created new, additional grounds upon which an immigrant visa application can be refused under 8 U.S.C. § 1201(g) and 22 C.F.R. § 42.81, including but not limited to the past receipt of noncash assistance or charitable contributions, that exist nowhere in the statute or implementing regulations.

277. Defendants have since reinforced and expanded the Consular Processing Cable's substantive standards through mandatory, generally applicable directives—the Public Charge Directives and Review and Override Policy. Defendants similarly adopted them without notice-and-comment rulemaking. These agency actions do not merely advise officers how to exercise existing discretion; they impose binding procedures governing how public-charge eligibility is assessed and how favorable determinations are subjected to further review. For example, the September 14 Cable requires reviewing managers to ensure that officers consider applicants' past receipt of public welfare in their home countries and other factors prescribed by the Consular Processing Cable. Ex. AF ¶¶ 4–5. The September 10 Cable requires officers to complete new public-charge worksheets when reconsidering previously adjudicated applications and encourages repeat interviews, thus increasing consular workloads and imposing additional documentation, travel, time costs and other expenses on applicants. Ex. AE, 26 STATE 88862 ¶ 6. The September 21 instructions add another layer of centralized review after consular adjudication and managerial review, requiring additional processing and potentially further follow-up by consular staff, while creating additional burdens and risks of delay for applicants. Ex. AG [Sept. 21 email]. Together, these directives do more than prescribe internal review procedures. They make the Cable's expanded substantive criteria mandatory components of immigrant visa adjudications, including for applicants previously found eligible under the prior standards, while imposing additional administrative burdens, costs, and delays on consular posts, officers, and applicants.

278. The APA presumptively requires that a substantive rule be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendants failed to publish the Consular Processing Cable, Public Charge Directives, and Review and Override Policy as required by this provision.

279. No exception to the notice-and-comment requirement is applicable to the Consular Processing Cable, Public Charge Directives, and Review and Override Policy.

280. The Consular Processing Cable and Review and Override Policy therefore violate the APA for failure to comply with required procedures and must be vacated and set aside.

**COUNT FIVE**

**(Blanket Visa Ban —Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Arbitrary and Capricious)**

281. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

282. Pursuant to the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

283. The Blanket Visa Ban is arbitrary and capricious for multiple reasons, including, among other things, because Defendants failed to provide a reasoned explanation for the Ban; failed to consider important aspects of the problem (including less restrictive, statutory tools like individualized public charge adjudication); failed to consider reliance interests of applicants and petitioners who have already paid fees and scheduled or attended interviews; and provided no end date or metrics supporting countrywide suspensions. Further, Defendants relied on conclusory assertions (e.g., preventing immigrants who would "extract wealth from the American people") without country-specific evidence or reasoned distinctions, relied on factors Congress did not intend for them to consider, and departed from prior agency policy without explanation. The

Blanket Visa Ban is merely a pretext for Defendants' aim to curtail lawful immigration, especially by nonwhite immigrants.

284. Defendants failed to distinguish among visa classification types, including employment-based immigration categories—particularly national interest waiver beneficiaries—whose recipients are unlikely to implicate public-charge concerns and have already demonstrated an ability to support themselves and their endeavors through extensive documentation. Public charge is, by statute, an individualized inquiry, yet the Ban applies countrywide without explaining why employment-based or family-based applicants should be swept in rather than addressed through case-by-case adjudication. Defendants also failed to consider the economic disruption the Ban will cause in the U.S. through the loss of skilled workers and investment capital, and whether Defendants' goals could be accomplished through alternative, less disruptive means.

285. The Blanket Visa Ban therefore violates the APA because it is arbitrary and capricious agency action and must be vacated and set aside.

## COUNT SIX

**(Consular Processing Cable, Public Charge Directives, and Review and Override Procedure—Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)—Arbitrary and Capricious)**

286. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

287. Pursuant to the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

288. The Consular Processing Cable, together with the Public Charge Directives and Review and Override Policy that have operationalized it, are arbitrary and capricious for multiple reasons, including, among other things, because Defendants failed to provide a reasoned

explanation for the changed standards announced in the Consular Processing Cable, Public Charge Directives, and Review and Override Policy; failed to explain why global heightened public-charge scrutiny and additional review are warranted without identified case-specific concerns, or what additional information those requirements are expected to yield; failed to consider reliance interests of employers, workers or individuals and families who, in the past, participated in government programs or received charitable donations based on their well-founded understanding that such actions would not bear on a public charge determination; failed to adequately explain departures from prior policies; and because the Consular Processing Cable, Public Charge Directives, and Review and Override Policy are a pretext for Defendants' goal of reducing lawful immigration, especially by nonwhite immigrants.

