**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CATHOLIC LEGAL IMMIGRATION NETWORK, INC. (CLINIC), AFRICAN COMMUNITIES TOGETHER (ACT), WAEL ALI, TIMOLYN EBONY CARNEJA HOLT, AGNES KYEREMAA, WEBAZA NICHOLAS, HANAN RAMI, JOSHUA WHITNEY, ANGELA DURO, SABAH KALSOOM JAVAID, SALMAN HOSSAIN KHAN, YESSICA LINARES, MARU MAHMUD HASSEN, MUNTHAZ MAHMUD HASSEN, ALESSANDRA MARQUES LIMA, ADRIAN MITCHELL, CHRISTINA MULLIGAN, PATRICIA RICHARDSON, LINA MARGARITA ANGULO PEÑARANDA, FERNANDO LIZCANO LOSADA and ANDRES ALFONSO MEDINA RAMIREZ,

*Plaintiffs*,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and the UNITED STATES DEPARTMENT OF STATE,

*Defendants*.

Civil Action No. 1:26-cv-00858-JAV

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. § 705**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 2

I. RELEVANT STATUTORY, REGULATORY, AND FAM PROVISIONS ........ 3

II. THE CONSULAR PROCESSING CABLE, THE PUBLIC CHARGE DIRECTIVES, AND THE REVIEW AND OVERRIDE POLICY ........ 7

III. THE CHALLENGED POLICIES HAVE HARMED AND CONTINUE TO HARM PLAINTIFFS ........ 11

ARGUMENT ........ 14

I. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS. ........ 15

A. THE CHALLENGED POLICIES ARE FINAL AGENCY ACTION SUBJECT TO CHALLENGE UNDER THE APA. ........ 15

B. THE CHALLENGED POLICIES ARE ARBITRARY AND CAPRICIOUS. ........ 18

C. THE CHALLENGED POLICIES VIOLATE THE *ACCARDI* DOCTRINE. ........ 20

D. THE CHALLENGED POLICIES VIOLATE THE APA BECAUSE THEY WERE ADOPTED WITHOUT NOTICE AND COMMENT. ........ 24

II. THE CHALLENGED POLICIES IMPOSE IRREPARABLE HARM ON PLAINTIFFS. 27

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF. ........ 32

CONCLUSION ........ 34

## TABLE OF AUTHORITIES

Page(s)

## CASES

*Afr. Cmtys. Together v. Lyons*,
799 F. Supp. 3d 362 (S.D.N.Y. 2025)....................16

*Alzokari v. Pompeo*,
973 F.3d 65 (2d Cir. 2020)....................18

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993)....................24, 26

*Ashtari v. Pompeo*,
496 F. Supp. 3d 462 (D.D.C. 2020)....................23

*Bennett v. Spear*,
520 U.S. 154 (1997)....................15, 17

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018)....................23

*De La Mota v. U.S. Dep't of Educ.*,
No. 02 Civ. 4276 (LAP), 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003)....................15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................18

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................18, 19, 20

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................18

*Ghazvinian Zanjani v. Rubio*,
No. 1:26-cv-50-ZMF, 2026 WL 2326190 (D.D.C. Aug. 6, 2026), appeal filed, No. 26-5307 (D.C. Cir. Aug. 27, 2026)....................23

*Jafarzadeh v. Nielsen*,
321 F. Supp. 3d 19 (D.D.C. 2018)....................26

*Make the Rd. N.Y. v. Pompeo*,
475 F. Supp. 3d 232 (S.D.N.Y. 2020)....................24, 25, 27, 33

*Mantena v. Johnson*,
809 F.3d 721 (2d Cir. 2015)....................22

*Mayor and City of Balt. v. Trump*,
416 F. Supp. 3d 452 (D. Md. 2019)....................25

*Metro. Transp. Auth. v. Duffy*,
No. 25-cv-1413 (LJL), 2026 WL 588117 (S.D.N.Y. Mar. 3, 2026), appeal filed, No. 26-1213 (2d Cir. May 4, 2026) ....................20

*Montilla v. I.N.S.*,
926 F.2d 162 (2d Cir. 1991)....................21, 22

*Morton v. Ruiz*,
415 U.S. 199 (1974)....................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................18

*N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*,
267 F.3d 128 (2d Cir. 2001)....................24

*Nagornyi v. Rubio*,
No. 25-cv-01321-ZMF, 2026 WL 1893483 (D.D.C. March 26, 2026)....................23

*Nasab v. Blinken*,
No. 22-cv-02084, 2022 WL 4473922 (D.D.C. Sept. 26, 2022)....................23

*New York v. Admin. for Children and Families*,
833 F. Supp. 3d 361 (S.D.N.Y. 2026)....................14

*New York v. Trump*,
767 F. Supp. 3d 44 (S.D.N.Y. 2025), modified by 784 F. Supp. 3d 619 (S.D.N.Y. 2025), appeal filed, No. 25-1860 (July 31, 2025) ....................15

*New York v. U.S. Dep't of Health & Hum. Servs.*,
414 F. Supp. 3d 475 (S.D.N.Y. 2019)....................18

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020)....................3, 14, 18, 20, 27

*Ohio v. EPA*,
603 U.S. 279 (2024)....................18

*Razi v. Pompeo*,
No. 20-cv-0982-W-MSB, 2020 WL 6262380 (S.D. Cal. Oct. 23, 2020)....................23

*Salazar v. King*,
822 F.3d 61 (2d Cir. 2016)....................15, 21

*Sangster v. Rubio*,
No. 25-cv-00447 (ART) (CSD), 2026 WL 222316 (D. Nev. Jan. 28, 2026) ....................26

*Singh v. U.S. Dep't of Justice*,
461 F.3d 290 (2d Cir. 2006)....................21

*Sweet v. Sheahan*,
235 F.3d 80 (2d Cir. 2000)....................24

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ....................26

*Trump v. Hawaii*,
585 U.S. 667 (2018)....................22

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
578 U.S. 590 (2016)....................15, 16

*United Afr. Org. v. Biden*,
620 F. Supp. 3d 756 (N.D. Ill. 2022) ....................23

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)....................20, 21

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)....................14

**STATUTES**

5 U.S.C. § 551....................24

5 U.S.C. § 553....................24

5 U.S.C. § 705....................1, 2, 14, 34

5 U.S.C. § 706....................18

8 U.S.C. § 1101 et seq....................3

8 U.S.C. § 1104....................3

8 U.S.C. §§ 1151–1154....................3

8 U.S.C. § 1182....................3, 11

8 U.S.C. § 1201....................3, 6, 7

8 U.S.C. § 1202....................3

22 U.S.C. § 2658a....................23

Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501 (1999)....................7

Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228,
116 Stat. 1350 (2002)....................6, 7

**RULES**

Fed. R. Civ. P. 65....................14

**REGULATIONS**

8 C.F.R. § 213a.2 ....................5

22 C.F.R. § 40.6 ....................3
22 C.F.R. § 41.113 ....................5
22 C.F.R. § 41.121 ....................5
22 C.F.R. § 42.73 ....................5, 19, 22
22 C.F.R. § 42.81 ....................3, 5

**OTHER AUTHORITIES**

9 FAM 301.1-2....................3
9 FAM 302.8-2....................3, 4, 5, 8, 19, 21
9 FAM 403.12-1....................6
9 FAM 504.1-3....................3
9 FAM 504.9-2....................3
9 FAM 504.11-3....................6, 19, 22
9 FAM 601.14-13....................5, 8
U.S. Dep't of State, Foreign Affairs Manual (2026), https://perma.cc/86W2-JGRU ....................23

## PRELIMINARY STATEMENT

In November 2025, Defendants Secretary of State and Department of State ("DOS") issued a cable redefining the standard that consular officers must apply in determining whether an applicant for an immigrant visa is likely to become a "public charge" and therefore inadmissible. In response to this Court's decision vacating the unlawful 75-country Blanket Visa Ban, Defendants doubled down on their public-charge campaign, issuing a series of directives building on the November 2025 cable. Taken together, the November 2025 cable and these new, additional directives materially change longstanding Department policies by imposing new public charge standards, requirements, and practices. And they add multiple levels of categorical supervisory and Department-level review even after consular officers have found applicants eligible and authorized their visas for printing. The effect of the cable and subsequent directives is to impose another insurmountable barrier to receiving an immigrant visa. As the individual Plaintiffs in this case, CLINIC clients, ACT members, and many others have experienced, a favorable adjudication—and even the actual issuance of a visa—no longer means a visa will issue and remain effective; it means only that the cases will be subject to further review and indefinite further delays.