289. The September 10 Cable affirmatively urges comprehensive, in-person re-interviews of applicants whose prior refusals rested solely on the Blanket Visa Ban, citing the passage of time since their initial interviews, even where those interviews occurred only months earlier. This approach departs from the State Department's April 2024 guidance aimed at reducing repeat interviews, unnecessary document requests, § 221(g) refusals, and processing delays. *See* Ex. AL, 24 STATE 41484 ¶¶ 2, 5–6 (Apr. 18, 2024), filed in *Medani v. Trump*, No. 5:26-cv-06332-EJD (N.D. Cal. Sept. 21, 2026), ECF No. 115-4. That guidance specifically instructed officers not to routinely require updated financial documentation merely because time had passed and explained how reducing unnecessary follow-up would lessen consular workloads and backlogs. *Id.* Defendants have not explained this departure from their own guidance, what additional eligibility or security information comprehensive re-interviews are expected to yield when more limited inquiries or requests for updated documents would suffice, or whether they considered the additional costs, burdens, and delays imposed on applicants and consular posts.

290. Defendants also failed to adequately explain their departure from the longstanding framework for reviewing immigrant visa issuances. Unlike nonimmigrant visa issuances, for which regulations expressly require supervisory review, 22 C.F.R. § 41.113(i), the FAM leaves to consular supervisors' discretion which immigrant visa issuances warrant review, based on considerations such as the applicant pool, fraud environment, and officer experience. 9 FAM 504.11-3(A)(2)(a). The September 14 Cable departs from that framework by mandating categorical global review of specified categories of immigrant visa adjudications, including every case in which a consular officer overcomes a public-charge refusal. Ex. AF, 26 STATE 89798 ¶¶ 2–3. The September 21 instructions go further, requiring that cases found eligible by consular officers and reviewed by consular managers be submitted for additional categorical review through a centralized electronic system. Ex. AG [Sept. 21 email] at 2. Although Defendants invoke national security, legal compliance, and fraud prevention, they have not adequately explained why every determination by a consular officer overcoming a public charge refusal must undergo mandatory managerial review, regardless of whether the cause presents any particular concern warranting further scrutiny, especially when such determinations ordinarily concern an applicant's financial circumstances rather than national security. Nor have they explained why favorable determinations must then undergo additional centralized review, what that review adds to the adjudicating officer's individualized assessment, or whether they considered the resulting cost and time burdens and delays for consular posts and visa applicants.

291. Defendants also failed to consider that the Consular Processing Cable's generalized public-charge premise is inapplicable to applicants pursuing employment-based visas, given the ordinary record development and financial vetting that accompanies employment-based immigration. Employment-based cases typically include substantial documentation bearing on the

applicant's professional standing, plans, and resources, substantially reducing any plausible basis to presume future dependence. The Cable nonetheless offers no reasoned explanation for applying its heightened screening approach indiscriminately to employment-based applicants, including national interest waiver beneficiaries, let alone all applicants, instead of making individualized determinations under the statutory factors in 8 U.S.C. § 1182(a)(4).

292. The Consular Processing Cable, Public Charge Directives, and Review and Override Policy therefore violate the APA because they are arbitrary and capricious agency actions and must be vacated and set aside.

**COUNT SEVEN**

**(Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), 8 U.S.C. §§ 1201–1202, 22 C.F.R. §§ 40.6, 42.81—*Accardi* Doctrine)**

293. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

294. The Consular Rules are contrary to the express terms of the statute and the implementing regulations described above and should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which requires government agencies to follow their own "existing valid regulations." *Id.* at 268.

295. *Accardi* "is not limited to rules attaining the status of formal regulations. As the Supreme Court noted, "'[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required,' and even though the procedural requirement has not yet been published in the federal register." *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (alteration in original) (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

296. Specifically, 8 U.S.C. § 1201(g) provides authority for consular officers to refuse issuance of visas only based on one of the specific grounds listed in the INA and on the specific facts in each visa applicant's materials.