The Court should preliminarily enjoin the challenged policies and postpone them under 5 U.S.C. § 705 under the familiar three-part test for such relief.

*First*, Plaintiffs are likely to show that these new policies violate the Administrative Procedure Act (APA) and the *Accardi* doctrine. The challenged policies—the Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy—break sharply from past practice and the Department's own Foreign Affairs Manual (FAM). Defendants have adopted these new policies without the notice and comment the APA requires, with no explanation beyond conclusory references to "national security," "national security," "compliance with laws and

procedures," and prevention of "visa fraud," and with no consideration of current and prospective applicants' and immigrants' reliance on longstanding existing policies.

*Second*, the policies have imposed and continue to impose grave and irreparable harm on Plaintiffs. Many of the individual Plaintiffs or their family members had already been found eligible for a visa before the Visa Ban prevented issuance. Their cases should have proceeded when the Court vacated the Visa Ban. Instead, they have been subject to further public-charge screening, documentation requirements, and repeated interviews—often at significant expense—followed by new and unexplained refusals or a return to administrative processing. As a result, just as under the Visa Ban, families continue to be separated, lives, companies and career plans remain in limbo, and aspiring immigrants and the organizations that serve them continue to face delay and uncertainty. These harms cannot be restored through a subsequent favorable visa decision.

*Finally*, the balance of equities and the public interest both call for relief. These factors favor lawful, individualized adjudication over repeated adjudications and mandatory, categorical, multistage review imposed without adequate justification, particularly for applicants who have already undergone extensive scrutiny. A preliminary injunction or postponement of the policies under 5 U.S.C. § 705 does not direct a specific result or interfere with a consular officer's discretion; instead, consistent with law, regulations, the current FAM and Department policy, it expedites a final decision under existing law and longstanding Department policy.

The Court should grant interim relief to abate these harms and forestall Defendants' unlawful actions.

## FACTUAL BACKGROUND

The Court summarized the statutory framework, the facts relevant to the Visa Ban, and other matters in its Opinion and Order on the parties' cross-motions for summary judgment. ECF No. 83. We set forth here only the facts germane to this motion.

## I. Relevant Statutory, Regulatory, and FAM Provisions

As described in the Court's Opinion and Order, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*., sets forth the statutory framework governing the admissibility of immigrants. ECF No. 83 at 2–7; 8 U.S.C. §§ 1151–1154. The statute requires consular officers—and only consular officers—to issue or refuse immigrant visas. ECF No. 83 at 4, 38, 42–44, citing 8 U.S.C. §§ 1202(b) and 1104(a). A consular officer may refuse an application for an immigrant visa only if the officer concludes that the applicant is ineligible under one or more of the statutory grounds listed in the INA. ECF No. 83 at 5–6, 38–42; 8 U.S.C. § 1201(g); 22 C.F.R. §§ 40.6, 42.81(a); 9 FAM 301.1-2(3), 504.1-3(g). Once an application has been executed, the FAM requires consular officers either to issue a visa or refuse it. 9 FAM 504.9-2(U).

Two aspects of procedure under the INA for adjudicating immigrant visas are directly relevant to this motion: (i) determinations of whether an applicant for an immigrant visa is admissible under the statute's public charge provision, 8 U.S.C. § 1182(a)(4); and (ii) supervisory review of immigrant visa issuances.

***Public charge determinations***. The public-charge provision, 8 U.S.C. § 1182(a)(4), sets forth one ground of ineligibility for an immigrant visa for certain applicants. ECF No. 83 at 6–7, 31–33; *see generally New York* v. *U.S. Dep't of Homeland Sec*., 969 F.3d 42 (2d Cir. 2020). Public-charge assessments must be based on a case-by-case evaluation of "the 'totality of the circumstances' existing when the visa application is submitted." 9 FAM 302.8-2(B)(2)(a). The consular officer must "at a minimum" consider five statutory factors specific to the applicant, including age; health; family status; assets, resources, and financial status; and education and skills, 8 U.S.C. § 1182(a)(4)(B)(i), and may consider an affidavit of support from a sponsor, *id*. § 1182(a)(4)(B)(ii).

The FAM provides instructions to consular officers for making public-charge determinations. It defines "public charge" as someone who, after admission to the United States, is likely to become "primarily dependent on the U.S. Government for subsistence." 9 FAM 302.8-2(B)(1)(a)(1). Such primary dependence, the FAM explains, means either (i) "[r]eceipt of public cash assistance for income maintenance" or (ii) institutionalization for long-term health care at U.S. government expense. *Id.* By contrast, receipt of assistance under "non-cash and/or supplemental" benefit programs, including but not limited to SNAP, Medicaid, CHIP, WIC, educational assistance, and others, do not render an applicant a public charge. *Id.* at 302.8-2(B)(1)(c).

The FAM provides that an applicant's past or current receipt of such excluded benefits is not relevant to a public-charge determination and prohibits consular officers from considering or even "try[ing] to find out" whether the applicant received them. It states:

> Neither the past nor possible future receipt of such non-cash or supplemental assistance is relevant when determining whether an applicant is likely to become a public charge.

*Id.*; *see also id.* 302.8-2(B)(3)(b) ("Past or current receipt of other types of benefits [other than cash assistance for income maintenance and long-term institutionalization] *must not be considered*," and the consular officer "*should not try to find out* whether an applicant has previously or is currently receiving [such excluded] benefits") (emphasis added).

The FAM also addresses the significance of affidavits of support. It provides that a properly filed and non-fraudulent affidavit of support (referred to as a Form I-864) by itself "is normally sufficient to satisfy the . . . requirements" to overcome public-charge ineligibility. 9 FAM 302.8-2(B)(2)(b). In addition, current or past receipt of public benefits does not disqualify a sponsor who otherwise has income sufficient to support the applicant from providing an affidavit of support. The FAM states:

> We and USCIS have determined that, as a matter of policy, the sponsor is not required to disclose their receipt of means-tested public benefits and not consider the fact that a sponsor has received such means-tested public benefits in the past in evaluating [an affidavit of support].

9 FAM 601.14-13(f).[1]

***Supervisory review of issuances of immigrant visas***. Neither the INA nor any regulation provides for supervisory or Department review of a decision by a consular officer to issue an immigrant visa. 22 C.F.R. § 42.73. Department regulations provide for supervisory review of other actions by consular officials—namely, refusals of immigrant visas and issuances and refusals of nonimmigrant visas. *See* 22 C.F.R. § 42.81(c) (providing that the consular officer's supervisor "shall review . . . without delay" immigrant visa refusals, unless the refusal can be overcome by the presentation of additional evidence); *id.* § 42.81(d) (permitting but not requiring the Department to review immigrant visa refusals and to issue "an advisory opinion to the consular officer for assistance in considering the case further," and providing that only "[r]ulings of the Department concerning an interpretation of law, as distinguished from an application of the law to the facts, are binding upon consular officers"); *id.* § 41.113(i) ("Nonimmigrant visa issuances must be reviewed . . . by consular supervisors, or a designated alternate, to ensure compliance with applicable laws and procedures."); *id.* § 41.121(c) (similar requirement for nonimmigrant visa refusals).

[1] A separate FAM provision, 9 FAM 302.8-2(B)(3)(b)(3) instructs officers to review a sponsor's current ability to provide support if the sponsor or a household member had received means-tested benefits within the preceding three years. Under the Department's practices before the challenged policies went into effect, the receipt of such benefits was not an independent basis for disqualifying the sponsor. Rather, consular officers' review focused on the sponsor's actual financial capacity and was limited to sponsors who earned less than 125% of the federal poverty guidelines, in accordance with 8 C.F.R. § 213a.2(c)(2)(iii), and whose receipt of such benefits raised concerns about financial capacity. Burton Decl. ¶ 5.

The FAM likewise does not provide for routine review of immigrant visa approvals, while providing for such review of refusals of immigrant visas and of both refusals and issuances of nonimmigrant visas. 9 FAM 504.11-3(A)(2) (requiring supervisory review of immigrant visa refusals); *id*. at 403.12-1 (requiring supervisory review of nonimmigrant visa "issuances and refusals"). The FAM acknowledges that the Code of Federal Regulations "does not mandate reviewing issuances" or refusals for further adjudication under INA § 221(g), 8 U.S.C. § 1201(g). It provides that supervisory review of issuances of immigrant visas is permitted (but not required), but only at the "supervisor's discretion," and that supervisors "may elect to review more or fewer of these cases" depending on such factors as the applicant pool, "fraud environment," and the adjudicating officer's experience. 9 FAM 504.11-3(A)(2)(a)(2).