297. Moreover, 8 U.S.C. § 1202(b) provides that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer."

298. "A visa can be refused [under 8 U.S.C. § 1201(g)] only upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6.

299. "When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, [or] refuse the visa...." 22 C.F.R. § 42.81(a). And the FAM, which provides consular processing guidance on implementing the INA, further provides that a consular officer cannot "temporarily refuse, suspend, or hold the visa for future action." 9 FAM 504.1-3(g).

300. The Blanket Visa Ban purported to override these regulations, without even mentioning or discussing them. Contrary to 8 U.S.C. §§ 1201(g), 1202(b) and 22 C.F.R. § 42.81(a), the Blanket Visa Ban provides that "Immigrant Visa issuance to applications from [covered] countries is paused until further notice." Exs. B & G, at 5, ¶ 4. And in direct contravention of 22 C.F.R. § 40.6, the Blanket Visa Ban directed consular officers to refuse visas even where the officer has no reason to believe any inadmissibility ground exists. Exs. B & G, at 5, ¶ 4. ("Officers should assess all other potential grounds of ineligibility first, and if an officer has not refused the applicant under any other ground, the officer should make detailed case notes explaining all aspects of the case (including the factors highlighted in Ref. B) where additional information could yield more data concerning the applicant's eligibility vis-à-vis 212(a)(4). Officers should then refuse the

applicant 221(g) while the Department develops additional screening and vetting tools, polices, and operations to more accurately identify any IV [immigrant visa] applicant likely to become a public charge.").

301. Requiring consular officers to refuse visas as "the Department develops additional screening and vetting tools, polices, and operations to more accurately identify any IV applicant likely to become a public charge," (Exs. B & G, at 5, ¶ 4), is not premised on a ground specifically set out in the law or implementing regulations and is therefore forbidden by statute and regulation.

302. Similarly, the Consular Processing Cable's mandate to consider the "applicant's current or past use of any other form of public assistance, social welfare, or private charity either in the United States or elsewhere intended to help low-income people," (Exs. C & AB ¶ 29), as well as the Public Charge Directives (*e.g.*, Ex. AF, at 3, 26 STATE 89798 (mandating consideration of "[a]ny current or past receipt of public welfare of any type in [the applicant's] home country")), directly contradict the FAM, which instructs that "[n]either the past nor possible future receipt of such non-cash or supplemental assistance is relevant when determining whether an applicant is likely to become a public charge," 9 FAM 302.8-2(B)(1)(c)(1). Also, the Consular Processing Cable's direction that consular officers "should consider whether the sponsor or joint sponsor uses or has used any public assistance, including but not limited to public cash assistance," (Exs. C & AB ¶ 36), directly contradicts 8 C.F.R. § 213a.2(c)(2)(ii), which enumerates the only factors to be considered: (A) income, (B) number of persons to be supported, and (C) sufficiency of income. In turn, 8 C.F.R. § 213a.2(c)(2)(i)(C)(1) provides conclusively that "[t]he sponsor's ability to meet the income requirement will be determined based on the sponsor's household income," without any allowance for consideration of prior use of public assistance. The Consular Processing Cable also treats a sufficient Form I-864 as merely a threshold condition and one factor in a broader analysis,

without explaining its departure from the FAM's guidance that a properly filed, nonfraudulent I-864 is "normally sufficient" to satisfy the public-charge inquiry. 9 FAM 302.8-2(B)(3)(a)(2).

303. Moreover, the Review and Override Policy requires consular managers to submit applications that have been print-authorized for additional review and possible further action. Although Defendants have represented that visas may issue before that review is complete, the policy leaves open the possibility that issuance will be deferred pending its results. To the extent the policy permits consular officers to withhold issuance without entering a lawful refusal, it conflicts with 9 FAM 504.9-2(U), which requires officers to issue or refuse executed visa applications rather than hold them for future action. Defendants' implementation of the Consular Rules has also resulted in renewed scrutiny of USCIS-approved immigrant petitions, including Ms. Angulo Peñaranda's NIW petition, which the Embassy has announced it will return for revocation without identifying any grounds for doing so, notwithstanding the FAM's limitations on consular review of approved petitions. *See* 9 FAM 504.2-8(A), (B)(2).

304. Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and the FAM in contravention of *Accardi* and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), and must be vacated and set aside.