These provisions of the FAM are consistent with longstanding practice of Department consular officers. As set forth in the accompanying Declaration of Josef Burton, a former consular official who has personally adjudicated approximately 6,000 immigrant visa applications in three overseas posts, consular officers making public-charge determinations did not consider the applicant's past or anticipated receipt of noncash or supplemental public benefits, and the receipt of such benefits by sponsors of affidavits of support was not a ground to reject an otherwise sufficient affidavit. Burton Decl. ¶¶ 3–7. Likewise, while supervisors at consular posts had discretion to review visa decisions, such review was not mandatory. Centralized review by the Department was reserved for such issues as the applicant's potential terrorist or criminal connections, complex fraud concerns, or legal questions requiring a Department advisory opinion, not for routine review of public charge eligibility. *Id*. ¶¶ 8–13.

Statute and Department policy encourage the adjudication process to be streamlined. Thus, Congress has imposed strict time limits on adjudication of immigrant visa applications. Foreign

Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, div. A, title II, § 233, 116 Stat. 1350, 1373 (2002) (codified at 8 U.S.C. § 1201 note) (requiring 30-day processing for immigrant visa applications for immediate relatives of U.S. residents and 60-day processing for all other immigrant visa applications); Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, div. B, § 1000(a)(7), 113 Stat. 1501, 1501A-430 (1999) (codified at 8 U.S.C. § 1201 note) (same). And the Department has directed its personnel to minimize repeat interviews, avoid unnecessary document requests, and reduce processing delays. Ex. AL.[2]

## II. The Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy

The Consular Processing Cable, Public Charge Directives, and Review and Override Policies materially alter these existing policies and practices.

***The Consular Processing Cable***. The Consular Processing Cable, issued on November 6, 2025, alters the standards for public-charge determinations by consular officers. *See* First Am. Compl., ECF No. 134 ¶¶ 3, 69–75. The Cable acknowledges that "[u]nder current regulation," a person is ineligible for a visa under the public-charge provision only if they are likely to become "primarily dependent on the U.S. government for subsistence," which means either: "(a) Receipt of public cash assistance for income maintenance... or (b) Institutionalization for long-term care at U.S. government expense." *Id*. ¶ 56. But the Cable breaks from that approach by mandating that consular officers making public-charge determinations consider the applicant's current or past receipt of both cash assistance and, in addition, "any other form of public assistance, social welfare, or private charity, whether in the United States or elsewhere, intended to help low-income people," including housing, food, and medical assistance. Ex. AB ¶ 29. The Cable acknowledges that "the

---

[2] "Ex. _" refers to the Exhibits to the Amended and Supplemental Complaint, ECF No. 134 ("ASC").

current regulatory definition of public charge does not include these [benefits], [but] use of them indicates that an applicant . . . could become a public charge in the future." *Id*. The Cable does not acknowledge the contrary provisions of the FAM prohibiting consideration of such benefits. 9 FAM 302.8-2(B)(1)(c), 302.8-2(B)(3)(b).

The Consular Processing Cable departs from the FAM in other respects as well. In contrast to the FAM provision that a properly filed and non-fraudulent affidavit of support is "normally sufficient" to render an applicant eligible under the public-charge provision, the Cable provides that a sufficient affidavit of support is only a "threshold condition" for eligibility and "one factor (but not the only)" in determining whether the applicant is likely to become a public charge. And, in contrast to the provision of the FAM precluding consideration of the sponsor's receipt of public benefits, 9 FAM 601.14-13(f), the Cable expressly directs consular officers to consider whether the sponsor "uses or has used any public assistance, including but not limited to public cash assistance," to determine whether the affidavit of support is sufficient, Ex. AB ¶ 36. The Cable also directs consular officers to consider the applicant's English-language proficiency, *id*. ¶ 25, a factor not listed in the FAM. Once again, the Consular Processing Cable does not acknowledge, much less seek to explain, these departures from the FAM.

***The Public Charge Directives***. Beginning shortly before the Court's August 21, 2026 Opinion and Order vacating the Blanket Visa Ban, DOS issued a series of instructions to consular officers worldwide (referred to in the Amended and Supplemental Complaint as the "Public Charge Directives"). ECF No. 134 ¶¶ 101–105; Exs. AC–AG. The Public Charge Directives, summarized below, consist of cables from the Department to consular posts worldwide dated August 15, 2026, Ex. AC; September 1, 2026, Ex. AD; September 10, 2026, Ex. AE; and September 14, 2026, Ex. AF; and an email message from the Department to consular posts dated

September 21, 2026, Ex. AG. *See* ECF No. 134 ¶¶ 101–110. The Public Charge Directives implement the Consular Processing Cable and impose significant additional costs, burdens, and delays on visa applicants.

The Public Charge Directives, among other things, implement the direction of the Consular Processing Cable to consider an applicant's current or past use of any public benefits, including noncash and supplemental benefits. *First*, the August 15, September 1, and September 10 cables direct officers to use a "public charge worksheet" in evaluating immigrant visa applications subject to public-charge evaluation. Ex. AC ¶ 3; Ex. AD ¶¶ 2, 4; Ex. AE ¶ 6. For example, the August 15 cable states that "[e]ffective immediately, consular officers must utilize the public charge worksheet . . . [to] ensure consular officers undertake a rigorous and well-informed assessment of the public charge ineligibility. . . ." Ex. AC ¶ 3. The worksheet, in turn, directs applicants to disclose whether they have "ever received government financial help, such as cash assistance," or "help from a charity or food bank," and, if they have, whether they can provide "proof that shows [they] won't need public assistance in the future." Mitchell Decl., Attachment 2; Richardson Decl., Attachment 2. The September 1 cable further required all consular officers to complete mandatory online public-charge training within 60 days, followed by in-person training and certification of individual officers and consular sections, and announced expanded managerial review of immigrant-visa adjudications. Ex. AD ¶¶ 3, 5–7. *Second*, the September 14 cable, Ex. AF, directs consular officers to consider "[a]ny current or past receipt of public welfare of any type in [the applicant's] home country" in making public-charge determinations. Ex. AF ¶ 5. *Third*, the September 10 cable, Ex. AE, directs consular officers to make entirely new public-charge assessments even for applicants who have previously been deemed eligible under the public-

charge provision and encourages re-interviews of previously reviewed applicants, citing the time elapsed since their initial interviews.

The Public Charge Directives impose burdensome and time-consuming obligations on applicants that have resulted in lengthy adjudication delays. Pursuant to the Public Charge Directives, individual Plaintiffs and their family members—including those who were previously determined to be eligible—have been required to obtain and provide extensive and invasive documentation regarding employment, health insurance, and finances. The requirements that consular officers make new public-charge assessment for applicants who have previously been found eligible for a visa and re-interview previously reviewed applicants also impose significant burdens and costs on applicants, who in many cases must travel long distances for reinterviews. *See* Ex. AL; *see also, e.g.*, Holt Decl., ¶¶ 20–25; Ali Decl., ¶¶ 16–21; Kyeremaa Decl. ¶¶ 11–19; Kassa Decl. ¶¶ 26–29, 32, 34, 37, 40–41 & 48–49. Immigrant visa applicants who had been approved, deemed approvable, print-authorized, or previously found admissible by a consular officer pursuant to their statutorily mandated discretion have been forced to go through renewed public-charge review, additional interviews, unexplained delays, post-approval reversals, and refusals after re-adjudication due to the Public Charge Directives.

***The Review and Override Policy***. The Public Charge Directives also implement a new policy (the "Review and Override Policy") requiring categorical managerial review of all immigrant-visa adjudications in which an officer has made a favorable determination, along with additional centralized electronic review after all favorable determinations and print authorizations. *See* ECF No. 134 ¶¶ 106–110; Ex. AF ¶¶ 2, 3, 6; Ex. AG at 2. The Public Charge Directives require consular managers to review any immigrant ("IV") and diversity visa ("DV") application in which the adjudicating officer has determined that the applicant has overcome a refusal under

§ 1182(a)(4) (the public-charge provision). Thus, the September 14, 2026 Cable provides that, "[e]ffective immediately," managers or deputy chiefs of mission "must review a standard set of IV adjudications each day IVs are adjudicated" and specifically must review consular officers' public-charge assessments. Ex. AF ¶¶ 3, 5–6. And the September 21 email to posts requires that, if the manager confirms the determination that the applicant is eligible, they must submit the case for "additional adjudication review" through the centralized Immigrant Visa Adjudication Review ("IVAR") process, using an electronic application. Ex. AG at 2. Defendants have confirmed that these requirements remain in force for applications previously refused solely under the Blanket Visa Ban, including the mandatory additional review of favorable visa determinations. ECF No. 132 at 1–2; *see also* ECF No. 134 ¶¶ 109–110.