**COUNT EIGHT**

**(Review and Override Policy—5 U.S.C. § 706(2)(A)-(C)—Contrary to Law and Constitutional Right and Excess of Statutory Authority)**

305. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

306. The Review and Override Policy exceeds Defendants' statutory authority under 8 U.S.C. §§ 1104(a) and 1202(b). Congress requires immigrant visa applications to be reviewed and

adjudicated by consular officers and precludes the Secretary of State from controlling their determinations relating to the granting or refusal of visas. As this Court has already held, the Secretary may not displace consular officers from the adjudicatory role Congress assigned them. ECF No. 83 at 42–44.

307. The Review and Override Policy requires review of specified favorable consular determinations, including determinations overcoming public-charge refusals, by managers or higher-ranking officials, some of whom may lack consular commissions. It further requires submission of cases for additional adjudication review through a centralized electronic application after the adjudicating officer has determined the applicant is eligible and authorized issuance. That additional review may compel the officer to reconsider an otherwise favorable determination, including whether to revoke an issued visa.

308. Although the INA and implementing regulations permit supervisory review and advisory opinions by centralized authorities in appropriate circumstances, they do not authorize Defendants to substitute the controlling judgment of non-consular officers for the individualized determination entrusted to the adjudicating officer. The Review and Override Policy operates to constrain or undermine favorable consular determinations through the additional review process, exceeding the authority granted to Defendants by Congress. The Policy is therefore contrary to law and in excess of statutory authority under 5 U.S.C. § 706(2)(A), (C).

309. The Court should hold the Review and Override Policy to be unlawful and vacate it and set it aside.

## COUNT NINE

## (Ultra Vires Violation of the Constitution)

310. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

311. The Consular Rules, individually and taken together, are illegal and ultra vires.

312. Courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986). The INA mandates individualized public charge assessments, 8 U.S.C. § 1182(a)(4), prescribes an individualized case-by-case framework for immigrant visa allocation, adjudication, processing, approvals, and refusals, 8 U.S.C. § 1201(g), prohibits categorical nationality or country-level discrimination in the issuance of immigrant, 8 U.S.C. § 1152(a)(1)(A), and protects consular officers' discretion against encroachment by the Secretary of State, 8 U.S.C. § 1104(a).

313. DOS does not have any authority to rewrite the INA by imposing a blanket nationality bar.

314. Defendants have imposed an indefinite de facto nationality embargo on immigrant visas absent an 8 U.S.C. § 1182(f) Presidential proclamation and have repudiated Congressionally required individualized assessments under 8 U.S.C. § 1182(a)(4) and 8 U.S.C. § 1201(g). These actions are ultra vires by any measure.

315. Defendants' attempt to indefinitely ban certain immigrants based on their nationality via the Blanket Visa Ban exceeds Congress's delegated power to the Executive to suspend the entry of noncitizens and issue reasonable rules for the entry of noncitizens.

316. Defendants' attempt to ban certain immigrants based on their nationality in the Blanket Visa Ban and its accompanying Cable, (Exs. A & G); to create a new ground of inadmissibility and an expansion of the public charge ground of inadmissibility that Congress has previously considered and chosen not to include in the INA via the Blanket Visa Ban, the Visa Ban Cable, and the Consular Processing Cable, (Exs. A–C); and to legislate a new embargo against the individualized totality of circumstances test mandated by statute, (Exs. A & G), violate constitutional separation of powers principles because their actions contravene Congress's expressed intent in creating the public charge test as an individualized inquiry based on the totality of circumstances, not on applicants' country of nationality nor on the receipt of other noncash public benefits.

317. Defendants' Consular Rules are therefore ultra vires, violate the Constitution, and must be vacated and set aside.

**PRAYER FOR RELIEF**

318. WHEREFORE, Plaintiffs respectfully request that the Court:

1. Assume jurisdiction over this action;
2. Issue a declaratory judgment stating that the indefinite Blanket Visa Ban and Visa Ban Cable (as described in Exs. A & G) are unauthorized by and contrary to the Constitution and laws of the United States;
3. Issue a declaratory judgment stating that the November 6, 2025, Consular Processing Cable (as described in Exs. C & AB) is unauthorized by and contrary to the Constitution and laws of the United States;
4. Issue a declaratory judgment that Defendants' Public Charge Directives, including 26 STATE 80666, 26 STATE 86164, 26 STATE 88862 (to the extent

challenged herein), and 26 STATE 89798, and the Review and Override Policy implemented through 26 STATE 89798 and the September 21, 2026 instructions to posts, are contrary to law and exceed Defendants' statutory authority under the INA and APA;