The only explanation or justification Defendants have offered for the new policies are terse, conclusory references to "national security," "compliance with laws and procedures," prevention of "visa fraud," and "match[ing]" adjudications of immigrant and nonimmigrant visas. Ex. AF ¶ 2; *see also* Ex. AD ¶ 6 (asserting that expanded review of immigrant visa adjudications "protects our national security, guaranteeing compliance with laws"); Ex. AE ¶ 2 (expanded review intended "to protect our national security, guarantee compliance with laws and procedures, and prevent visa fraud").

## III. The Challenged Policies Have Harmed and Continue to Harm Plaintiffs

The harms to Plaintiffs from the Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy are set forth in detail in the accompanying Plaintiff Declarations and are briefly summarized here.

Many of the individual Plaintiffs had already completed consular processing and had been determined to be eligible for approval before the Visa Ban took effect. Even after the Court vacated

the Visa Ban, however, the challenged policies have imposed further delays and denials as a result of additional public-charge screening, documentation requirements, interviews, and layers of review. Some Plaintiffs or their family members have been required to return for repeated re-interviews—as many as four times in certain cases—and, after receiving favorable adjudications, have received new refusals or had their cases returned to administrative processing without explanation. *See, e.g.*, Kyeremaa Decl. ¶¶ 11–18; Ali Decl. ¶¶ 10–11, 18–21. Others have received little explanation for the continued delay. *See, e.g.*, Rami Decl. ¶¶ 16–17; Duro Decl. ¶¶ 16–17; Javaid Decl. ¶¶ 13–15. Even inquiries through congressional offices have yielded no meaningful explanation for the continued delays. Rami Decl. ¶ 17; Linares Decl. ¶ 18; Mulligan Decl. ¶ 12.

To take just two examples: Plaintiff Agnes Kyeremaa, an 81-year-old U.S. citizen, has seen her four adult children required to undergo repeated interviews in Accra, ten hours from their homes; receive favorable determinations; and then face reversals and renewed refusals. Kyeremaa Decl. ¶¶ 1, 11–18. Following their re-interviews, the children were informed that their visas had been approved, and their applications were marked "Issued," but their cases were then returned to further processing. *Id.* ¶¶ 11–14. On November 9, after yet another round of interviews, all four were refused on public-charge grounds. *Id.* ¶ 18. Each additional interview required substantial expense and travel to Accra, involving nearly ten hours by bus and an overnight stay. *Id.* ¶ 25. Plaintiff Holt's husband was initially told that his application looked good apart from the Ban, but then even after the Ban was vacated, he was required to appear for an entirely new public-charge re-interview, and his application was then refused with no explanation. Holt Decl. ¶¶ 15–25; Kassa Decl. ¶¶ 33–34.

Other individual Plaintiffs have likewise been refused—although they were previously determined to be admissible, and their personal circumstances have not materially changed—after

the Visa Ban was vacated, even after having to undergo time-consuming and burdensome new public-charge adjudications. *E.g.*, Richardson Decl. ¶¶ 10–14; Mitchell Decl. ¶¶ 13–19; Ali Decl. ¶¶ 11, 18–24; Angulo Decl. ¶¶ 10–23. The resulting uncertainty prevents these Plaintiffs from making crucial decisions about where to live, whether to purchase a home, and whether and when to start or expand their families, while others have lost professional opportunities. *E.g.*, Khan Decl. ¶¶ 26–28, 32–34; Javaid Decl. ¶¶ 19, 22–25; Nicholas Decl. ¶¶ 16, 18–28.

That uncertainty can persist even after immigrant visas have actually been issued, as the experience of former Plaintiff Juan David Buitrago Cagua illustrates. At his October 1, 2026 follow-up interview in Bogota, which was more detailed than his initial interview, the consular officer told him everything was in order except the medical examinations and that visas would issue once visa numbers became available. Juan David Buitrago Cagua Decl. ¶ 7. The Embassy subsequently requested his passport and updated medical examination, identifying no other outstanding requirements. *Id.* ¶ 8. On October 15, the Embassy issued visas to Mr. Buitrago and his wife and returned their passports. *Ids.* ¶¶ 9–10. Relying on those visas, the couple paid the USCIS Immigrant Fee, booked flights and accommodations for January 1, 2027, began closing their bank accounts, and made concrete employment preparations, including his wife's completed degree evaluation and pursuit of teaching opportunities. *Id.* ¶ 12. Because the visas had been issued, Plaintiffs removed him from their amended complaint. *Id.* ¶ 11. Yet just two weeks later, after Plaintiffs filed the amended complaint, the Embassy warned Mr. Buitrago by telephone that he and his wife would be refused entry if they traveled, then confirmed in writing that he could not use his issued visa pending further review. *Id.* ¶¶ 13–14. The Embassy provided no reason for the review and no timetable as to when it might be completed. *Id.* ¶ 15. Despite having received their

visas and made arrangements to relocate, the couple's lives and professional plans are once again on hold. *Id.* ¶¶ 16–20.

The Department policies challenged in this motion also harm the organizational Plaintiffs. *See* Wheeler Decl. ¶¶ 7–17; Kassa Decl. ¶¶ 17–53. The challenged policies have substantially increased requests for assistance from affiliates of Plaintiff CLINIC handling consular cases, requiring it to redirect resources from other ongoing work. Wheeler Decl. ¶¶ 8–12, 16–17. Likewise, members of Plaintiff ACT and their families have suffered concrete injuries from the challenged policies, including repeated interviews and new public-charge refusals after earlier favorable adjudications. Kassa Decl. ¶¶ 2–11 & 14–53; Ali Decl. ¶¶ 11, 18–21; Holt Decl. ¶¶ 15, 18–25; Kyeremaa Decl. ¶¶ 9–18. And ACT's own services have been disrupted, diverting resources from other work assisting immigrants. Kassa Decl. ¶¶ 11, 13, 21–22, 48–50, 52–53.

## ARGUMENT

Federal Rule of Civil Procedure Rule 65 authorizes a court to issue a preliminary injunction where the plaintiffs establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *New York*, 969 F.3d at 58; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Where, as here, the government is a party, the final two factors merge. *New York*, 969 F.3d at 58–59. The same test applies in determining whether, under 5 U.S.C. § 705, the Court should "postpone the effective date of an agency action." *New York v. Admin. for Children and Families*, 833 F. Supp. 3d 361, 381 (S.D.N.Y. 2026).[3]

[3] This motion does not rest on the claims in the Complaint that the challenged policies were motivated by animus and are contrary to law. ASC ¶¶ 140–151, 170–195, 261–264. Plaintiffs reserve the right to pursue these claims in subsequent proceedings in this matter.

## I. Plaintiffs Are Likely to Prevail on the Merits.

Plaintiffs are likely to show that the Consular Processing Memo, Public Charge Directives, and Review and Override Policy violate the APA and the *Accardi* doctrine. They are final agency action reviewable under the APA. (Section A). They are arbitrary and capricious by departing from existing Department policy, as set out in the FAM, Department regulations, and Department practice, without adequate explanation. (Section B.) They violate the *Accardi* doctrine because they depart from the Department's binding procedures. (Section C.) And they were adopted without required notice-and-comment procedures. (Section D.)

### A. The Challenged Policies Are Final Agency Action Subject to Challenge Under the APA.

Agency actions are "final" and thus subject to challenge under the APA where they (1) "mark the consummation of the agency's decisionmaking process" and (2) are actions by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597–98 (2016) (reaffirming the *Bennett* standard); *see generally* ECF No. 83 at 26–29. The *Bennett* test is interpreted "in a pragmatic way," *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (internal quotation marks omitted), with a focus on the "practical effect" of the challenged agency action, *New York v. Trump*, 767 F. Supp. 3d 44, 76 (S.D.N.Y. 2025) (Vargas, J.) (quoting *De La Mota v. U.S. Dep't of Educ.*, No. 02 Civ. 4276 (LAP), 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003)), modified by *New York v. Trump,* 784 F. Supp. 3d 619 (S.D.N.Y. 2025), *appeal filed*, No. 25-1860 (July 31, 2025).