5. Vacate and set aside Defendants' immigrant visa "Pause" or Blanket Visa Ban and Visa Ban Cable announced on January 14, 2026, effective January 21, 2026 (as described in Exs. A, B & G and related directives) under 5 U.S.C. § 706(2) of the APA, and stay its effectiveness under 5 U.S.C. § 705;

6. Vacate and set aside Defendants' November 6, 2025 Consular Processing Cable (as described in Exs. C & AB) and the amended public charge standards contained therein under 5 U.S.C. § 706(2) of the APA, and stay its effectiveness under 5 U.S.C. § 705;

7. Vacate and set aside the Public Charge Directives and Review and Override Policy, including the binding requirements imposed by 26 STATE 80666, 26 STATE 86164, 26 STATE 89798, the challenged portions of 26 STATE 88862, and the September 21, 2026 instructions to posts, pursuant to 5 U.S.C. § 706(2), and stay their effectiveness under 5 U.S.C. § 705;

8. Preliminarily and permanently enjoin Defendants from enforcing (a) the Blanket Visa Ban (as described in Exs. A & G and related directives) and immigrant visa freeze ; (b) the Consular Processing Cable (as described in Exs. C & AB) ; and (c) the Public Charge Directives and Review and Override Policy to the extent found unlawful by the Court;

9. Order Defendants to resume case-by-case adjudications, processing approvals and issuance for immigrant visas consistent with 8 U.S.C. § 1182(a)(4), the definition of public charge in the current 9 FAM 302.8-2, and the INA's individualized framework and complete visa processing, approvals, and issuance in accordance with statutory law;

10. Award Plaintiffs their reasonable attorneys' fees and costs; and

11. Grant such other and further relief as the Court deems just and proper.

Dated: November 6, 2026

Respectfully submitted,

*<u>/s/ Joanna Elise Cuevas Ingram</u>*
Joanna Elise Cuevas Ingram (JC 2704)
Tanya Broder*
Efrén C. Olivares*
Elizabeth Choo
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
(213) 377-5258
cuevasingram@nilc.org
broder@nilc.org
olivares@nilc.org
choo@nilc.org

*<u>/s/ Erez Reuveni</u>*
Erez Reuveni*
Catherine M.A. Carroll*
Elena Goldstein
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 316-9538 (Reuveni)
ereuveni@democracyforward.org
ccarroll@democracyforward.org
egoldstein@democracyforward.org

*<u>/s/ Hasan Shafiqullah</u>*
Hasan Shafiqullah

Evan Henley
Emily Lundgren
THE LEGAL AID SOCIETY
49 Thomas St., 5th Floor
New York, NY 10013
(212) 577-3300
hhshafiqullah@legal-aid.org
ewhenley@legal-aid.org
elundgren@legal-aid.org

*/s/ Susan Welber*
Susan Welber
Government Benefits Unit
Bronx Neighborhood Office
260 E. 161st Street
Bronx, New York 10451
sewelber@legal-aid.org

*/s/ Baher Azmy*
Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445

*/s/ Antionette Dozier*
Antionette Dozier*
David Kane*
Joy Dockter*
WESTERN CENTER ON LAW & POVERTY
3701 Wilshire Blvd. Suite 208
Los Angeles, CA 90010
(213) 487-7211
adozier@wclp.org
dkane@wclp.org
jdockter@wclp.org

*/s/ Sarah Wilson*
Sarah Wilson*
David Kim*
COLOMBO & HURD
301 E. Pine Street, Suite 450
Orlando, Florida 32801
(407) 478-1111

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Joanna Elise Cuevas Ingram, hereby certify that on November 6, 2026, I filed the foregoing First Amended Complaint with the Clerk of the Court for the United States District Court for the Southern District Court of New York using the CM/ECF system. Notice of this filing is being sent by operation of the Court's electronic filing system to all counsel of record who are registered CM/ECF users.

*/s/ Joanna E. Cuevas Ingram*
Joanna E. Cuevas Ingram (JC2704)