The Consular Processing Cable, the Public Charge Directives, and the Review and Override Policy satisfy both *Bennett* prongs. *First*, they are not "'of a merely tentative or interlocutory nature,'" but are "mandatory" directions that on their face "remain[] in effect

indefinitely." ECF No. 83 at 27 (quoting *U.S. Army*, 578 U.S. at 597). They are the Department's operative and binding instructions to consular posts about the information they are required to consider in making statutorily required public-charge assessments and the review procedures Department personnel must conduct in determining whether to issue or refuse immigrant visas. *See id.*; *see also Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 387 (S.D.N.Y. 2025) (holding that Department of Justice email providing guidance to immigration judges was likely a final action because it constituted the adoption of a policy determining the "agency's obligations, from which legal consequences would flow") (citing *New York*, 799 F. Supp. 3d at 78).

The mandatory nature of these policies is evident from the face of the Consular Processing Cable and the Public Charge Directives themselves. The Consular Processing Cable identifies several requirements for implementing the INA's public-charge provision. Ex. AB ¶¶ 1–3. It instructs consular officers that in making public-charge determinations they "must" take into account the applicant's use of any and all forms of public assistance, social welfare, or private charity, *id.* ¶ 29, and "must" determine whether an affidavit of support is likely to prevent the applicant from becoming a public charge, *id.* ¶ 37.

The Public Charge Directives are likewise mandatory on their face. The earliest such directive, the State Department's cable to diplomatic and consular posts dated August 15, 2026, states that "[e]ffective immediately," consular officers "must" use the public-charge worksheet in assessing whether an applicant is ineligible under the statutory public-charge provision. Ex. AC ¶ 3. It further states that the public-charge worksheet and related automated scripts "ensure" that consular officers comply with the Department's public-charge policies "by *requiring* [consular] officers to enter inputs on individual prompts for each case." *Id.* ¶ 4 (emphasis added). *See also* Ex. AD ¶ 2 ("consular officers *must* . . . use all tools available, including the public charge

worksheet, to thoroughly evaluate all visa applicants") (emphasis added); Ex. AE ¶ 6 ("In all immigrant visa cases, . . . posts *must* complete a public charge worksheet. . . .").

The Public Charge Directives similarly emphasize the mandatory nature of the Review and Override Process. The September 14, 2026, Cable provides that "[e]ffective immediately, consular managers *must* expand their review of immigrant visa (IV) adjudications" in accordance with the Review and Override Policy. Ex. AF ¶ 2; *see also id.* ¶ 3 ("Appropriate consular managers or [deputy chiefs of mission] *must* review a standard set of IV adjudications each day IVs are adjudicated . . . .") (emphasis added); *id.* ¶ 6 (managers "must" review public charge assessments). The Department's September 21 email to posts similarly mandates that "a manager *must* complete an adjudication review" of all immigrant visa applicants deemed eligible, and, once that review is completed, "must" submit the case for "additional adjudication review." Ex. AG at 2 (emphasis added).

This clear language eliminates any doubt about the mandatory nature of these directions. *See* ECF No. 83 at 27–28 (relying on similar mandatory language in DOS Visa Ban in concluding that the Visa Ban satisfied the first *Bennett* prong).

*Second*, the Consular Processing Cable and Public Charge Directives are actions by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted). They impose mandatory obligations on consular officers assessing immigrant visa applications. And they have direct legal consequences for applicants and their U.S.-based sponsors and family members. They impose new cost, time, and delay burdens on applicants, raise the bar for eligibility under the public-charge provision, and create additional hurdles to issuance of immigrant visas and additional opportunities for Department personnel to refuse them. These policies have already resulted in multiple

unexplained and indefinite refusals, preventing applicants from uniting with their families or pursuing their careers in the United States. *See supra* 11–14. They accordingly satisfy the second *Bennett* prong. *See* ECF No. 83 at 28.

**B. The Challenged Policies Are Arbitrary and Capricious.**

The APA authorizes courts to set aside agency action that is arbitrary or capricious. 5 U.S.C. § 706(2); *New York*, 969 F.3d at 63. The arbitrary-and-capricious standard requires that agency actions be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Alzokari* v. *Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020) (same).

In particular, when an agency changes existing policy, it must acknowledge and "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 547 (S.D.N.Y. 2019) (same). Among other requirements, the agency's explanation must take into account any "serious reliance interests" engendered by the prior policy. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars,* 579 U.S. at 222).

The Consular Processing Cable is arbitrary and capricious because it materially changes Department policy without explanation or even acknowledgment. As discussed above, the Cable deviates from express provisions of the FAM and longstanding Department practice prohibiting consideration by consular officers of noncash or supplemental public benefits by the applicant,

requiring that facially valid affidavits of support normally be treated as sufficient to satisfy the public-charge provision, and not providing for consideration of the applicant's English language proficiency. *See supra* 7–8. The Consular Processing Cable does not acknowledge or try to justify these policy changes.

The Public Charge Directives and Review and Override Policy are arbitrary and capricious for similar reasons. The Public Charge Directives' requirement that consular officers consider current or past use of noncash or supplemental public benefits in making public-charge determinations, Exs. AD, AE, AF; Mitchell Decl., Attachment 2; Richardson Decl., Attachment 2, departs significantly from existing policy and practice reflected in the FAM, which prohibits such consideration, *see supra* 8–10; 9 FAM 302.8-2(B)(1)(c), 302.8-2(B)(3)(b); Burton Decl. ¶¶ 3–7. The Review and Override Policy further departs from the FAM's discretionary framework for reviewing immigrant-visa issuances by categorically mandating managerial review of all favorable public-charge immigrant visa adjudications and additional electronic, centralized review following all favorable determinations and print authorization, rather than in response to identifiable concerns in specific cases. *See supra* 10–11; 22 C.F.R. § 42.73; 9 FAM 504.11-3(A)(2)(a)(2); Ex. AF ¶¶ 2–3, 6; Ex. AG at 2; Burton Decl. ¶¶ 8–12. The Review and Override Policy also departs from existing Department policy under which the visa adjudicator "the finder of fact." ECF 63, STATE00055, [25 STATE 5914] ¶ 5. Finally, as noted, the Public Charge Directives undermine statutes and prior Department policy by delaying immigrant visa adjudications without explanation. *See supra* 3–14.

Defendants' conclusory references to "national security," "compliance with laws and procedures," prevention of "visa fraud," and "match[ing]" the process for immigrant and nonimmigrant visa adjudications, Ex. AF ¶ 2, do not satisfy the APA. *Encino*, 579 U.S. at 212–13

(agency statement that "said almost nothing" and did not "analyze or explain" agency's policy change did not satisfy its obligation to provide "reasoned explication"); *New York*, 969 F.3d at 85 (agency's "unsupported and conclusory claim[s]" justifying new policy do not "satisfy [its] obligation to explain its action[]"); *Metro. Transp. Auth. v. Duffy*, No. 25-cv-1413 (LJL), 2026 WL 588117, at *45 (S.D.N.Y. Mar. 3, 2026) (mere "conclusory statements" by the agency "will not do; an agency's statement must be one of *reasoning*"), *appeal filed*, No. 26-1213 (2d Cir. May 4, 2026). The Cable and Directives provide no supporting data or analysis showing that the existing public-charge standards and immigrant visa assessment procedures endangered national security, resulted in violations of any law and procedures, or failed to prevent visa fraud. Nor do they show that these policy changes could be expected to address any such shortfalls. They do not explain why favorable determinations must undergo additional categorical review regardless of any identified case-specific concern, or adequately address the resulting burdens. Likewise, they do not show (and do not even assert) that any benefits of the Public Charge Directives outweigh the burdens and costs they impose on intending immigrants or their U.S. families or employers or the U.S. public. Nor do they address or even acknowledge the reliance interests of families and individuals who may have chosen to participate in government programs or to accept charitable donations on the well-founded understanding that such actions would not be held against them in a public-charge determination. Finally, they make no effort to explain why, in light of the basic differences between immigrant and nonimmigrant visas and the different treatment of adjudication review in the Department's own regulations, *see supra* 3–7, review of the two visa types should "match."

**C. The Challenged Policies Violate the *Accardi* Doctrine.**

The challenged policies also violate the principle enunciated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which requires government agencies to follow their

own "existing valid regulations," *id.* at 268. The Second Circuit has explained that the *Accardi* doctrine

> is not limited to rules attaining the status of formal regulations. As the Supreme Court noted "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required," and even though the procedural requirement has not yet been published in the federal register.

*Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (alteration in original) (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)). As the Second Circuit emphasized in *Montilla*, the *Accardi* doctrine "has continued vitality, particularly where a petitioner's rights are 'affected.'" *Id.* (quoting *Morton*, 415 U.S. at 235); *see also Salazar*, 822 F.3d at 76 (reversing dismissal of claim that Department of Education failed to comply with its own regulations regarding collection of student loans and citing *Montilla*); *Singh v. U.S. Dep't of Justice*, 461 F.3d 290, 296 (2d Cir. 2006) (holding under *Accardi* that Board of Immigration Appeals abused its discretion by failing to adhere to its own regulations); ECF No. 83 at 51–52.

As discussed above, the challenged policies depart from the Department's existing regulations and procedures in at least two material respects. *See supra* 3–10. *First*, they require consular officers to consider current or past use of noncash or supplemental public benefits by applicants and sponsors in making public-charge determinations, Exs. AD, AE, AF; Mitchell Decl., Attachment 2; Richardson Decl., Attachment 2, in contrast to the existing policy prohibiting such consideration, 9 FAM 302.8-2(B)(1)(c), 302.8-2(B)(3)(b); Burton Decl. ¶¶ 3–7. *Second*, the Review and Override Policy categorically requires supervisory review of all favorable public-charge immigrant-visa determinations made by a consular officer and additional centralized review of all print-authorized cases. Ex. AF ¶¶ 2–3, 6; Ex. AG at 2. In contrast, the FAM leaves review of immigrant-visa issuances to supervisors' discretion at the consular post, rather than prescribing categorical review of all favorable determinations or additional centralized, post-authorization

review and override. *See supra* 5–7; 22 C.F.R. § 42.73; 9 FAM 504.11-3(A)(2)(a)(2); Burton Decl. ¶¶ 8–13.

As shown above, *supra* 11–14, the Public Charge Directives and Review and Override Policy affect the interests of individual Plaintiffs, their family members, and clients and members of the organizational Plaintiffs. *See Montilla*, 926 F.2d at 167. They burden applicants by requiring them to complete lengthy public-charge questionnaires, to provide extensive new documentation of their finances, health and health insurance, and use of public benefits, and to undergo, in some cases, multiple rounds of costly and time-consuming re-interviews. The Public Charge Directives also raise the bar for eligibility under the public-charge provision, and the Public Charge Directives and Review and Override Policy create additional hurdles to issuance of immigrant visas and additional opportunities for Department personnel to refuse them. At best, these additional hurdles impose further delays on applicants' opportunity to obtain an immigrant visa and unite with their families or pursue their careers; at worst, they cut off that opportunity altogether. As the Court held in determining that the individual Plaintiffs had standing under Article III, the loss of opportunity to obtain an immigrant visa is a cognizable injury sufficient to establish standing, ECF No. 83 at 19 (citing *Trump* v. *Hawaii*, 585 U.S. 667, 698 (2018); *Mantena* v. *Johnson*, 809 F.3d 721, 731 (2d Cir. 2015)), and certainly affected the rights of Plaintiffs under *Accardi* and *Montilla*.

The *Accardi* doctrine applies to the FAM provisions at issue here. While the Court's Opinion and Order did not reach whether the Visa Ban violated the FAM and other internal DOS regulations and procedures, ECF No. 83 at 52, the doctrine, as noted, "is not limited to rules attaining the status of formal regulations," *Montilla*, 926 F.2d at 167. The FAM and its associated handbooks are (as the Department states) an "authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State

Department . . ." *See* U.S. Dep't of State, *Foreign Affairs Manual*, (2026), https://perma.cc/86W2-JGRU. Indeed, by federal statute, the FAM "appl[ies] with equal force and effect and without exception to all Department of State personnel, including the Secretary of State . . . ," 22 U.S.C. § 2658a(a). The statute expresses Congress's intention that the FAM is not simply precatory but rather controls all visa adjudications at all levels of the Department.

Courts have held that, under *Accardi*, the State Department is bound by the procedures set forth in the FAM. *Ghazvinian Zanjani v. Rubio*, No. 1:26-cv-50-ZMF, 2026 WL 2326190, at *3 (D.D.C. Aug. 6, 2026) (concluding that, under *Accardi*, FAM requirement that a visa must be either issued or refused once a visa application has been properly completed and executed imposed a nondiscretionary duty on the consular officer to reach a final adjudication), *appeal filed*, No. 26-5307 (D.C. Cir. Aug. 27, 2026); *Nagornyi v. Rubio*, No. 25-cv-01321-ZMF, 2026 WL 1893483, at *3 (D.D.C. March 26, 2026) (same); *Razi v. Pompeo*, No. 20-cv-0982-W-MSB, 2020 WL 6262380, at *4 (S.D. Cal. Oct. 23, 2020) (stating in dicta that plaintiffs' claim that State Department failed to follow FAM was reviewable under *Accardi*); *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 469 (D.D.C. 2020) (plaintiff may challenge State Department guidance intended to supplement the FAM under *Accardi*).

While some courts have held that *Accardi* does not apply where the FAM provision at issue does not "protect[] individual rights or impose[] 'binding norms on the agency,'" *Nasab v. Blinken*, No. 22-cv-02084, 2022 WL 4473922, at *2 (D.D.C. Sept. 26, 2022) (quoting *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018), none of these cases appears to have considered 22 U.S.C. § 2658a, which as noted demonstrates Congress's intention that the FAM is not aspirational and makes it applicable to all DOS personnel, including the Secretary. *See also United Afr. Org. v. Biden*, 620 F. Supp. 3d 756, 774 (N.D. Ill. 2022). In any event, the FAM provisions at issue here—

which impose limits on the information consular officers may consider in making public charge determinations—on their face both protect the rights of intending immigrants and their families and impose binding norms on consular officials. *Accardi* thus requires Defendants to abide by these guidelines.

### D. The Challenged Policies Violate the APA Because They Were Adopted Without Notice and Comment.

The APA, with narrow exceptions, requires agencies to give the public notice and an opportunity to comment before adopting any rule. 5 U.S.C. § 553. The Act broadly defines a "rule" in relevant part as any "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4); *see generally* ECF No. 83 at 44–50.

The Second Circuit has explained that "substantive" or "legislative" rules requiring notice and comment are "those that create new law, right[s], or duties, in what amounts to a legislative act." *N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 131 (2d Cir. 2001) (internal quotation marks omitted); *Sweet v. Sheahan*, 235 F.3d 80, 90–91 (2d Cir. 2000) (same). Under the *American Mining* test for identifying legislative rules cited with approval by the Second Circuit, *see Sweet*, 235 F.3d at 91, courts consider

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). If any of these questions is answered affirmatively, the rule is legislative. *Id.*; *see also Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 263 (S.D.N.Y. 2020).

In analogous circumstances, courts have held that the Department's 2019 revisions to the FAM's public-charge provisions, which, among other things, directed consular officers to consider the applicant's receipt of noncash and supplemental public benefits in making public-charge determinations, were a legislative rule requiring notice and comment. Judge Daniels of this Court reasoned that those revisions to the FAM were legislative because they "institute[d] a comprehensive framework for public charge inadmissibility determinations" that did not merely "clarify what is set forth in the INA," and in doing so "substantially alter[ed]" the existing legal framework "by imposing new legal limitations on visa applicants . . . including eliminating a safe harbor for non-cash public assistance utilized by applicants or their family members." *Make the Rd. N.Y.*, 475 F. Supp. 3d at 264; *see also id*. (agency actions were legislative rules because they "established a substantive set of rules governing public charge determinations beyond the minimum requirements set forth in the INA"); *Mayor and City of Balt. v. Trump*, 416 F. Supp. 3d 452, 504–09 (D. Md. 2019) (reaching the same conclusion on the ground that the revised FAM provisions alter the Department's substantive rules regarding public charge and noting that "a visa applicant (or family member) who utilizes non-cash benefits faces the prospect of being deemed inadmissible to enter the United States on public charge grounds").

Likewise, the Consular Processing Cable and Public Charge Directives create new rights and duties on the part of applicants for immigrant visas and impose obligations on consular officers in adjudicating applications for such visas, and a visa applicant who uses or has used noncash benefits or fails to undertake the burdens imposed by them faces the prospect of being deemed inadmissible and denied a visa application after having detrimentally relied on a determination that they were admissible.

While the Court held in its Opinion and Order that the Visa Ban was not a legislative rule

requiring notice and comment, the facts of the Public Charge Directives compel a different result. The Court reasoned that the Visa Ban was not a legislative rule on the ground that it "cannot be said to create new rights, and the only duties it imposes are on consular officers." ECF No. 83 at 46. In explaining its disagreement with the contrary holding in *Sangster v. Rubio*, No. 25-cv-00447 (ART) (CSD), 2026 WL 222316 (D. Nev. Jan. 28, 2026), the Court reasoned that, under the Visa Ban, "[i]mmigrant visas are not refused because of any action taken by the applicant in abrogation of a legal duty imposed by the Policy." ECF No. 83 at 48.

The Consular Processing Cable and Public Charge Directives differ fundamentally in that respect. They impose burdensome new mandatory obligations on visa applicants and their legal representatives to provide extensive and potentially costly information about their finances, health care, and use of public benefits. *See supra* 7–14. No such burden or risk would exist absent these new policies. And, in contrast to how the Court described the Visa Ban, immigrant visas can be refused precisely because of "action taken by the applicant's abrogation of a legal duty" imposed by these new policies—that is, failing to provide the information and documents they demand.

Under *American Mining*, these policies accordingly are legislative rules because "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties." *Am. Mining*, 995 F.2d at 1112; *see Texas v. United States*, 809 F.3d 134, 177 (5th Cir. 2015) (holding that DAPA policy was legislative rule requiring notice and comment because, among other things, it altered the substantive standards by which agency evaluated applications for designating certain noncitizens as lawfully present); *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 46 (D.D.C. 2018) (agency rule was legislative rule requiring notice and comment because it "alter[ed] some aliens' legal rights and impose[d] new burdens on them," resulting in "delay[s] and probable denial" of green card

applications). The Consular Processing Cable and Public Charge Directives therefore could not be adopted without notice and comment.

## II. The Challenged Policies Impose Irreparable Harm on Plaintiffs.

Plaintiffs face ongoing and irreparable injuries from Defendants' challenged public-charge policies. These policies, as shown above, burden individual Plaintiffs and their family members and clients and members of the organizational Plaintiffs with additional public-charge reviews, lengthy delays in visa adjudications, and, in many cases, unexplained denials on public-charge grounds even after an applicant has previously been determined to be eligible. As a result, these applicants and their family members have suffered prolonged separation from spouses, children, and other close family members; the disruption of employment, businesses, and long-established plans to immigrate; and substantial interference with the work of organizations that provide immigration legal services.

Irreparable harm is injury that is "neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York*, 969 F.3d at 86 (citation omitted). Courts have recognized prolonged family separation is an irreparable injury. *See Make the Rd. N.Y.*, 475 F. Supp. 3d at 268. Indeed, this Court has already recognized the serious consequences of Defendants' original Blanket Visa Ban, including the immeasurable human costs of delaying reunification, necessary medical care, and professional opportunities. *E.g.*, ECF No. 109 at 8–9. These injuries are already occurring and will continue while the challenged policies remain in effect.

As discussed above, the experiences of the individual Plaintiffs and their family members reflect the operation of the Consular Processing Cable, the Public Charge Directives that implement it, and the Review and Override Policy. *See supra* 11–14, above. For example, after multiple rounds of interviews following the Court's vacatur of the Visa Ban, Plaintiff Kyeremaa's

children, after first being approved, were inexplicably reverted to administrative processing and ultimately refused again. Kyeremaa Decl. ¶¶ 1, 11–19; Kassa Decl. ¶¶ 23–32. Plaintiff Holt's husband was told while the Visa Ban was in place that his application was approvable apart from the Ban, but after the Ban was vacated and the Public Charge Directives were issued he was required to attend a new public-charge interview and was ultimately refused without explanation. Holt Decl. ¶¶ 15, 18–26; Kassa Decl. ¶¶ 33–35. Plaintiff Mitchell's mother was also told that her application would have been approved but for the Ban, but after vacatur and the issuance of the Public Charge Directives she was required to complete a new public-charge questionnaire and attend another interview before being refused without explanation. Mitchell Decl. ¶¶ 17–19. Plaintiffs Richardson's sister, Plaintiff Lima and her daughter underwent similar experiences and were ultimately refused. Richardson Decl. ¶¶ 13–14; Marques Lima Decl. ¶¶ 10–23. The injuries to Plaintiffs caused by the challenged policies are irreparable. For family-based Plaintiffs, every additional day of separation carries consequences that cannot be undone. U.S.-citizen parents are raising newborns and young children without their spouses, while other parents remain separated from children abroad. For example, Plaintiff Hanan Rami has been caring for her newborn daughter, who is vulnerable to infection, without her husband. Rami Decl. ¶¶ 15, 26–35. *See also* Holt Decl. ¶¶ 6, 32–39; Linares Decl. ¶¶ 6, 15, 32–39. Plaintiff Wael Ali's 11-year-old son has experienced grave emotional and academic difficulties from the separation from his mother and sister. Ali Decl. ¶¶ 42–48, 55. *See also* Duro Decl. ¶¶ 29–30; Linares Decl. ¶ 36.

The separation also deprives vulnerable family members of essential care and support. For example, Plaintiff Adrian Mitchell's 71-year-old mother, who ordinarily lives in Florida and cares for her 92-year-old husband, remains in Jamaica following a second consular interview and renewed refusal. Mitchell Decl. ¶¶ 7–9, 17–19, 29. Her husband has serious medical conditions,

and Mr. Mitchell has assumed caregiving responsibilities while also raising two minor children. *Id.* ¶¶ 24, 37–39. Plaintiff Joshua Whitney, who was diagnosed with cancer shortly after the Ban took effect and is now in remission, has likewise endured his illness and recovery alone, apart from his wife. Whitney Decl. ¶ 20. The stress he has undergone as a result of the Visa Ban and ensuing policies has exacerbated his physical symptoms, including panic attacks and insomnia. *Id.* ¶¶ 20–21.

The employment-based Plaintiffs face related but distinct harms. They pursued lengthy immigration processes, obtained approved petitions, and made plans to establish careers and businesses in the United States that now remain on hold. For example, Plaintiff Alessandra Marques Lima, whose EB-2 national interest waiver petition USCIS approved in July 2025, has postponed expanding her existing accounting business and making long-term professional commitments while awaiting permission to relocate with her young daughter. Marques Lima Decl. ¶¶ 6, 25–27. After receiving a request for a second interview, she spent more than 60 hours over ten days voluntarily assembling extensive financial records from two countries, obtaining translations, and preparing supporting materials to address the new public-charge inquiries. *Id.* ¶¶ 13–15. She nevertheless received a public-charge refusal. *Id.* ¶¶ 19–21. She remains unable to begin developing the U.S. tax-compliance and anti-fraud software that formed the basis of her approved petition, while also struggling to plan her daughter's schooling and their future home. *Id.* ¶¶ 7, 25–28.

Plaintiff Lina Margarita Angulo Penaranda, meanwhile, faces the prospect of losing the very petition on which her immigration plans depend. After completing her application and undergoing an initial interview, Ms. Angulo Penaranda received a refusal notice indicating that her visa could not be issued because of the Visa Ban. Following the Court's vacatur of the Visa

Ban, the issuance of the Public Charge Directives, and a second consular interview at which she was quizzed about her and her family's financial circumstances, health insurance, and work plans, the U.S. Embassy in Bogota informed her that it would return her approved EB-2 national interest waiver petition to USCIS with a request for revocation, without identifying any defect in the petition. Angulo Decl. ¶¶ 16–18. This threatens to undo years of diligent compliance with U.S. immigration requirements and cast aside USCIS's considered determination that her proposed work serves the national interest. *Id.* ¶¶ 4–5. It also puts at risk the very architectural projects underlying that approval. *Id.* ¶¶ 22–23.

CLINIC and ACT also suffer ongoing injuries to their operations and members. CLINIC supports a nationwide network of more than 415 affiliated immigration legal service programs in 49 states, many of which provide consular-processing services. Wheeler Decl. ¶¶ 3–5. The challenged policies have substantially increased the number of assistance requests CLINIC fields, and, as a result, CLINIC has had to reallocate staff time and other resources to meet affiliate needs. *Id.* ¶¶ 9–12, 16–17.

Similarly, ACT faces disruption to its own services as a national membership-based organization that provides immigration legal information and assistance. Kassa Decl. ¶¶ 2–4, 11, 14. The challenged policies also interfere with ACT's existing efforts to connect eligible immigrants with essential benefits and services and have caused ACT to divert its resources to address harm created by the challenged policies. *Id.* ¶¶ 13, 18–22, 52–53. In addition, six of ACT's members are also individual Plaintiffs in this action, and their declarations document concrete injuries from the challenged policies. *Id.* ¶¶ 23, 48–50. Several of those members' families have undergone repeated interviews and received new public-charge refusals after earlier favorable assessments. Ali Decl. ¶¶ 11, 18–21; Holt Decl. ¶¶ 15, 18–25; Kyeremaa Decl. ¶¶ 11–18.

These injuries have continued, and in many instances compounded, following the Ban's vacatur. Defendants have directed consular officers to undertake new public-charge assessments, complete additional worksheets, and subject applications to new and expanded categorical re-review, including applications previously refused solely because of the vacated Ban. Am. Compl. ¶¶ 102–13. Application of the challenged policies has resulted in renewed re-interviews, additional documentary demands, public-charge refusals, and reversals of favorable determinations after these directives took effect. Defendants themselves have acknowledged that reconsideration of applications affected by the Ban would categorically proceed under the new public-charge guidance and worksheet, together with expanded managerial review. ECF No. 96 at 3. The September 14 and September 21 instructions additionally require categorical managerial review followed by further electronic, centralized review of all favorable immigrant visa determinations, even after consular officers have authorized the visas for printing. Am. Comp. ¶¶ 106–10; Exs. AF–AG. Defendants subsequently confirmed that the additional categorical review required by the September 21 guidance remains in effect. ECF No. 132 at 1–2. These requirements impose additional screening and review burdens and costs on Plaintiffs.

The requested relief would address those continuing injuries. Suspending the challenged requirements would permit applications to proceed under the governing statutory and regulatory framework, without the new public-charge standards, mandatory worksheets, and additional review procedures imposed by Defendants' new policies. Reconsideration of applications affected by those requirements would provide an opportunity for lawful adjudication. Such relief would neither compel the issuance of any visa nor eliminate delays arising from legitimate, case-specific concerns. It would, however, prevent the challenged policies from imposing further burdens and

adverse consequences while their legality is determined. Without preliminary relief, Plaintiffs will remain exposed to compounding injuries that cannot be adequately remedied after final judgment.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF.

The balance of equities and public interest favor relief. The concrete injuries to Plaintiffs described above outweigh any interest of the government in changing longstanding policies while the legality of these changes is litigated.

Plaintiffs do not seek to interfere with the government's authority to investigate genuine, case-specific concerns involving fraud, national security, or statutory ineligibility. But the government's interest in accurate adjudications provides little justification for subjecting applicants to mandatory new public-charge assessments and additional layers of review even where consular officers have previously found no ground for refusal apart from the vacated Ban. Yet Defendants have directed officers to reassess affected applications using new public-charge guidance and mechanisms, including the mandatory worksheet, and to subject categorical favorable determinations to expanded managerial and electronic review, including cases in which consular officers had identified no other basis for refusal. *Id.* at 3; Am. Comp. ¶¶ 103–10; Exs. AE–AG. Under the challenged policies, applicants who were previously told that their visas were approved have undergone repeated interviews, incurred substantial additional expenses, and received new refusals. *E.g.*, Kyeremaa Decl. ¶¶ 11–18, 23; Ali Decl. ¶¶ 11, 18–21; Holt Decl. ¶¶ 18–25. Preliminary relief would preserve the government's authority to address legitimate, individualized concerns while preventing the continued application of the challenged standards and review requirements to applicants who have already endured extensive scrutiny and delay.

This Court has already addressed closely related equities. In denying Defendants' request to stay its earlier judgment, the Court recognized that the government's decision to undertake additional public-charge evaluations, interviews, and layers of review imposed administrative

burdens of its own making. ECF No. 109 at 7–8. The Court contrasted those burdens with the serious human consequences of continued delay, including family separation, disrupted medical care, and lost professional opportunities. *Id.* at 8–9. The same practical concerns remain relevant to the new Consular Rules, which impose additional requirements on many of the same applicants.

The record now starkly illustrates those consequences. Families have undergone repeated interviews and incurred additional expenses without obtaining final resolution. Holt Decl., ¶¶ 20–25; Ali Decl., ¶¶ 16–21; Kyeremaa Decl. ¶¶ 11–18; Nicholas Decl. ¶¶ 12–13, 19–20; Kassa Decl. ¶¶ 26–29, 32, 34, 37, 40–41 & 48–49. Some applicants have received new public-charge refusals despite earlier favorable determinations. Ali Decl. ¶¶ 11, 19–21; Holt Decl. ¶¶ 15, 24–25; Marques Lima Decl. ¶¶ 10–12, 19–21. Others have seen visas marked "Issued" and later canceled or returned to further processing. Kyeremaa Decl. ¶¶ 11–18; Mulligan Decl. ¶¶ 9–10. The government has a substantial interest in accurate adjudications, but it has not established that the challenged requirements are necessary to protect that interest or that lawful, individualized adjudication under existing standards would be inadequate.

The public also has a substantial interest in the orderly administration of the immigrant-visa system and the observance of statutory limits on executive authority. Congress established a framework that accommodates family reunification, employment-based immigration, and protection of public resources through individualized eligibility determinations. Maintaining that framework while the Court resolves Plaintiffs' claims serves those interests. *See Make the Rd. N.Y.*, 475 F. Supp. 3d at 268–69.

Plaintiffs have endured months of separation, expense, and uncertainty. Further delay will prolong injuries that no eventual judgment can fully remedy. The balance of equities and public interest favor preliminary relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and postponement under 5 U.S.C. § 705 and enter the accompanying Proposed Order.

Dated: November 23, 2026

Respectfully submitted,

*/s/ Joanna Elise Cuevas Ingram*
Joanna Elise Cuevas Ingram
Tanya Broder*
Efrén C Olivares*
Elizabeth Choo
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
(213) 377-5258
cuevasingram@nilc.org
broder@nilc.org
olivares@nilc.org
choo@nilc.org

*/s/ Erez Reuveni*
Erez Reuveni*
Catherine M.A. Carroll*
Elena Goldstein
Jonathan H. Hurwitz
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 316-9538 (Reuveni)
ereuveni@democracyforward.org
ccarroll@democracyforward.org
egoldstein@democracyforward.org
jhurwitz@v.democracyforward.org

*/s/ Hasan Shafiqullah*
Hasan Shafiqullah
Susan Welber
Evan Henley

Emily Lundgren
THE LEGAL AID SOCIETY
49 Thomas St., 5th Floor
New York, NY 10013
(212) 577-3300
hhshafiqullah@legal-aid.org
sewelber@legal-aid.org
ewhenley@legal-aid.org
elundgren@legal-aid.org

*/s/ Baher Azmy*
Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445
bazmy@ccrjustice.org
aguisado@ccrjustice.org

*/s/ Antionette Dozier*
Antionette Dozier*
David Kane*
Joy Dockter*
WESTERN CENTER ON LAW & POVERTY
3701 Wilshire Blvd. Suite 208
Los Angeles, CA 90010
(213) 487-7211
adozier@wclp.org
dkane@wclp.org
jdockter@wclp.org

*/s/ Sarah Wilson*
Sarah Wilson*
David Kim*
COLOMBO & HURD
301 E. Pine Street, Suite 450
Orlando, Florida 32801
(407) 478-1111
swilson@colombohurd.com
dkim@colombohurd.com

* *Admitted Pro Hac Vice*

*** Petition for Attorney Admission Forthcoming*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Erez Reuveni, hereby certify that on November 23, 2026, I filed the foregoing Document with the Clerk of the Court for the United States District Court for the Southern District Court of New York using the CM/ECF system. Notice of this filing is being sent by operation of the Court's electronic filing system to all counsel of record who are registered CM/ECF users. I have also emailed counsel of record for Defendants.

*/s/ Erez Reuveni*
Erez Reuveni

## CERTIFICATE OF COMPLIANCE

I, Erez Reuveni, hereby certify that this document complies with the applicable word-count limitation proposed by the parties in their joint letter, as it is less than 11,000 words.

*/s/ Erez Reuveni*
Erez Reuveni